1  ROBYN B. SOKOL - Bar No. 159506
   TAMAR TERZIAN - Bar No. 254148
2  JESSICA S. WELLINGTON - Bar No. 324477
   BRUTZKUS GUBNER
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone:  (818) 827-9000
   Facsimile:  (818) 827-9099
5  Email:      rsokol@bg.law
               tterzian@bg.law
6              jwellington@bg.law

7
   Attorneys for Elissa D. Miller, Chapter 7 Trustee
8
                **UNITED STATES BANKRUPTCY COURT**
9
                **CENTRAL DISTRICT OF CALIFORNIA**
10
                     **LOS ANGELES DIVISION**
11

12 | In re | **Case No. 2:20-bk-12042-BB** |

13 MARK ABBEY SLOTKIN,                    **Adv. Case No. 2:20-ap**

14              Debtor.

15                                         **Chapter 7**

16 _____        **COMPLAINT FOR:**

17 ELISSA D. MILLER, CHAPTER 7 TRUSTEE,    **(1) DECLARATORY RELIEF;**

18              Plaintiff,                 **(2) AVOIDANCE OF FRAUDULENT**
   v.                                      **TRANSFERS PURSUANT TO 11 U.S.C. §§**
19                                         **544 AND 548, CAL. CIV. CODE §§ 3439.04,**
   SLOTKIN DEFECTIVE TRUST OF              **3439.05, 3439.07, 3439.09;**
20 DECEMBER 14, 2012; SLOTKIN DEFECTIVE
   TRUST OF APRIL 12, 2010;               **(3) AVOIDANCE OF POST PETITION**
21 INTENTIONALLY DEFECTIVE SLOTKIN        **TRANSFERS PURSUANT TO 11 U.S.C. §**
   FAMILY CHILDREN'S TRUST DATED          **549;**
22 JANUARY 1, 1997; SAVANNAH SLOTKIN;
   LOREN MARKEN AS TRUSTEE OF             **(4) RECOVERY OF AVOIDED**
23 SLOTKIN DEFECTIVE TRUST OF             **TRANSFERS FOR BENEFIT OF ESTATE**
   DECEMBER 14, 2012;  LOREN MARKEN AS    **PURSUANT TO 11 U.S.C. §§ 550 AND 551;**
24 TRUSTEE OF SLOTKIN DEFECTIVE TRUST
   OF APRIL 12, 2010; LOREN MARKEN AS     **(5) TURNOVER OF ESTATE ASSETS;**
25 TRUSTEE OF THE INTENTIONALLY
   DEFECTIVE SLOTKIN FAMILY               **(6) ACCOUNTING;**
26

27

28
                              1

2439616_2

| | |
|---|---|
| 1  CHILDREN'S TRUST DATED JANUARY 1, 1997; TO BE NAMED TRUSTEE[1] OF <br> 2  SLOTKIN DEFECTIVE TRUST OF APRIL 12, 2010; TO BE NAMED TRUSTEE OF <br> 3  SLOTKIN DEFECTIVE TRUST OF DECEMBER 14, 2012; TO BE NAMED <br> 4  TRUSTEE OF INTENTIONALLY DEFECTIVE SLOTKIN FAMILY CHILDREN'S TRUST <br> 5  DATED JANUARY 1, 1997; ROBERT MAYMAN; 17841 PALORA MANOR LLC; <br> 6  14257 CHANDLER MANOR LLC; 748 DETROIT MANOR LLC; MARK ABBEY <br> 7  SLOTKIN <br><br>                                Defendants. | **(7) OBJECTION TO DISCHARGE OF MARK ABBEY SLOTKIN PURSUANT TO 11 U.S.C. 727(a)(2)(B); AND,** <br><br> **(8) INJUNCTIVE RELIEF** |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE,**

**AND DEFENDANTS:**

Plaintiff, Elissa D. Miller, the duly appointed and acting chapter 7 trustee ("Trustee" or "Plaintiff"), for the bankruptcy estate of Mark Abbey Slotkin ("Debtor"), complaining of the Slotkin Defective Trust of December 14, 2012 ("2012 Trust"), the Slotkin Defective Trust of April 12, 2010 ("2010 Trust"), the Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997 ("1997 Trust"), Savannah Slotkin, Loren Marken as Trustee of the Slotkin Defective Trust of April 12, 2010, Loren Marken as Trustee of the Slotkin Defective Trust of December 14, 2012, Loren Marken as Trustee of the Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997, To Be Named Trustee of the of the Slotkin Defective Trust of April 12, 2010, To Be Named Trustee of the Slotkin Defective Trust of December 14, 2012, To Be Named Trustee of the Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997, Robert Mayman, 17841 Palora Manor LLC ("Palora LLC"), 14257 Chandler Manor LLC ("Chandler LLC"), and 748 Detroit Manor LLC ("Detroit LLC") and the Debtor (collectively, "Defendants"), hereby alleges as follows:

---

[1] Loren Marken, the trustee for the Slotkin Defective Trust of December 14, 2012, Slotkin Defective Trust of April 12, 2010 and Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997 passed on or about September 9, 2020.  As far as Elissa Miller, the duly appointed and acting chapter 7 trustee for the above captioned debtor knows, substitute trustees have not yet been designated.

2439616_2

## STATEMENT OF JURISDICTION AND VENUE

1.      On February 25, 2020 (the "Petition Date"), the Debtor commenced his bankruptcy case by filing a petition under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 544, 548, 549, 550, and 551.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H), (J) and (O).

3.      The Bankruptcy Court has constitutional jurisdiction to enter a final judgment in this adversary proceeding.  To the extent the Court does not have constitutional jurisdiction to enter a final judgment, the Trustee consents to the Court entering a final judgment in this proceeding.

4.      Venue properly lies in this judicial district in that the civil proceeding arises under title 11 of the United States Code as provided in 28 U.S.C. § 1409.

5.      This adversary proceeding arises out of the case entitled *In re Mark Abbey Slotkin*, Case No. 2:20-bk-12042-BB, filed on February 25, 2020, and currently pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

## PARTIES

6.      Plaintiff is the duly and acting chapter 7 trustee of the Debtor's bankruptcy estate, and brings this action solely in her capacity as Trustee.

7.      Defendant the Slotkin Defective Trust of December 14, 2012 is an irrevocable trust settled under the laws of California.

8.      Defendant the Slotkin Defective Trust of April 12, 2010 is an irrevocable trust settled under the laws of California.

9.      Defendant the Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997 is an irrevocable trust settled under the laws of California.

10.     Defendant Savannah Slotkin is an individual residing in Los Angeles, California, and the beneficiary of the 2012 Trust, the 2010 Trust, and the 1997 Trust.

///

2439616_2

11.     Defendant Loren Marken and/or his probate estate in his capacity as trustee of the 2010 Trust.  The Trustee is informed and believes that Loren Marken passed on or about September 9, 2020.

12.     Defendant Loren Marken and/or his probate estate in his capacity as trustee of the 2012 Trust.

13.     Defendant Loren Marken and/or his probate estate in his capacity as trustee of the 1997 Trust.

14.     Defendant To Be Named Trustee of the Slotkin Defective Trust of April 12, 2010 is the anticipated replacement trustee for the 2010 Trust.  As far as Plaintiff knows, a substitute trustee has not yet been designated.

15.     Defendant To Be Named Trustee of the Slotkin Defective Trust of December 14, 2012 is the anticipated replacement trustee for the 2012 Trust.  As far as Plaintiff knows, a substitute trustee has not yet been designated.

16.     Defendant To Be Named Trustee of the Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997 is the anticipated replacement trustee for the 1997 Trust.  As far as Plaintiff knows, a substitute trustee has not yet been designated.

17.     Defendant Robert Mayman is an individual residing in Los Angeles County, and an attorney admitted to the State Bar of California.  The Trustee is informed and believes that Robert Mayman created the 2010 Trust and the 2012 Trust.  The Trustee is informed and believes that Robert Mayman is the organizer and agent for service of process of certain limited liability companies including 8777 Appian Way, LLC, 17841 Palora Manor LLC, 14257 Chandler Manor LLC and 748 Detroit Manor LLC.

18.     17841 Palora Manor LLC is a California Limited Liability Company organized by Robert Mayman on or around October 31, 2019.

19.     14257 Chandler Manor LLC is a California Limited Liability Company organized by Robert Mayman on or around October 31, 2019.

20.     748 Detroit Manor LLC is a California Limited Liability Company organized by Robert Mayman on or around October 31, 2019.

4

2439616_2

# GENERAL ALLEGATIONS

## Introduction

21.     By and through this Complaint the Trustee seeks to unwind the intricate web of intentionally defective grantor trusts, limited liability companies and corporations that the Debtor has spun for the purpose of hiding and attempting to shield valuable assets from his creditors. Attached hereto and incorporated herein by this reference as Exhibit "1" is a chart setting forth the three Trusts and the assets contained in each of the Trusts based on the information currently available to the Trustee.

22.     While the 1997 Trust was formed for a proper purpose, it is evident that by 2010 when it became clear that the marriage of the Debtor and Abigail Slotkin was coming to an end, the Debtor began to move assets out of the 1997 Trust and form new intentionally defective grantor trusts as well as numerous limited liability companies.  Over the next ten years, assets were transferred from limited liability companies in the 1997 Trust to new limited liability companies and/or to the 2010 Trust and 2012 Trust.  With each new creditor, additional transfers were made to shelter the Debtor's assets.   For example, to prevent Southwest Guaranty Investors, Ltd. ("Southwest Guaranty") from executing on its judgment against Breakfront, LLC and Golden Oak, LLC, the limited liability companies that owned the Debtor's residence located at 8777 Appian Way, Los Angeles, California, this property was transferred to a new limited liability company – 8777 Appian Way, LLC. *See* Exhibit "1." As set forth herein, this shell game has continued post-petition with valuable real property held by the Trusts being sold for significant profits and in some instances simply transferred out of the Trusts for no consideration.

23.     As set forth herein and found by the Superior Court of California, the Debtor at all times retained control over each one of the limited liability companies and corporations placed into the 1997 Trust, 2010 Trust and 2012 Trust as well as maintained control over the 1997 Trust, 2010 Trust and 2012 Trust (collectively, the "Trusts").

24.     To create the illusion that he did not control the Trusts, the Debtor placed his longtime friend, Loren Marken, as trustee of the 2010 Trust and 2012 Trust from their inception and on the Petition Date the Debtor resigned as trustee of the 1997 Trust and post-petition, Loren

2439616_2

1    Marken became the trustee of the 1997 Trust.

2        25.    Since the inception of each one of the Trusts, the Debtor has made all decisions

3    regarding each of the Trusts and the assets held by each of the Trusts and has benefitted from the

4    assets in the Trusts by, *inter alia¸* having the Trusts support his lavish lifestyle.

5        26.    By and through this Complaint, the Trustee seeks declaratory relief that the assets

6    held in each of the Trusts as identified herein are property of the Debtor's Bankruptcy estate

7    ("Estate") and such assets must be turned over to the Trustee for the benefit of creditors.  This

8    Complaint also includes claims seeking to avoid numerous fraudulent transfers and post-petition

9    transfers for the benefit of the Estate and its creditors, a claim objecting to the discharge of the

10   Debtor, an accounting of the income and assets of the Debtor, which include the assets of the Trusts

11   and a judgment enjoining the Defendants from selling, transferring or encumbering assets that the

12   Trustee believes are assets of the Estate.

13   **Bankruptcy Case Background**

14       27.    On February 25, 2020, Debtor filed a voluntary petition under chapter 7 of the

15   Bankruptcy Code in the United States Bankruptcy Court for the Central District of California. Dkt.

16   No. 1.

17       28.    On February 25, 2020, Elissa Miller was appointed Chapter 7 Trustee. Dkt. No. 1.

18       29.    On or about March 11, 2020, the Debtor filed his Schedules and Statement of

19   Financial Affairs. Dkt. No. 10.

20       30.    In his Schedule A/B, the Debtor represented that he owns no real property and only

21   $3,450 in personal property.  *Id.*

22       31.    Despite the fact that the Debtor was the managing member of a number of limited

23   liability companies, none of these limited liability companies which hold significant assets were

24   listed in his Schedules.  *Id.*

25       32.    In his Schedule A/B, in response to Question No. 25 "Trusts, equitable or future

26   interests in property…, and rights or powers exercisable for your benefit," the Debtor answered

27   "No." In his Statement of Financial Affairs, in response to Question No. 23 "Do you hold or control

28

2439616_2

any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone," the Debtor answered "No."

33.    Contrary to these representations, the Debtor states in his Statement of Affairs that in 2018 he received $1,268,186 in income from an "Intentionally Defective Grantor Trust." *Id.*

34.    In Schedules D and E/F, the Debtor lists liabilities in the aggregate amount of $3,013,632.15, including secured claims totaling $1,995,816.68 and priority claims totaling $610,466.15 based on tax liability.  The tax liability listed includes the $301,622.32 claim of the Internal Revenue Service.  *Id.*

35.    In his Schedule I, the Debtor represented that he is not employed and receives monthly income in the amount of $7,458.00 from: (i) social security; (ii) gambling winnings; (iii) real estate consulting; and (iv) garage rental. *Id.*

36.    In his Schedule J, the Debtor represented that he has no monthly expenses for his residence, utilities, telephone, internet, and installment or lease payments for a vehicle.  *Id.*

37.    On April 29, 2020, the Debtor's creditor meeting pursuant to Bankruptcy Code section 341(a) commenced. Debtor testified under oath during the meeting.  He admitted that monies between Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC, Olympic Holdings, LLC and Antiquarian Traders, Inc. are commingled, and Breakfront, LLC, Golden Oak Partners, LLC, and 8777 Appian Way, LLC do not have bank accounts.

38.    Debtor also claimed at the meeting that he transferred all of his ownership and/or management interests in these entities to his "very good friend" Loren Marken, but did not identify any consideration given to him for this transfer.  Further, when the Trustee asked for Loren Marken's contact information, Debtor said he did not have it.  Debtor similarly could not recall the owner of the real property located at 8777 Appian Way, Los Angeles, California (the "Appian Way Property").

39.    On May 27, 2020, the Debtor's creditor meeting continued.  Both the Debtor and Robert Mayman appeared at this meeting.  The Debtor again testified under oath.  The Debtor revealed that he was the sole person with signature authority on the relevant bank accounts for Olympic Holdings, LLC and Antiquarian Traders, Inc.

2439616_2

**State Court Dissolution Action**

40.    The Trustee is informed and believes that Abigail Slotkin and Debtor separated in early 2010.   On or about September 1, 2010, Abigail Slotkin filed a dissolution petition in the Superior Court of California, County of Los Angeles thereby commencing the dissolution proceeding ("Divorce Action").

41.    The Trustee is informed and believes that the Debtor and Abigal Slotkin have been litigating the Divorce Action for over ten years and such litigation continued post- petition.

42.    The Trustee is informed and believes that during the course of the Divorce Action many orders were entered.  On April 1, 2020, the Superior Court of California issued a Statement of Decision ("Statement of Decision"), which among other things found that:

> The parties were married for eighteen (18) years… [Statement of Decision, p. 2]

> The parties separated in 2010 and a petition for dissolution was filed that year…[*Id.*]

> In 1997 the parties created the Slotkin Family Children's Trust, an irrevocable trust which…was designed as an Intentionally Defective Grantor Trust.  Both parties were named as co-trustors and initial co-trustees.  The parties' then-minor children, Nicolette and Savannah, were the named beneficiaries.  [*Id.*]

> In 2006 a resignation of trustee was created…by which [Abigail Slotkin] is alleged to have resigned as trustee, leaving [Debtor] the sole trustee.  [Abigail Slotkin] claims she did not resign and the resignation is a forgery. [*Id.*, p. 3]

> During the time the parties were married and living together their source of payment of their living expense was primarily from the assets of the [1997 Trust]. **[Debtor's] source of payment of his living expenses has been primarily from the assets of the trust as well as social security and some gaming income.** [*Id.*]

> While the Court does not find that the businesses which are part of the [1997] Trust corpus are indistinguishable from [Debtor], the Court finds that **[Debtor] has exercised complete control of all such businesses, their assets and bank accounts and that he has used both assets and income from the business as if he had never put them into a trust.** [*Id.* at p. 8](emphasis added)

> [Debtor] testified that it is his position that he <u>did</u> comply with Judge Treu's charging orders but explained that he believes he was excused from such compliance in that he did not have the ability to comply with the orders for payments …because no money actually came to him and that Antiquarian Traders and Olympic Holdings didn't have to comply with the charging orders because it was not paying money **TO** [Debtor], only paying expenses **OF** [Debtor], or expenses of the entities themselves which [Debtor] incidentally

2439616_2

enjoyed such as the use of the Appian Way home, furniture in the Apian Way home and use of a vehicle. [*Id.* at pp. 11-12]

*See* Statement of Decision, a true and correct copy of which is attached hereto as Exhibit "2" and incorporated herein by this reference.

43.     The Divorce Action was resolved on October 6, 2020 with the entry of the Dissolution Judgment, a true and correct copy of which is attached hereto as Exhibit "3" and incorporated herein by this reference.  The Dissolution Judgment liquidated numerous claims against the Debtor in favor of Abigail Slotkin, Langlois Family Law, APC, Robert J. Nachshin P.C., Mayer, Hoffman McCann PC and found that with respect to some of the awards, Olympic Holdings, LLC and Antiquarian Traders, Inc. were jointly and severally liable.  *See* Exhibit "3."

**The Intentionally Defective Slotkin Family Trusts**

44.     The Trustee is informed and believes that there exist three intentionally defective grantor trusts – The Slotkin Family Children's Trust created by the Debtor and Abigail Slotkin as trustors and trustees on or about January 1, 1997 – the 1997 Trust, the Slotkin Intentionally Defective Trust wherein the Debtor is the grantor and Loren Marken is named as trustee that was formed on or about April 12, 2010 – the 2010 Trust, and the Slotkin Defective Trust in which the Debtor is the grantor and Loren Marken is named as trustee – the 2012 Trust.

45.     The beneficiaries of each of Trusts were originally the Debtor's children, Nicollette A. Slotkin and Savannah T. Slotkin.  The Trustee  is informed and believes that Savannah T. Slotkin is the sole beneficiary of each of the Trusts at this time as Nicollette Slotkin passed in July 2019.

46.     The Trusts are each intentionally defective grantor trusts.   An intentionally defective grantor trust is a complete transfer to a trust for transfer tax purposes, but an incomplete, "defective" transfer for income tax purposes.  For estate and gift tax purposes, the future value of the assets transferred is removed from the grantor's gross estate on the date of the trust's funding.  However, the grantor retains control over the trust to such an extent that the grantor is treated for federal income tax purposes as the owner of all or part of the trust.  As a result, the grantor, rather than the fiduciary or beneficiary, is taxed directly on the trust's income and/or other tax attributes.

47.     Beginning Spring of 2010 (around the same time that the Debtor and Abigail Slotkin separated), the Debtor commenced moving assets out of the 1997 Trust into the 2010 Trust and then

2439616_2

into the 2012 Trust.  The Trustee is informed and believes that efforts to transfer assets from the Trusts to newly formed trusts or entities is ongoing.

**The 1997 Trust**

48.     The 1997 Trust is dated January 1, 1997.  Pursuant to the 1997 Trust Agreement, a true and correct copy of which is attached hereto as Exhibit "4" and incorporated herein by this reference, the Debtor and Abigail Slotkin were the grantors and original trustees.

49.     Pursuant to the 1997 Trust Agreement, the 1997 Trust was funded with $10.00 and the property listed on Schedule A which includes:  (i) Olympic Holdings, LLC; (ii) Alameda Holdings, Inc.; (iii) Antiquarian Traders, Inc.; (iv) ownership interests in Abbey-Properties, LLC; (v) partnership interests in Slotkin Properties; (vi) ownership interests in 1501 Main Co.; (vii) ownership interests in Consolidated Assets Co.; (viii) Golden Oak Partners, LLC; (ix) Wooton Group, LLC; (x) Breakfront, LLC; and (xi) Rolltop, LLC.  Exhibit "4."

50.     In or about October 1997, the 1997 Trust was funded with Breakfront, LLC and Rolltop, LLC which held the following real property: (i) 7316 Gage Avenue, Commerce, California; (ii) 5610 District Blvd., Bakersfield, California; (iii) 7001 White Lane, Bakersfield, California; (iv) 701 Roberts Lane, Bakersfield, California; (v) 4851 Alameda Street, Los Angeles, California. *See* Exhibit "4."

51.     Since the formation of the 1997 Trust the assets held by the limited liability companies, Alameda Holdings, Inc. and Antiquarian Traders, Inc. have been sold or transferred and some of the entities no longer exist or hold assets. *See* Exhibit "1."

52.     The Trustee is informed and believes that in 2006, Debtor removed Abigail Slotkin (referred to as Gail Ellen Slotkin in the 1997 Trust Agreement) as trustee by allegedly forging her name on a resignation of trustee.

53.     Debtor remained the sole Trustee of the 1997 until the Petition Date when he resigned.  Attached hereto and incorporated herein by this reference as Exhibit "5" is the Appointment of Substitution Trustee and Acceptance by Successor Trustee of the Slotkin Family Children's Trust U/T/D January 1, 1997 (the "Substitution of Trustee").  The Debtor executed the Substitution of Trustee on February 25, 2020 (the "2020 Transfer") which is the Petition Date.

2439616_2

54.    On or about March 2, 2020, Loren Marken executed the Substitution of Trustee. Exhibit "5."

55.    The Trustee is informed and believed that the appointment of Loren Marken was not in accordance with the requirements for the appointment of the successor Trustee as set forth in the 1997 Trust. *See* Exhibit "4."

**Current Assets in the 1997 Trust**

56.    Plaintiff is informed and believes that the 1997 Trust holds interests in the following entities which hold assets as described in detail below: Alameda Holdings, Inc., Antiquarian Traders, Inc., Sailfish Capital Partners, LLC, Golden Oak Partners, LLC, Breakfront, LLC, Wooton Group, LLC, Olympic Holdings, LLC and Appian Way, LLC. *See* Exhibit "1," And "5."

57.    Olympic Holdings, LLC is a California Limited Liability Company whose members are the 1997 Trust, the 2012 Trust, and Antiquarian Traders, Inc. The 1997 Trust holds a 79% interest in Olympic Holdings, LLC, the 2012 Trust holds a 20% interest, and Antiquarian Traders, Inc. hold a 1% interest. The manager of Olympic Holdings, LLC is the Debtor.

58.    Alameda Holdings, Inc. is a California Corporation whose shareholders are the 1997 Trust and Antiquarian Traders, Inc. The Trustee is informed and believes that the 1997 Trust holds a 99% interest in Alameda Holding, Inc. and Antiquarian Traders, Inc. holds a 1% interest. Debtor is the registered agent for service of process for Alameda Holdings, Inc. According to the California Secretary of State website, Alameda Holdings, Inc. is suspended by the California Franchise Tax Board.

59.    Antiquarian Traders Inc. is a California Corporation whose shareholders are the 1997 Trust and the 2012 Trust. The 1997 Trust holds an 80% interest in Antiquarian Traders, Inc. and the 2012 Trust holds a 20% interest. The officer, director and manager of Antiquarian Traders, Inc. is the Debtor.

60.    Golden Oak Partners, LLC is a California Limited Liability Company whose members are the 1997 Trust, the 2012 Trust, and Antiquarian Traders, Inc. The 1997 Trust holds a 79% interest in Golden Oak Partners, LLC, the 2012 Trust holds a 20% interest, and Antiquarian Traders, Inc. holds a 1% interest. The operating manager, secretary, and treasurer of Golden Oak

Partners, LLC is the Debtor.  According to the California Secretary of State website, Golden Oak

Partners, LLC is suspended by the California Franchise Tax Board.

61.    Breakfront, LLC is a California Limited Liability Company whose members are the

1997 Trust, the 2012 Trust, and Antiquarian Traders, Inc.  The 1997 Trust holds a 79% interest in

Breakfront, LLC, the 2012 Trust holds a 20% interest, and Antiquarian Traders, Inc. holds a 1%

interest.  The operating manager, secretary, and treasurer of Breakfront, LLC is the Debtor.

According to the California Secretary of State website, Breakfront, LLC is suspended by the

California Franchise Tax Board.

62.    Wooton, LLC is a California Limited Liability Company whose members are the

1997 Trust, the 2012 Trust, and Antiquarian Traders, Inc.  The 1997 Trust holds a 79% interest in

Wooton, LLC, the 2012 Trust holds a 20% interest, and Antiquarian Traders, Inc. holds a 1%

interest.   The operating manager, secretary, and treasurer of Wooton, LLC is Debtor.

63.    Rolltop, LLC is a California Limited Liability Company organized by Mark Slotkin.

On December 23, 2003, Debtor, Trustee, executed a Limited Liability Company Certificate of

Cancellation, which was filed in the office of the Secretary of State of the State of California on

December 31, 2003.

64.    Abbey-Properties, LLC is a California Limited Liability Company.

65.    The Debtor has testified that 8777 Appian Way, LLC is part of the 1997 Trust.  8777

Appian Way, LLC is a California Limited Liability Company.  On or around August 19, 2015,

Robert Mayman organized 8777 Appian Way, LLC.  According to the Statement of Intention filed

with the Secretary of State of the State of California, Loren Marken was a manager or member of

8777 Appian Way, LLC.

66.    The Trustee is informed and believes that the current assets held by the entities

serving as the corpus for the 1997 Trust are as follows:

a.    The Trustee is informed and believes that Olympic Holdings, LLC currently owns

real property[2] located at the following addresses:

---

[2] As discussed below, three properties owned by Olympic Holdings, LLC were transferred post-
petition from Olympic Holdings, LLC to three (3) newly formed limited liability companies owned

(1) 14806 Hesby Street, Sherman Oaks, California 91403;

(2) 852 North Vista Street, Los Angeles, California 90046;

(3) 823 North Citrus Avenue, Los Angeles, California 90038;

(4) 14827 Huston Street, Sherman Oaks, California 91403;

(5) 12105 South Hoover Street, Los Angeles, California 90044;

(6) 11921 Standford Avenue, Los Angeles, California 90059; and

(7) 15714 Morrison Street, Encino, California 91436.

b.      Olympic Holdings, LLC rents the above properties fully furnished for monthly rent ranging between $10,000 and $16,000 per month.  Exhibit "2," Statement of Decision, pp. 16–17.

c.      8777 Appian Way, LLC owns the Appian Way Property where the Debtor resides but does not pay any rent, taxes or utilities.  According to the Statement of Decision, fair market rent for this property is $10,000 to $11,000 per month.  Exhibit "2."

d.      Antiquarian Traders Inc. is a California Corporation that has been an established dealer in rare and unusual antiques for over 30 years.  According to its website, Antiquarian Traders Inc., specializes "in mint condition antique furniture and museum quality pieces from the 19[th] and early 20[th] century.  Their stock includes quality antique American Victorian furniture, dining sets, tables, cabinets, architectural pieces, entry gates, chandeliers, mirrors, and stained glass."  According to the list of inventory provided by the Debtor on August 18, 2020, the total value of the Antiquarian Traders Inc.'s inventory is $6,463,955.28 as of August 12, 2020.

e.      Plaintiff is informed and believes that assets owned by Golden Oak Partners, LLC, Breakfront, LLC, Wooton Group, LLC and Alameda Holdings, Inc. were sold or transferred by the Debtor.

**2010 Trust**

67.      On April 12, 2010, the Debtor and Loren Marken executed the Trust Agreement of the Slotkin Intentionally Defective Trust thereby forming the 2010 Trust (the "2010 Transfer"), a

---

and managed by Robert Mayman.  The three (3) properties transferred post-petition are located at 748 N. Detroit Street, Los Angeles, CA, 14257 Chandler Boulevard, Sherman Oaks, CA and 17841 Palora Street, Encino, CA.

2439616_2

true and correct copy of which is attached hereto as Exhibit "6" and incorporated herein by this reference.

68.    The Debtor was the grantor of the 2010 Trust and Loren Marken was the Trustee of the 2010 Trust.

69.    The Debtor as grantor transferred $50.00 into the 2010 Trust.

70.    The 2010 Trust is the 50% member of Clover Industrial Properties, LLC which owns real property located at 3001 Navone Road, Stockton, California 95215 ("Navone Property") which was recently sold for a profit of approximately $1,200,000.  These proceeds were used to purchase the properties located at 13348 Chandler, Blvd., Sherman Oaks, California ("Chandler Property") and 24050 Park Casino, Calabasas, California ("Park Casino Property").

71.    The 2010 Trust is also the 100% owner of Cruises to Nowhere, LLC.

**2012 Trust**

72.    On December 14, 2012, the Debtor and Loren Marken executed the Trust Agreement of the Slotkin Intentionally Defective Trust thereby forming the 2012 Trust (the "2012 Transfer"), a true and correct copy of which is attached hereto as Exhibit "7" and incorporated herein by this reference.

73.    The Debtor was the grantor of the 2012 Trust and Loren Marken was the Trustee of the 2012 Trust.

74.    The Debtor as grantor transferred $50.00 into the 2012 Trust.

75.    The 2012 Trust is the 50% member of Clover Industrial Properties, LLC which owns the Navone Property which was recently sold for a profit of approximately $1,200,000.  As discussed below, these sale proceeds were used to purchase the Chandler Property and the Park Casino Property.

76.    On December 14, 2012, Loren Marken as Trustee of the 2012 Trust entered into an agreement with the Debtor as Trustee of the 1997 Trust to become effective on December 31, 2012 whereby 20% of the issued and outstanding shares of Antiquarian Traders, Inc. belonging to the 1997 Trust shall be transferred to the 2012 Trust ("Antiquarian Transfer").  The purchase price for the transferred shares was to be the appraised value determined by Claris Thompson & Schroeder,

Inc. on or before September 30, 2013 and in the absence of an appraisal, the purchase price was deemed to be $1,100,000 for a 20% interest in Antiquarian Traders, Inc.  Thus, on December 2012, Antiquarian Traders, Inc. had a value of $5,500,000.  The Debtor and Loren Marken executed the Agreement For Purchase and Sale of Corporation's Shares ("Antiquarian Sale Agreement") on December 14, 2012.

77.    A Promissory Note was attached to the Antiquarian Sale Agreement, which provides that the 2012 Trust is obligated to pay the 1997 Trust $1,092,500 with the first monthly installment of $26,766.25 due December 31, 2014 and paid through December 31, 2038.  The Trustee is informed and believes that no payments were made on the Promissory Note provided for the purchase of the 20% interest in Antiquarian Traders Inc. by the 2012 Trust from the 1997 Trust. Based on this, the Trustee believes that no consideration was provided to the 1997 Trust for the Antiquarian Transfer.

78.    Also on December 14, 2012, the Debtor on behalf of the 1997 Trust issued a bill of sale and assignment for the benefit of Loren Marken, trustee of the 2012 Trust for 20% of the issued and outstanding shares of Antiquarian Traders, Inc. "arising out of the ownership by Mark A. Slotkin, individually or as trustee of an interest in the above described personal property held by the [1997 Trust]".

79.    On December 14, 2012, Loren Marken as trustee of the 2012 Trust also entered into an agreement with the Debtor as trustee of the 1997 Trust to become effective on December 31, 2012, whereby 20% of the membership units of Olympic Holdings, LLC, Breakfront, LLC, Golden Oak Partners, LLC, and Wooton Group, LLC belonging to the 1997 Trust shall be transferred to the 2012 Trust ("LLC Transfers").  The purchase price for the transferred units were to be the appraised value determined by Claris Thompson & Schroeder, Inc. on or before September 30, 2013 and in the absence of an appraisal, the purchase price would be deemed to be $2,800,000 or $140,000 per limited liability unit.  The Debtor and Marken executed the Agreement For Purchase and Sale of Corporation's Shares ("LLC Sale Agreement") on December 14, 2012.  Based on this, in December 2012, the Debtor believed that the real property held by Olympic Holdings, LLC, Breakfront, LLC,

1   Golden Oak Partners, LLC, and Wooton Group, LLC had a value of $14,000,000 as of December

2   31, 2012.

3       80.    A Promissory Note was attached to the LLC Sale Agreement which provides that the

4   2012 Trust is obligated to pay the 1997 Trust $1,330,000 with the first monthly installment of

5   $32,585 due December 31, 2014 and paid through December 31, 2038.   The Trustee is informed

6   and believes that no payments were made pursuant to this Promissory Note and that the 20%

7   membership units of Olympic Holdings, LLC, Breakfront, LLC, Golden Oak Partners, LLC, and

8   Wooton Group, LLC belonging to the 1997 Trust were transferred to the 2012 Trust for no

9   consideration.

10      81.    Also on December 14, 2012, the Debtor on behalf of the 1997 Trust issued a bill of

11  sale and assignment for the benefit of Loren Marken, Trustee of the 2012 Trust for 20% of the

12  membership units of Olympic Holdings, LLC, Breakfront, LLC, Golden Oak Partners, LLC, and

13  Wooton Group, LLC "arising out of the ownership by Mark A. Slotkin, individually or as trustee of

14  an interest in the above described personal property held by the [1997 Trust]."

15  **Clover Industrial Properties, LLC**

16      82.    On October 29, 2018, Clover Industrial Properties, LLC was formed as a California

17  limited liability company.   A true and correct copy of the Operating Agreement of Clover Industrial

18  Properties, LLC is attached hereto as Exhibit "8" and incorporated herein by this reference.  On

19  October 29, 2018, Articles of Organization were filed for Clover Industrial Properties, LLC.

20      83.    The Debtor is the manager of Clover Industrial Properties, LLC.

21      84.    The members of Clover Industrial Properties, LLC are the 2010 Trust and the 2012

22  Trust.  Each member allegedly contributed $25,000 to the Clover Industrial Properties, LLC for its

23  membership interest.

24      85.    Wooton Group, LLC and Breakfront, LLC owned the Navone Property.  On or about

25  November 3, 2017, a notice of default was sent by Citizens Business Bank.  Thereafter a sale notice

26  was sent.

27  *///*

28

2439616_2

86.    The Trustee is informed and believes based on her review of records that the Navone Property was foreclosed upon and sold at a trustee's sale at a significant loss.[3]

87.    The Trustee is informed and believes based on her review of records that three months later, Clover Industrial Properties, LLC became the owner of the Navone Property – thereby moving the Navone Property from the 1997 Trust to Clover Industrial Properties LLC whose members are the 2010 Trust and 2012 Trust.

88.    On or about November 28, 2018, Clover Industrial Properties LLC purchased the Navone Property from the Robhana Group Hawthorne LLC for $5,693,500.

89.    On or about April 14, 2020, the Navone Property was sold by Clover Industrial Properties, LLC for $10,200,000 (the "Navone Transfer").  Clover Industrial Properties, LLC received approximately $1,200,000 from the sale of the Navone Property.  These proceeds were used as part of a 1031 exchange to purchase the Chandler Property and the Park Casino Property.  At the time of the Navone Transfer, the Debtor Owned and controlled Clover Industrial Properties, LLC and the Navone Property.

**Recent Transfers of Trust Assets**

90.    In addition to moving assets from the 1997 Trust to the 2010 Trust and 2012 Trust, the Trustee is informed and believes that the Debtor and certain Defendants transferred certain assets post-petition from the Trusts and/or entities owned by the Trusts to newly formed entities.

91.    Olympic Holdings, LLC, an entity held by the 1997 Trust, was the owner of real property located at 748 N. Detroit Street, Los Angeles, California 90046 ("Detroit Property"), 17841 Palora Street, Encino, California 91316 ("Palora Property"), and 14257 Chandler Blvd., Sherman Oaks, California 91401 ("14257 Chandler Property") before the Petition Date.  At all times the Debtor maintained ownership and control of these properties.  The Detroit Property was transferred on March 4, 2020 from Olympic Holdings, LLC to Detroit LLC.  The Palora Property was transferred on March 5, 2020 from Olympic Holdings, LLC to Palora LLC.  The 14257 Chandler

---

[3] As a result of the foreclosure sale of the Navone Property, the judgment recorded against the Navone Property by Southwest Guaranty was wiped out.

Property was transferred on March 5, 2020 from Olympic Holdings, LLC to Chandler LLC.  As of the drafting of this Complaint, the Trustee does not believe that Olympic Holdings, LLC received any consideration for the transfers of the Palora Property, 14257 Chandler Property and the Detroit Property.

92.    Olympic Holdings, LLC transferred the Palora Property to Palora LLC on March 5, 2020 when a grant deed transferring the Palora Property was recorded ("Palora Transfer").  The Debtor executed the grant deed for the transfer on November 11, 2019 but it was not recorded until March 5, 2020.  Palora LLC refinanced the Palora Property for $1,960,000.  Robert Mayman was the borrower and executed the promissory note and deed of trust.  On August 28, 2020, Palora LLC sold the Palora Property to a third party for $2,435,000.  As a result, of this transaction the Palora Property was transferred out of the 1997 Trust and then sold for a profit.  Palora LLC is a California limited liability company formed on or about October 31, 2019 and Robert Mayman is the manager and/or member and serves as the agent for service of process.

93.    Olympic Holdings, LLC transferred the Detroit Property to Detroit LLC by and through the grant deed executed by the Debtor that was recorded on March 4, 2020 ("Detroit Transfer").  Detroit LLC refinanced the Detroit Property with a loan of $2,860,000 on March 4, 2020.  As a result, of this transaction the Detroit Property was transferred out of the 1997 Trust. Detroit LLC is a California limited liability company organized on or about October 31, 2019 and Robert Mayman is the manager and/or member and serves as the agent for service of process.

94.    Olympic Holdings, LLC transferred the 14257 Chandler Property to Chandler LLC on March 5, 2020 with the recording of a grant deed executed by the Debtor ("14257 Chandler Transfer").  The Debtor executed the grant deed for the transfer on November 11, 2019 but it was not recorded until March 5, 2020.  As a result, of this transaction the 14257 Chandler Property was transferred out of the 1997 Trust.  Chandler LLC is a California limited liability company organized on or about October 31, 2019 and Robert Mayman is the manager and/or member and serves as the agent for service of process.

2439616_2

**Other Transfers of Trust Assets**

95.     On or about August 24, 2015, the Debtor caused Breakfront, LLC and Golden Oak Partners, LLC to transfer title to the Appian Way Property to 8777 Appian Way, LLC ("Appian Way Transfer").  8777 Appian Way, LLC was formed on August 19, 2015.  Robert Mayman was the organizer and agent for service of process.  The Appian Way Transfer was done to hinder, delay and defraud creditor Southwest Guaranty which obtained a judgment against the Debtor as trustee of the 1997 Trust, Breakfront, LLC and Golden Oak Partners, LLC in the 81st/218th Judicial District, Atascosa County, Texas on July 17, 2015.

96.     The Debtor testified at one of the meeting of creditors that the Appian Way Property is property of the 1997 Trust.  Prior to such testimony, at a Judgment Debtor Exam of the Debtor taken on June 21, 2018, the Debtor testified that Breakfront, LLC and Golden Oak Partners, LLC owned the Appian Way Property.

97.     On or about August 25, 2015, Breakfront, LLC and Golden Oak Partners, LLC, through the Debtor, transferred title to the real property located at 307 Sailfish Lane, Freeport, Texas 77541 ("Sailfish Property") to Sailfish Capital Partners, LLC when the Deed Without Warranty was recorded.  On or about September 17, 2018, Breakfront, LLC and Golden Oak Partners, LLC, through the Debtor, transferred title to the Sailfish Property to Sailfish Capital Partners, LLC when the  Warranty Deed was recorded (together, "Sailfish Transfers").  Sailfish Capital Partners, LLC was formed on August 18, 2015.  Loren Marken was the organizer.  Breakfront, LLC holds a 75% interest in Sailfish Capital Partners, LLC and Golden Oak Partners, LLC holds a 25% interest in Sailfish Capital Partners, LLC.  The Debtor and Loren Marken are the managing members of Sailfish Capital Partners.

**Commingling of Assets and Debtor's Control Over the Trusts, Limited Liability Companies and Antiquarian Traders Inc.**

98.     The Debtor retains complete control of all assets contained in each of the Trusts and benefits from the use of these assets.

99.     As described above, the Navone Property was transferred from the 1997 Trust to the 2010 Trust and 2012 Trust, the Detroit Property, Palora Property and the 14257 Chandler Property

were transferred out of the 1997 Trust to newly formed entities, the Appian Way Property was transferred from Breakfront, LLC and Golden Oak Partners, LLC to 8777 Appian Way, LLC and the Sailfish Property was transferred to Sailfish Capital Partners, LLC which is owned by Breakfront, LLC and Golden Oak Partners, LLC.

100.    Debtor listed as co-debtors on its Schedule H to his petition Breakfront, LLC, Golden Oak Partners, LLC and Antiquarian Traders, Inc.  Dkt. No. 10.  The Debtor listed himself as "[a]n officer, director, or managing executive" of Antiquarian Traders, Inc. on Official Form 107 to his Petition.  *Id.*

101.    Debtor has executed documents as the managing member of Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC and Olympic Holdings, LLC.  The Debtor at all times has managed and controlled Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC and Olympic Holdings, LLC.

102.    The Debtor is listed as the agent for service of process for Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC and Olympic Holdings, LLC.

103.    The Trustee is informed and believes that Clover Industrial Properties, LLC currently covers most of the expenses of the Appian Way Property including the mortgage payments, utilities and taxes for the Appian Way Property.

104.    Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC and Olympic Holdings, LLC all share a common business address.

105.    Debtor identities Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC and Olympic Holdings, LLC on his personal tax returns and recognizes profits and losses from these entities

106.    Debtor is the chief executive officer, chief financial officer, and secretary of Antiquarian Traders, Inc.

107.    Antiquarian Traders, Inc. holds an ownership interest in Olympic Holdings, LLC, Wooton Group, LLC, Golden Oak Partners, LLC, Breakfront, LLC and Alameda Holdings, Inc.

108.    The books and records for Breakfront, LLC, Golden Oak Partners, LLC, 8777 Appian Way, LLC, Olympic Holdings, LLC, Alameda Holdings, Inc., Antiquarian Traders Inc., Sailfish

2439616_2

Capital Partners, LLC, Wooton Group, LLC, Cruises to Nowhere, LLC are all maintained in

QuickBooks by a single bookkeeper hired by the Debtor.  The QuickBook entries are not entered on

a regular basis for these entities.  Instead bills for these entities are paid from the Clover Industrial

Properties, LLC bank account, and at the end of the year the bookkeeper is provided with

instructions from the accountant to make general journal entries into the QuickBook files allocating

the expenses for each of the entities.  The QuickBook files for Clover Industrial Properties, LLC are

maintained by an outside accountant but the information for the entries into the Clover Industrial

Properties, LLC QuickBooks account is provided by the Debtor to the accountant.

109.    As set forth in the Statement of Decision, the State Court found that the Debtor "**has
exercised complete control of all such businesses, their assets and bank accounts and that he
has used both assets and income from the business as if he had never put them into a trust.**"
Exhibit "2," Statement of Decision, p. 8 (emphasis added).

**Debtor Benefits From the Trusts**

110.    The Debtor lives at the Appian Way property but testified at his meeting of creditors

that he does not pay rent, the mortgage or the utilities.  Over the years, the mortgage payments have

been made by Antiquarian Traders, Inc., Olympic Holdings, LLC and Clover Industrial Properties,

LLC.  Plaintiff is informed and believes that this remains the case after the Petition Date.  *See* Dkt.

No. 10.

**Summary of 2018 Benefits Received by Debtor from the Trusts**

111.    In 2018, funds from Cruises to Nowhere, LLC, Antiquarian Traders, Inc. and

Olympic Holdings, LLC were used to satisfy amounts due on the Debtor's personal Citi credit cards

in the approximate amount of $147,410 as follows:

    a.    Approximately $48,000 was paid by Antiquarian Traders, Inc. to satisfy the Debtor's
       personal Citicard account.

    b.    Approximately $33,000 was paid by Cruises to Nowhere, LLC to satisfy the Debtor's
       personal Citicard account.

    c.    Approximately $66,410 was paid by Olympic Holdings, LLC to satisfy the Debtor's
       personal Citicard account.

      d.   The above Citi credit card charges consist of charges for items such as restaurants, groceries, Target, Uber, gas, DirecTV, car rentals, car repairs, Hot Yoga, Postmates, iTunes purchases and Amazon purchases.

112.    In 2018, funds from Cruises to Nowhere, LLC, Antiquarian Traders, Inc. and Olympic Holdings, LLC were used to satisfy amounts due on the Debtor's personal Capital One credit cards in the approximate amount of $109,024.84.  There are four accounts for Capital One – Antiquarian Traders/Mark Slotkin:  1672, 7432, and 9483, 0118; and one account for Capital One – Mark Slotkin: 9138.  The $109,024.84 of payments made on these cards in 2018 were for the Debtor's personal charges for items such as Netflix, airfare, restaurants, iTunes purchases, Amazon purchases, HULU, clothing, gym memberships, flowers, dry cleaning, doctors, Uber, Postmates, Hot Yoga, gas, Prime Video and groceries.  The charges on these cards were several thousand dollars each month and were paid by Cruises to Nowhere, LLC, Antiquarian Traders, Inc. and Olympic Holdings, LLC.  The charges on the Debtor's personal Capital One card are minimal, a few hundred dollars each month and consisted of food and services.

113.    In 2018, Antiquarian Traders, Inc. and Cruises to Nowhere, LLC made total payments of $14,542.76 to Ford Motor Credit for the Debtor's vehicle.

114.    In 2018, approximately $29,930.97 was paid to Hillcrest Country Club from funds transferred from Antiquarian Traders, Inc., Cruises to Nowhere, LLC, Olympic Holdings, LLC and Clover Industrial Properties, LLC, to cover the Debtor's personal country club membership dues.  While the membership payments were made from the Debtor's personal bank account, funds were transferred into this account by Antiquarian Traders, Inc., Cruises to Nowhere, LLC, Olympic Holdings, LLC and Clover Industrial Properties, LLC prior to the membership dues being paid.

115.    In 2018, the Debtor issued $27,500 in checks to "Cash" from Olympic Holdings, LLC.

116.    In 2018, Cruises to Nowhere, LLC paid $54,863.54 for mortgage payments, utilities and expenses for the Appian Way Property, where the Debtor resides rent-free.

2439616_2

**Summary of 2019 Benefits Received by Debtor from the Trusts**

117.    In 2019, funds from Cruises to Nowhere, LLC, Antiquarian Traders, Inc., Olympic Holdings, LLC and Clover Industrial Properties, LLC were used to satisfy amounts due on the Debtor's personal Capital One credit cards in the amount of $121,819.14.  There are four accounts for Capital One – Antiquarian Traders/Mark Slotkin:  1672, 7432, and 9483, 0118; and one account for Capital One – Mark Slotkin: 9138.  The $121,819.14 of payments made on these cards in 2019 were for the Debtor's personal charges for items such as Netflix, airfare, restaurants, iTunes purchases, Amazon purchases, HULU, clothing, gym memberships, flowers, dry cleaning, doctors, Uber, Postmates, Hot Yoga, gas, Prime Video and groceries.  The charges on these cards were several thousand dollars each month and were paid by Cruises to Nowhere, LLC, Antiquarian Traders, Inc., Olympic Holdings, LLC and Clover Industrial Properties, LLC.  The charges on the Debtor's personal Capital One card are minimal, a few hundred dollars each month and consist of food and services.

118.    In 2019, Clover Industrial Properties, LLC made total payments of $14,742.76 to Ford Motor Credit for the Debtor's vehicle.

119.    In 2019, approximately $17,312.12 was paid to Hillcrest Country Club from funds transferred from Clover Industrial Properties, LLC, to cover the Debtor's personal country club membership dues.  While the membership payments were made from the Debtor's personal bank account, funds were transferred into this account from the Clover Industrial Properties, LLC account prior to the membership dues being paid.

120.    In 2019, the Debtor issued $32,400 in checks to "Cash" from Olympic Holdings, LLC and Clover Industrial Properties, Inc.

121.    In 2019, Clover Industrial Properties, LLC paid $80,696 for mortgage payments, utilities, security services, pest control, taxes and other expenses for the Appian Way Property, where the Debtor resides rent-free.

**Creditors of the Debtor**

122.    On July 27, 2015, in the 81st/218th Judicial District, Atascosa County, Texas, Case No. 14-04-0331-CVA, Southwest Guaranty obtained a judgment against Debtor, individually and as

the trustee of the 1997 Trust, Breakfront, LLC, and Golden Oak Partners, LLC in the principal

amount of $1,312,496.01, not including interest.  This claim arose well before July 27, 2015.

Southwest Guaranty filed Proof of Claim No. 9 as a secured claim in the amount of $1,740,879.25.

123.    In the Debtor's schedule E/F, the Debtor lists a priority unsecured claim in the

amount of $301,622.30 in favor of the Internal Revenue Service.  The Debtor indicated that the basis

of the claim was for taxes owed to the government, and that the debt was incurred in 2018.

124.    As discussed above, the Dissolution Judgment resolved the Divorce Action

commenced in 2010.  The Dissolution Judgment provides, *inter alia*, that:

 a. Debtor, Antiquarian Traders, Inc. and Olympic Holding, LLC shall pay

  forthwith to Petitioner Abigail Slotkin the amount of $908,618 with interest

  accruing on the unpaid principal balance at the legal rate of 10% per annum for

  child support;

 b. Debtor shall pay Abigail Slotkin the amount of $501,205 with interest accruing

  at 10% for spousal support;

 c. Debtor, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay

  forthwith to Petitioner Abigail Slotkin $186,699 with interest accruing at 10%

  on the principal balance of $95,000, for child support and spousal support

  arrearages;

 d. Debtor, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay

  forthwith to Petitioner Abigail Slotkin, payable to the Law Office of Robert J.

  Nachshin P.C., $180,864, with interest accruing on the unpaid principal balance

  of $95,000 at the legal rate, for reasonable attorney fees and costs arrearages;

 e. Debtor, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay

  forthwith to Petitioner Abigail Slotkin, payable to Petitioner's forensic

  accountants at Mayer, Hoffman McCann PC, $42,836, with interest accruing on

  the unpaid principal balance of $22,500 at the legal rate, for reasonable forensic

  accounting fees and costs arrearages;

2439616_2

f.    Debtor, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay
forthwith to Petitioner Abigail Slotkin, payable to the Law Office of Robert J.
Nachshin P.C., $51,606, with interest accruing on the unpaid principal balance
of $33,600 at the legal rate, for reasonable attorney fees and costs arrearages;

g.    Debtor, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay
forthwith to Langlois Family Law, APC, $196,438, with interest accruing on the
unpaid principal balance of $150,000 at the legal rate, for reasonable attorney
fees and costs arrearages;

h.    Debtor and/or Antiquarian Traders Inc. shall pay directly to Langlois Family
Law APC $700,000, as his further contributive share of Petitioner's reasonable
attorney's fees and costs not previously awarded;

i.    Debtor shall pay directly to Petitioner Abigail Slotkin $125,000 as his
contributive share of Petitioner's reasonable forensic accounting fees not
previously awarded; and

j.    The State Court defers to this Court regarding issues surrounding the disposition
of sale proceeds in excess of $80,000 from the inventory of Antiquarian
Traders, Inc., which the Debtor was ordered to deposit into the trust account of
Langlois Family Law APC pursuant to Judge Moloney's June 18, 2013
enforcement order.

*See* Dissolution Judgment, Exhibit "3."

125.    The Trustee  is informed and believes that the Debtor was insolvent at the time of the
2010 Transfer, 2012 Transfer, LLC Transfers, Antiquarian Transfer, Appian Way Transfer and
Sailfish Transfers or became insolvent as a result of these transfers.

*///*

2439616_2

# FIRST CLAIM FOR RELIEF

## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201

**[1997 Trust, 2010 Trust, 2012 Trust, Savannah Slotkin, Loren Marken as Trustee of 1997 Trust, Loren Marken as Trustee of 2010 Trust, Loren Marken as Trustee of 2012 Trust, To Be Named Trustee of 1997 Trust, To Be Named Trustee of 2010 Trust, To Be Named Trustee of 2012 Trust, 17841 Palora Manor LLC, 14257 Chandler Manor LLC, and 748 Detroit Manor LLC]**

126.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 125, inclusive, as though fully set forth herein.

127.    An actual controversy exists as between the Trustee and each of the Defendants in that the Trustee believes that assets held by the Defendants or for the benefit of the Defendants or transferred from one of the Trusts or entities held by one of the Trusts are or were property of the Debtor and are property of the Debtor's Estate.  The Trustee is informed and believes that the Defendants contest the Trustee's contentions.  The determination of this dispute will impact the value of the Estate.

128.    The Trustee seeks a determination by this Court that the assets contained in each of the Trusts and held by the following entities are property of the Estate (the "Assets"):

a.    Real property located at the following addresses owned by Olympic Holdings, LLC:

(1) 14806 Hesby Street, Sherman Oaks, California 91403;
(2) 852 North Vista Street, Los Angeles, California 90046;
(3) 823 North Citrus Avenue, Los Angeles, California 90038;
(4) 14827 Huston Street, Sherman Oaks, California 91403;
(5) 12105 South Hoover Street, Los Angeles, California 90044;
(6) 11921 Standford Avenue, Los Angeles, California 90059; and,
(7) 15714 Morrison Street, Encino, California 91436.

b.    Real property located at 8777 Appian Way, Los Angeles, California 90046 owned by 8777 Appian Way LLC;

c.    Real property held by Clover Industrial Properties, LLC which includes the property located at 13348 Chandler, Blvd., Sherman Oaks, California and 24050 Park Casino, Calabasas, California.

d.    The Detroit Property owned by Detroit LLC;

e.    The Palora Property and/or the proceeds from the sale of the Palora Property to the extent it was sold to a good faith purchaser which exceed $450,000;

2439616_2

f.      The 14257 Chandler Property owned by 14257 Chandler LLC;

g.      Real property located at 307 Sailfish Lane, Freeport, Texas 77541 owned by Sailfish Capital Partners, LLC;

h.      Antiquarian Traders, Inc. including but not limited to all inventory, accounts receivable and other tangible and intangible assets owned by Antiquarian Traders, Inc.;[4]

i.      Any assets owned by Rolltop, LLC, Abbey-Properties, LLC, Alameda Holdings, Inc. and Consolidated Assets Co; and,

j.      Other assets to be found through further investigation.

129.    The Defendants contend that these assets are not property of the Debtor and therefore not property of the Debtor's Estate.  Defendants contend that the Trusts were formed for a proper purpose and as a result all assets contained in each of the Trusts is protected from the Debtor's creditors.   The Trustee disputes this contention.

130.    The Trustee believes that the Assets are property of the Estate because the Trusts are the alter egos of the Debtor who acts as the equitable owner of each of the Trusts and the Assets held by each of the Trusts through various entities.  Additionally, up until the Petition Date the Debtor served as trustee of the 1997 Trust and was the legal owner of the 1997 Trust.  At all times either as the actual trustee of the Trusts or through Loren Marken who served as trustee of the Trusts, the Debtor controlled each of the Trusts.

131.    The Debtor at all times dominated and controlled all decisions of the Trusts, received payments from the Trusts, resided at property held by one of the Trusts rent free for years and diverted assets from the Trusts to the detriment of his creditors.

132.    The State Court found that "[Debtor] has exercised complete control of all such businesses, their assets and bank accounts and that he has used both assets and income from the business as if he had never put them into a trust."  Statement of Decision, Exhibit "2."

---

[4] The Trustee is informed and believed that Antiquarian Traders Inc. currently holds in excess of $6.4 million in inventory.

2439616_2

133.    The Debtor at all relevant times herein has controlled the Assets and benefitted from the Assets.

134.    A judicial declaration is necessary and appropriate at this time declaring that the Assets are property of the Estate.

## SECOND CLAIM FOR RELIEF

### AVOIDANCE OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544, CAL. CIV. CODE §§ 3439.004(a)(1), 3439.009, 26 U.S.C. §§ 6502 and 6901

**[2010 Trust, 2012 Trust, Savannah Slotkin, Loren Marken as Trustee of 2010 Trust, Loren Marken as Trustee of 2012 Trust, To Be Named Trustee of 2012 Trust, To Be Named Trustee of 2010 Trust]**

135.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 134, inclusive, as though fully set forth herein.

136.    The 2010 Transfer, 2012 Transfer, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer were made with the intent to hinder, delay, or defraud creditors of the Debtor, including but not limited to the claims of Abigail Slotkin.

137.    As a result of the 2010 Transfer and the 2012 Transfer, assets of the Debtor were transferred from the 1997 Trust of which the Debtor was the legal owner and retained control as the trustee to the 2010 Trust and the 2012 Trust.

138.    On information and belief, the fraudulent nature of the 2010 Transfer and the 2012 Transfer could not have been discovered, even with reasonable diligence, prior to the Petition Date.

139.    The Internal Revenue Services holds claims against the Debtor and such claims are entitled to a ten-year collection period under 26 U.S.C. § 6502, which Trustee may take advantage of pursuant to 11 U.S.C. § 544(b).

140.    Claims arose against the Debtor before the 2010 Transfer, 2012 Transfer, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer.

141.    Accordingly, the 2010 Transfer, 2012, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer are avoidable, and should be avoided, as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civil Code §§ 3439.04(a)(1), 3439.07 and 3439.09 and 26 U.S.C. §§ 6502 and 6901.

2439616_2

### THIRD CLAIM FOR RELIEF

**AVOIDANCE OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544, CAL.
CIV. CODE §§ 3439.04(a)(2), 3439.05, 3439.07, 3439.09 AND
26 U.S.C. §§ 6502 and 6901**

**[2010 Trust, 2012 Trust, Savannah Slotkin, Loren Marken as Trustee of 2010 Trust,
Loren Marken as Trustee of 2012 Trust, To Be Named Trustee of 2012 Trust, To Be
Named Trustee of the 2010 Trust]**

142.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 141, inclusive, as though fully set forth herein.

143.    The 2010 Transfer and 2012 Transfer involved the transferring of the Debtor's assets from the 1997 Trust to the 2010 Trust and 2012 Trust for no consideration and was an attempt to place such assets out of the reach of Abigail Slotkin, a creditor at the time of each of these transfers. As set forth in detail, the Navone Property was purchased by Clover Industrial Properties, LLC, thereby taking the Navone Property out of the 1997 Trust and placing it in the 2010 Trust and 2012 Trust.

144.    The Debtor did not receive reasonably equivalent value in exchange for the 2010 Transfer and 2012 Transfer.  The 2010 Trust and the 2012 Trust did not provide any consideration to the Debtor or the 1997 Trust for the transfer of assets into the 2010 Trust and the 2012 Trust.

145.    The 2010 Transfer and the 2012 Transfer were made for no consideration.

146.    The Debtor received no consideration for the LLC Transfers, Antiquarian Transfer, Appian Way Transfer and Sailfish Transfers.

147.    The Debtor was undercapitalized at the time of the 2010 Transfer, 2012 Transfer, LLC Transfers, Antiquarian Transfer, Appian Way Transfer and Sailfish Transfers.

148.    At the time that the 2010 Transfer, 2012 Transfer, LLC Transfers, Antiquarian Transfer, Appian Way Transfer and Sailfish Transfers were made, the Debtor (i) was engaged or was about to be engaged in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction, or (ii) intended to incur, or reasonably should have believed that he would incur, debts beyond his ability to pay as they came due.

149.    On information and belief, the 2010 Transfer and 2012 Transfer could not have been discovered, even with reasonable diligence, prior to the Petition Date.

2439616_2

150.    The Internal Revenue Service holds claims against the Debtor and such claims are entitled to a ten-year collection period under 26 U.S.C. § 6502, which Plaintiff may take advantage of pursuant to 11 U.S.C. § 544(b).

151.    Accordingly, the 2010 Transfer, 2012 Transfer, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer are avoidable, and should be avoided, as fraudulent pursuant to 11 U.S.C. § 544(b) and Cal. Civil Code §§3439.04(a)(1), 3439.07 and 3439.09 and 26 U.S.C. §§ 6502 and 6901.

## FOURTH CLAIM FOR RELIEF

### AVOIDANCE OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 544, 548(a)(1)(B) and CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05

**[1997 Trust, Savannah Slotkin, Loren Marken as Trustee of  1997 Trust, To Be Named Trustee of 1997 Trust]**

152.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 151, inclusive, as though fully set forth herein.

153.     On the Petition Date, the Debtor resigned as the trustee of the 1997 Trust and attempted to put Loren Marken, his closest friend, in his place as trustee of the 1997 Trust – the 2020 Transfer.  To the extent the 2020 Transfer is not a post-petition transfer, it is an avoidable pre-petition transfer under 11 U.S.C. §§ 544, 548 and Cal. Civ. Code §§ 3439.04, 3439.05.

154.    The 2020 Transfer was made by the Debtor within two (2) years of the Petition Date.

155.    Avoidance of the 2020 Transfer will result in the Debtor being the trustee of the 1997 Trust on the Petition Date and the holder of the legal interests in the 1997 Trust and all the 1997 Trust assets.  Such assets include but are not limited to the real property held by the 1997 Trust through Olympic Holdings, LLC, 8777 Appian Way, LLC, Golden Oak Partners, LLC, Wooton Group, LLC, Breakfront, LLC and Antiquarian Traders, Inc., assets with equity well in excess of $20,000,000.

156.    The Debtor did not receive reasonably equivalent value in exchange for the 2020 Transfer.  The Debtor received no consideration in exchange for the 2020 Transfer.

157.    At the time the 2020 Transfer was made, the Debtor (i) was insolvent, or became insolvent as a result of obligations or transfers; (ii) was engaged or was about to be engaged in a

business or transaction for which the remaining assets were unreasonably small in relation to the

business or transaction, or (ii) intended to incur, or reasonably should have believed that he would

incur, debts beyond his ability to pay as they came due.

158.     There exist creditors of the Debtor whose claims arose before the 2020 Transfer was

made including but not limited to Abigail Slotkin, the Internal Revenue Service, and Southwest

Guaranty.

159.     Accordingly, the 2020 Transfer made by the Debtor is avoidable, and should be

avoided, as fraudulent and recovered for the benefit of the Estate pursuant to 11 U.S.C. §§ 544(b),

548(a)(1)(B), 550 and Cal. Civil Code §§ 3439.04(a)(2), 3439.05 and 3439.07.

**FIFTH CLAIM FOR RELIEF**

**AVOIDANCE OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 544 AND
548(a)(1)(A) AND CAL. CIV. CODE §§ 3439.04(a)(1) AND 3439.07**

**[1997 Trust, Savannah Slotkin, Loren Marken as Trustee of 1997 Trust, To Be
Named Trustee of 1997 Trust]**

160.     The Trustee  realleges and incorporates by reference each and every allegation set

forth in paragraphs 1 through 159, inclusive, as though fully set forth herein.

161.     To the extent the 2020 Transfer is not a post-petition transfer, it was made by the

Debtor within two (2) years of the Petition Date.

162.     The 2020 Transfer was incurred and made with the intent to hinder, delay, or defraud

creditors of the Debtor.

163.     Accordingly, the 2020 Transfer made by the Debtor is avoidable as fraudulent

pursuant to 11 U.S.C. §§ 544 and 548(a)(1)(A) and Cal. Civil Code §§ 3439.04(a)(1) and 3439.07.

**SIXTH CLAIM FOR RELIEF**

**AVOIDANCE OF POST-PETITION TRANSFERS UNDER 11 U.S.C. § 549**

**[1997 Trust, Savannah Slotkin, Loren Marken as Trustee of 1997 Trust, To Be
Named Trustee of 1997 Trust, 17841 Palora Manor LLC, 14257 Chandler Manor
LLC, and 748 Detroit Manor LLC]**

164.     The Trustee realleges and incorporates by reference each and every allegation set

forth in paragraphs 1 through 163, inclusive, as though fully set forth herein.

///

2439616_2

165.    On the Petition Date, the Debtor attempted to resign as trustee of the 1997 Trust, however, the 2020 Transfer did not occur until after the Petition Date when Loren Marken executed the Substitution of Trustee on March 2, 2020.  Exhibit "5."

166.    On the Petition Date, Olympic Holdings, LLC owned the Detroit Property, the Palora Property and the 14257 Chandler Property.  On March 4, 2020, the Debtor caused the Detroit Property to be transferred from Olympic Holdings, LLC to Detroit LLC.  On March 5, 2020, the Debtor caused the Palora Property to be transferred from Olympic Holdings, LLC to the Palora LLC.  On March 5, 2020, the Debtor caused the 14527 Chandler Property to be transferred from Olympic Holdings, LLC to Chandler LLC.

167.    Plaintiff is informed and believes, and based thereon alleges, that the 2020 Transfer, Palora Transfer, 14257 Chandler Transfer, Detroit Transfer and Navone Transfer (collectively, "Post-Petition Transfers") were each transfers of an interest of the Debtor in property.

168.    Plaintiff is informed and believes, and based thereon alleges, that each of the Post-Petition Transfers was made after the Petition Date.

169.    Plaintiff is informed and believes, and based thereon alleges, that each of the Post-Petition Transfers was not authorized under the Bankruptcy Code or by the Bankruptcy Court or the Trustee.

170.    Accordingly, the Post-Petition Transfers are each avoidable under 11 U.S.C. § 549.

### SEVENTH CLAIM FOR RELIEF

### RECOVERY OF TRANSFERS FOR THE BENEFIT OF THE ESTATE
### PURSUANT TO 11 U.S.C. §§ 550 AND 551

**[1997 Trust, 2010 Trust, 2012 Trust, Savannah Slotkin, Loren Marken as Trustee of 1997 Trust, Loren Marken as Trustee of 2010 Trust, Loren Marken as Trustee of 2012 Trust, To Be Named Trustee of 1997 Trust, To Be Named Trustee of 2010 Trust, To Be Named Trustee of 2012 Trust, 17841 Palora Manor LLC, 14257 Chandler Manor LLC, and 748 Detroit Manor LLC]**

171.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 170, inclusive, as though fully set forth herein.

///

2439616_2

172.    The 1997 Trust, 2010 Trust, 2012 Trust, Savannah Slotkin, Loren Marken as Trustee of 1997 Trust, Loren Marken as Trustee of 2010 Trust, Loren Marken as Trustee of 2012 Trust, To Be Named Trustee of 1997 Trust, To Be Named Trustee of 2010 Trust, To Be Named Trustee of 2012 Trust, Palora LLC, Chandler LLC, and Detroit LLC were the initial transferees of the avoidable transfers described herein.

173.    Pursuant to 11 U.S.C. §§ 544 and 550, Plaintiff is entitled to recover and preserve for the benefit of the Estate, the Assets or the value of the Assets which were transferred by and through the 2020 Transfer, 2012 Transfer, 2010 Transfer, Post-Petition Transfers, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer.

## EIGHTH CLAIM FOR RELIEF

### TURNOVER OF ESTATE PROPERTY

**[1997 Trust, 2010 Trust, 2012 Trust, Savannah Slotkin, Loren Marken as Trustee of 1997 Trust, Loren Marken as Trustee of 2010 Trust, Loren Marken as Trustee of 2012 Trust, To Be Named Trustee of 1997 Trust, To Be Named Trustee of 2010 Trust, To Be Named Trustee of 2012 Trust, 17841 Palora Manor LLC, 14257 Chandler Manor LLC, and 748 Detroit Manor LLC, Robert Mayman]**

174.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 173, inclusive, as though fully set forth herein.

175.    The Assets are property of the Estate but the Debtor through the Trusts and various entities retains control over most of the Assets.  The balance of the Assets have been transferred post-petition to newly formed entities such as Palora LLC, Chandler LLC and Detroit LLC and are property of the Estate.

176.    Since the Petition Date, the Defendants and the Debtor have been in possession, custody and control of the Assets.

177.    Accordingly, the Trustee seeks turnover of the Assets.

178.    The Trustee prays for judgment directing Defendants to turnover the Assets to the Trustee to be administered as assets of the Estate.

///

2439616_2

**NINTH CLAIM FOR RELIEF**

**ACCOUNTING**

**[All Defendants]**

179.    The Trustee  realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 178, inclusive, as though fully set forth herein.

180.    The Trustee  is informed and believes that the Defendants have received and continue to receive, profits and revenues in connection with the Assets.

181.    By and through this claim, the Trustee seeks an accounting of all assets held and transferred by each of the Trusts, a summary of all real property and assets owned by Alameda Holdings, Inc., Antiquarian Traders, Inc. Sailfish Capital Partners, LLC, Golden Oak Partners, LLC, Breakfront, LLC, Wooton Group, LLC, Olympic Holdings, LLC, Clover Industrial Properties, LLC, Cruises to Nowhere, LLC and revenues received by each of these entities.

**TENTH CLAIM FOR RELIEF**

**OBJECTION TO DISCHARGE PURSUANT TO 11 U.S.C. §§ 727(a)(2)(B)**

**[Mark Abbey Slotkin]**

182.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 181, inclusive, as though fully set forth herein.

183.    Section 727(a)(2)(B) of the Bankruptcy Code provide in its pertinent part that:

(a) The court shall grant the Debtor a discharge, unless — …

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed— …

(B) property of the estate, after the date of the filing of the petition;

184.    The 2020 Transfer, the Navone Transfer, Detroit Transfer, Palora Transfer and 14257 Chandler Transfer all occurred after the Petition Date.

185.    All of these transfers were made by the Debtor with the intent to "hinder, delay, or defraud a creditor" and the Debtor must be denied his discharge under Section 727(a)(2)(B) of the Bankruptcy Code.

2439616_2

## ELEVENTH CLAIM FOR RELIEF

### INJUNCTIVE RELIEF

### [All Defendants]

186.    The Trustee realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 185, inclusive, as though fully set forth herein.

187.    The Trustee request this Court enjoin the Defendants and each of them from disposing of or exerting dominion and control over or encumbering the Assets.

188.    The Trustee requests that pending resolution of this action the Court issue a temporary restraining order and/or preliminary injunction, restraining and enjoining the Defendants and each of them from disposing of or exerting dominion and control over or encumbering any of the Assets.

## PRAYER FOR RELIEF

WHEREFORE, Trustee prays for a judgment on her Complaint, as follows:

1.    On the First Claim for Relief, a declaratory judgment that the Assets held by the Defendants or for the benefit of the Defendants or transferred from one of the Trusts or entities held by one of the Trusts are or were property of the Debtor and are property of the Debtor's Estate;

2.    On the Second, Third, Fourth and Fifth Claims for Relief, avoidance of the 2020 Transfer, 2012 Transfer, 2010 Transfer, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer for the benefit of the Estate;

3.    On the Sixth Claim for Relief, avoidance of the Post-Petition Transfers;

4.    On the Seventh Claim for Relief, recovery of the 2020 Transfer, 2012 Transfer, 2010 Transfer, Post-Petition Transfers, LLC Transfers, Antiquarian Transfer, Sailfish Transfers, and Appian Way Transfer or the value of such transfers for the benefit of the Estate;

5.    On the Eighth Claim for Relief, for a judgment directing the Defendants to turnover the Assets to the Trustee;

6.    On the Ninth Claim for Relief, for a judgment directing the Defendants to provide an accounting to the Trustee of all assets held and transferred by each of the Trusts, a summary of all real property and assets owned by Alameda Holdings, Inc., Antiquarian Traders, Inc. Sailfish

2439616_2

Capital Partners, LLC, Golden Oak Partners, LLC, Breakfront, LLC, Wooton Group, LLC, Olympic Holdings, LLC, Clover Industrial Properties, LLC, Cruises to Nowhere, LLC and revenues received by each of these entities;

7.    On the Tenth Claim for Relief, for a judgment denying the Debtor a discharge under 11 U.S.C. § 727(a)(2)(B);

8.    On the Eleventh Claim for Relief a judgment enjoining each and all of the Defendants from transferring or encumbering in any way the Assets;

9.    For costs of suit; and

10.    For such other and further relief as the Court may deem appropriate.


DATED:  November 23, 2020              BRUTZKUS GUBNER


                                    By: /s/ Robyn B. Sokol
                                        Robyn B. Sokol
                                        Attorneys for Elissa D. Miller,
                                        Chapter 7 Trustee

2439616_2

# EXHIBIT "1"



Slotkin Ownership Property Flow Chart
*Ownership percentages are based off 2018 tax returns and additional information discovered
Slotkin Family Trust 1997
Slotkin Defective Trust 12.12.12
Slotkin Intentionally Defective Trust April 2010
Alameda Holdings, Inc
Slotkin Family Trust 99% owner
Antiquarian Traders 1% owner
Asset
Sold Property
Antiquarian Traders Inc
Slotkin Family Trust 80% owner
Assets
5610 District Blvd (11.4.97)
7316 E Gage Ave (11.14.97)
Sailfish Capital Partners LLC
Antiquarian Traders 1% owner
Slotkin Family Trust 79% owner
Golden Oak Partners 25% owner
Assets
307 Sailfish Lane
Golden Oak Partners, LLC
Slotkin Def. Trust 20% owner
Breakfront 75% owner
Olympic Holdings, LLC
Antiquarian Traders 1% owner
Slotkin Family Trust 79% owner
Slotkin Def. Trust 20% owner
Assets
14806 Hesby St
15714 Morrison
852 N Vista
823 N Citrus Ave
14827 Huston St
11921 Standford Ave (purchased 2003)
12105 Hoover St (purchased 2003)
4851 S Alameda St (2.5.16)
748 N Detroit (transferred 3.4.20)
17841 Palora St (transferred 3.5.20)
14257 Chandler Blvd (transferred 3.5.20)
748 N Detroit Manor, LLC
Asset
748 N Detroit
14257 Chandler Blvd Manor LLC
Asset
14257 Chandler Blvd
17841 Palora Manor LLC
Asset
17841 Palora Manor
Breakfront, LLC
Slotkin Family Trust 79% owner
Antiquarian Traders 1% owner
Slotkin Def. Trust 20% owner
Golden Oak Partners 50% owner
Breakfront 50% owner
Asset
8777 Appian Way (transferred)
8777 Appian Way, LLC
Asset
8777 Appian Way
Wooton Group, LLC
Antiquarian Traders 1% owner
Slotkin Family Trust 79% owner
Slotkin Def. Trust 20% owner
Assets
6840 Fairchild Rd (sold)
2945 South Angus (7.9.18)
5610 District Blvd (10.6.05)
3001 Navone Road (8.23.18)
Clover Industrial Properties, LLC
Slotkin Def. Trust 50% owner
Slotkin Intentionally Defective Trust 50% owner
Assets
3001 Navone Rd. Exchange (4.14.20)
13348 Chandler, Blvd.
24050 Park Casino
Cruises to Nowhere, LLC
Slotkin Intentionally Defective Trust 100% owner
= Individual/Trust
= Entity
= Assets
*Dates next to the property represent the property sale date, unless stated otherwise
*Properties that say sold with no date, means date is unknown

# EXHIBIT "2"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Family Division

RECEIVED VIA *mail* ON
4-9-20 @

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

Honorable Dianna Gould-Saltman, Judge

Charlotte Andrews, Judicial Assistant

---

**NATURE OF PROCEEDINGS:**   Statement of Decision

The following parties are present for the aforementioned proceeding:

　　　No Appearances

The matter is not called for hearing.

<u>Marriage of Slotkin</u>

　　　This tentative decision constitutes the Proposed Statement of Decision under CRC Rule 3.1590(c)(1), and will become the Statement of Decision unless, within ten (15) days, any party serves and files objections under CRC Rule 3.1590 (g). Any pleading that specifies objections shall be ten (10) total pages or less, shall use appropriate formatting and font size as provided by the Rules of Court, and shall not re-argue the case. No abbreviations, charts, or additional exhibits will be allowed or considered.   In addition to serving the other side by mail or personal delivery, a courtesy copy of any such pleading should be e-mailed to opposing counsel and the court clerk when served.

　　　In the event that any party serves and files objections, the responding party shall have 10 days from the date of service of the objections to file a Response. Any Response shall be ten (10) total pages or less, shall use appropriate formatting and font size as provided by the Rules of Court, and shall not re-argue the case. No abbreviations, charts, or additional exhibits will be allowed or considered. A courtesy copy of any such responsive pleading should be e-mailed to opposing counsel and the court clerk when served.

**<u>Relevant Procedural Facts</u>:**

Petitioner filed her petition September 1, 2010. At the time the parties' daughters were 16 and almost 15. In a series of hearings between October 2010 and December 2011, Judge Maloney made pendente lite spousal support and child support orders as well as attorney and accounting fee orders. **[Exhibit 1, 2]**

In February 2012 Judge Maloney issued domestic violence restraining orders against Respondent in favor of Petitioner. **[Exhibit 112]**

Between February 2013 and July 2013 Judge Nelson heard the bifurcated issue of the validity of the parties' Prenuptial Agreement. She found that the Prenuptial Agreement was valid and enforceable and that the law regarding prenuptial agreements which existed in 1993, the date the agreement was signed, applied. Under that version of the law, only the unconscionability of the agreement at the time of its execution is deemed relevant, not at the time the agreement is sought to be enforced. She reserved to trial the issue of the reasonableness of fees sought by Petitioner (exclusive those incurred to contest the validity of the prenuptial agreement, which Judge Nelson found were not recoverable). She also reserved to trial Petitioner's ability to argue disentitlement based on separate conduct unrelated to the terms of the prenuptial agreement.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

<div align="right">

**April 1, 2020**
**8:30 AM**

</div>

January 2015 Judge Maloney made his child support orders retroactive to October 1, 2010. He also ordered pending RFO's continued to the time of trial, including Respondent's RFO to modify Judge Maloney's 2011 spousal and child support orders.

February 18, 2015 Respondent unsuccessfully appealed that order, which was deemed a non-appealable order and dismissed October 28, 2016.

October 2015 Judge Whittaker declined to hear Respondent's Motion to Bifurcate Status based on his failure to comply with prior support orders.

August 2016 Judge Treu made an additional pendente lite attorney fee order against Respondent.

August 2017 Judge Treu granted various motions in limine against Petitioner.

Respondent filed a Notice of Appeal August 30, 2017 which was abandoned March 1, 2018.

2018 Judge Treu issued various charging orders and writs, including those directed at Antiquarian Traders and Olympic Holdings, two entities with which Respondent is affiliated. **[Exhibit 147, 150, 151]**

May 16, 2019 Respondent appealed Judge Treu's order. That appeal is pending.

In July 2019 the party's oldest daughter, Nicollette, died tragically.

August 13, 2019 trial, previously set to be heard soon thereafter by Judge Treu, was reassigned to Judge Gould-Saltman to begin February 26, 2020 and discovery was reopened for limited purposes.

On January 27, 2020 this Court conducted a final status conference at which both parties and Petitioner's counsel appeared. Respondent contended that he did not have to produce his tax returns as he had a right to privacy. The Court addressed that with Respondent and ordered him to produce tax returns. The Court further set dates for final trial documents to be exchanged and filed. Petitioner complied with these orders. Respondent did not comply with any of these orders.

February 25, 2020 Respondent filed for personal bankruptcy protection under Chapter 7. A Notice of Stay of Proceedings was filed with this Court that day. Trial on the portions of the dissolution proceedings not affected by the Stay in bankruptcy commenced February 26, 2020. As of the last day of trial no schedules filed in the bankruptcy proceeding, if any, had been provided to the court.

**Relevant Undisputed Facts:**

The parties were married for eighteen (18) years. They had two children together. They had no minor children at the time of trial. The parties separated in 2010 and a petition for dissolution was filed that year. The parties had a prenuptial agreement which was previously deemed valid in a bifurcated trial. **[Exhibit 33]**

In 1997 the parties created the Slotkin Family Children's Trust. **[Exhibit 80],** an irrevocable trust which Respondent testified was designed as an Intentionally Defective Grantor Trust. Both parties were named as co-trustors and initial co-trustees. The parties' then-minor children, Nicollette and Savannah, were the named beneficiaries. Among its terms the parties could not direct or control the property contained in the trust (Article 3) except as provided in Article 11, which addresses the trustors' ability to reallocate as amongst beneficiaries. When created, the corpus of the trust was $10. The

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

next day it was additionally funded with several of Respondent's premarital assets, including the stock of the businesses known as Antiquarian Traders and Olympic Holdings. There were a total of five fundings, all within the year the trust was created. Petitioner testified that the former family residence located at 1350 Benedict Canyon, was also put into the trust. Although that property does not appear in Exhibit 80, other admitted exhibits support that contention, including **Exhibit 12**, indicating that the Benedict Canyon property was acquired by the Trust and granted to Petitioner as trustee for the Trust, when the property was acquired in November 2003. Petitioner testified that she put her separate property brokerage accounts into the trust as well. No documentation was presented about this.

In 2006 a resignation of trustee was created  **[Exhibit 13]** by which Petitioner is alleged to have resigned as trustee, leaving Respondent the sole trustee. Petitioner claims she did not resign and the resignation is a forgery. Respondent claims that Petitioner did resign and asked him to handle issues involving assets contained in the trust. Respondent submitted the declaration of attorney Michael Abramson in support of his position regarding this issue in November 2010 **[Exhibit 95]** but did not call Mr. Abramson to testify at trial as a witness or to be cross-examined.

In February 2007 Respondent, as the sole trustee of the Trust, obtained a loan from Washington Mutual Bank for $4,600,000 against the Benedict Canyon home.

In 2010 Petitioner filed suit in probate court to remove Respondent as co-trustee **[Exhibit 15]** and that matter is still pending, awaiting the results of this family law matter.

Petitioner testified, uncontradicted, that the parties' daughter, Nicollette, filed suit to have certain distributions made to her from the trust in probate court and that she was unsuccessful in her claim.

The property on Benedict Canyon was lost to foreclosure in 2013.

Nicollette has since died with no spouse or children. Savannah remains the only named beneficiary of the trust.

During the time the parties were married and living together their source of payment of their living expenses was primarily from the assets of the trust. Since separation, Respondent's source of payment of his living expenses has been primarily from the assets of the trust as well as social security and some gaming income. Petitioner's primary source of payment of her expenses has been depleting her separate property assets and, for a time, payment of her expenses by the businesses contained in the trust.

## Effect of Bankruptcy Filing:

"(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

(1) the commencement or continuation, including the issuance or employment of process, of **a judicial**, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title."
(11 U.S.C. §362 (a).)

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, **does not operate as a stay--**

(1) under subsection (a) of this section, of **the commencement or continuation of** a criminal action or proceeding against the debtor;

(2) under subsection (a)--

**(A) of the commencement or continuation** of a civil action or proceeding--

(i) for the establishment of paternity;

**(ii) for the establishment or modification of an order for domestic support obligations;**

(iii) concerning child custody or visitation;

**(iv) for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate;** or

(v) regarding domestic violence;

**(B) of the collection of a domestic support obligation from property that is not property of the estate;**

**(C) with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute**

Based on the above, the family court action is not stayed as to the establishment or modification of the child and spousal support orders, dissolution of the parties' marital status, collection of a support obligation to the extent it is not property of the (bankruptcy) estate and withholding income that IS property of the estate for payment of a domestic support obligation under a judicial order. The Court believes it has the authority consistent with the stay, to determine attorney fees and costs to the extent they are related to a support claim.

The Court believes it is precluded from ruling on the issues of personal property claims, attorney fees and costs unrelated to support, and determination of allegations of breach of fiduciary duty. To the extent these issues need to be decided, the Court reserves jurisdiction on them until there is either an order from the bankruptcy court relieving the parties from the stay to address those issues or the bankruptcy proceeding is dismissed or the bankruptcy is concluded.

**<u>Effect of Prenuptial Agreement on Support and Fee Orders</u>:**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

In his order of January 22, 2015 **[Exhibit 3]**, after Judge Nelson had made her determination regarding the validity of the prenuptial agreement, Judge Moloney made certain orders to be applied at trial. These include the following:

Division of community property, if any (now in abeyance as a result of the bankruptcy proceedings)

Confirmation of separate property (now in abeyance as a result of the bankruptcy proceedings);

Remaining issues re attorneys' fees to Petitioner as allowed in the prenuptial agreement;

Child support, including any offsets and credits for payments by the Respondent;

Offsets and credits to Respondent for payment of pendente lite support (the Court believes this is intended to refer to spousal support as it would otherwise be duplicative of the prior item);

Issues related to alter ego;

Petitioner's request for orders filed June 13, 2013;

Respondent's requests to modify child and spousal support to zero filed July 11, 2013 would be heard at trial;

Child and spousal support arrears, if any;

Whether spousal support may be modified upward from the amount set forth in the prenuptial agreement based on allegations of domestic violence, failure to specify spousal support is non-modifiable or because of the doctrine of disentitlement;

Sanctions under Family Code, Section 271;

Issues related to breach of fiduciary duty;

Credits for time either minor child lived with Respondent while child support was ordered.

Respondent notes the prohibition of a subsequent trial court bench officer reconsidering the rulings of a prior trial court bench officer in the same case. In re Marriage of Oliverez (2015) 238 Cal.App.4th 1242, 190 Cal.Rptr.3d 436. In this regard, this Court does not reconsider Judge Nelson's finding that the prenuptial agreement is enforceable. The Court must, however, consider Judge Moloney's orders regarding modification of temporary spousal and child support because Judge Moloney, himself, referred those issues to the trial judge.

In **Exhibit 22**, Judge Moloney ordered that, consistent with Judge Nelson's order upholding the validity of the prenuptial agreement, Respondent is responsible for payment of Petitioner's reasonable attorney fees other than

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Family Division

BD531307
## GAIL SLOTKIN VS MARK SLOTKIN

**April 1, 2020**
**8:30 AM**

those incurred to contest the validity of the prenuptial agreement. He ordered that the reasonableness of the fees, "shall be determined as a cost item in the judgment pursuant to <u>Civil Code</u>, Section 1717(a)."

That section provides, "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract.

Reasonable attorneys' fees shall be fixed by the court and shall be an element of the costs of suit.

Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void."

The issue of attorney fees has been bifurcated and will be addressed separately.

## Alter Ego

Petitioner's notice indicates that Petitioner personally filed for bankruptcy protection under Chapter 7. No evidence was presented to indicate that either the Trust or any of the entities which presently comprise the Trust corpus, have recently filed for bankruptcy protection or have such a petition pending (some assets which funded the trust in its initial year have since that time filed bankruptcy or ceased operation).

Black's Law Dictionary defines "alter ego" as, "the doctrine that treats a corporation and those who own its stock to be identical. It is applied with no regard to the corporate entity in order to further justice."

Petitioner testified that the parties filed joint personal tax returns each year during their marriage and that Respondent was never required to pay taxes because he assigned all trust income to an entity called, "Play the Red," which received all depreciation, deductions and carry-forwards.

It is Petitioner's contention that Respondent IS those business entities and that they are his alter ego. Petitioner supports this contention with the following:

At his debtor's examination on June 21, 2018 Respondent acknowledged that his housing expenses were paid by the entities Antiquarian Traders and Olympic Holdings, that it furnishes the home in which he lives and pays for most all of his living expenses. He testified that other of his entities, including "Jacks or Better," Wooten Group and Breakfront, LLC may also have contributed to his expenses. **[Exhibit 4].** Photographs of the residence, in a residential neighborhood, were admitted into evidence. Respondent contends that it is beneficial to the business to show the furniture in situ to prospective customers and thus he uses the residence in which he lives, and for which Antiquarian Traders pays virtually all expenses, in lieu of a showroom. **[Exhibit 17]**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

BD531307
GAIL SLOTKIN VS MARK SLOTKIN

April 1, 2020
8:30 AM

On October 26, 2010 Respondent, through counsel, provided his Schedule of Assets and Debts **[Exhibit 52]** which referenced that it included, "Respondent's separate property assets held by Slotkin Family Children's Trust UTA 1/1/97 (irrevocable)." It included assets worth $50,175,033 with encumbrances of $28,627,166 and additional debt of $240,576 (security deposits of tenants) and an undisclosed amount for the debt of automobile leases by Antiquarian Traders, for a net asset value of $21,307,291.

At that same time, he provided an Income and Expense Declaration identifying approximately $10,000 a month personal income and over $51,000 a month in expenses. **[Exhibit 61]**. A year later Respondent provided an Income and Expense Declaration **[Exhibit 62]** in which his income was approximately the same and his expenses were then in excess of $52,000 per month but he no longer lived with Petitioner and the children. By January 2013 Respondent provided an Income and Expense Declaration **[Exhibit 64]** showing income of approximately $1,400 per month but indicated his estimated monthly personal expenses were $17,784 plus an additional $15,604 which he indicated he paid for Petitioner and the parties' children. Later that same year Respondent claimed the same social security income as his sole income but with personal estimated expenses of just over $13,000 per month and alleged payments of an additional approximate $11,200 per month for Petitioner and the parties' daughters, both of whom were now adults. **[Exhibit 67]**. By March 2017 Petitioner's Income and Expense declaration **[Exhibit 68]** indicated his sole income was from just over $1,500 per month social security and that his estimated personal expenses were $15,450 per month and an additional $13,270 per month for payments he attributed to the benefit of Petitioner and the parties' children, by then both adults.

In November 2013 Respondent prepared a Final Declaration of Disclosure in pro per **[Exhibit 60]**. In it he claimed assets of approximately $50,000 and debt of over $1,000,000. He attached an unaudited financial statement prepared by his accountant from approximately a year earlier (12/31/12). His accountant notes that the financial statement does not include the approximate $10,000,000 in assets contained in the Trust, noting that Respondent is entitled to compensation in his capacity as an executive of the businesses which comprise much of the corpus of the Trust. Virtually all the more than $1,000,000 of personal debt listed is either a judgment for unpaid child support, spousal support, attorney fees or for his own unpaid attorney fees. Respondent represented himself as having no other outstanding personal debt and identified regular monthly personal expenses in excess of $13,000.

**Exhibit 70** Shows that the Trust had net assets of $54,269,120 in May 2010, $18,997,722 net assets in April 2012 and $25,925,059 net assets in February 2016.

Respondent purchased the Appian Way residence in the name of Antiquarian Traders for $2,125,000 with a loan of $1,593,750. He thereafter refinanced through Premier America Credit Union. All information provided to the lender, Premier America Credit Union, addressed Respondent's personal finances and included information pertaining to the assets of the Trust, including the balance sheets for the Trust. **[ Exhibit 71]**

Respondent acknowledged that those payments which he believes are in lieu of child or spousal support were paid by Antiquarian Traders, either directly to the creditor, to Petitioner or to the children. He does not allege that any substantial payments were made by him. **[ Exhibit 76]**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

BD531307
GAIL SLOTKIN VS MARK SLOTKIN

April 1, 2020
8:30 AM

In her declaration accompanying Petitioner's supplemental declarations filed November 12, 2010, Marie Ebersbach, Petitioner's forensic accountant indicates that she was not provided current financial information from the trust but that she did have sufficient back-up documentation to assess the cash flow of the Trust for the period 2003-2007. She Indicated that roughly $1,900,000 came into the trust and slightly less, $1,896,407, came out of the trust. Her conclusions were that, for that period of time, "it appears that all of the parties' cash flowed through the Children's Trust, rather than the Children's Trust being used to accumulate(d) wealth for the benefit of the parties' children. " **[Exhibit 94]**. That analysis is consistent with the other evidence and testimony presented at trial in 2020.

In December 2011 Respondent applied for a lease of an Audi. The lease was in the name of Antiquarian Traders. Respondent listed himself as the guarantor and listed his income as $100,000 per month. **[Exhibit 99]** Petitioner testified that Respondent used an entity called, "Play the Red," as a vehicle to tax shelter income from other entities. He did so by selling the entity to his personal attorney for a $1,000,000 promissory note and declaring a nearly $5,400,000 tax loss which he continues to carry forward. His accountant confirmed in November 2010 that the promissory note, which was collateralized with the entity, "Play the Red," which he'd just sold in December 2009, was worthless **[Exhibit 103]**.

Respondent complains that in her analysis of his cash available for support Ms. Leh failed to appropriately deduct business expenses before calculating his perquisites and included some of the business expenses of Antiquarian Traders as perqs to him. **[Exhibit 107]** In that analysis Ms. Leh attributes no perqs to Respondent from any of the entities which he controlled during the relevant period other than Antiquarian Traders, because of lack of supporting documents. Other than a few 2015 insurance information pages Respondent did not provide his own forensic accountant any greater amount of supporting documents **[Exhibit 109]**, nor were such documents provided as evidence at trial with the exception of several hundred pages of City National Bank statements. Respondent failed to identify in his testimony where in those several hundred pages he could identify expenses attributed to him as perqs which were actually business expenses, notwithstanding the Court's proposing he do so and providing examples of how he might do so.

While the Court does not find that the businesses which are part of the Trust corpus are indistinguishable from Respondent, the Court finds that Respondent has exercised complete control of all such businesses, their assets and bank accounts, and that he has used both assets and income from the business as if he had never put them into a trust.

## Disentitlement Doctrine:

A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state. MacPherson v. MacPherson (1939) 13 Cal. 2d 271, at 277

"[Wife's] conduct since the judgment has frustrated the attempts of the court to legitimately effect its own orders. She has missed court dates, failed to keep her own promises, lacked candor in her communications with the court, and ignored the

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

BD531307
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

court's orders. She cannot therefore now seek relief from the appellate court. The disentitlement doctrine applies." (Blumberg v. Minthorne, supra, 233 Cal.App.4th at p. 1392.)

Petitioner argues that Respondent should not be able to seek affirmative relief from the court because of his conduct during these proceedings, including his failure to comply with numerous court orders. She notes that Respondent was ordered to pay unallocated family support, attorney fees and accountant fees in May 2011 **[Exhibit 1]** and paid only about five percent (5%) of what he was ordered to pay while, at that time, he had over a million dollars at his disposal. Judge Moloney considered both parties' testimony and evidence presented but found that Respondent was able to pay support and fees. Respondent refused to do so.

In July 2011 Respondent was ordered to pay discovery sanctions of $6,975. **[Exhibit 20]** He did not do so.

In December 2011 Respondent was ordered to pay additional spousal and child support. He never paid any of the sums ordered at this time **[Exhibit 2]**. He had claimed to only have income of $10,000 per month and was found to have nontaxable income of $100,000 per month. The Court had even asked for, and received from both parties, briefing as to whether pendente lite support could exceed the amount authorized in the prenuptial agreement, the validity of which had not yet been determined. The Court found that it could. This order did not reserve jurisdiction to modify it and Respondent did not appeal this order.

Between 2010 and January 16, 2013 during a period when Respondent was not in compliance with support and fee orders, he paid to his own attorneys $366,794 and to his own accountants $60,525 **[Exhibit 24]**. In his trial testimony Respondent's explanation was that he had to or they wouldn't continue to work for him.

In January 2015 the Court extended child support retroactive to October 2010, when the Request for pendente lite support was served. The Court did specifically reserve for trial the issue of whether spousal support should be payable for the period October 1, 2010 through December 11, 2011. **[Exhibit 3]**. Respondent did not pay any of the amounts ordered in this January 22, 2015 order. Respondent attempted to appeal the order but the Court of Appeal determined that this was not an appealable order and dismissed the appeal.

Respondent argues that prior judicial officers in this case have not applied the doctrine of disentitlement and that this court either can not or should not. The Court disagrees. In that the doctrine of disentitlement addresses the failure or recalcitrance of a litigant to comply with lawful court orders, one judge might consider non-compliance with an order insufficient to trigger the doctrine while another judge might find that same non-compliance sufficient. Failure of compliance with a then-recent order might not trigger the doctrine but continued non-compliance for a longer period might do so. It may be that there is non-compliance with additional orders along the way and that it is the cumulative recalcitrance that triggers the doctrine. The Court does agree with Respondent's argument at closing that the doctrine of disentitlement when applied, if at all, must be related to the failure of compliance.

Respondent acknowledged that the business entities he controls pay most of his expenses **[Exhibit 4]** and that he had directed the bookkeeper of those entities not to pay the obligations that Respondent had been ordered to pay, and which Judge Treu had ordered that the entities pay on Respondent's behalf.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

BD531307
GAIL SLOTKIN VS MARK SLOTKIN

April 1, 2020
8:30 AM

Although ordered to maintain the status quo for the family pending resolution of the support issues, Respondent did not continue to pay the mortgage on the former family home, which then went into foreclosure. [**Exhibit 9, Exhibit 10**].

July 11, 2011 Respondent was ordered to pay $6,975 in discovery sanctions [**Exhibit 20**]. He never paid any portion of this.

In 2012 Respondent was ordered to pay additional discovery sanctions of $4,040 [**Exhibit 21**]. He never paid any portion of this.

Respondent was ordered on January 22, 2015 to pay an additional $50,000 in attorney fees. He paid $16,500 to Petitioner's attorney, Mr. Langlois but did not otherwise pay any additional principal or interest on this order [**Exhibit 22**].

In April 2017 Judge Treu ordered Respondent to pay Petitioner's counsel an additional $100,000, to pay court reporter fees of $20,000 and to pay Petitioner's expert fees of $30,000. [**Exhibit 23**] None of those fees were ever paid. The Court ordered payment from Antiquarian Traders and Olympic Holdings. Neither entity paid the fees and Respondent testified that he instructed his staff at those entities not to do so. Although unknown to Petitioner at that time, Antiquarian Traders had just sold its warehouse for $22,000,000. At that same time Respondent had just represented to lenders that he had substantial income.

Respondent testified that he felt he did comply with the order "because I was unable to pay it." Respondent acknowledged that he has paid nothing on this order.

Although warned several times as to the consequences of non-compliance, Respondent did not comply and instructed the entities not to comply. Judge Treu authorized a judgment debtor examination in 2018 and issued both charging orders and writs. [**Exhibits 150 and 151**].

In June 2013 Judge Moloney made certain orders regarding funds from certain property, if sold, to be turned over to Mr. Langlois. Although there was evidence that these items were sold, the funds were never provided to Mr. Langlois [ **Exhibit 37, Exhibit 39, Exhibit 41**].

Respondent testified that he did not instruct his bookkeeper, Flora, to provide any funds pursuant to this order to Mr. Langlois. He did not recall if he had so instructed Ms. Lesinski (she testified she did not know of this order). He testified that he did not instruct any prior bookkeeper to provide proceeds to Mr. Langlois.

November 28, 2012 Respondent was ordered to permit the Antiquarian Traders inventory to be inspected, its invoices to be produced for inspection and to give Petitioner's accountant access to Antiquarian Traders' Quickbooks records as well as permit the accountant to inspect the supporting documents. [ **Exhibit 45**] Petitioner contends that none of this was permitted by Respondent when the attorney and accountant attempted to conduct the review.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

Petitioner attempted to enforce the order for inspection in May 2015. A date was agreed upon for the inspection. While en route to the location of the records on August 31, 2015, Respondent's then attorney called and told them they would not be allowed in to do the inspection. [ **Exhibit 50, Exhibit 51].** Petitioner was eventually able to conduct some inspection by January 2017 but was not provided bank records requested nor were the electronic records produced on a flash drive.

Respondent acknowledged that he denied Petitioner access to the Appian way property in contravention of the 2015 order (**Exhibit 51**).

In December 2016 and January 2017 Petitioner then generated additional Requests for Production and Requests for Inspection [**Exhibits 54 and 55**] with which there was partial compliance and partial non-compliance. Respondent contends that all books and records were made available to Petitioner, her attorneys and accountants but "they didn't want to make copies" so they didn't take them. The Court finds that contention not credible given the supportable history of this case. Respondent was not to be present when this occurred and did not produce witnesses who were present to corroborate this contention.

When Respondent's request to continue trial was granted in 2019 and Petitioner was granted an extension of the discovery cut-off, Petitioner generated additional discovery, either for documents previously requested which were not produced or for new documents. [**Exhibit 53, Exhibit 56, Exhibit 57.**] Petitioner contends that there was not compliance with these requests. Respondent testified that he believed that there had been some compliance but that he was "inundated with discovery" by Mr. Langlois at a time when he was self-represented and emotionally unable to attend to litigation because of the recent death of the parties' daughter, Nicollette.

**Exhibit 76:** Respondent testified in his deposition that he did not pay child support to Petitioner but gave money to the children directly and paid for things they needed. He declined to pay child support to Petitioner "because she is not a child." He acknowledged there was no agreement with Petitioner to pay child support to anyone other than Petitioner.

Petitioner contends that the Court should consider the Domestic Violence Restraining order in conjunction with the other evidence presented to preclude Respondent from benefitting from his wrongful behavior [**Exhibit 112, 113**]

Judge Treu issued certain charging orders in March 2018 [**Exhibit 150, 151**]. Per the transcript [**Exhibit 147**] Respondent, through counsel, contended that the orders were overbroad. There is no question that there was no compliance with these orders by Respondent or either of the entities mentioned in the orders.

Respondent testified that it is his position that he did comply with Judge Treu's charging orders but explained that he believes he was excused from such compliance in that he did not have the ability to comply with the orders for payments.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

BD531307
## GAIL SLOTKIN VS MARK SLOTKIN

**April 1, 2020**
**8:30 AM**

**[Exhibit 150, 151]** because no money actually came to him and that Antiquarian Traders and Olympic Holdings didn't have to comply with the charging orders because it was not paying money **TO** Respondent, only paying expenses **OF** Respondent, or expenses of the entities themselves which Respondent incidentally enjoyed such as the use of the Appian Way home, furniture in the Appian Way home and use of a vehicle.

Respondent argues that fiduciary duty can not be part of the consideration in that there was no community property and a breach of fiduciary duty can only pertain to community property.

"Wife's assertion that a spouse cannot be subject to statutory breach of fiduciary duty for mismanagement of separate property [is] contrary both to sound public policy and to the language of Family Code section 721, subdivision (b) which speaks of the confidential relationship between husband and wife imposing on them the duty of 'highest good faith and fair dealing' and 'not taking unfair advantage of the other.' We can fathom no reason to distinguish between a spouse's duty to deal fairly and in good faith with separate property and her duty to deal fairly and in good faith with community property." (Id. at p. 1419.) In re Marriage of Walker (2006) 138 Cal.App.4th 1408, 42 Cal.Rptr.3d 325

"The Legislature finds and declares the following:

(a) It is the policy of the State of California (1) to marshal, preserve, and protect community and quasi-community assets and liabilities that exist at the date of separation so as to avoid dissipation of the community estate before distribution, (2) to ensure fair and sufficient child and spousal support awards, and (3) to achieve a division of community and quasi-community assets and liabilities on the dissolution or nullity of marriage or legal separation of the parties as provided under California law.

(b) Sound public policy further favors the reduction of the adversarial nature of marital dissolution and the attendant costs by fostering full disclosure and cooperative discovery.

(c) In order to promote this public policy, a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest must be made in the early stages of a proceeding for dissolution of marriage or legal separation of the parties, regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties. Moreover, each party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes so that at the time the parties enter into an agreement for the resolution of any of these issues, or at the time of trial on these issues, each party will have a full and complete knowledge of the relevant underlying facts. (Am Stats 2001, C703)"

Family Code, Section 2100

"(a) Subject to subdivision (b), either spouse may enter into any transaction with the other, or with any other person, respecting property, which either might if unmarried.

(b) Except as provided in Sections 143, 144, 146, 16040, and 16047 of the Probate Code, in transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following

(1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

(2) Rendering upon request, true and full information of all things affecting any transaction that concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.

(3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse that concerns the community property. (Am Stats 2014, C82)"

Family Code, Section 721

Petitioner contends that, among other reasons Respondent should be disentitled to seek relief from the Court is his own breach of material terms of the prenuptial agreement which Judge Nelson upheld. She specifically notes that he failed to pay the payments in lieu of spousal support for the past two years, he failed to pay the required auto insurance (paragraph 7©), he failed to provide her with an automobile as required (paragraph 7(d)), he failed to pay reasonable attorney fees which were either expressly or implicitly determined to be reasonable and were actually ordered (Paragraph 7€), that he failed to indemnify her in a lawsuit in which she was named (paragraph 6(d)), and that he had a duty to provide her with proof of a requisite life insurance policy he was to maintain but failed to do so (paragraph 6©), all of which excuses her performance under the prenuptial agreement (paragraph 7(a)).

The Court notes that the prenuptial agreement contains a severability clause (referred to as a "separability" clause at paragraph 14), such that a breach of one term can have a remedy without abrogating the entirety of the document.

The Court finds that the disentitlement document applies as more specifically addressed below.

## Retroactive Child Support Modification:

In his January 22, 2015 order, Judge Moloney found that, "On May 11, 2011 this Court ordered the Respondent to pay $100,000 in unallocated family support plus $100,000 in attorneys;' fees and $25,000 for forensic accounting fees.

This Order is not a portion of the Respondent's Request for Order filed July 22, 2013. The Court finds that was a Final Order and was not appealed and is therefore not subject to modifications." **[Exhibit 3]**

He had at that time the analysis of the Mayer Hoffman firm **[Exhibit 102]** supporting the contention that Respondent had cash available for support of over $358,000 per month based on data from 2009. A further lifestyle analysis shoed marital standard of living for Petitioner to be in excess of $168,000 per month **[Exhibit 104]**.

In his October 2012 deposition **[Exhibit 76]** Respondent testified that he did not pay child support to Petitioner as ordered because she is not a child and he did not think she would spend it on the children. He testified that he took care of the children's needs and paid the children directly as an "allowance."

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

Anna Leh, Petitioner's retained forensic accountant, prepared a list of the documents available to her [**Exhibit 89**] from which she was able to establish income available for support for periods of time between 2011 and 2015 and determine arrears [**Exhibits 107, 108**]. She testified regarding same. Ms. Leh testified that during the sixty (60) month period she evaluated, Respondent's monthly average income, including perquisites, was $87,512. She included in her consideration the increased value of property exchanged under 1031 for the Alameda warehouse owned by Antiquarian Traders. She considered as a comparison the three (3) loan applications submitted by Respondent during this time.

Those loan applications included a loan from Keyes Automotive in which Respondent obtained a lease in the name of Antiquarian Traders. As part of that application in which Respondent was a guarantor, he listed his own employment income as $100,000 per month [**Exhibit 99**].

In establishing this amount, Ms. Leh testified that she included sums which were identified in the general ledger as payments to or for Respondent's benefit or the benefit of his family. She included all automobile insurance paid as a perquisite because none had been segregated as exclusively for a business vehicle. On cross-examination Petitioner acknowledged that Antiquarian Traders had a large and a small truck but she did not know whether they were insured. She also knew Antiquarian Traders covered health insurance for her and believed that, prior to separation, Antiquarian Traders covered health insurance for some employees, notably Karen Roth, Noel, Manuel, Francisco and she did not know whether Oscar, Daniel DeCruz or James Mahlow were covered.

Jackie Adams-Ings was retained by Respondent several days into trial. She had previously been engaged by Respondent in 2017 regarding pendente lite matters. Immediately prior to trial she had indicated to Mr. Langlois that she had not been retained to testify and thus was not deposed.

Ms. Adams-Ings testified that she had not been made aware until the day prior to her testimony that Ms. Leh was involved in the case. In testifying she was relying on representations of Respondent, and a two-page list of documents. She had not been provided Exhibit 89, the list of documents which had been provided to Ms. Leh. She did see the Premier loan documents for the purchase of Palora and the 2015 loan application for the purchase of Appian Way. She had been provided the attachments to the 1997 Trust. She testified that she did not see any back up documents other than a 2015 insurance statement.

Ms. Adams-Ings, relying on the general ledger and Respondent's explanations, allocated to Respondent payment of groceries by Antiquarian Traders on behalf of Petitioner, $19,275. She indicated that she was able to verify reimbursements to Petitioner of $16,500 of these. She was unable to verify $2,775 of these.

Ms. Adams-Ings also credited Respondent as having paid, through Antiquarian Traders, spousal support of $37,000. She accounted for payments made between May 2011 and October 2011 which were not accounted for in Ms. Leh's analysis [**Exhibit 108**], notes that she did not find payments between November 2011 and August 2012, and accounted for payments made in September 2013 and October 2013. She confirmed that Antiquarian Traders did pay for Petitioner's Bentley. It was her understanding that the procedure that had been followed was that Petitioner would submit bills for which she requested reimbursement to the Antiquarian Traders

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

bookkeeper, Mr. Alkombright, Mr. Alkombright would confer about the requested reimbursements with Respondent, and Respondent would either approve or would not approve the reimbursement by Antiquarian Traders. This method was confirmed by both parties in their testimony.

Ms. Adams-Ings testified that Ms. Leh likely overstated medical premiums paid on behalf of the Slotkin family members by fifty five percent (55%) based on a 2015 insurance statement showing there were five (5) unrelated employees for which Antiquarian Traders paid health insurance. She believes dental and vision insurance premiums are overstated by sixty six percent (66%) in that only thirty four percent (34%) of the premiums were paid for Slotkin family members. On cross-examination Ms. Adams-Ings acknowledged she extrapolated from the 2015 insurance statement, assuming the same employees, the same number of employees and the same cost of insurance for the entirety of the period 2011-2015. She acknowledged she did not have any documents for the vision insurance. [**Exhibit 110**]

Ms. Leh testified that she would not change her allocation of insurance payments based on a single  insurance statement from a single year, as that would be too speculative. If she had been provided that information, which she testified she had not been, at most she might extrapolate the expense to that single calendar year.

She also notes that Antiquarian Traders acquired a Ferrari in 2013 for $65,000 and there was a deposit into Antiquarian Traders account in 2015 for $88,500 for which the general ledger notes, and Respondent stated, was the sales proceeds from the sale of that Ferrari. She acknowledged on cross-examination she did not see any tax returns for 2015 reflecting how the sale of Ferrari was treated. She understood, inconsistent from the testimony of both parties, that the Ferrari was not driven, but just stayed parked during the period of time Antiquarian Traders owned it.

Ms. Leh stated she classified the Ferrari as a perq for several reasons. Firstly, the nature of the business of Antiquarian Traders was furniture, not automobiles. The vehicle was 15 years old when purchased. It did not likely seem an investment, nor was it the type of business purchase which was likely used 100% for business. She also noted that the Antiquarian Traders bookkeeper classified it as "due to/from properties" in the general ledger. Other expenses classified by the bookkeeper as "due to/from properties" included utilities at the Benedict Canyon home in which the parties resided prior to separation, cable television and pool service at that home. These were all personal expenses for the parties, not for the business. Ms. Leh testified she was not provided any documentation regarding mileage either at purchase or sale nor was she able to see a tax return to determine how it was treated. She considered the value of the use of that vehicle $1,083 per month, which both Ms. Leh and Ms. Adams-Ings testified was consistent with the cost of such a luxury vehicle.

Overall Ms. Adams-Ings believes that for the sixty (60) month period analyzed by Ms. Leh, Ms. Leh overstated perquisites/ understated business expenses, by $349,254, or $5,821 per month. On cross-examination she acknowledged that she relied on the notations in the check memos to categorize payments attributed to "GS" (Petitioner), relying on Mr. Alkombright's categorization.

Ms. Leh testified that she received Ms. Adams-Ing's analysis for 12/11-3/13. She believes that analysis simply regurgitated Mr. Alkombright's schedules drafted around that time. She also noted that Ms. Adams-Ings gave

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

Respondent credit against support for Antiquarian Traders' payment of a home equity line of credit after separation but that there was no showing of how that home equity line of credit obtained by Respondent was used. She further noted that some expenses were listed under "GS" which were noted as expenses for one or both of the parties' children, including payments after Nicollette was 18.

Petitioner testified that the types of expenses for which she requested reimbursement were NOT those in lieu of support for the children but in addition to basic support. The types of expenses for which she would seek reimbursement, which she sometimes received and other times did not, included things such as food for parties, SAT preparation, tutoring, braces, co-pay for the girls' psychologists or pediatrician, prom expenses, Spring Break vacations, concerts and weekend trips. She did not seek reimbursement for household supplies which were to be paid from regular support Respondent was ordered to pay. She testified she requested payment of support more than ten times.

Petitioner testified that expenses attributed to Respondent by Ms. Adams-Ings for "Irma," which Ms. Adams-Ings had been told by Respondent was the housekeeper, had been fired many years prior to separation. Expenses for "Pedro," credited toward support by Ms. Adams-Ings, was a handyman who came occasionally to fix things, she estimated not more than once a month after May 2011.

Noel Lesinski has worked on and off for Respondent's companies for over twenty (20) years. She testified that she has been employed as director of operations of Olympic Holdings, LLC, since April 2016 where she manages its residential properties. She testified Respondent has very little to do with day to day operations of Olympic Holdings. She manages the following properties owned by Olympic Holdings:

748 N. Detroit, Los Angeles 90046. She testified that this currently rents for $15,000 a month. She did not know the mortgage balance and does not pay the mortgage as that is the job of the bookkeeper.

852 N. Vista, Los Angeles 90046. She testified that this is kept as a very short-term tenancy, most recently four days. She did not know the mortgage balance and does not pay the mortgage as that is the job of the bookkeeper.   She estimates its monthly rental value at $18,000 to $19,000 per month.

823 Citrus, Los Angeles, 90038. She testified that this is currently not rented but was last rented in February 2020 at $15,300 per month. She did not know the mortgage balance and does not pay the mortgage as that is the job of the bookkeeper.  She believes its rental value is between $16,500 and $17,500 per month.

15714 Morrison, Encino. This was most recently on an 8 month least at $15,000 per month.

14257 Chandler, Sherman Oaks, 91604. This is not on a long-term lease but is currently being rented for $4,000 a week. If rented long-term she believes it would rent for $17,000 a month.

14827 Huston, Sherman Oaks, 91602. This is not being leased long term but is presently being leased for $650 a night. She believes it would lease long-term for $15,500 to $16,500 a month.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

14806 Hesby Street, Sherman Oaks. This is being leased long-term for $15,000 a month.

17841 Palora St., Encino. This is being leased on an insurance lease subject to extension at $15,000 a month. She believes it would lease long term for $14,000 to $15,000 a month.

Ms. Lesinski also noted that she deals with the warehouse used by Antiquarian Traders and with the home in which Respondent lives on Appian Way, Los Angeles.

She testified that the Appian Way property has a fair rental value long-term of $10,000 to $11,000 a month. It is furnished with furniture from Antiquarian Traders and all the rental homes are furnished.

She further testified that she has been the person in charge of direct marketing operations for Antiquarian Traders since February 2014. She testified that she works two to five (2-5) days a week for Antiquarian Traders. She testified that Respondent is not at the warehouse often.

Respondent testified that Appian Way property was owned by Golden Oak and Breakfront, two entities which are part of the Trust. That ownership was then transferred to "8775 Appian Way, LLC" which Respondent testified is wholly owned by the Trust. He testified that just before trial commenced he designated Loren Marken, a friend of his, to be successor trustee of the trust.

Respondent testified that he continues to use Hillcrest Country Club as recently as this year. He stated that he sometimes pays his Hillcrest obligations in cash, which he receives from gaming revenues. He testified that he is good at gambling and is a good handicapper. He testified he had a gambling ship, "Cruises to Nowhere, LLC" and he is the general manager. It contains gaming tables, slot machines and a sports bar. He testified he makes part of his living gambling, sufficient that he is often comp'ed.

**Exhibits 67 and 68**, Respondent's Income and Expense declarations filed November 4, 2013 and March 15, 2017, respectively, identify no gambling income. Respondent's explanation is that he doesn't "game to the extent the IRS would be interested."

He testified he is not current with his membership dues.

Respondent testified that he has driven a Ferrari which he acquired as an asset of Antiquarian Traders and which was sold. He testified that he drives a mustang on a daily basis.

In May and June 2016 Respondent applied to Premier Bank for a loan. He testified that there's no proof that HE alleged he owned the property referenced in the application, although he acknowledged that he was the one who signed the loan application on May 14, 2016. In that application Respondent indicated he'd been in his profession 441 years and had owned his business for 25 years. He indicated he had $4,900,000 net in commercial real estate, $1,600,000 net in residential real estate, $4,000,000 net in antiques and $2,740,000 still in cash from a 1031 exchange. Respondent then testified that, on these loan applications, his monthly income was "grossly exaggerated."

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

**Exhibit 76:** Respondent testified in his deposition that he did not pay child support to Petitioner but gave money to the children directly and paid for things they needed. He declined to pay child support to Petitioner "because she is not a child." He acknowledged there was no agreement with Petitioner to pay child support to anyone other than Petitioner.

Substantial evidence was presented that the child support set by Judge Moloney, and made retroactive by him to October 1, 2010, was an appropriate figure given Respondent's income and income attributable to him by way of perquisites during the relevant period.

Based on Respondent's acknowledged refusal to pay child support directly to Petitioner notwithstanding the Court's order to do so, the Court declines under the doctrine of disentitlement to modify the child support order of $10,000 per month per child until each child attained the age of 18 and was no longer a full time high school student, whichever last occurred.

This Court is charged at trial, additionally, with allocating the $100,000 as between child and spousal support. The Court finds that, of that $100,000 support order of May 11, 2011, $20,000 shall be chargeable to child support for the period October 1, 2010 to October 31, 2010, $4,625 shall be chargeable to spousal support for the period October 1, 2010 to October 31, 2010, $20,000 shall be chargeable to child support for the period November 1, 2010 to November 30, 2010, $4,625 shall be chargeable to spousal support for the period November 1, 2010 to November 31, 2010, $20,000 shall be chargeable to child support for the period December 1, 2010 to December 31, 2010, $4,625 shall be chargeable to spousal support for the period December 1, 2010 to December 31, 2010, $20,000 shall be chargeable to child support for the period January 1, 2011 to January 31, 2011, $4,625 shall be chargeable to spousal support for the period January 1, 2011 to January 31, 2011, $1,000 shall be chargeable to child support for the period February 1, 2011 to February 28, 2011 and $500 shall be chargeable to spousal support for the period February 1, 2011 to February 28, 2011.

## Jackson Credits:

Pursuant to Jackson v. Jackson (1975) 51 Cal.App.3d 363, 124 Cal.Rptr. 101, a parent's obligation to pay child support may be partially satisfied if the child lives with the payor parent rather than the recipient parent and the payor pays the living expenses of the minor child.

There is no dispute that Nicollette continued to reside primarily with Petitioner until after she was 18. Petitioner testified that Savannah graduated high school in June 2013 when she was still 17. She testified that Savannah spent July 2013 on a graduation trip to Europe then returned to Petitioner's home in August. Savannah started college either the end of August 2013 or the beginning of September 2013 and moved onto campus. The home was foreclosed in August 2013.

Judge Moloney found in 2011 and 2012 that Respondent's timeshare was 5% with both girls. There is no dispute that the custody order was never changed. Respondent's contention is that Savannah either lived with

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

<div align="right">

**April 1, 2020**
**8:30 AM**
</div>

him after she graduated or did not live with Petitioner after she graduated. Respondent failed to produce any witnesses or documents to demonstrate that Savannah lived with him between her graduation from high school and her attaining the age of 18. If Savannah was under 18 and on a trip, that does not eliminate Respondent's obligation to pay child support to Petitioner [See In re Marriage of Hubner [Hubner II] (2001) 94 Cal.App.4th 175, 114 Cal.Rptr.2d 646.] The Court declines to credit Respondent with Jackson credits for lack of proof.

<u>**Child and Spousal Support Offsets by reason of "status quo" payments, credits and alleged arrears**</u>:

Ms. Leh testified that spousal support arrears would be $4,347,306.64 based on the pendente lite orders of the court (without consideration of Judge Nelson's ruling upholding the limitations on spousal support) and including interest. [**Exhibit 108**]

Petitioner testified she had been on title to the Benedict Canyon home at the time of purchase, as trustee for the Trust. When Respondent was ordered to leave the residence in May 2011 she could not afford to pay the mortgage because Respondent had refinanced the mortgage and taken $1,600,000 from the refinance. As a result, the mortgage payments became too expensive for her to pay unless Respondent paid the child and spousal support of $60,000 a month Judge Moloney had ordered. Respondent did not make the payments and Petitioner had no source with which to continue the payments. She testified that she had nothing to do with taking a home equity line of credit on the home. She testified that, notwithstanding Judge Moloney's order that Respondent maintain the status quo payments for the home pending a more specific order, Respondent did not do so. He stopped payment for the gardener, pool maintenance and security sometime in 2012 and paid none in 2013. He paid about half the utilities in 2012 and none in 2013.

Respondent raised the issue of In re Marriage of Hebbring (1989) 207 Cal.App.3d 1260, 255 Cal.Rptr. 488 for the proposition that he is entitled to credit for post-separation payments. Hebbring addressed the issue of a short marriage and addresses the issue of post-separation earnings paying community debts. This Court is not addressing payment of community debts as the issue of asset and debt division is precluded by Respondent's filing of bankruptcy. The Court also defers to the Bankruptcy Court the issue of over $80,000 of assets sold which was to have been deposited in Mr. Langlois's trust account but which Respondent did not facilitate. [**Exhibit 39**]

The Court has also reviewed and considered Ms. Adams-Ing's calculations of payments attributed to Respondent for the periods May 1, 2011 to October 31, 2013 [Exhibit 580] and September 1, 2010 through October 31, 2013 [Exhibit 581]. Payments made while the parties were not yet separated and while they continued to reside together are not afforded any weight for purposes of any offsets. To the extent Ms. Adams-Ings has attributed expenses differently than did Ms. Leh, her differences are based primarily on information provided her by Respondent without supporting documentation, except in limited circumstances. Petitioner testified that expenses attributed as payments to her "in lieu" of support were not in lieu of support but for extraordinary expenses.

Because the Court is not addressing the division of assets and debts, in that Respondent has filed for bankruptcy protection, the Court declines to address Epstein-type credits as well. The Court is not persuaded that Ms. Leh's rationale for attributing perqs during the relevant period in inaccurate and Respondent had the burden to provide supporting evidence, either by way documentation or testimony of the person who paid the bills, which he did

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

not, to rebut Petitioner's testimony. He did not do so. His failure to do so at every instance when it was requested in discovery compounds the problem and compels the Court to find that he is not entitled to any offsets as against child or spousal support by reason of payments contained in **Exhibit 581.**

## Health insurance (per PNA)

Petitioner testified that Respondent did cover her health insurance but constantly threatened to cancel it. She testified that when she paid co-pays he received the reimbursement checks and kept the money, which she estimates was between $1,000 and $1,500.

## Auto insurance (per PNA)

Petitioner testified that Respondent maintained insurance on the Bentley she drove at the time of separation. When it broke down Respondent took it back. He never paid automobile insurance for her in the nine years since. She testified that she paid approximately $4,000 per year for automobile insurance, for a total of approximately $36,000.

## Replacement automobile (per PNA):

Petitioner testified that since the Bentley broke down Respondent never got her a replacement vehicle. That testimony was uncontroverted.

## Health insurance (per PNA)

Although Petitioner complained that Respondent failed to maintain health coverage there was substantial evidence that health coverage was maintained on behalf of Petitioner and the children during their minority.

## Life Insurance (per PNA):

Respondent was to have obtained and maintained a life insurance policy naming Petitioner as beneficiary. He did obtain such a policy but, without notice to Petitioner or her permission, he split the life insurance so that there were three beneficiaries, Petitioner and each of the parties' daughters, with each receiving 1/3 the payout should Respondent die. At trial, Respondent produced, for the first time, a copy of a term life insurance policy with a twenty (20) year term, from 1999. By its terms, at the time of trial, that policy had expired. **[Exhibit 552]**

## Retroactive Spousal Support Modification:

When asked if he'd made any direct payments to Petitioner between December 15, 2011 and the date of trial (3/4/20) Respondent testified that he didn't know. Petitioner testified that Respondent had stopped making any spousal support payments two years ago.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

April 1, 2020
8:30 AM

Judge Moloney made his pendente lite spousal support order before the validity of the prenuptial agreement was determined. The order far exceeded the amount of support agreed to by the parties in the prenuptial agreement. The prenuptial agreement was upheld. Petitioner has argued that the prenuptial agreement should be deemed void on this issue of spousal support for a variety of reasons, including Respondent's breach of the agreement itself and the doctrine of disentitlement based on his numerous violations of court orders. Some of these arguments were made the Judge Nelson at the time she ruled on the validity of the prenuptial agreement. Insofar as Petitioner raises the same arguments based on facts which existed at the time of Judge Nelson's ruling, they are not reconsidered here.

The Court is not persuaded, however, that in light of Judge Nelson's ruling, any amount of spousal support other than the amount negotiated by the parties in their prenuptial agreement is the appropriate amount. The Court therefore modifies Judge Moloney's spousal support order from $40,000 per month to $4,625 per month retroactive to October 1, 2010.

## Prospective Spousal Support:

Petitioner testified that the parties enjoyed an opulent lifestyle within the two years before separation. She described money as not being an issue between 1993 and 2010. "It was endless." She testified about the parties' travels and spending habits for themselves and the children. She testified that she worked in Respondent's businesses uncompensated and that she created a gift shop within one of the stores which she maintained for four and a half (4 ½) years as well as a pop-up store in Aspen, both of which no longer exist.

Petitioner testified that Respondent filed bankruptcies for various entities he controlled during marriage and that this was part of an overall financial strategy.

Petitioner testified that she is now receiving food stamps and cash aid from the government. She testified that she can't drive because of panic attacks, she is losing her car, is in therapy but is isolated, and expects to lose her condominium, which has no mortgage, because she can not afford to pay the homeowner's association dues. Since separation her health has been most impacted by the death of the parties' daughter, Nicollette, but that her other medical conditions include high blood pressure, an enlarged heart and constant panic attacks.

While the Court might make a different order based on the Family Code, Section 4320 factors absent the prenuptial agreement, in light of Judge Nelson's ruling, the Court makes the following orders consistent with that ruling:

Respondent is to pay to Petitioner as and for a living allowance, the sum of $4,625 per month, payable on the first of each month;

Respondent shall in addition pay all premiums on medical insurance in the amount and type of coverage up to that was in force in May 2011;

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

<div align="right">

April 1, 2020
8:30 AM

</div>

Respondent shall pay in addition all premiums on automobile insurance for Petitioner in an amount and type of coverage up to that which was in force May 2011;

Respondent shall in addition provide Petitioner with an automobile up to a value of $20,000.

Respondent's obligation to pay the above expenses shall continue until Petitioner's death, remarriage, cohabitation as defined in the prenuptial agreement or October 1, 2027, whichever first occurs.

The above payments are neither taxable income to Petitioner not deductible to Respondent.

**<u>Review of Prior Attorney Fee Orders</u>:**

In his January 22, 2015 order, Judge Moloney found that, "On May 11, 2011 this Court ordered the Respondent to pay $100,000 in unallocated family support plus $100,000 in attorneys' fees and $25,000 for forensic accounting fees.

This Order is not a portion of the Respondent's Request for Order filed July 22, 2013. The Court finds that was a Final Order and was not appealed and is therefore not subject to modifications."

In July 2011 Respondent was ordered to pay discovery sanctions of $6,975. **[Exhibit 20]** He did not do so. These fees as sanctions are not dischargeable in bankruptcy.

In 2012 Respondent was ordered to pay additional discovery sanctions of $4,040 **[Exhibit 21]**. He never paid any portion of this.

Also on January 22, 2015, the Court signed an order regarding a domestic violence hearing conducted between December 2010 and February 2012 in which Respondent was ordered to pay $50,000 with $33,600 being paid directly to Nachshin & Langlois and $16,400 being paid to Langlois Family Law. The $16,400 was paid to Langlois Family Law. **[Exhibit 22]** Respondent stated he paid the $33,600 to Nachshin & Langlois but provided no physical evidence of it.

Judge Treu ordered Respondent to pay $150,000 pursuant to Family Code, Section 2030 (need/ability-based fees.) **[Exhibit 23]** He explicitly considered the statutory factors and specifically referenced consideration of Judge Nelson's order, finding that this sum was both reasonable and consistent with that order. Respondent has interpreted Judge Treu's order as only requiring Antiquarian Traders or Olympic Holdings to make payments pursuant to this order IF it paid funds to Respondent. This interpretation makes little sense, in that (a) once payment is made TO Respondent by either entity, it isn't making payments pursuant to this order and (b) Respondent has the sole discretion to have either entity make any or no payments to him, but instead to directly pay Respondent's living expenses so that no actual funds from the entities is ever transmitted directly to Respondent. He testified as much and that he had instructed his bookkeeper, who pays bills for those entities, NOT to honor this order. Respondent testified that he has appealed this order but court records reflect that Respondent's appeal of this order was abandoned March 1, 2018.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

Given the extent of Respondent's estate and the manner in which he exercises control over assets which are part of the Trust, given Respondent's recalcitrance in providing timely and complete information to Petitioner's counsel, and in consideration of Judge Nelson's ruling on the validity of the prenuptial agreement, the Court finds that the fee orders made thus far have been reasonable and necessary. To the extent fees were incurred to challenge the validity of the prenuptial agreement, this Court will address those fees, by way of exclusion, in the bifurcated attorney fee ruling.

**Attorney Fees NOT related to the division of property, debt:**

As addressed at the time of closing argument, the Court orders the following briefing schedule with regards to attorney fees and costs with the following admonitions:

1. Any Keech declaration shall not exceed ten single-spaced pages;
2. Parties may include relevant points and authorities which may not exceed ten pages;
3. The declaration may have no exhibits except correspondence relevant to the fee request and billing statements. Any redactions of either the correspondence or the billing statement substantially reduces the probability that the Court will consider any billing pertaining to the redacted portion in that the Court will be less able to determine the reasonableness of those fees incurred;
4. The declaration and/or points and authorities shall include reference only to exhibits admitted during trial, the most recent income and expense declaration filed contemporaneously with the Keech declaration and/or points and authorities, and the limited exhibits referenced in number 3, above;
5. A current Income and Expense declaration with all required attachments and all lines completed shall be exchanged and filed concurrently with the Keech declaration and/or points and authorities. Failure to timely file a current Income and Expense declaration shall be considered a violation of this order;
6. A responsive declaration shall be no more than five single-spaced pages long and for the sole purpose of addressing that which is contained in the other party's fee request which was not already included in the moving papers requesting fees; that is, if a party has set out his or her position and receives the other side's fee request alleging something different, it is not necessary to repeat that which was already contained in your own fee request.

In consideration of the General Order of the Presiding Judge of the Los Angeles Superior Court which substantially limits non-emergency court proceedings, the Court is setting the dates for filing documents pertaining to attorney fees beyond June 22, 2010. Non-appearance matter such as the filing of non-emergency documents is still available to the parties.

The initial Keech declaration and/or points and authorities shall be served on the other party's attorney, or party who is self-represented, no later than 4 p.m. on June 22, 2020. It shall be filed with a proof of service no later than close of business on June 24, 2020.

The responsive declaration shall be served no later than 4 p.m. on July 6, 2020. It shall be filed with a proof of service no later than close of business on July 8, 2020. The Court will issue a written ruling on attorney fees and costs.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Family Division

**BD531307**
**GAIL SLOTKIN VS MARK SLOTKIN**

**April 1, 2020**
**8:30 AM**

### Preparation of Judgment:

The Court orders Petitioner's counsel to prepare a judgment consistent with the above terms and submit same to Respondent no later than May 11, 2020. Respondent shall have fifteen (15) days from the date of mailing to provide Petitioner's counsel with any corrections to the judgment or sign and return the judgment to Petitioner's counsel for processing.

If Petitioner's counsel receives a fully executed judgment from Respondent within fifteen (15) days of mailing the proposed judgment, counsel may submit same with the additional documentation required for processing. If Petitioner's counsel does not receive a fully-executed judgment within that time, counsel may submit the proposed judgment to the court without Respondent's signature and a cover letter of explanation, copied to Respondent. Respondent may file and serve on Petitioner's counsel his formal objections within ten (10) days of the date the proposed judgment is submitted to the court.

### CLERK'S CERTIFICATE OF MAILING/
### NOTICE OF ENTRY OF ORDER

I, Sherri R. Carter, Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Entry of the above minute order of April 1, 2020 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States Mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Dated: April 1, 2020

By:    /s/ Charlotte Andrews
Charlotte Andrews, Deputy Clerk

LANGLOIS FAMILY LAW, APC
23632 CALABASAS ROAD, SUITE 104
CALABASAS, CA 91302

MARK SLOTKIN
5141 FIRESTONE PL
SOUTH GATE, CA 90280

---

# EXHIBIT "3"

FL-190

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar Number, and address):*
Joseph A. Langlois, Esq.                                           138120
Langlois Family Law, APC
23632 Calabasas Rd. Suite 104
Calabasas, CA 91302

TELEPHONE NO.: (818) 225-9900        FAX NO. *(Optional):* (818) 225-9929
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Petitioner, Abigail Slotkin

RECEIVED VIA *mail* ON
10-9-20 @

*FOR COURT USE ONLY*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 06 2020

Sherri R. Carter, Executive Officer/Clerk
By: C. Andrews, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF      Los Angeles
STREET ADDRESS: 7339 South Painter Avenue
MAILING ADDRESS: same
CITY AND ZIP CODE: Whittier, CA 90602
BRANCH NAME: Southeast

PETITIONER: Gail Slotkin (aka Abigail Slotkin)

RESPONDENT: Mark Slotkin

| NOTICE OF ENTRY OF JUDGMENT | CASE NUMBER:<br>BD531307 |
|---|---|

You are notified that the following judgment was entered on *(date):*    OCT 06 2020

1. [X] Dissolution
2. [ ] Dissolution - status only
3. [ ] Dissolution - reserving jurisdiction over termination of marital status or domestic partnership
4. [ ] Legal separation
5. [ ] Nullity
6. [ ] Parent-child relationship
7. [ ] Judgment on reserved issues
8. [ ] Other *(specify):*

Date:    OCT 06 2020

Clerk, by _____, Deputy

**-NOTICE TO ATTORNEY OF RECORD OR PARTY WITHOUT ATTORNEY-**

Under the provisions of Code of Civil Procedure section 1952, if no appeal is filed the court may order the exhibits destroyed or otherwise disposed of after 60 days from the expiration of the appeal time.

**STATEMENT IN THIS BOX APPLIES ONLY TO JUDGMENT OF DISSOLUTION**   OCT 06 2020
Effective date of termination of marital or domestic partnership status *(specify):*
**WARNING: Neither party may remarry or enter into a new domestic partnership until the effective date of the termination of marital or domestic partnership status, as shown in this box.**

**CLERK'S CERTIFICATE OF MAILING**

I certify that I am not a party to this cause and that a true copy of the *Notice of Entry of Judgment* was mailed first class, postage fully prepaid, in a sealed envelope addressed as shown below, and that the notice was mailed

at *(place):* Los Angeles                        , California, on *(date):*    OCT 06 2020

Date:    OCT 06 2020                             Clerk, by _____, Deputy

┌ Name and address of petitioner or petitioner's attorney ┐
Gail Slotkin (aka Abigail Slotkin)
c/o Joseph A. Langlois, Esq.
Langlois Family Law, APC
23632 Calabasas Road, Suite 104
Calabasas, CA 91302
└ ┘

┌ Name and address of respondent or respondent's attorney ┐
Mark Slotkin, In Pro Per
5141 Firestone Place
South Gate, CA 90280
└ ┘

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
FL-190 [Rev. January 1, 2005]

CEB. Essential
ceb.com Forms™

**NOTICE OF ENTRY OF JUDGMENT**
**(Family Law-Uniform Parentage-Custody and Support)**

Family Code, §§ 2338, 7636, 7637
*www.courtinfo.ca.gov*

FL-180

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Joseph A. Langlois, Esq. 138120
Langlois Family Law APC.
23632 Calabasas Road, Suit 104
Calabasas, CA 91302

TELEPHONE NO.: (818) 225-9900     FAX NO. *(Optional):* (818) 226-9929
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Petitioner, Abigail Slotkin

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central

MARRIAGE OR PARTNERSHIP OF
PETITIONER: Abigail Slotkin
RESPONDENT: Mark Slotkin

FOR COURT USE ONLY

**FILED**
Superior Court of California
County of Los Angeles

OCT 06 2020

Sherri R. Carter, Executive Officer/Clerk
By   C. Andrews   , Deputy
Charlotte Andrews

| JUDGMENT | CASE NUMBER: |
|---|---|
| [X] DISSOLUTION   [ ] LEGAL SEPARATION   [ ] NULLITY | BD531307 |

[ ] Status only
[ ] Reserving jurisdiction over termination of marital or domestic
    partnership status
[ ] Judgment on reserved issues
Date marital or domestic partnership status ends: OCT 0 6 2020

1.  This judgment [ ] contains personal conduct restraining orders [ ] modifies existing restraining orders.
    The restraining orders are contained on page(s)       of the attachment. They expire on *(date):*
2.  This proceeding was heard as follows: [ ] Default or uncontested [ ] By declaration under Family Code section 2336
    [X] Contested [ ] Agreement in court
    a.  Date: 02/26/2020 - 03/10/2020   Dept.: 35       Room: 4 I I
    b.  Judicial officer *(name):* Dianna Gould-Saltman    [ ] Temporary judge
    c.  [X] Petitioner present in court   [X] Attorney present in court *(name):* Joseph A. Langlois, Esq.
    d.  [X] Respondent present in court   [ ] Attorney present in court *(name):*
    e.  [ ] Claimant present in court *(name):*
    f.  [ ] Other *(specify name):*                   [ ] Attorney present in court   *(name):*

3.  The court acquired jurisdiction of the respondent on *(date):* September 7, 2010
    (a) [X] The respondent was served with process.
    (b) [ ] The respondent appeared.

THE COURT ORDERS, GOOD CAUSE APPEARING
4.  a.  [X] Judgment of dissolution is entered. Marital or domestic partnership status is terminated and the parties are restored to the
            status of single persons
        (1) [X] on *(specify date):* OCT 0 6 2020
        (2) [ ] on a date to be determined on noticed motion of either party or on stipulation.
    b.  [ ] Judgment of legal separation is entered.
    c.  [ ] Judgment of nullity is entered. The parties are declared to be single persons on the ground of *(specify):*

    d.  [ ] This judgment will be entered nunc pro tunc as of *(date):*
    e.  [ ] Judgment on reserved issues.
    f.  The [ ] petitioner's [ ] respondent's former name is restored to *(specify):*
    g.  [X] Jurisdiction is reserved over all other issues, and all present orders remain in effect except as provided below.
    h.  [ ] This judgment contains provisions for child support or family support. Each party must complete and file with the court a
            *Child Support Case Registry Form* (form FL-191) within 10 days of the date of this judgment. The parents must notify the
            court of any change in the information submitted within 10 days of the change, by filing an updated form. The *Notice
            of Rights and Responsibilities—Health-Care Costs and Reimbursement Procedures and Information Sheet on Changing a
            Child Support Order* (form FL-192) is attached.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
FL-180 [Rev. July 1, 2012]

JUDGMENT
(Family Law)

Family Code, §§ 2024, 2340,
2343, 2346
www.courts.ca.gov

FL-180

| CASE NAME (Last name, first name of each party):<br>Slotkin, Abigail<br>Slotkin, Mark | CASE NUMBER:<br>BD531307 |
|---|---|

4. i. ☐ The children of this marriage or domestic partnership are:

    (1) ☐ Name                           Birthdate

    (2) ☐ Parentage is established for children of this relationship born prior to the marriage or domestic partnership

j. ☐ Child custody and visitation (parenting time) are ordered as set forth in the attached

    (1) ☐ Settlement agreement, stipulation for judgment, or other written agreement which contains the information required by Family Code section 3048(a).

    (2) ☐ *Child Custody and Visitation Order Attachment* (form FL-341).

    (3) ☐ *Stipulation and Order for Custody and/or Visitation of Children* (form FL-355).

    (4) ☐ Previously established in another case. Case number:            Court:

k. ☐ Child support is ordered as set forth in the attached

    (1) ☐ Settlement agreement, stipulation for judgment, or other written agreement which contains the declarations required by Family Code section 4065(a).

    (2) ☐ *Child Support Information and Order Attachment* (form FL-342).

    (3) ☐ *Stipulation to Establish or Modify Child Support and Order* (form FL-350).

    (4) ☐ Previously established in another case. Case number:            Court:

l. ☒ Spousal, domestic partner, or family support is ordered:

    (1) ☐ Reserved for future determination as relates to ☐ petitioner     ☐ respondent

    (2) ☐ Jurisdiction terminated to order spousal or partner support to ☐ petitioner     ☐ respondent

    (3) ☐ As set forth in the attached *Spousal, Partner, or Family Support Order Attachment* (form FL-343).

    (4) ☐ As set forth in the attached settlement agreement, stipulation for judgment, or other written agreement.

    (5) ☒ Other (specify):
        See Child Support Arrearages ¶¶5 (1) (3.1), Spousal Support Arrearages ¶¶5 (2.1) (3.1), Permanent Spousal Support ¶¶5 (2.2 - 2.3)

m. ☒ Property division is ordered as set forth in the attached

    (1) ☐ Settlement agreement, stipulation for judgment, or other written agreement.

    (2) ☐ *Property Order Attachment to Judgment* (form FL-345).

    (3) ☒ Other (specify):
        Breach of fiduciary duty and property issues are reserved. See ¶ 5 (8)

n. ☒ Attorney fees and costs are ordered as set forth in the attached

    (1) ☐ Settlement agreement, stipulation for judgment, or other written agreement.

    (2) ☐ *Attorney Fees and Costs Order* (form FL-346).

    (3) ☒ Other (specify):
        See Attorney Fees and Costs Arrearages ¶¶5 (3.2-3.8) and Support Related Fees at Trial ¶¶5 (4.1-4.2)

o. ☒ Other (specify):
    See ¶¶5 (5) and (6)

Each attachment to this judgment is incorporated into this judgment, and the parties are ordered to comply with each attachment's provisions. Jurisdiction is reserved to make other orders necessary to carry out this judgment.

Date: _____

5. Number of pages attached: **7**

                                        JUDICIAL OFFICER
                         ☐ SIGNATURE FOLLOWS LAST ATTACHMENT

**NOTICE**

Dissolution or legal separation may automatically cancel the rights of a spouse or domestic partner under the other spouse's or domestic partner's will, trust, retirement plan, power of attorney, pay-on-death bank account, transfer-on-death vehicle registration, survivorship rights to any property owned in joint tenancy, and any other similar property interest. It does not automatically cancel the rights of a spouse or domestic partner as beneficiary of the other spouse's or domestic partner's life insurance policy. You should review these matters, as well as any credit cards, other credit accounts, insurance policies, retirement plans, and credit reports, to determine whether they should be changed or whether you should take any other actions.

An earnings assignment may be issued without additional proof if child, family, partner, or spousal support is ordered.

Any party required to pay support must pay interest on overdue amounts at the "legal rate," which is currently 10 percent.

A debt or obligation may be assigned to one party as part of the dissolution of property and debts, but if that party does not pay the debt or obligation, the creditor may be able to collect from the other party.

An earnings assignment may be issued without additional proof if child, family, partner, or spousal support is ordered.

Any party required to pay support must pay interest on overdue amounts at the "legal rate," which is currently 10 percent.

1

## JUDGMENT

2  A contested trial on support related issues in this case was held on February 26 -28 and

3  March 1-6, and 10, in Department 35 of the Stanley Mosk Superior Court, the Honorable Dianna

4  Gould-Saltman, Judge of the Superior Court, presiding.  Pursuant to the Court's Statement of

5

6  Decision/Findings Re Permanent Spousal Support, Child Support Arrearages, Spousal Support

7  Arrearages, and other Pendente Lite matters, the Court orders as follows.

8  1.  **Child Support Arrearages (January 2012 and January 2015 Court Orders)**.

9  Pursuant to Judge Stephen M. Moloney's child support orders of January 5, 2012 and January

10
   22, 2015, the Court finds that Respondent Mark Slotkin owes child support arrearages to
11

12  Petitioner Abigail Slotkin in the amount of $908,618, including accrued interest through May 31,

13  2020, with interest accruing on the unpaid principal balance of $499,000 at the legal rate of ten

14  percent (10%) per annum, simple interest.  The Court finds that the amount of $908,618 takes

15  into account the Court's allocation of the May 2011 Order, does not duplicate and is in addition

16
   to the amounts owed under the May 2011 Order (see ¶ 3.1).  Pursuant to Judge Rolf M. Treu's
17

18  March 18, 2019 enforcement order, Respondent Mark Slotkin, Antiquarian Traders, Inc. and

19  Olympic Holding, LLC. shall pay forthwith to Petitioner Abigail Slotkin the amount of

20  $908,618, with interest accruing on the unpaid principal balance at the legal rate.

21
   **2.  Spousal Support.**
22

23  2.1  Temporary Spousal Support and Arrearages (Per PNA).  Pursuant to the terms of ¶¶ 6

24  and 7 of the parties' Pre-Nuptial Agreement dated March 26, 1993 ("PNA"), which was held to

25  be enforceable by Judge Maren E. Nelson on July 30, 2012, the  Court finds that Respondent

26  Mark Slotkin owes spousal support arrearages to Petitioner Abigail Slotkin in the amount of

27  $501,205, including accrued interest through May 31, 2020, with interest accruing on the unpaid

28

MARRIAGE OF SLOTKIN /BD531307                                           Page 1

## JUDGMENT

principal balance of $360,447 at the legal rate of ten percent (10%) per annum, simple interest.

The Court finds that the sum of $501,205 includes the following: (1) spousal support arrearage

pursuant to the parties' PNA in the principal amount of $295,550 accrued interest of $105,156

through May 31, 2020 (subtotal $400,706); (2) health insurance/copay reimbursement in the

principal amount of $1,250, with accrued interest of $21 through May 31, 2020 (subtotal

$1,271); (3) auto insurance arrearage pursuant to the parties' PNA in the principal amount of

$36,000, with accrued interest of $15,906 (subtotal $51,906); (4) replacement automobile

pursuant to the parties' PNA in the principal amount of $20,000, with accrued interest of $19,342

(subtotal $39,342); and (5) life insurance arrearage pursuant to the parties' PNA in the principal

amount of $7,647, with accrued interest of $333 (subtotal $7,980).  The Court finds that the

amount of $501,205 takes into account the Court's allocation of the May 2011 Order, does not

duplicate and is in addition to the amounts owed under the May 2011 Order (see ¶ 3.1).

Respondent Mark Slotkin shall pay forthwith to Petitioner Abigail Slotkin the amount of

$501,205, with interest accruing on the unpaid principal balance at the legal rate.

2.2    Permanent Spousal Support (Per PNA).  As permanent spousal support and pursuant to

¶¶ 7(B), 7(C) of the PNA, Respondent Mark Slotkin shall pay to Petitioner Abigail Slotkin the

amount of $4,625 per month, payable on the first day of each calendar month, commencing June

1, 2020, and continuing until the first to occur of the following circumstances: Petitioner Abigail

Slotkin's death, her remarriage, or her cohabitation (as defined in ¶ 7(E) of the PNA, or October

1, 2027, pursuant to the parties' PNA.

2.3    Health Insurance and Automobile Insurance as Additional Spousal Support (Per PNA).

As additional spousal support and pursuant to ¶¶ 7(B), 7(C) of the PNA , Respondent Mark

Slotkin shall obtain, maintain and pay for Petitioner Abigail Slotkin's health insurance and

MARRIAGE OF SLOTKIN /BD531307                                                                Page 2

**JUDGMENT**

automobile insurance of the same amount and type of coverage as was in force immediately prior

to the date of dissolution, commencing June 1, 2020, and continuing until the first to occur of the

following circumstances: Petitioner Abigail Slotkin's death, her remarriage, or her cohabitation

(as defined in ¶ 7(E) of the PNA, or October 1, 2027, pursuant to the parties' PNA.

3.    **Pendente Lite Orders.**

3.1    Child / Spousal Support Arrearages (May 2011 Order).  Pursuant to Judge Stephen M.

Moloney's spousal and child support order of May 11, 2011, the Court finds that Respondent

Mark Slotkin owes child and spousal support arrearages to Petitioner Abigail Slotkin in the

amount of $186,699, including accrued interest through May 31, 2020, with interest accruing on

the unpaid principal balance of $95,000 at the legal rate of ten percent (10%) per annum, simple

interest.  The Court finds that the $100,000 support order of May 11, 2011 shall be allocated as

follows:  $20,000 shall be chargeable to child support for the period October 1, 2010 to October

31, 2010, $4,625 shall be chargeable to spousal support for the period October 1, 2010 to

October 31, 2010, $20,000 shall be chargeable to child support for the period November 1, 2010

to November 30, 2010, $4,625 shall be chargeable to spousal support for the period November 1,

2010 to November 31, 2010, $20,000 shall be chargeable to child support for the period

December 1, 2010 to December 31, 2010, $4,625 shall be chargeable to spousal support for the

period December 1, 2010 to December 31, 2010, $20,000 shall be chargeable to child support for

the period January 1, 2011 to January 31, 2011, $4,625 shall be chargeable to spousal support for

the period January 1, 2011 to January 31, 2011, $1,000 shall be chargeable to child support for

the period February 1, 2011 to February 28, 2011 and $500 shall be chargeable to spousal

support for the period February 1, 2011 to February 28, 2011.  The Court finds that the amount

of $186,699 takes into account the Court's allocation of this May 2011 Order, does not duplicate

MARRIAGE OF SLOTKIN /BD531307                                                    Page 3

**JUDGMENT**

and is in addition to the amounts owed as child support arrearages (see ¶ 1) and spousal support

arrearages (see ¶ 2.1).  Pursuant to Judge Rolf M. Treu's March 18, 2019 enforcement order,

Respondent Mark Slotkin, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay

forthwith to Petitioner Abigail Slotkin the amount of $186,699, with interest accruing on the

unpaid principal balance of $95,000 at the legal rate.

3.2    Attorney Fees and Cost Arrearages (May 2011 Order). Pursuant to Judge Stephen M.

Moloney's order of May 11, 2011, the Court finds that Respondent Mark Slotkin owes

reasonable attorney fees and costs arrearages to Petitioner Abigail Slotkin in the amount of

$180,864, including accrued interest through May 31, 2020, with interest accruing on the unpaid

principal balance of $95,000 at the legal rate of ten percent (10%) per annum, simple interest.

Pursuant to Judge Rolf M. Treu's March 18, 2019 enforcement order, Respondent Mark Slotkin,

Antiquarian Traders Inc., and Olympic Holdings LLC shall pay forthwith to Petitioner Abigail

Slotkin, payable to the Law Office of Robert J. Nachshin P.C., the amount of $180,864, with

interest accruing on the unpaid principal balance of $95,000 at the legal rate.

3.3    Forensic Accounting Fee Arrearages (May 2011 Order). Pursuant to Judge Stephen M.

Moloney's order of May 11, 2011, the Court finds that Respondent Mark Slotkin owes

reasonable forensic accounting fees and costs arrearages to Petitioner Abigail Slotkin in the

amount of $42,836, including accrued interest through May 31, 2020, with interest accruing on

the unpaid principal balance of $22,500 at the legal rate of ten percent (10%) per annum, simple

interest.  Pursuant to Judge Rolf M. Treu's March 18, 2019 enforcement order, Respondent Mark

Slotkin, Antiquarian Traders Inc., and Olympic Holdings LLC shall pay forthwith to Petitioner

Abigail Slotkin, payable to Petitioner's forensic accountants at Mayer, Hoffman McCann PC, the

**JUDGMENT**

1   amount $42,836, with interest accruing on the unpaid principal balance of $22,500 at the legal

2   rate.

3   3.4     Attorney Fees and Cost Arrearages (September 2011 Order). Pursuant to Judge Stephen

4   M. Moloney's attorney's fee and cost order of September 20, 2011, the Court finds that

5
6   Respondent Mark Slotkin owes reasonable attorney fees and costs arrearages to Langlois Family

7   Law APC in the amount of $6,975, with interest accruing on the unpaid principal balance of

8   $6,975 at the legal rate of ten percent (10%) per annum, simple interest.  The Court specifically

9   finds these attorney's fees and costs are in the nature of support and are intended to be non-

10
11  dischargeable in bankruptcy.  Respondent Mark Slotkin shall pay forthwith to Langlois Family

12  Law APC, the amount of $6,975,  with interest accruing on the unpaid principal balance of

13  $6,975 at the legal rate.

14  3.5     Attorney Fees and Cost Arrearages (March 2013 Order).  Pursuant to Judge Stephen M.

15  Moloney's attorney's fee and cost order of March 29, 2013 order, the Court finds that

16
17  Respondent Mark Slotkin owes reasonable attorney fees and costs arrearages to Langlois Family

18  Law, APC. in the amount of $7,173, with interest accruing on the unpaid principal balance of

19  $4,040 at the legal rate of ten percent (10%) per annum, simple interest.  Respondent Mark

20  Slotkin shall pay forthwith to Langlois Family Law, APC, the amount $7,173, with interest

21  accruing on the unpaid principal balance of $4,040 at the legal rate.

22
23  3.6     Attorney Fees and Cost Arrearages (January 22, 2015).  Pursuant to Judge Stephen M.

24  Moloney's attorney fee and cost order of January 22, 2015, the Court finds that Respondent

25  Mark Slotkin owes reasonable attorney fees and costs arrearages to Petitioner Abigail Slotkin in

26  the amount of $51,606, with interest accruing on the unpaid principal balance of $33,600 at the

27  legal rate of ten percent (10%) per annum, simple interest.  Pursuant to Judge Rolf M. Treu's

28

MARRIAGE OF SLOTKIN /BD531307                                                    Page 5

**JUDGMENT**

March 18, 2019 enforcement order, Respondent Mark Slotkin, Antiquarian Traders Inc., and Olympic Holdings LLC. shall pay forthwith to Petitioner Abigail Slotkin, payable to the Law Office of Robert J. Nachshin P.C., the amount $51,606, with interest accruing on the unpaid principal balance of $33,600 at the legal rate.

3.7    Attorney Fees and Cost Arrearages (April 2017 Order).  Pursuant to Judge Rolf M. Treu's attorney fee and cost order of April 28, 2017, the Court finds that Respondent Mark Slotkin owes reasonable attorney fees and costs arrearages to Langlois Family Law, APC, in the amount of $196,438, with interest accruing on the unpaid principal balance of $150,000 at the legal rate of ten percent (10%) per annum, simple interest.  Pursuant to Judge Rolf M. Treu's March 18, 2019 enforcement order, Respondent Mark Slotkin, Antiquarian Traders Inc., and Olympic Holdings LLC. shall pay forthwith to Langlois Family Law, APC, the amount of $196,438, with interest accruing on the unpaid principal balance of $150,000 at the legal rate.

3.8    Appellate Attorney Fees and Costs Arrearages (March 2018 Order). Pursuant to Judge Rolf M. Treu's attorney fee and cost order of March 14, 2018, the Court finds that Respondent Mark Slotkin owes reasonable appellate attorney fees and costs arrearages to Petitioner Abigail Slotkin in the amount of $3,980, with interest accruing on the unpaid principal balance of $3,325 at the legal rate of ten percent (10%) per annum, simple interest.  Pursuant to Judge Rolf M. Treu's March 18, 2019 enforcement order, Respondent Mark Slotkin, Antiquarian Traders Inc., and Olympic Holdings LLC. shall pay forthwith to Petitioner Abigail Slotkin, payable to Benedon & Serlin, LLP, the amount of $3,980, with interest accruing on the unpaid principal balance of $3,325 at the legal rate.

/ / /

/ / /

**JUDGMENT**

4.    **Attorney's Fees and Costs at Trial**.

4.1    <u>Order on Support Related Attorney's Fees and Costs</u>.  As his further contributive share of Petitioner's reasonable attorney's fees and costs incurred with Langlois Family Law, APC, related to child and spousal support, Respondent Mark Slotkin and/or Antiquarian Traders Inc. shall pay directly to Langlois Family Law APC, the sum of $700,000, payable forthwith.  This award of attorney's fees is in addition to those previously ordered.

4.2    <u>Order on Support Related Accounting Fees</u>.  As his contributive share of Petitioner's reasonable forensic accounting fees not previously awarded, incurred with various forensic accounting firms and related to child and spousal support, Respondent Mark Slotkin shall pay directly to Petitioner Abigail Slotkin the sum of $125,000, payable forthwith.

5.    **Deferral of $80,000 Claim to Bankruptcy Court**.  The Court finds that Respondent Mark Slotkin filed for Chapter 7 bankruptcy protection, on February 25, 2020, USBC, Central District of California, Case No. 2:20-bk-12042-BB.  The Court defers to the Bankruptcy Court, the issues surrounding the disposition of the sale proceeds in excess of $80,000 from the inventory of Antiquarian Traders, Inc., which Mr. Slotkin was ordered to deposit into the trust account of Langlois Family Law APC, on behalf of Petitioner, pursuant to Judge Stephen M. Moloney's June 18, 2013 enforcement order, but which Respondent Mark Slotkin did not facilitate.

6.    **Reservation of Jurisdiction**.  The Court reserves jurisdiction over all other issues in this case, consistent with further orders from the Bankruptcy Court.

**IT IS SO ORDERED.**

Dated:  _10/6/2020_

_Honorable Dianna Gould-Saltman,_
Judge of the Superior Court

MARRIAGE OF SLOTKIN /BD531307

DIANNA GOULD-SALTMAN

**JUDGMENT**

74

# EXHIBIT  "4"

# THE SLOTKIN FAMILY CHILDREN'S TRUST

*Table of Contents of the*

# THE SLOTKIN FAMILY CHILDREN'S TRUST

**ARTICLE ONE**
Creation of The Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARTICLE TWO**
Funding The Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARTICLE THREE**
Administration of Trust During Life of Trustor . . . . . . . . . . . . . . . . . . . . . . . 2

**ARTICLE FOUR**
Administration of The Trust on the Death of the Trustor . . . . . . . . . . . . . . . . . 3

**ARTICLE FIVE**
Distribution of The Trust Property After Death of The Trustor . . . . . . . . . . . . . 4

**ARTICLE SIX**
Ultimate Distribution Pattern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**ARTICLE SEVEN**
Methods of Distribution and Trust Administration
with Regard to Minor and Disabled Beneficiaries . . . . . . . . . . . . . . . . . . . . . 6

**ARTICLE EIGHT**
The Resignation, Replacement and Succession of The Trustees . . . . . . . . . . . . . 7

**ARTICLE NINE**
General Matters and Instructions with Regard to the Trusteeship . . . . . . . . . . . 8

**ARTICLE TEN**
The Trustee's Administrative and Investment Powers . . . . . . . . . . . . . . . . . . . 12

**ARTICLE ELEVEN**
Rights Reserved to Trustor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**ARTICLE TWELVE**
Definitions and General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**SCHEDULE "A"**
Initial Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**SCHEDULE "B"**
Living Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

## THE SLOTKIN FAMILY
## CHILDREN'S TRUST

### ARTICLE ONE
### CREATION OF THE TRUST

**Section 1.      The Trust**

This is an irrevocable trust, created by MARK ABBEY SLOTKIN and GAIL ELLEN SLOTKIN as Trustors, and MARK ABBEY SLOTKIN and GAIL ELLEN SLOTKIN, as the initial Trustees.

All references to "trust" or "trusts", unless otherwise stated, shall refer to this irrevocable trust and the trusts created in it. All references to "Trustees" or "Trustee" shall refer to the initial Trustee or the successor or successors in trust.

When the term "Trustors" is used in the trust, it shall have the same legal meaning as "Grantors," "Settlors," or any other term referring to the maker of a trust.

**Section 2.      Name of Trust**

For convenience, this irrevocable trust shall be known as:

### THE SLOTKIN FAMILY CHILDREN'S TRUST.

For purposes of beneficiary designations, transfers directly to the trust, and formal correspondence, the trust shall be referred to as:

### THE SLOTKIN FAMILY CHILDREN'S TRUST, dated January 1, 1997

**Section 3.      An Irrevocable Trust**

This trust is irrevocable, and the Trustors shall not have any power to control and direct payments, remove trust property, or alter, amend, revoke, or terminate this trust, either in whole or in part, other than as provided in Article Eleven, hereof.

### ARTICLE TWO
### FUNDING THE TRUST

**Section 1.      Initial Funding**

The trust will be initially funded with ten dollars ($10.00) and such other property as shall be listed on Schedule A.  Schedule A shall be made a part of and shall be incorporated by reference in this Agreement.

1

78

**Section 2.    Additional Funding**

The trust may be additionally funded by the Trustors or by any other person in any manner with property interests of all kinds. All property interests transferred, assigned, conveyed, or delivered to the Trustee in trust shall be absolute and irrevocable and must be acceptable to the Trustee.

All property interests transferred, assigned, conveyed, or delivered to the Trustee shall be subject to all of the terms and conditions set forth in this Agreement.

<div align="center">

**ARTICLE THREE**
**ADMINISTRATION OF TRUST DURING LIFE OF THE TRUSTORS**

</div>

**Section 1.    Lifetime Beneficiaries**

The beneficiaries of this Trust shall be NICOLLETTE ABBEY SLOTKIN and SAVANNAH TAYLOR SLOTKIN.

**Section 2.    Separate Shares**

All contributions to this trust while the Trustors are living shall be divided into equal shares for each beneficiary who is living at the time of a contribution. Each share set aside for a beneficiary shall be held in a lifetime separate trust for the beneficiary as provided in this Article.

**Section 3.    Distribution of Income and Principal**

The Trustee shall pay to, or apply for the benefit of, a beneficiary as much of the net income and principal of a beneficiary's lifetime separate trust as the Trustee, in its sole and absolute discretion, determines to be necessary or advisable for a beneficiary's education, health, maintenance, and support.

Subject to the provisions of Article Eleven, any net income not distributed by the Trustee shall be accumulated and added to the principal of the lifetime separate trust.

    **a.    Other Available Resources**

In making distributions pursuant to this Section, the Trustee shall take into consideration, to the extent that the Trustee deems advisable in its sole and absolute discretion, any income or other resources which are available to the beneficiaries outside of the trust and are known to the Trustee.

    **b.    Discharge of a Legal Obligation**

No payment or distribution shall be made by the Trustee for the discharge of any legal obligation of the Trustors, or otherwise for the monetary benefit of the Trustors.

<div align="center">2</div>

c.      **Nonproductive Trust Property**

The Trustee is expressly authorized to purchase, acquire, hold, and retain, as an asset of the trust, underproductive property including, but not limited to, limited partnership shares, shares of a closely held corporation, and life insurance policies.

The Trustee in its discretion may pay the expenses and carrying charges attributable to underproductive property from the trust income or principal, or partly from each, as the Trustee shall determine.

<div align="center">

**ARTICLE FOUR**
**ADMINISTRATION OF THE TRUST ON THE DEATH OF THE SURVIVING TRUSTOR**

</div>

**Section 1.      Purchase of Assets and Loans**

The Trustee is authorized to purchase and retain in the form received, as an addition to the trust, any property which is a part of the probate or trust estate of the deceased Trustor. In addition, the Trustee may make loans, with or without security, to such probate or trust estate.  The Trustee shall not be liable for any loss suffered by the trust as a result of the exercise of the powers granted in this Section.

Notwithstanding anything in this Agreement to the contrary, the Trustee shall not have the power to use any trust property for the benefit of the estate of the deceased Trustor as defined in Section 20.2042-1(b) of Title 26 of the Code of Federal Regulations, unless such property is included in the deceased Trustor's gross estate for federal estate tax purposes.

**Section 2.      Distributions of Amounts Included in a Trustor's Estate**

Upon the death of a Trustor, the Trustee shall distribute an amount equal to the value of any asset of this trust which is includible in a deceased Trustor's gross estate for federal estate tax purposes to the living trust of the deceased Trustor.  The name of each Trustor's living trust, if any, is included on Schedule B of this agreement.  Any amount so distributed shall be added to the property of the living trust and disposed of in accordance with its terms.

If either Trustor dies and a respective living trust is not in existence, the Trustee shall distribute the amount called for under this Section to those persons or entity designated to receive such amounts in the deceased Trustor's last will or other valid written instrument specifically referring to this power.  Any amount not so appointed by a deceased Trustor shall be distributed to such deceased Trustor's surviving spouse.  If the deceased Trustor has no surviving spouse, such amount shall instead be distributed according to the terms of this trust.

<div align="center">3</div>

## ARTICLE FIVE
## DISTRIBUTION OF THE TRUST PROPERTY AFTER DEATH OF
## THE SURVIVING TRUSTOR

**Section 1.    Division into Separate Shares**

Upon the death of the surviving Trustor, the trust property not previously distributed under the terms of the trust agreement shall be divided into as many shares as shall be necessary to create one equal share for each of the surviving beneficiaries of this trust, and one equal share for each deceased beneficiary who has then living children.

**Section 2.    Distribution of Trust Shares**

Each such share shall be held, administered and distributed as follows:

**a.    Distributions of Net Income**

The Trustee, in its sole and absolute discretion, shall apply to, or for the benefit of, such beneficiary as much of the net income from that beneficiary's trust share as the Trustee deems advisable for education, health, maintenance, and support.

**b.    Distributions of Principal**

The Trustee, in its sole and absolute discretion, shall apply to, or for the benefit of, such beneficiary as much of the principal from that beneficiary's trust as the Trustee deems advisable for education, health, maintenance, and support.

When the beneficiary reaches the age of thirty-five (35), or if on the creation of such beneficiary's trust, upon the death of the surviving Trustor, that beneficiary has already attained the age of thirty-five (35), the Trustee shall distribute one-fourth (1/4) of the accumulated net income and principal to the beneficiary; when the beneficiary reaches the age of forty (40), or if on the creation of such beneficiary's trust, upon the death of the surviving Trustor, that beneficiary has already attained the age of forty (40), the Trustee shall distribute one-half (1/2) of the accumulated net income and principal to the beneficiary; when the beneficiary reaches the age of forty-five (45), or if on the creation of such beneficiary's trust, upon the death of the surviving Trustor, that beneficiary has already attained the age of forty-five (45), the Trustee shall distribute three-fourths (3/4) of the accumulated net income and principal to the beneficiary; and when the beneficiary reaches the age of fifty (50) or if on the creation of such beneficiary's trust, upon the death of the surviving Trustor, that beneficiary has already attained the age of fifty (50) years, the Trustee shall distribute to the beneficiary, free of the trust, all of the accumulated income and the principal of such beneficiary's trust as then constituted.

**c.    Guidelines for discretionary Distributions**

To the extent that the Trustee has any discretionary authority over the distribution

of income or principal to a beneficiary, it is the Trustors' desire that the Trustee be liberal in exercising such discretion.

The Trustors also desire that the Trustee give assistance to a beneficiary for:

The purchase of a residence.

The purchase or establishment of a business or professional practice.

Any other extraordinary opportunity or expense deemed by the Trustee to be in the best interests of such beneficiary.

In making discretionary distributions, the Trustee shall be mindful of, and take into consideration to the extent it deemed necessary, any additional sources of income and principal available to such beneficiary which arise outside of this Agreement and are known to the Trustee.

It is the express desire of the Trustors that the Trustee take into consideration the future probable needs of the beneficiary prior to making any discretionary distributions hereunder.

**d.    Distribution on the Death of Beneficiary**

If a beneficiary should die before the complete distribution of his or her trust share, such trust shall terminate and the Trustee shall distribute the balance of that beneficiary's trust property to that beneficiary's then living descendants, per stirpes.

If a deceased beneficiary has no then living descendants, the Trustee shall distribute the balance of that beneficiary's trust property to the Trustors' then living descendants, per stirpes.

If the Trustors have no then living descendants, the Trustee shall distribute the balance of the trust property as provided in Article Six of this Agreement.

## ARTICLE SIX
## ULTIMATE DISTRIBUTION PATTERN

If at any time there is no person, corporation, or other entity entitled to receive all or any part of the trust property:

The trust property shall be distributed to those persons who would be the heirs of the last Trustor to die, had he died intestate owning such property.

The distribution of trust property, for purposes of this Article, shall be determined by the laws of descent and distribution for intestate estates in the State of California as such laws are in effect at the time of any distribution under this Article.



## ARTICLE SEVEN
## METHODS OF DISTRIBUTION AND TRUST ADMINISTRATION
## WITH REGARD TO MINOR AND DISABLED BENEFICIARIES

**Section 1.      General Guidelines for Distribution**

Whenever a distribution is authorized or required by a provision of this Agreement to any beneficiary who is disabled or incapacitated, such distribution may be made by the Trustee:

> Without continuing court supervision or the intervention of a guardian, conservator, or any other legal representative.

> Without giving or requiring any bond or surety on bond.

> Pursuant to any of the methods authorized under this Article.

In making distributions under this Article, disability or incapacity shall include adjudicated mental incapacity by a court of competent jurisdiction, or incapacity because of age, illness, or injury.

Before making any distributions to beneficiaries under this Article, it is the Trustors' desire that the Trustee, to the extent that it is both reasonable and possible:

> Inquire into the ultimate disposition of the distributed funds.

> Take into consideration the behavior of trust beneficiaries with regard to their disposition of prior distributions of trust property.

The Trustee shall obtain a receipt from the person, corporation, or other entity receiving any distribution called for in this Article.

**Section 2.      Methods of Payment**

The Trustee may make the distributions called for in this Article in any one or more of the following ways:

> Directly to a beneficiary.

> To persons, corporations, trusts or other entities for the use and benefit of the beneficiary.

> To an account in a commercial bank or savings institution in the name of the beneficiary, or in a form reserving the title, management, and custody of the account to a suitable person, corporation, or other entity for the use and benefit of the beneficiary.

> In any prudent form of annuity purchased for the use and benefit of the beneficiary.

6

**83**

To any person or duly licensed financial institution, including the Trustee, as a custodian under the Uniform Transfers to Minors Act, or any similar act, of any state, or in any manner allowed by any state statute dealing with gifts or distributions to minors or other individuals under a legal disability.

To any guardian or other person deemed by the Trustee to be responsible, and who has assumed the responsibility of caring for the beneficiary.

## ARTICLE EIGHT
## THE RESIGNATION, REPLACEMENT AND SUCCESSION OF THE TRUSTEES

**Section 1.    The Resignation of a Trustee**

A Trustee may resign by giving thirty days' written notice to the then current Trustee, any other Co-Trustee and to all of the beneficiaries then eligible to receive mandatory or discretionary distributions of net income from any trust created under this Agreement.

If a beneficiary is a minor or is legally incapacitated, the notice shall be delivered to that beneficiary's guardian or other legal representative.

**Section 2.    Replacement of Trustees**

If an initial Trustee is removed, dies, resigns, becomes legally incapacitated, or is otherwise unable or unwilling to serve, the remaining Trustee shall serve as Trustee hereunder.  If the remaining Trustee dies, resigns, becomes legally incapacitated or is otherwise unable or unwilling to serve, DAVID MOULTON and BETTY MOULTON shall jointly act as Successor Trustees hereunder.  If either is unable or unwilling to serve then the other shall act as sole Trustee hereunder.

**Section 3.    Unfilled Trusteeship**

In the event no named Trustees are available, a majority of the beneficiaries then eligible to receive mandatory or discretionary distributions of net income under this Agreement shall forthwith name a corporate fiduciary.

If a majority of the beneficiaries then eligible to receive mandatory or discretionary distributions of net income under this Agreement cannot agree on a corporate fiduciary, any beneficiary can petition a court of competent jurisdiction, ex parte, to designate a corporate fiduciary as a Trustee.

The court that designates the successor Trustee shall not acquire any jurisdiction over any trust created under this Agreement, except to the extent necessary to name a corporate fiduciary as a successor Trustee.

**Section 4.    Corporate Fiduciaries**

Any corporate fiduciary named in this trust agreement or appointed



by a court of competent jurisdiction as a Trustee must be a bank or trust company situated in the United States having trust powers under applicable federal or state law.

**Section 5.     Powers and Liabilities of Successor Trustee**

Any successor Trustee whether corporate or individual, shall have all of the rights, powers, and privileges, and be subject to all of the obligations and duties, both discretionary and ministerial, as given to the original Trustee.

Any successor Trustee shall be subject to any restrictions imposed on the original Trustee. No successor Trustee shall be required to examine the accounts, records, and acts of any previous Trustee.

No successor Trustee shall in any way be responsible for any act or omission to act on the part of any previous Trustee.

## ARTICLE NINE
## GENERAL MATTERS AND INSTRUCTION WITH REGARD TO THE TRUSTEESHIP

**Section 1.     Use of "Trustee" Nomenclature**

As used throughout this Agreement, the word "Trustee" shall refer to the initial Trustees as well as any single, additional, or successor Trustees.  It shall also refer to any individual, corporation, or other entity acting as a replacement, substitute, or added Trustee.

**Section 2.     No Requirement to Furnish Bond**

The Trustee shall not be required to furnish any bond for the faithful performance of its duties.

If a bond is required by any law or court of competent jurisdiction, it is my desire that no surety be required on such bond.

**Section 3.     Court Supervision Not Required**

All trusts created under this Agreement shall be administered free from the active supervision of any court.

Any proceedings to seek judicial instructions or a judicial determination shall be initiated by the Trustee in the appropriate state court having original jurisdiction of those matters relating to the construction and administration of trusts.

**Section 4.     The Trustee's Responsibility to Make Information Available**

The Trustee shall report, at least annually, to the beneficiaries then eligible to receive mandatory or discretionary distributions of the net income from the various trusts created in this Agreement all of the receipts, disbursements, and distributions occurring during the

8



**85**

reporting period along with a complete statement of the trust property.

The trust's books and records along with all trust documentation shall be available and open at all reasonable times to the inspection of the trust beneficiaries and their representatives.

The Trustee shall not be required to furnish trust records or documentation to any individual, corporation, or other entity that is not a beneficiary, does not have the express written approval of a beneficiary, or is not requesting such pursuant to a court order.

### Section 5.    Delegation among The Trustees

Any Trustee may delegate to any other Trustee the power to exercise any or all powers granted the Trustee in this Agreement, including those which are discretionary, if allowed by law.  The delegating Trustee may revoke any such delegation at will.

The delegation of any such power, as well as the revocation of any such delegation, shall be evidenced by an instrument in writing executed by the delegating Trustee.

As long as any such delegation is in effect, any of the delegated powers may be exercised by the Trustee receiving such delegation with the same force and effect as if the delegating Trustee had personally joined in the exercise of such power.

### Section 6.    Utilization of Substitute Trustee

If the Trustee is unwilling or unable to act as to any trust property, the Trustee shall designate, in writing, an individual, bank trust department, or trust company to act as a substitute Trustee with regard to such property.

The property being administered by the substitute Trustee, as well as the net income therefrom, shall be distributed or remitted as directed by the delegating Trustee consistent with the terms of this Agreement.

Each substitute Trustee shall exercise all of the fiduciary powers granted by this Agreement unless expressly limited by the delegating Trustee in the instrument appointing such substitute Trustee, or by any provision within this Section.

Any substitute Trustee may resign at any time by delivering written notice to the Trustee to that effect.

### Section  7.    Trustee's Fee

The Trustee shall be entitled to fair and reasonable compensation for the services it renders as a fiduciary.  The amount of compensation shall be an amount equal to the customary and prevailing charges for services of a similar nature during the same period of time and in the same geographic locale.  The Trustee shall be reimbursed for the reasonable costs and expenses incurred in connection with its fiduciary duties under this Agreement.



**86**

**Section 8.       A Majority of Trustees Required to Control**

When more than two (2) Trustees are acting, the concurrence and joinder of a majority of Trustees shall control in all matters pertaining to the administration of any trust created under this Agreement.

If only two Trustees are acting, the concurrence and joinder of both shall be required.

When more than two Trustees are acting, any dissenting or abstaining Trustee may be absolved from personal liability by registering a written dissent or abstention with the records of the trust; the dissenting Trustee shall thereafter act with the other Trustees in any manner necessary or appropriate to effectuate the decision of the majority.

**Section 9.       Successor Corporate Fiduciaries**

If any bank or trust company ever succeeds to the trust business of any corporate fiduciary serving as a Trustee under this Agreement, whether because of a name change or any other form of reorganization, or if such corporate fiduciary ever transfers all of its existing business to any other bank or trust company, the successor shall thereupon, without any action being required, succeed to the trusteeship hereunder as if originally named.

**Section 10.     Early Termination of Trusts Based on Cost**

If the Trustee shall determine, in its sole and absolute discretion, that any trust created under this Agreement has become uneconomical to administer due to the high cost of administration relative to the value of the trust property, the Trustee may terminate such trust or trusts and distribute the trust property, including any accrued but undistributed net income, in the following order:

   To the then mandatory income beneficiaries of the trust, per stirpes.

   If there are no living mandatory income beneficiaries, then equally among the beneficiaries then entitled to receive discretionary payments of income of the trust, per stirpes.

**Section 11.     Generation-Skipping Tax Provisions**

In order to minimize the impact of any generation-skipping tax that may be applied to any of the trusts created by this Agreement or their beneficiaries, the Trustee, in its sole and absolute discretion, is authorized to take the following actions:

   **a.       Division into Exempt and Nonexempt Trusts**

   If any trust created under this Agreement would be partially exempt from generation-skipping tax by reason of an allocation of a generation-skipping tax exemption to it, prior to such allocation the Trustee shall divide the total trust assets into two separate trust shares of equal or unequal value, to permit allocation of the exemption

10



**87**

solely to one trust share (the exempt trust"). The exempt trust shall consist of a fractional interest of the total trust assets in an amount necessary to cause the exempt trust to be entirely exempt from generation-skipping tax. The other trust share (the "nonexempt trust") shall consist of the remaining fractional interest of the total trust assets. For purposes of this allocation, assets values as finally determined for federal estate tax purposes shall be used.

**b.    Additions to a Separate Trust**

If a trust under this Agreement, whether created under this Section or not, is entirely exempt or nonexempt from generation-skipping tax and adding property to it would partially subject the trust to generation-skipping tax, the Trustee may hold that property in a separate trust in lieu of making the addition.

**c.    Terms of the Trust**

If the Trustee divides a trust into two separate trust shares or creates a separate trust for additions, the trusts or trust shares that result shall have the same terms and conditions as the original trust. The Trustee shall not make discretionary distributions from the income or principal of the exempt trust to beneficiaries who are nonskip persons as long as any readily marketable assets remain in the nonexempt trust.

**d.    Allocation from an Exempt Trust First**

Upon division or distribution of any exempt trust and a nonexempt trust, the Trustee may allocate property from the exempt trust first to a share from which a generation-skipping transfer is more likely to occur.

**e.    Taxable Distributions**

If the Trustee considers that any distribution from a trust under this Agreement, other then pursuant to a power to withdraw or appoint, is a taxable distribution subject to a  generation-skipping tax payable by the beneficiary, the Trustee shall augment the distribution by an amount which the Trustee estimates to be sufficient to pay the tax and shall charge the same against the trust to which the tax relates.

**f.    Taxable Terminations**

If the Trustee considers that any termination of an interest in trust property is a taxable termination subject to a generation-skipping tax, the Trustee shall pay the tax from the portion of the trust property to which the tax relates, without adjustment of the relative interests of the beneficiaries.



## ARTICLE TEN
## THE TRUSTEE'S ADMINISTRATIVE AND INVESTMENT POWERS

**Section 1.    Introduction to Trustee's Powers**

Except as otherwise provided in this Agreement, the Trustee shall have both the administrative and investment powers enumerated under this Article and any other powers granted by law with respect to the various trusts created by this Agreement.

**Section 2.    Powers to Be Exercised in the Best Interests of the Beneficiaries**

The Trustee shall exercise the following administrative and investment powers without the order of any court, as the Trustee determined in its sole and absolute discretion to be in the best interests of the beneficiaries.

Notwithstanding anything to the contrary in this Agreement, the Trustee shall not exercise any power in a manner inconsistent with the beneficiaries' right to the beneficial enjoyment of the trust property in accordance with the general principles of the law of trusts.

**Section 3.    Administrative and Investment Powers**

The Trustee is hereby granted the following administrative and investment powers:

**a.    Agricultural Powers**

The Trustee may retain, sell, acquire, and continue any farm or ranching operation whether as a sole proprietorship, partnership, or corporation.

It may engage in the production, harvesting, and marketing of both farm and ranch products either by operating directly or with management agencies, hired labor, tenants, or sharecroppers.

It may engage and participate in any government farm program, whether state or federally sponsored.

It may purchase or rent machinery, equipment, livestock, poultry, feed, and seed.

It may improve and repair all farm and ranch properties;  construct buildings, fences, and drainage facilities;  acquire, retain, improve, and dispose of wells, water rights, ditch rights, and priorities of any nature.

The Trustee may, in general, do all things customary or desirable to operate a farm or ranch operation for the benefit of the beneficiaries of the various trusts created under this Agreement.



**b.**     **Business Powers**

The Trustee may retain and continue any business in which one or both of us have or had an interest as a shareholder, partner, sole proprietor, or as a participant in a joint venture, even though that interest may constitute all or a substantial portion of the trust property.

It may directly participate in the conduct of any such business or employ others to do so on behalf of the beneficiaries.

It may execute partnership agreements, buy-sell agreements, and any amendments to them.

It may participate in the incorporation of any trust property;   any corporate reorganization, merger, consolidation, recapitalization, liquidation, dissolution; or any stock redemption or cross purchase buy-sell agreement.

It may hold the stock of any corporation as trust property, and may elect or employ directors, officers, employees, and agents and compensate them for their services.

It may sell or liquidate any business interest that is part of the trust property.

The Trustee may exercise all of the business powers granted in this Agreement regardless of whether the Trustee is personally interested or an involved party with respect to any business enterprise forming a part of the trust property.

**c.**     **Common Fund Powers**

For the purpose of convenience with regard to the administration and investment of the trust property, the Trustee may hold the several trusts created under this Agreement as a common fund.

The Trustee may make joint investments with respect to the funds comprising the trust property.

The Trustee may enter into any transaction authorized by this Article with fiduciaries of other trusts or estates in which any beneficiary hereunder has an interest, even though such fiduciaries are also Trustees under this Agreement.

**d.**     **Compensation Powers**

The Trustee shall pay from income or principal all of the reasonable expenses attributable to the administration of the respective trusts created in this Agreement.

The Trustee shall pay itself reasonable compensation for its services as fiduciary as provided in this Agreement, and shall reasonably compensate those persons employed by the Trustee, including agents, auditors, accountants, and attorneys.

### e.    Distribution Powers

The Trustee is specifically authorized to make divisions and distributions of the trust property either in cash or in kind, or partly in cash and partly in kind, or in any proportion it deems advisable.

It shall be under no obligation or responsibility to make pro rata  divisions and distributions in kind.

The Trustee may allocate specific property to any beneficiary or share although the property may differ in kind from the property allocated to any other beneficiary or share.

The foregoing powers may be exercised regardless of the income tax basis of any of the property.

### f.    Income and Principal Powers

The Trustee may determine in a fair, equitable, and practical manner how all Trustee's fees, disbursements, receipts, and wasting assets shall be credited, charged, or apportioned between principal and income.

The Trustee may set aside from trust income reasonable reserves for taxes, assessments, insurance premiums, repairs, depreciation, obsolescence, depletion, and for the equalization of payments to or for the beneficiaries;  it may select any and all accounting periods with regard to the trust property.

All increases in the value of any life insurance policies prior to the death of the insured held by this trust shall be principal and not income.

### g.    Investment Powers in General

The Trustee may invest and reinvest in such classes of stocks, bonds, securities, futures, puts, calls, commodities, options, metals, or other property, real or personal, as it shall determine.

It may invest in investment trusts as well as in common trust funds.

It may purchase life, annuity, accident, sickness, and medical insurance on the behalf of and for the benefit of any trust beneficiary.

### h.    Loan, Borrowing, and Encumbrance Powers

The Trustee may loan money to any person, including a beneficiary, except either or both of us, with or without interest, on any term or on demand, with or without collateral, as it deems in the best interests of the trust beneficiaries.



**91**

It may borrow money upon such terms and conditions as it shall deem advisable, including, in the case of a corporate fiduciary, the power to borrow from its own banking or commercial department.

It shall have the power to obligate the trust property for the repayment of any sums borrowed where the best interests of the beneficiaries have been taken into consideration.

The Trustee shall have the power to encumber the trust property, in whole or in part, by a mortgage or mortgages, deeds of trust, or by pledge, hypothecation or otherwise, even though such encumbrance may continue to be effective after the term of any trust or trusts created in this Agreement.

### i.    Margin, Brokerage, and Bank Account Powers

The Trustee is authorized to buy, sell, and trade in securities of any nature, including puts and calls, naked or covered, short sales and sales or purchases on margin. The Trustee may maintain and operate margin accounts with brokers, and may pledge any securities held or purchased by the Trustee with such brokers as securities for loans and advances made to the Trustee. The Trustee is authorized to establish and maintain bank accounts of all types in one or more banking institutions that the Trustee may choose.

### j.    Mortgage Powers

The Trustee shall have the power to enter into any mortgage whether as a mortgagee or mortgagor, to purchase mortgages on the open market, and to otherwise buy, sell, or trade in first or subordinate mortgages.

It may reduce the interest rate on any mortgage and consent to the modification or release of nay guaranty of any mortgage.

The Trustee may continue mortgages upon and after maturity with or without renewal or extension, and may foreclose any mortgage. It may purchase the mortgaged property or acquire it by deed from the mortgagor without foreclosure.

### k.    Nominee Powers

The Trustee may hold any trust property in the name of the Trustee, or in the name of the nominee, and may enter into agreements to facilitate holding such property. It may accomplish such with or without disclosing its fiduciary capacity.

### l.    Nonproductive Property

The Trustee may hold property which is non-income producing or is otherwise nonproductive if the holding of such property is, in the sole and absolute discretion of the Trustee, in the best interests of the beneficiaries.



**m.      Oil, Gas, Coal, and Other Mineral Powers**

The Trustee may do all things necessary to maintain in full force and effect any oil, gas, coal, or other mineral interest comprising part or all of the trust property.

It may purchase additional oil, gas, coal, and other mineral interest when necessary or desirable to effect a reasonable plan of operation or development with regard to the trust property.

It may buy or sell undivided interests in oil, gas, coal, and other mineral interest, and may exchange any of such interest for interest in other properties of for services.

It may execute oil, gas, coal, and other mineral leases on such terms as the Trustee may deem proper, and may enter into pooling, unitization, repressurization, and other types of agreements relating to the development, operation, and conservation of mineral properties.

Any lease or other agreement may have a duration that the Trustee deems reasonable, even though extending beyond the duration of any trust created in this Agreement.

It may execute division orders, transfer orders, releases, assignments, farmouts, and any other instruments which it deems proper.

It may drill, test, explore, mine, develop, and otherwise exploit any and all oil, gas, coal, and other mineral interests, and may select, employ, utilize, or participate in any business form, including partnerships, joint ventures, co-owners' groups, syndicates, and corporations, for the purpose of acquiring, holding, exploiting, developing, operating, or disposing of oil, gas, coal, and other mineral interests.

It may employ the services of consultants or outside specialists in connection with the evaluation, management, acquisition, disposition, or development of any mineral interest, and may pay the cost of such services from the principal or income of the trust property.

The Trustee may use the general assets of the trusts created under this Agreement for the purposes of acquiring, holding, managing, developing, pooling, unitizing or disposing of any mineral interest.

**n.      Powers of Attorney**

The Trustee may execute, deliver, and grant to any individual or corporation a revocable or irrevocable power of attorney to transact any and all business on behalf of the various trusts created in this Agreement.

The power of attorney may grant to the attorney-in-fact all of the rights, powers, and discretion that the Trustee could have exercised.

16

**93**



**o.    Powers to Merge Similar Trusts**

The Trustee may merge and consolidate or distribute trust income and principal to any trust created in this Agreement with any other trust created by the Trustors or any other person at any other time, if the other trust contains substantially the same terms for the same beneficiaries as determined in the sole  and absolute discretion of the Trustee.

**p.    Powers of an Insured Trustee**

Any individual Trustee under this Agreement is prohibited from exercising any power conferred on the owner of any policy which insures the life of such individual Trustee and which is held as part of the trust property.

If the Trustee holds any such policy or policies as a part of the trust property, the powers conferred on the owner of such a policy shall be exercised only by the other then acting Trustee.

If the insured Trustee is the only then acting Trustee, then such powers shall be exercised by a substitute Trustee designated pursuant to the provisions of this agreement dealing with the trusteeship.

If any rule of law or court decision construes the ability of the insured Trustee to name a substitute Trustee as an incident od ownership, the substitution process shall be implemented by a majority of the then current mandatory and discretionary income beneficiaries, excluding the insured Trustee if the insured Trustee is a beneficiary.

**q.    Real Estate Powers**

The Trustee may make leases and grant options to lease for any term, even though the term may extend beyond the termination of any trust created under this agreement.

It may grant or release easements and other interests with respect to real estate, enter into party wall agreements, execute estoppel certificates, and develop and subdivide any real estate.

It may dedicate parks, streets, and alleys or vacate any street or alley, and may construct, repair, alter, remodel, demolish, or abandon improvements.

It may elect to insure, as it deems advisable, all actions contemplated by this subsection.

The Trustee may take any other action reasonably necessary for the preservation of real estate and fixtures comprising a part of the trust property or the income therefrom.

**r.     S Corporation Stock**

If any stock of an S corporation becomes distributable to a trust created under this agreement, and such trust is not a qualified Subchapter S trust, the Trustee may implement any of the following alternatives with respect to the S corporation stock:

**1.     A Sole Beneficiary**

Where the original trust is for a sole beneficiary, the Trustee may create for that beneficiary a separate trust that qualifies as a Subchapter S trust, and then distribute such stock to the newly created trust.

**2.     Multiple Beneficiaries**

Where the original trust is for multiple beneficiaries, the Trustee may divide the trust into separate trusts for each of the beneficiaries. Each newly created trust shall hold that beneficiary's pro rata share of the S corporation stock, and shall qualify as a Subchapter S trust.

**3.     Outright Distribution**

If circumstances prevent the Trustee from accomplishing the first two alternatives under this paragraph, the Trustee may, in its sole and absolute discretion, distribute such stock to the beneficiaries as if the trust had terminated, while continuing to hold any other non-S corporation property in trust.

Each newly created S corporation trust shall have mandatory distributions of income and shall not provide for powers of appointment that can be exercised by the beneficiary during the beneficiary's lifetime. In all other respects, the newly created trusts shall be as consistent as possible with the original trusts and still qualify as Subchapter S trusts.

The Trustee may take any action necessary with regard to S corporations, including making any elections required to qualify stock as S corporation stock, and may sign all required tax returns and forms.

**s.     Sale, Lease, and Other Dispositive Powers**

The Trustee may sell, lease, transfer, exchange, grant options with respect to, or otherwise dispose of the trust property.

It may deal with the trust property at such time or times, for such purposes, for such considerations and upon such terms, credits, and conditions, and for such periods of time, whether ending before or after the term of any trust created under this agreement, as it deems advisable.



The Trustee may make such contracts, deeds, leases, and any other instruments it deems proper under the immediate circumstances, and may deal with the trust property in all other ways in which a natural person could deal with his or her property.

**t.      Securities Powers**

In addition to those securities powers granted throughout this Article, the Trustee may retain, exercise, or sell rights of conversion or subscription with respect to nay securities held as part of the trust property.

The Trustee may vote or refrain from voting at corporate meetings either in person or by proxy, whether general or limited, and with or without substitutions.

**u.      Settlement Powers**

The Trustee may compromise, adjust, arbitrate, alter the terms of, or abandon any claim in favor of or against any trust created under this agreement, and may take deeds in lieu of foreclosure.

**v.      Trust Addition and Retention Powers**

The Trustee is authorized to receive additional trust property, whether by gift, will, or otherwise, wither from us or from any other person, corporation, or entity.

Upon receipt of any additional property, the Trustee shall administer and distribute the same as part of the trust property.

The Trustee may retain, without liability for depreciation or loss resulting from such retention, all property constituting the trust estate at the time of its creation or thereafter received from other sources.

The foregoing shall be acceptable even though such property may not be of the character prescribed by law for the investment of trust funds or may result in inadequate diversification of the trust property.

**w.      Trustees' or Fiduciaries' Powers Act**

In addition to all of the powers specifically granted our Trustee in this Article, our trustee may exercise those powers set forth under the Trustees' or Fiduciaries' Powers Act, or their equivalent, of the State of California, together with any amendment to such laws.

The Trustee may perform every act reasonably necessary to administer each and every share or trust created under this agreement.

All of the powers granted to the Trustee in this Article shall be in addition to those



powers conferred upon Trustees under all applicable state and federal statutes.

Each power conferred upon the Trustee under this Article, or upon Trustees in general, by applicable state or federal statutes, shall be subject to any express limitations or contrary directions contained in this agreement.

<div align="center">

**ARTICLE ELEVEN**
**RIGHTS RESERVED TO TRUSTOR**

</div>

Notwithstanding any provision of this Trust Agreement to the contrary, until the death of the surviving Trustor, the Trustors shall have the power, in their sole and absolute discretion, to alter the beneficial interests of the beneficiaries, as between themselves, with respect to such beneficiary's share of trust income or principal.  Income or principal removed from a beneficiary shall be added to the trust share of one or more of the other beneficiaries of the trusts created hereunder.  If at any time, there remains only one beneficiary of a trust created hereunder, the Trustors shall have the power, in their sole and absolute discretion, to distribute any portion of the income or principal of such child's trust to any charitable organization designated by the Trustors. The power exercisable hereunder shall not be construed as allowing the Trustors or the Trustee to apply any portion of trust income or principal for the benefit of the Trustors or their estate.

<div align="center">

**ARTICLE TWELVE**
**DEFINITIONS AND GENERAL PROVISIONS**

</div>

**Section 1.    Definitions**

For purposes of this agreement, the following words and phrases shall be defined as follows:

**a.     Adopted and Afterborn Persons**

Persons who are legally adopted while they are under 18 years of age shall be treated for all purposes under this agreement as though they were  the naturally born children of their adopting parents.

A child in gestation who is later born alive shall be considered a child in being throughout the period of gestation.

**b.     Descendants**

A person's descendant shall include all of his or her lineal descendants through all generations.

A descendant in gestation who is later born alive shall be considered a descendant in being throughout the period of gestation.

An adopted person, and all persons who are the descendants by blood or by legal adoption while under the age of 18 years of such adopted person, shall be considered

<div align="center">

20

</div>

descendants of the adopting parents as well as the adopting parents' ancestors.

**c.  Per Stirpes Distributions**

Whenever a distribution is to be made to a person's descendants, per stirpes:

> The distributable assets are to be divided into as many shares as there are then living children of such person and deceased children of such person who left then living descendants.

> Each then living child shall receive one share and the share of each deceased child shall be divided among such child's then living descendants in the same manner.

**d.  Education**

As used in this trust, "education" shall include:

> Any course of study or instruction at an accredited college or university granting undergraduate or graduate degrees.

> Any course of study or instruction at any accredited institution for specialized, vocational, or professional training.

> Any curriculum offered by any institution that is recognized for purposes of receiving financial assistance from any state or federal agency or program.

> Any course of study or instruction which may be useful in preparing a beneficiary for any vocation consistent with the beneficiary's abilities and interests.

Distributions for education may include tuition, fees, books, supplies, living expenses, travel, and spending money to the extent that they are reasonable.

**e.  Personal Representative**

For the purposes of this agreement, the term "personal representative" shall include an executor, administrator, guardian, custodian, conservator, trustee, or any other form of personal representative.

**f.  Incapacity**

Except as otherwise provided in this agreement, any individual may be treated as disabled, incompetent, or legally incapacitated if:

> The individual has been declared or adjudicated as such by a court of competent jurisdiction, or

<div align="center">21</div>



**98**

A guardian, conservator, or other personal representative of such individual's person or estate has been appointed by a court of competent jurisdiction, or

The individual has been certified as such in writing by at least two licensed physicians, or

The individual has disappeared or is absent for unexplained reasons, or the individual is being detained under duress where the individual is unable to effectively manage his or her property or financial affairs.

**Section 2.**     **The Rule Against Perpetuities**

Unless sooner terminated by the express provisions of this agreement, each trust created in this agreement shall terminate twenty-one years after the death of the last survivor of the group composed of the Trustors and those of the Trustors' descendants living at the date this trust agreement is signed. At that time, the property held in trust shall be discharged of any further trust, and shall immediately vest in and be distributed to those persons entitled to receive or have the benefit of the income from the respective trust.

For purposes of distributions under this Section only, it shall be presumed that any person then entitled to receive any discretionary payments of the income of a separate trust is entitled to receive all of the income, and it shall be presumed that any class of persons entitled to receive discretionary payments of income is entitled to receive all of such income.

**Section 3.**     **Protective Clause**

To the fullest extent permitted by law, the interests of all of the beneficiaries in the various trusts and trust property subject to this agreement shall not be alienated, pledged, anticipated, assigned, or encumbered unless specifically authorized by the terms of this agreement.

Such interests shall not be subject to legal process or to the claims of any creditors while such interests remain trust property.

**Section 4.**     **Maintaining Property in Trust**

If, on the termination of any separate trust created under this agreement, a final distribution is to be made to a beneficiary for whom the Trustee holds a trust created under this agreement, such distribution shall be added to such trust rather than being distributed.

The property that is added to the trust shall be treated for purposes of administration as though it had been an original part of the trust.

**Section 5.**     **Contest Clause**

If any person, including a beneficiary, shall in any manner, directly or indirectly, attempt to contest or oppose the validity of this agreement, or commences or prosecutes any legal



proceedings to set this agreement aside, then in such event such person shall forfeit his or her share, cease to have any right or interest in the trust property, and shall be deemed to have predeceased the Trustors.

Should any person disclaim his or her interest, in whole or in part, in any trust created for his or her benefit in this trust agreement the result of which would be for that person to receive the trust property free of trust earlier than provided by the terms of the trust, then the disclaiming person shall forfeit his or her interest in the trust, shall cease to have any right or interest in the trust property, and shall be deemed to have predeceased both of us.

## Section 6.    Changing the Trust Situs

Upon the death or disability of the surviving Trustor, the situs of this agreement may be changed by the unanimous consent of all of the beneficiaries then eligible to receive mandatory or discretionary distributions of net income under this agreement.

If such consent is obtained, the beneficiaries shall notify the Trustee in writing of such change of trust situs, and shall, of necessary, designate a successor corporate fiduciary in the new situs.  This notice shall constitute removal of the current Trustee, if appropriate, and any successor corporate Trustee shall assume its duties as provided under this agreement.

A change in situs under this Section shall be final and binding, and shall not be subject to judicial review.

## Section 7.    General Matters

The following general matters of construction shall apply to the provisions of this agreement:

### a.    Construction

Unless the context requires otherwise, words denoting the singular may be construed as denoting the plural, and words of the plural may be construed as denoting the singular.  Words of one gender may be construed as denoting another gender as is appropriate within such context.

### b.    Headings of Articles, Sections, and Paragraphs

The headings of Articles, Sections, and Paragraphs used within
this agreement are included solely for the convenience and reference of the reader. They shall have no significance in the interpretation or construction of this agreement.

### c.    Notices

All notices required to be given in this agreement shall be made in writing by either:

Personally delivering notice to the party requiring it, and securing a written



receipt, or

Mailing notice by certified United States mail, return receipt requested, to the last known address of the party requiring notice.

The effective date of the notice shall be the date of the written receipt or the date of the return receipt.

**d.     Delivery**

For purposes of this agreement "delivery" shall mean:

Personal delivery to any party, or

Delivery by certified United States mail, return receipt requested to the party making delivery.

The effective date of delivery shall be the date of personal delivery or the date of the return receipt.

**e.     Applicable State Law**

The validity of this trust shall be determined by reference to the laws of the State of California.

Questions with regard to the construction and administration of the various trusts contained in this agreement shall be determined by reference to the laws of the state in which the trust is then currently being administered.

**f.     Duplicate Originals**

This agreement may be executed in several counterparts; each counterpart shall be considered a duplicate original agreement.

**g.     Severability**

If any provision of this agreement is declared by a court of competent jurisdiction to be invalid for any reason, such validity shall not affect the remaining provisions of this agreement. The remaining provisions shall be fully severable, and this agreement shall be construed and enforced as if the invalid provision had never been included in this agreement.



We have executed this agreement the day and year first written above.

We certify that we have read the foregoing irrevocable trust agreement, and that it correctly states the terms and conditions under which our trust property is to be held, managed, and disposed of by the Trustee.  We approve this irrevocable trust in all particulars, and request the Trustees execute it.

Dated: 1/2/97

_____
MARK ABBEY SLOTKIN, Trustor

Dated: 1/2/97

_____
GAIL ELLEN SLOTKIN, Trustor

Dated: 1/2/97

_____
MARK ABBEY SLOTKIN, Trustee

Dated: 1/2/97

_____
GAIL ELLEN SLOTKIN, Trustee

25

## SCHEDULE "A"

## INITIAL FUNDING

Ten dollars, the receipt of which is acknowledged.

**103**

## SCHEDULE "A"

**Second Funding:**  January 3, 1997

Partnership Interests:

Abbey Properties
Slotkin Properties
1501 Main Co.
Consolidated Assets Co.

Common Stock:  Antiquarian Traders, Inc.
              Alameda Holdings, Inc.


Membership Interests in California Limited Liability Company:
Olympic Holdings, LLC

26(a)

## SCHEDULE "A"

<u>Third Funding:</u> September 22, 1997

Membership Interests in Limited Liability Company
Golden Oak Partners, LLC

26 (b)

## SCHEDULE "A"

**Fourth Funding:** September 26, 1997

Membership Interests in Limited Liability Company:
Wooton Group, LLC

26 (c)

# SCHEDULE "A"

**Fifth Funding**:  October 1, 1997

Membership Interests in Limited Liability Companies:
Breakfront, LLC
Rolltop,LLC

Real Properties Held by LLC's:      7316 Gage Avenue, Commerce, CA
                                                    5610 District Blvd., Bakersfield, CA
                                                    7001 White Lane, Bakersfield, CA
                                                    701 Roberts Lane, Bakersfield, CA
                                                    4851 Alameda Street, Los Angeles, CA

26(d)

## SCHEDULE "B"

# EXHIBIT "5"

**APPOINTMENT OF SUBSTITUTION TRUSTEE AND ACCEPTANCE BY SUCCESSOR TRUSTEE OF THE SLOTKIN FAMILY CHILDREN'S TRUST U/T/D JANUARY 1, 1997**

   **THE UNDERSIGNED GRANTOR**, pursuant to Article 9 Section 6 of the SLOTKIN FAMILY CHILDREN'S TRUST dated January 1, 1997 (the "Trust") hereby removes himself as the initial Trustee of all of the Trust properties, including, but not limited to, Olympic Holdings, LLC, Golden Oak Partners, LLC, Wooton Group, LLC, Breakfront, LLC, Rolltop, LLC, Sailfish Capital Partners, LLC, 8777 Appian, Way, LLC and corporations, including, but not limited to, Antiquarian Traders, Inc., and Alameda Holdings, Inc., and hereby appoints **LOREN MARKEN** as Substitute Trustee effective as of the date of the acceptance by **LOREN MARKEN** of the obligations and responsibilities as Substitute Trustee of the Trust.


                  _____
                  MARK A. SLOTKIN, Grantor


    **THE UNDERSIGNED LOREN MARKEN** accepts the appointment as the Trustee of the Trust effective as of the date set forth below.

Dated: _____   _____
               LOREN MARKEN, Successor Trustee


A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached , and not the truthfulness, accuracy, or validity of that document.


STATE OF CALIFORNIA     )
             ) ss
COUNTY OF LOS ANGELES  )

   On 2·25·20   before me, M·LAMORIE the undersigned notary public in and for said State personally appeared Mark A. Slotkin, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

   Witness my hand and official seal.



M. LAMORIE
Notary Public – California
Los Angeles County
Commission # 2223534
My Comm. Expires Dec 26, 2021

**110**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached , and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA      )
                         )  ss
COUNTY OF ~~LOS ANGELES~~  )
         _SAN BERNARDINO_

On _MARCH 2, 2020_ before me, _JOANN PETERSEN_ the undersigned notary public in and for said State personally appeared LOREN MARKEN, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

    Witness my hand and official seal.

JO ANN PETERSEN
Notary Public -- California
San Bernardino County
Commission # 2189201
My Comm. Expires Apr 28, 2021

_____
Notary Public for the State of California

3

**111**

# EXHIBIT "6"

# TRUST AGREEMENT

## OF THE SLOTKIN INTENTIONALLY DEFECTIVE TRUST

MAYMAN & MAYMAN LLP
10100 SANTA MONICA BLVD.
SUITE 2320
LOS ANGELES, CA 90067
(310) 553-8111

# SLOTKIN INTENTIONALLY DEFECTIVE TRUST

## TABLE OF CONTENTS

Page

ARTICLE 1 DECLARATIONS OF TRUST: .............................................. 2

    1.1    Principal of Trust ........................................................................ 2
    1.2    Acceptance of Trust by the Trustee ............................................ 2

ARTICLE 2 RIGHTS RESERVED TO THE GRANTOR: ....................... 3

    2.1    Trust To Be Irrevocable ............................................................. 3
    2.2    Additions .................................................................................... 3
    2.3    Grantor's Power to Remove and Replace Trustees
           and Named Successor Trustees ................................................... 3
    2.4    Intent to Create Grantor Trust ................................................... 4

ARTICLE 3 PERSONAL DECLARATIONS: ........................................... 4

    3.1    Declarations Concerning Family ................................................ 4
    3.2    Residency ................................................................................... 4

ARTICLE 4 BENEFICIARY POWER OF WITHDRAWAL DURING
THE LIFE OF THE GRANTOR .................................................................. 4

    4.1    Power to Withdraw Principal ..................................................... 4
    4.2    Who May Exercise the Power .................................................... 5
    4.3    Notice to Beneficiaries ............................................................... 5
    4.4    Exercise of Power to Withdraw ................................................. 5
    4.5    Beneficiary Lacking Legal Capacity ......................................... 5
    4.6    Non-Exercise of Power .............................................................. 6
    4.7    Periodic Lapse of Power to Withdraw ...................................... 6
    4.8    Beneficiary Power of Appointment ........................................... 7
    4.9    Power of Trustee to Amend ....................................................... 7

ARTICLE 5 ADMINISTRATION OF TRUST ESTATE: ........................ 7

    5.1    Administration of Trust Estate as Set Forth in This
           Article ........................................................................................ 7
    5.2    Allocation of Trust Estate .......................................................... 7

i

## TABLE OF CONTENTS
## (CONTINUED)

Page

| | | |
|---|---|---|
| 5.3 | Distribution of Income | 8 |
| 5.4 | Distributions of Principal | 9 |
| 5.5 | Partial Distributions of Principal | 9 |
| 5.6 | Distribution Upon the Death of a Beneficiary | 9 |
| 5.7 | Contingent Beneficiaries | 9 |

ARTICLE 6 SUCCESSOR TRUSTEE:                                                      10

| | | |
|---|---|---|
| 6.1 | Designated Successor Trustee | 10 |
| 6.2 | Special Provisions Regarding Non-Resident Fiduciaries | 10 |
| 6.3 | Power of an Individual Trustee to Designate a Successor Trustee | 10 |
| 6.4 | Right of Trustee to Resign; Appointment of Successor Trustee in the Event of a Vacancy | 13 |
| 6.5 | Declination of a Named Successor Trustee | 13 |
| 6.6 | Substitution of Corporate Trustee | 13 |
| 6.7 | Effect of Succession of Trustees | 14 |
| 6.8 | Powers and Authorities of Successor Trustee | 14 |
| 6.9 | No Duty of Successor Trustees to Investigate | 14 |
| 6.10 | Indemnification of Trustee | 14 |
| 6.11 | Prohibited Trustee Designations | 15 |

ARTICLE 7 POWERS OF TRUSTEE:                                                      15

| | | |
|---|---|---|
| 7.1 | Powers of Trustee Set Forth in This Article | 15 |
| 7.2 | Power to Act as Owner | 16 |
| 7.3 | Investment Powers | 16 |
| 7.4 | Special Provisions While Corporate Trustee Is Acting | 17 |
| 7.5 | Power to Retain or Abandon Property | 18 |
| 7.6 | Certain Management Powers | 18 |
| 7.7 | Reimbursement of Trustee | 19 |
| 7.8 | Power to Employ | 19 |
| 7.9 | Installment Payments of Income | 19 |
| 7.10 | Segregation, Allocation and Distribution of Assets | 19 |
| 7.11 | Trust Distributions | 20 |
| 7.12 | Powers of Trustee In the Event of Beneficiary Misconduct | 20 |
| 7.13 | Principal and Income | 22 |

## TABLE OF CONTENTS
## (CONTINUED)

Page

7.14    Acceptance of Gifts .................................................22
7.15    Powers Over Securities.............................................23
7.16    Transactions With Other Entities.................................23
7.17    Power to Purchase Insurance ....................................24
7.18    Payments to or for Minors or Incapacitated
        Persons.................................................................24
7.19    Banks and Brokerage Accounts and Endorsements ...................24
7.20    Option to Terminate Shares or Trusts..........................25
7.21    Power to Combine and Divide Trusts...........................25
7.22    Power to Withhold Distribution..................................26
7.23    Tax Elections .........................................................26
7.24    Subdivision of Real Property......................................27
7.25    Purchase at Foreclosure ..........................................27
7.26    Fiduciary Related Party Transactions .........................27
7.27    Power to Commence, Retain and Manage Closely
        Held Business .......................................................28
7.28    Power Regarding S Corporations ...............................29
7.29    Power Regarding Names of Trusts .............................29
7.30    Power to Transfer Trust to or from Another
        Jurisdiction..........................................................29
7.31    Power to Initiate and Defend Litigation; Power to
        Compromise Claims. ..............................................30
7.32    Environmental Matters ...........................................30
7.33    Discretion of Trustee ..............................................33
7.34    Power to Disclaim, Restrict or Enlarge Powers of
        Trustee ................................................................33
7.35    Power to Loan without adequate interest or
        adequate security...................................................33
7.36    Exchange Property for Equivalent Value .....................33

ARTICLE 8 TRUST ADMINISTRATION:                                     33

8.1     Trust Administrative Provisions Set Forth in This
        Article .................................................................33
8.2     Bond of Trustee .....................................................34
8.3     Compensation of Trustee..........................................34
8.4     Profits and Losses Charged to Trust............................34
8.5     Accrued and Undistributed Income .............................34
8.6     Payment of Expenses...............................................34

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

8.7     Disbursements in Good Faith ........................................34
8.8     Disclosure to Third Parties ..........................................34
8.9     Liability for Conduct of Co-Trustees, Predecessor
        Trustees and Successor Trustees................................35
8.10    Notification to Beneficiaries .......................................35

ARTICLE 9 PROVISIONS REGARDING  GENERATION-SKIPPING
        TRANSFER TAX:                                                   35

9.1     Intention Regarding Generation-Skipping Transfer
        Tax .......................................................................35
9.2     Duties Regarding Allocation of GST Tax
        Exemption..............................................................35
9.3     Creation of Separate Trusts Based Upon Inclusion
        Ratio.....................................................................36
9.4     Power to Grant and Revoke General Testamentary
        Power of Appointment..............................................36
9.5     Powers and Duties Regarding Payment of GST
        Tax Liability ..........................................................36
9.6     General Powers Regarding GST Tax and Other
        Considerations .......................................................37
9.7     Successor Trustee for Certain Purposes.......................38
9.8     Exoneration of Trustee..............................................38
9.9     Simultaneous Death .................................................38

ARTICLE 10 ACCOUNTINGS                                                  39

10.1    Duty to Account......................................................39
10.2    No Court Accounts ..................................................39
10.3    Requirement to Render Account................................39
10.4    Predecessor Trustees...............................................39
10.5    Receipts, Accounts and Releases..............................39
10.6    Settlement of Accounts ...........................................40
10.7    Limited Waiver of Accounts.....................................40

ARTICLE 11 NO CONTEST CLAUSE                                            40

11.1    General..................................................................40
11.2    Definitions .............................................................41
11.3    Authorization of Trustee...........................................42

## TABLE OF CONTENTS
### (CONTINUED)

Page

| | | |
|---|---|---|
| 11.4 | Costs of Defenses Charged Against Contesting Beneficiary | 43 |

**ARTICLE 12 GENERAL TRUST PROVISIONS:** 43

| | | |
|---|---|---|
| 12.1 | Termination | 43 |
| 12.2 | Spendthrift Provision | 44 |
| 12.3 | Tax Allocation | 44 |
| 12.4 | Invalidity | 44 |
| 12.5 | Governing Law | 44 |
| 12.6 | Disclaimers | 45 |
| 12.7 | Headings and Captions | 45 |
| 12.8 | Cross-References | 45 |
| 12.9 | Notices | 45 |

**ARTICLE 13 DEFINITIONS AND RULES OF CONSTRUCTION:** 46

| | | |
|---|---|---|
| 13.1 | Definitions Set Forth in This Article | 46 |
| 13.2 | Beneficiary | 46 |
| 13.3 | Corporate Trustee | 46 |
| 13.4 | Education | 46 |
| 13.5 | Gender or Number | 46 |
| 13.6 | Incapacity | 46 |
| 13.7 | Internal Revenue Code | 47 |
| 13.8 | Issue; Child; Children | 47 |
| 13.9 | Net Income | 48 |
| 13.10 | Or | 48 |
| 13.11 | Spouse | 48 |
| 13.12 | Support, Maintenance and Health | 48 |
| 13.13 | Survival | 48 |
| 13.14 | Treasury Regulations | 48 |
| 13.15 | Trust | 48 |
| 13.16 | Trust Estate | 48 |
| 13.17 | Trustee | 48 |

**ARTICLE 14 EXECUTION:** 49

| | | |
|---|---|---|
| 14.1 | Declaration of the Grantor | 49 |
| 14.2 | Execution by the Grantor | 49 |
| 14.3 | Execution by the Trustee | 49 |

# SLOTKIN INTENTIONALLY DEFECTIVE TRUST

TRUST AGREEMENT

THIS TRUST AGREEMENT is made this _____th day of April 2010 , by and between **MARK A. SLOTKIN**, a resident of Los Angeles County, State of California, (hereinafter sometimes referred to as the "Grantor") and **LOREN MARKEN** (hereinafter sometimes referred to as the "Trustee" or and "Initial Trustee") and his successors, (hereinafter referred to as the Successor Trustee", or the "Trustee").

## W I T N E S S E T H:

WHEREAS, the Grantor desires to establish an Irrevocable Trust pursuant to the California Probate Code, to make provisions for the care and management of his properties, for the ultimate dispositions of the trust properties and for such uses and purposes hereinafter set forth; and.

WHEREAS, it is contemplated that further sums of money investments or other property may be paid or transferred to or otherwise placed under the control of the Trustee hereof by way of addition to the Trust Fund to be held by the Trustee on the trusts hereinafter declared; and

WHEREAS, this Trust has been made intentionally defective by virtue of Grantor's rights contained in Article VII, Paragraphs 7.35 and 7.36 respectively; and

WHEREAS, for purposes of identification, the Trust shall be known as the **"SLOTKIN INTENTIONALLY DEFECTIVE TRUST"** or such other name as the trustees shall from time to time determine.

Page 1,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

NOW THEREFORE, in consideration of the premises and of the mutual covenants hereinafter made, the Grantor hereby assigns, gives, grant, convey, transfer, set over and deliver the sum of Fifty ($50.00) dollars, in cash, as the original trust estate, IN TRUST, unto the Trustee, who hereby declares that it has received from the Grantor the property listed in Exhibit "A" attached hereto and incorporated herein by reference, TO HAVE AND TO HOLD THE SAME IN TRUST, and to manage, invest and reinvest the same and any additions that may from time to time be made thereto, subject to the trust provisions hereinafter provided and the terms and conditions and powers and agreements relating thereto.

This **SLOTKIN INTENTIONALLY DEFECTIVE TRUST** (the "Trust Agreement") is entered into between GRANTOR (hereinafter called "Grantor") and TRUSTEE (hereinafter called "Trustee"), effective as of the date of execution.

## ARTICLE 1

### DECLARATIONS OF TRUST:

1.1    <u>Principal of Trust</u>.  The Grantor has transferred and delivered to the Trustee the sum of Fifty Dollars ($50), receipt of which is hereby acknowledged by the Trustee.  The Grantor may also transfer substantial additional property to this Trust. The initial principal of the Trust together with any property that may be later transferred to the Trust and any income thereon, shall be held, administered and distributed by the Trustee as provided herein.

1.2    <u>Acceptance of Trust by the Trustee</u>.  No consideration was or will be given to or by the Trustee for the conveyance or transfer to it of any of the Trust Estate.  The Trustee accepts title to the Trust Estate which is conveyed or transferred to it hereunder, without liability or responsibility for the conditions or validity of that title. The Trust Estate has been or will be conveyed or transferred to the Trustee, in trust, with power of sale, for the uses and purposes and upon the terms herein set forth.  The Trustee agrees to perform the duties of the Trustee and to hold the Trust Estate, the proceeds thereof, and any other property which may be later added to the Trust Estate, subject to the terms of this Trust Agreement.

Page 2,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

**120**

## ARTICLE 2

## RIGHTS RESERVED TO THE GRANTOR:

2.1    Trust To Be Irrevocable. The Trust or Trusts created pursuant to this Trust Agreement are irrevocable and may not be altered or amended in any respect. Furthermore, the Trust or Trusts created pursuant to this Trust Agreement may not be terminated except by distributions permitted by this Trust Agreement.

2.2    Additions. The Grantor shall have the right, at any time, to add to the Trust Estate, and the property so added to the Trust Estate, whether real, personal or mixed, shall, after notice to the Trustee, be subject to all the terms of this Trust Agreement. Any other person may, from time to time, with the consent of the Trustee, add property of any kind to the Trust Estate, or any part thereof, which shall be subject to all the terms and provisions of this Trust Agreement.

2.3    Grantor's Power to Remove and Replace Trustees and Named Successor Trustees.

(a)    Acting Trustees. The Grantor shall have the right, at any time and from time to time, to remove any acting Trustee or Co-Trustee. Upon such removal, the remaining Co-Trustee shall serve as sole Trustee, or the next-named successor Trustee shall commence to act as Trustee, unless the Grantor shall concurrently name a replacement Trustee, who shall serve in place of the removed Trustee or Co-Trustee, taking precedence over all other named successor Trustees or Co-Trustees (and over all successor Trustees or Co-Trustees designated by any named Trustee(s)).

(b)    Named Successor Trustees. The Grantor shall have the right, at any time and from time to time, to delete any named successor Trustee or Co-Trustee under this Trust Agreement. Further, the Grantor may, but shall not be required to, concurrently name one or more replacement successor Trustees in place of the deleted named successor Trustee, taking precedence over all other named successor Trustees or Co-Trustees (and over all successor Trustees or Co-Trustees designated by any named Trustee(s)).

(c)    Exercise of Power. The foregoing powers set forth in Paragraph 2.3(a) and/or Paragraph 2.3(b) may be exercised or relinquished by the Grantor by giving written notice to:

(1)    any Trustee or Co-Trustee then serving,

(2)    all successor Trustees or Co-Trustees named in this Trust Agreement (or previously designated by any named Trustee or Co-Trustee) who have not yet commenced serving,

(3)    the then-living adult Beneficiaries,

(4)    the guardians of any minor Beneficiaries, and

Page 3,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(5)     as otherwise required by law.

Any replacement Trustee or Co-Trustee (either serving pursuant to Paragraph 2.3(a) or designated as a named successor Trustee pursuant to Paragraph 2.3(c) may be removed (or deleted) and replaced in turn by the Grantor giving written notice in the same manner as the removal (or deletion) and replacement was made as provided above.  Any Trustee or Co-Trustee designated and serving pursuant to this Paragraph shall have all of the powers conferred upon a named Trustee under this Trust Agreement, shall serve without bond and shall for all other purposes be treated as a named Trustee under this Trust Agreement.

(d)     <u>Prohibited Powers</u>.  Notwithstanding anything in this Paragraph 2.3 to the contrary, the Grantor shall not be permitted to name as a replacement Trustee or Co-Trustee (i) the Grantor, (ii) the spouse of the Grantor or (iii) any person considered a related or subordinate party subservient to the wishes of the Grantor, within the meaning of Internal Revenue Code Section 672(c) or any successor to that Section.

2.4     <u>Intent to Create Grantor Trust</u>.  It is the intention of the Grantor that this Trust shall be treated as a grantor trust (as that term is defined in Sections 671-677 of the Internal Revenue Code) for federal income tax purposes, and all provisions of this Trust shall be construed so as to effectuate this intent.

## ARTICLE 3

## PERSONAL DECLARATIONS:

3.1     <u>Declarations Concerning Family</u>.   The Grantor has two (2) children; namely:

| | |
|---|---|
| NICOLLETTE A. SLOTKIN | 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 |
| SAVANNAH T. SLOTKIN | 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 |

It is expressly stipulated that any child or children hereafter born to the Grantor and/or adopted by him shall share in the benefits of the Trust, or any trust created hereunder, to the same extent as the children above-named.

3.2     <u>Residency</u>.  The Grantor is a permanent resident of the county of Los Angeles County, State of California.

## ARTICLE 4

## BENEFICIARY POWER OF WITHDRAWAL
## <u>DURING THE LIFE OF THE GRANTOR</u>

4.1     <u>Power to Withdraw Principal</u>.  For each direct or indirect transfer by a donor to the Trust prior to the death of the Grantor and during a calendar year, each beneficiary specified in this Article shall have the power to withdraw from the principal

Page 4,     SLOTKIN INTENTIONALLY DEFECTIVE TRUST

of the Trust Estate the lesser of (a) the amount of the then maximum annual gift tax exclusion under Section 2503(b) of the Internal Revenue Code, less prior transfers during the year by such donor for such beneficiary or (b) such beneficiary's equal portion (unless a different allocation is indicated by the donor in a written notice accompanying the gift) of the fair market value at the time of transfer to the Trust of any property transferred to the Trust during that calendar year or which is considered to be an indirect transfer on his or her behalf during such year; provided, however, that any gift that is accompanied by a written notice from its donor to the effect that such gift shall not be subject to withdrawal under the provisions of this Article shall be excluded from consideration under this Article as though such gift had not been made. Fair market value shall be determined in the same manner as such amount would be determined for the donor's federal gift tax purposes. For purposes of determining the identity of the donor(s) and the amount of available gift tax exclusion remaining, any gift of separate property made by a married person shall be deemed to have been made one-half (1/2) by that person and one-half (1/2) by the spouse of that person so long as the gift is accompanied by a statement that this sentence shall apply, provided that each person is either a citizen of the United States or a United States resident alien.

4.2    Who May Exercise the Power. The beneficiaries entitled to withdraw principal pursuant to this Article shall be only those persons who would be Beneficiaries on the respective dates of transfer as if the Event Date had occurred.

4.3    Notice to Beneficiaries. Upon receipt of any transfer pursuant to Paragraph 4.1, the Trustee shall immediately give notice to each beneficiary who has a power to withdraw under this Article with respect to that transfer of (a) the transfer and (b) such beneficiary's power to withdraw under the provisions of this Article. Such notice may, but shall not be required to, be in the form of the Notice to Beneficiaries, attached hereto as Exhibit "A".

4.4    Exercise of Power to Withdraw. In the event a beneficiary elects to withdraw the amount allowable by this Article, the Trustee, in its sole discretion, may distribute to that beneficiary that amount in kind at its value at the date of withdrawal as determined by the Trustee. The right to withdraw Trust property in kind hereunder includes the right to withdraw life insurance policies in kind at the then values of those policies that are withdrawn at the election of the Trustee. The power to withdraw under this Article may be exercised by a beneficiary only by written instrument delivered to the Trustee by the earlier to occur of: (a) thirty (30) days of the giving of that notice or (b) the date of death of the Grantor (the "Exercise Period").

4.5    Beneficiary Lacking Legal Capacity. In the event that the owner of the power to withdraw under this Article lacks legal capacity, the natural or legal guardian of a minor beneficiary or other fiduciary of that beneficiary's estate (other than the Grantor, the Grantor's spouse or a natural guardian who is not related by blood to the Grantor), as determined by the Trustee, shall be given the notice and may exercise the power to withdraw granted under this Article, and, in that event, the Trustee shall distribute that property to or for the benefit of that beneficiary, as determined by the Trustee, in accordance with the terms of this Trust Agreement. However, if the Grantor,

Page 5,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

the Grantor's spouse or a natural guardian who is not related by blood to the Grantor is that beneficiary's guardian or conservator, then the individual designated as next successor Trustee to the individual then serving as Trustee under this Trust Agreement (or any one of two or more Co-Trustees then serving) may make such demand on that beneficiary's behalf, unless the Trustee designates another individual in accordance with the remaining provisions of this Paragraph. If there is no individual designated successor Trustee, or if the Trustee prefers another individual to act in such capacity (in the exercise of the Trustee's discretion), the Trustee may designate an individual to so act (other than the Grantor or the Grantor's spouse, but specifically including a natural guardian who is not related by blood to the Grantor, if the Trustee deems it advisable).

4.6    Non-Exercise of Power. This power to withdraw shall be noncumulative and shall lapse if not exercised; provided, however, that to the extent the principal of the Trust Estate subject to a beneficiary's power to withdraw under this Article exceeds in value, at the end of the Exercise Period, the greater of the amounts stated in Section 2041(b)(2) of the Internal Revenue Code, that beneficiary's power to withdraw such excess amount of Trust principal (computed retroactively, as of the giving of notice and not at the end of the Exercise Period) shall not lapse if not exercised within the Exercise Period (a "Non-Lapsed Power"), but shall continue to be exercisable, on a cumulative basis, during the life of that beneficiary. If such power of withdrawal is not exercised as set forth hereinabove, then the portion of the Trust Estate which was the subject of such power of withdrawal shall remain as part of the Trust Estate to be held, divided, administered and distributed as hereinafter set forth in this Trust Agreement. Notwithstanding the foregoing, if a beneficiary under this Trust or one or more other trusts has powers of withdrawal that would otherwise appear to lapse in whole or in part in the same calendar year, for the purposes of taking such other lapses into account under this Trust, the Trustee may designate the order in which such provisions shall be taken into account for the purposes of this Paragraph. In the aggregate for a calendar year, the lapse of a beneficiary's powers of withdrawal under all such trusts shall be reduced to not more than the greater of Five Thousand Dollars ($5,000) or five percent (5%) of the aggregate value of the assets out of which the exercise of the lapsed powers could be satisfied under all such trusts and the lapse of the powers of withdrawal of a beneficiary under this Trust shall only be reduced to the extent necessary so that the aggregate lapse of all such rights does not exceed such amount.

4.7    Periodic Lapse of Power to Withdraw. Notwithstanding anything in this Article to the contrary, to the extent a beneficiary possesses a Non-Lapsed Power, a portion of such beneficiary's Non-Lapsed Power shall nevertheless lapse on the first day of the next calendar year in an amount equal to the excess, if any, of: (a) the greater of the amounts stated in Section 2041(b)(2) of the Internal Revenue Code; over (b) the amount of principal of the Trust Estate with respect to which such beneficiary newly obtains the right to withdraw pursuant to Paragraph 4.1 in such calendar year. In the event a beneficiary possesses Non-Lapsed Powers created in more than one calendar year, the portion of such Non-Lapsed Powers which shall lapse pursuant to this Paragraph shall relate to, first, the Non-Lapsed Powers arising in the earliest of such calendar years, then those Non-Lapsed Powers arising in chronologically successive calendar years, until the amount which shall lapse pursuant to this Paragraph is reached.

Page 6,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

4.8    Beneficiary Power of Appointment. At any time, or from time to time, if a beneficiary holds a power of withdrawal that has not lapsed, the Trustee shall distribute all or any part of the Trust Estate which is subject to that beneficiary's continuing power of withdrawal to the beneficiary, the beneficiary's spouse, or to one or more of the Grantor's other issue then living, and on such terms and conditions, either outright or in trust, as that beneficiary shall appoint by an acknowledged instrument specifically referring to and exercising this continuing power of withdrawal and delivered to the Trustee. If a beneficiary dies while holding a power of withdrawal that has not lapsed, the beneficiary may exercise this power of appointment by a Will or other written document specifically referring to and exercising this power of appointment.

4.9    Power of Trustee to Amend. The power of a beneficiary to withdraw principal pursuant to this Article is intended to allow any and all transfers by donors to the Trust prior to the death of the Grantor to constitute transfers of a present interest in property pursuant to Section 2503(b) of the Internal Revenue Code. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee shall have the power to delete, supplement or otherwise amend those provisions of the Trust, including without limitation this Article, from time to time as may be necessary for the sole purpose of achieving this intention to the extent allowable under then-existing law. No such amendment shall in any way restrict, enlarge or otherwise affect any beneficiary's power of withdrawal which exists prior to or at the time the amendment is made. The Trustee shall be relieved from any liability to any Beneficiary or to any other person or entity arising from or related to the exercise or non-exercise of the powers granted under this Paragraph 4.9.

ARTICLE 5

ADMINISTRATION OF TRUST ESTATE:

5.1    Administration of Trust Estate as Set Forth in This Article. The Trust Estate, including any assets received by the Trust from time to time subsequent to the execution of this Trust Agreement, shall be held, administered and distributed as set forth in this Article.

5.2    Allocation of Trust Estate. The Trustee, in his sole, absolute and unreviewable discretion, shall have the power, the exercise of which shall be absolutely binding on all persons interested now or in the future in this trust, to distribute to or apply for the benefit, enjoyment or use of (herein sometimes collectively referred to as the "benefits") any one or more of the following permissible distributees:

(a)    The Grantor's children (hereinafter in this Paragraph 5.2 referred to individually as a "primary beneficiary" and collectively as the "primary beneficiaries"),

(b)    The descendants of a primary beneficiary who are then living (even though not now living), including a descendant whose parent or parents are then living,

Page 7,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(c)    An eligible spouse (as defined in Paragraph 13.2) of one of the Children or their descendants as to income only, and/or

(d)    Any trust for the primary benefit of any one or more of the above-described permissible distributees (even one created by a Trustee hereunder), whether now existing or hereafter created (except (i) any trust which is created by either the Grantor or a donor of such trust hereunder or (ii) any trust as to which either the Grantor or such donor has a beneficial interest or any power which could affect beneficial enjoyment), provided, however, that during the Grantor's lifetime, any such trust is governed by an irrevocable trust instrument executed prior to or concurrently with this Trust Agreement,

So much of the income or principal, or both, of the trust estate, in equal or unequal proportions, and at such time or times as such Trustee shall deem appropriate for such beneficiaries' health, maintenance, support and education or for any other purposes, after taking into consideration their income or other resources; provided, however, in no event shall such benefits be less than that needed for the reasonable support of a primary beneficiary (including the support of those for whom such primary beneficiary provides support as members of a primary beneficiary's family) if a primary beneficiary's own means of support are inadequate.  Such reasonable support shall be in the primary beneficiary's accustomed standard of support unless, in the Trustee's judgment, the size of this trust estate and the probable future needs of all of the permissible distributees require a lesser standard.  Any net income not distributed shall be accumulated and added to principal.  In exercising the discretions conferred in this section, the Trustee may pay more to or apply more for some beneficiaries than others and may make payments to or applications of benefits for one or more beneficiaries to the exclusion of others, if such Trustee deems this necessary or appropriate in light of the circumstances, the size of the trust estate, and the probable future needs of all beneficiaries.  In addition, the Trustee, in his or her sole discretion and without diminishing any of the Trustee's powers authorized elsewhere in this document, may pay less to, exclude or discontinue payments to eligible spouses who no longer have any children or have only adult children who are the Children's descendants or have other means of support.  Except however, after the death of the Grantor, the Trustee shall make every effort within the discretion afforded herein to divide the Trust Estate equally among the primary beneficiaries or those beneficiaries described in Paragraph 3.1 hereof such that until the death of the last of the primary beneficiaries to die, each primary beneficiary is treated equally either directly or through his/her descendants. The Trustee shall not make any such distributions of income or principal from the trust estate to or for the benefit of a trust beneficiary hereunder until consideration has first been given to the advisability of using the beneficiary's own assets and resources for such purpose or purposes in order to reduce the amount of the beneficiary's taxable estate, thereby minimizing the amount of the beneficiary's future taxes.

5.3    Distribution of Income.  Subject to the remaining provisions of this Article, the net income of the Trust created hereunder shall be distributed to or applied for the use and benefit of the respective Beneficiary thereof in convenient installments, but not less frequently than annually.

Page 8,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

5.4    <u>Distributions of Principal</u>. Upon the death of the last to die of the primary beneficiaries, the Trustee shall distribute the principal of the Trust Estate to the beneficiary (Trusts) identified in Paragraph 5.2 hereof.

5.5    <u>Partial Distributions of Principal</u>. Until complete distribution pursuant to the provisions of Paragraph 5.4 the Trustee may distribute to or apply for the benefit of each Beneficiary those sums as the Trustee, in the Trustee's discretion, considers necessary for the proper support, maintenance, health and education of any one or more of that Beneficiary or that Beneficiary's issue, after taking into consideration, to the extent the Trustee considers advisable, any income or other resources of the Beneficiary or that Beneficiary's issue, as appropriate, outside of any Trust created pursuant to this Trust Agreement known to the Trustee and reasonably available for those purposes; provided, however, that no portion of the amount or amounts so distributed may be used to discharge any obligation of a parent of such issue to support any of those issue.

5.6    <u>Distribution Upon the Death of a Beneficiary</u>. Upon the death of a Beneficiary, the undistributed balance of that Beneficiary's Trust shall be allocated into separate Trusts among the issue of that deceased Beneficiary, with allocation to be made among such issue by right of representation. If there is no then-living issue of that deceased Beneficiary, the deceased Beneficiary's Trust shall be divided into shares and/or subshares for the then-living issue of that deceased Beneficiary's nearest ancestor not more remote than the Grantor (provided any such issue is a lineal descendant of the Grantor), with allocation to be made among such issue by right of representation. Any share so established for either (a) the issue of that deceased Beneficiary or (b) the issue of that deceased Beneficiary's nearest ancestor not more remote than the Grantor (provided any such issue is a lineal descendant of the Grantor) shall be held in trust and distributed in accordance with this Article. However, if any part of that deceased Beneficiary's Trust would otherwise be held in trust for a Beneficiary for whose benefit a Trust is already then being administered under this Trust Agreement, that part shall instead be added to that Trust and shall thereafter be administered according to its terms, except that, if that Trust provides for distribution in installments and if that Beneficiary has received a fractional distribution of that Trust pursuant to its terms, then there shall be distributed to that Beneficiary, free of trust, a fraction of that part equal to the fraction of that Beneficiary's interest previously distributed to that Beneficiary.

5.7    <u>Contingent Beneficiaries</u>. If at any time before full distribution of the Trust Estate, no other disposition of the Trust Estate is directed by this Trust Agreement, the Trust Estate, or the portion of it then remaining, shall be distributed, free of trust, to those persons who would then be the heirs of the Grantor, their identities and respective shares to be determined as though the death of the Grantor had occurred at that time, in accordance with the laws of the state of California then in effect relating to the succession of separate property not acquired from a predeceased spouse or ancestor.

Page 9,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

## ARTICLE 6

### SUCCESSOR TRUSTEE:

6.1     Designated Successor Trustee.  If the TRUSTEE shall fail to qualify, become unable to serve or otherwise cease to act as Trustee hereunder, and no successor has been appointed by the Grantor to act in his stead, then DAVID MAYMAN shall serve in his stead.

6.2     Special Provisions Regarding Non-Resident Fiduciaries. Notwithstanding any other provision of this Trust Agreement, if at any time an individual who is named or nominated as a Trustee or successor Trustee of the Trust or any Trust created hereunder is not a United States citizen or a United States resident for United States income tax purposes (the "Non-Resident Fiduciary"), and any Trust created hereunder will be subject to treatment as a foreign trust for United States income tax purposes, then the next named successor Trustee shall act as Co-Trustee with the Non-Resident Fiduciary, provided such named successor Trustee is a United States citizen or United States resident for United States income tax purposes.  If the next named successor Trustee shall fail to qualify, become unable to serve or otherwise cease to act as Co-Trustee hereunder, then the next named successor Trustee, if any, shall act as Co-Trustee with the Non-Resident Fiduciary, provided such named successor Trustee is a United States citizen or United States resident for United States income tax purposes.  If there are no named successor Trustees or if all the named successor Trustees shall fail to qualify, become unable to serve or otherwise cease to act as Co-Trustee hereunder, then the Non-Resident Fiduciary shall either (a) exercise the Non-Resident Fiduciary's power under this Article to designate a Co-Trustee (either an individual or a Corporate Trustee) who is a United States citizen or a United States domestic corporation, who or which is not a related or subordinate party to the Non-Resident Fiduciary within the meaning of Section 672(c) of the Internal Revenue Code, to serve with the Non-Resident Fiduciary or (b) if the Non-Resident Fiduciary fails to exercise such power, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries of any Trust created hereunder, acting by majority vote, shall name a Co-Trustee (either an individual or a Corporate Trustee) who is a United States citizen or a United States domestic corporation, who or which is not a related or subordinate party to the Non-Resident Fiduciary within the meaning of Section 672(c) of the Internal Revenue Code, to serve with the Non-Resident Fiduciary.  Moreover, notwithstanding the foregoing, unless the Non-Resident Fiduciary is a United States citizen or United States resident for United States income tax purposes, at no time shall the Non-Resident Fiduciary have the authority to control any substantial decisions of the Trust, and the Co-Trustee who is acting with the Non-Resident Fiduciary shall solely control all such decisions.  The purpose of this provision is to avoid any Trust created hereunder from being treated as a foreign trust for United States income tax purposes.

6.3     Power of an Individual Trustee to Designate a Successor Trustee. Subject to the provisions of Paragraph 2.3 and Paragraph 6.11, this Paragraph provides for the designation of successor Trustees and/or Co-Trustees by an individual Trustee, as provided below:

Page 10,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(a)    An individual acting as Trustee or named as a successor Trustee in this Trust Agreement (the "Designating Trustee") shall have the power to designate one or more successor Trustees or Co-Trustees (referred to collectively as "Designated Successors" or individually as a "Designated Successor"). Such Designated Successors shall be entitled to serve as Co-Trustees or successor Trustees subject to the limitations or conditions set forth in the remainder of this Paragraph.

(b)    Designated Successors shall commence to serve and shall serve as Trustee or Co-Trustees hereunder as follows:

(1)    A Designated Successor may be appointed to serve concurrently with the Designating Trustee, with the Designated Successor's term ending when the Designating Trustee ceases to act as Trustee hereunder for any reason.

(2)    A Designated Successor may be appointed to serve concurrently with the Designating Trustee, with the Designated Successor's term as Trustee hereunder continuing after the Designating Trustee ceases to act as Trustee hereunder for any reason, provided that there is no successor Trustee named in this Trust Agreement who commences to act as successor Trustee, in which case the Designated Successor shall cease to act as Co-Trustee hereunder, but may be named to resume acting as successor Trustee hereunder at such time as there is no successor Trustee named in this Trust Agreement who is then qualified or able to serve as Trustee hereunder for any reason.

(3)    Designated Successors may be named to act as successor Trustees hereunder, one or more at a time, in the order indicated by the Designating Trustee at such time as there are no successor Trustees named in this Trust Agreement who are available to act as successor Trustee.

(c)    Each acting individual Trustee and each named successor individual Trustee may exercise the power to name Designated Successors, subject to the following limitations:

(1)    Any designation of Trustees and successor Trustees by the Grantor, as set forth in this Trust Agreement, shall take precedence over the exercise of the power to name Designated Successors by any Designating Trustee.

(2)    If the individual named as or serving as Trustee as well as any one or more individuals named as successor Trustees hereunder act as Designating Trustees and exercise the power to name Designated Successors, the exercise by the first-named successor Trustee shall take precedence over an exercise by the second-named successor Trustee, which shall take precedence over an exercise by the third-named successor Trustee, and so on.

(3)    While Co-Trustees are serving, they shall exercise this power jointly; provided, however, that if one Co-Trustee does not join in the designation and does not attempt to make an alternative designation, then the designation by the one Co-Trustee shall be effective.

Page 11,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

**129**

(4)    A Designated Successor shall have the authority to name additional Designated Successors; provided, however, that any Designated Successor named by a Designated Successor may serve as Trustee hereunder only if no successor Trustees named in this Trust Agreement and no Designated Successors named by an individual named as a successor Trustee in this Trust Agreement are available to serve as Trustee hereunder.

(d)    The purpose of this Paragraph 6.3 is to provide a mechanism whereby one or more individuals may be named to serve as successor Trustee hereunder without a court proceeding.  However, no provision of this Paragraph 6.3 shall be interpreted to prevent a Designating Trustee from also naming a Corporate Trustee as a Designated Successor, subject to the provisions of Paragraph 6.3(h).

(e)    The foregoing power to name Designated Successors shall be exercised by a Designating Trustee by giving written notice of the designation of such Designated Successors to the then-living adult beneficiaries, the guardians of any minor beneficiaries and the conservators of any incapacitated beneficiaries, and as otherwise required by law.

(f)    Any designation pursuant to this Paragraph may be revoked or amended by the Designating Trustee by giving written notice in the same manner as the designation was made as provided above.

(g)    Any Designated Successor who serves as a successor Trustee (or Co-Trustee) hereunder shall have all of the powers conferred upon a named Trustee under this Trust Agreement, shall serve without bond and shall for all other purposes be treated as a named Trustee under this Trust Agreement.

(h)    A Designating Trustee may name a Corporate Trustee to act as a Designated Successor; provided that the Corporate Trustee has either (1) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (2) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000).

Page 12,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

6.4    Right of Trustee to Resign; Appointment of Successor Trustee in the Event of a Vacancy.

(a)    Resignation of Trustee. Any Trustee acting as a Trustee under any Trust created hereunder may resign and be discharged from acting as a Trustee of that Trust by giving written notice of its resignation to any remaining Co-Trustee, to the adult Beneficiaries, to the guardians of any minor Beneficiaries and to the conservators of any incapacitated Beneficiaries. The notice shall be served personally or by certified or registered mail, postage prepaid, return receipt requested, and shall specify the date when the resignation shall take effect. The effective date of the resignation shall be at least thirty (30) days after the service or mailing thereof, unless the person or persons to whom notice of the resignation shall have been given shall otherwise consent.

(b)    Appointment of Successor Trustee to Fill Vacancy. In the event a vacancy exists in the office of Trustee (whether as a result of the resignation of the then-acting Trustee or for any other reason), and unless a successor Trustee is designated or otherwise appointed as provided in this Trust Agreement, and subject to the provisions of Paragraph 6.11, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries may, by action of a majority in interest, in a written instrument, designate a successor Trustee or Co-Trustees (either individual Trustees and/or a Corporate Trustee) for the Trusts created hereunder; provided that:

(1)    any designated successor Corporate Trustee has either (A) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (B) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000); and

(2)    the Beneficiaries shall not be permitted to designate any individual Trustee who is considered to be a related or subordinate party subservient to the wishes of any Beneficiary, within the meaning of Section 672(c) of the Internal Revenue Code or any successor to that Section.

6.5    Declination of a Named Successor Trustee. Any person or Corporate Trustee named as a successor Trustee under the Trust may decline at any time to act as Trustee of any Trust created hereunder by giving written notice of declination to the acting Trustee. If there is no acting Trustee at that time, notice shall instead be given to the next named Trustee or, if none is named, then to the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries. The notice may be served personally, or by certified or registered mail, postage prepaid, return receipt requested.

6.6    Substitution of Corporate Trustee. At any time that a Corporate Trustee is serving as Trustee of any Trust created pursuant to the provisions of this Trust Agreement, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries of such Trusts shall have the power, by

Page 13,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

action of a majority in interest, to transfer the administration of those Trusts to a new Corporate Trustee who has either (a) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (b) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000). The substitution of a new Corporate Trustee shall be made by the giving of written notice by the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries, directed to the then-acting Corporate Trustee, indicating the desire of the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries to effect a substitution in the office of Corporate Trustee and designating the new Corporate Trustee selected. Upon securing the approval of the transfer and substitution by a court of competent jurisdiction to the extent that the approval may be required by law, or within thirty (30) days after receipt of the above-mentioned notice, the Corporate Trustee then serving as Trustee hereunder shall transfer and convey the entire interest of that Corporate Trustee in the Trust Estate to the new and substituted Corporate Trustee. The purposes of the foregoing provisions are to insure harmonious relations between the Corporate Trustee and the Beneficiaries, and to further the effective and efficient management of the Trusts created hereunder. At any time that a Corporate Trustee is named as a Trustee of any Trust created pursuant to the provisions of this Trust Agreement and that Corporate Trustee (a) declines to act as Trustee, (b) otherwise does not commence to act as Trustee or (c) is a named successor Trustee, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries of such Trust shall have the power, by action of a majority in interest, to substitute a new Corporate Trustee in the place of the named Corporate Trustee. The new Corporate Trustee must have either (a) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (b) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000). The new Corporate Trustee shall replace the named Corporate Trustee for all purposes of this Trust Agreement.

6.7    Effect of Succession of Trustees.  Any successor of a Trustee hereunder, whether resulting from consolidation, merger, or the transfer of Trust business or from death, resignation, refusal or inability to act, or by any other reason, shall succeed as Trustee with like effect as though originally named as such.

6.8    Powers and Authorities of Successor Trustee.  All powers and authorities, including discretionary and administrative powers, herein conferred upon a Trustee shall pass to any subsequent Trustee.

6.9    No Duty of Successor Trustees to Investigate.  A succeeding Trustee shall not be under any duty to examine the books and records of its predecessor Trustee and may accept as the full Trust Estate any properties which may be turned over to it.

6.10    Indemnification of Trustee.  To the fullest extent permissible under California law, no Trustee serving under this Trust Agreement shall be liable,

Page 14,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

responsible or accountable in damages or otherwise to the beneficiaries of the Trust for any acts performed within the scope of the authority conferred on such Trustee by this Trust Agreement, except for such Trustee's willful misconduct, gross negligence, bad faith or reckless indifference to the interest of the beneficiaries. The Trust shall indemnify and hold harmless the Trustee from and against any and all losses, claims, demands, costs, damages, liabilities, expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, brought against, or threatened against, such Trustee because such Trustee was a Trustee of the Trust, except for such Trustee's willful misconduct, gross negligence, bad faith or reckless indifference to the interest of the beneficiaries. Such indemnification shall be provided regardless of whether the Trustee continues to be a Trustee at the time any such liability or expense is paid or incurred.

(a)     Expenses incurred by a Trustee in defending any claim, demand, action, suit or proceeding subject to this Paragraph shall from time to time be advanced by the Trust prior to the final disposition of such claim, demand, action, suit or proceeding.

(b)     The indemnification provided by this Paragraph shall be in addition to any other rights to which those indemnified may be entitled under any agreement, vote of the Beneficiaries, as a matter of law or equity or otherwise, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Trustee.

(c)     The Trustee may purchase and maintain insurance, at the Trust's expense, on behalf of the Trustee, against any liability that may be asserted against, or any expense that may be incurred by, such persons in connection with the activities of the Trust and/or the acts or omissions of such persons, regardless of whether the Trust would have the power to indemnify such persons against such liability under the provisions of this Trust Agreement.

6.11    <u>Prohibited Trustee Designations</u>. Notwithstanding any provisions of this Article to the contrary, at no time shall the Grantor serve as Trustee under this Trust Agreement.

ARTICLE 7

<u>POWERS OF TRUSTEE:</u>

7.1    <u>Powers of Trustee Set Forth in This Article</u>. To carry out the purposes of any Trust created pursuant to the terms of this Trust Agreement and subject to any limitations stated elsewhere in this Trust Agreement, the Trustee is vested with the powers set forth in this Trust Agreement, including but not limited to those powers contained in this Article in addition to any now or hereafter conferred by law affecting any Trust created hereunder and the Trust Estate. In the event and to the extent that the terms of the prudent investor rule or the Uniform Prudent Investor Act broaden, restrict, conflict or contradict any of the terms of this Trust Agreement, then this Trust Agreement

Page 15,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

and not the prudent investor rule or the Uniform Prudent Investor Act shall apply. Any and all of the powers of the Trustee are subject to the fiduciary obligation of the Trustee to treat all beneficiaries hereunder equitably. In the event that Co-Trustees are serving as Trustee of any Trust created hereunder, the powers set forth in this Trust Agreement shall be exercisable by unanimous action of the Co-Trustees acting jointly and not otherwise. Except as provided elsewhere in the Trust Agreement, the signatures of all Co-Trustees shall be required to evidence the exercise of any trustee power.

7.2    Power to Act as Owner. The Trustee is authorized to do all acts, initiate all proceedings and exercise all rights and privileges in the management of the Trust Estate as if the absolute owner thereof. Without limiting the generality of the foregoing, the Trustee shall have the right and power to acquire, grant, bargain, sell (for cash or on deferred payments), sell short, convey, exchange, convert, lease for terms either within or beyond the duration of the Trust, grant for like terms the right to mine or drill for and remove from Trust properties gas, oil or minerals, encumber, borrow, hypothecate, assign, partition, divide, subdivide, improve, loan, reloan or grant options on any and all property of the Trust Estate. The Trustee is authorized to borrow money for any Trust purpose for the debts of the Trust, or the joint debts of the Trust and a Beneficiary, upon terms and conditions as the Trustee may deem to be proper and to obligate the Trust Estate for repayment; and the Trustee may encumber the Trust Estate or any of its property for the obligations of the Trust by mortgage, deed of trust, pledge, guarantee or otherwise, using such procedure or procedures to consummate the transaction or transactions as the Trustee may deem advisable. Except as otherwise specifically provided in this Trust Agreement, all transactions shall be for fair and adequate consideration.

7.3    Investment Powers. The Trustee is authorized to invest and reinvest the principal, and the income if the Trustee is permitted to accumulate it. In so doing, the Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing, specifically including, but not by way of limitation, the following:

(a)    General economic conditions.

(b)    The possible effect of inflation or deflation.

(c)    The expected tax consequences of investment decisions or strategies.

(d)    The role that each investment or course of action plays within the overall Trust portfolio.

(e)    The expected total return from income and the appreciation of capital.

(f)    Other resources of the beneficiaries known to the Trustee as determined from information provided by the beneficiaries.

Page 16,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(g)    Needs for liquidity, regularity of income, and preservation or appreciation of capital.

(h)    An asset's special relationship or special value, if any, to the purposes of the Trust or to one or more of the beneficiaries.

(i)    The anticipated needs of the Trust and its beneficiaries.

The Trustee shall consider individual investments as part of an overall investment strategy having risk and return objectives reasonably suited to the purposes of the Trust. In so doing, the Trustee shall act as a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, to attain the goals of the Grantor as determined from the Trust Agreement. Within the limitations of the foregoing standard and considering individual investments as part of an overall investment strategy, the Trustee is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate and government obligations of every kind, preferred or common stocks (on margin or otherwise), interests in limited liability companies, commodities (on margin or otherwise), options (whether covered or not) or futures for stocks, stock index options, commodities or other assets, any other derivative securities, shares of investment trusts, shares of investment companies, shares of mutual funds (including mutual funds of which the then-acting Trustee or an affiliate of the then-acting Trustee serves as investment adviser), mortgage participations, partnership interests (general or limited) and common trust funds (including common trust funds administered by the then-acting Trustee or an affiliate of the then-acting Trustee). Further, subject to the standards and limitations stated in this Trust Agreement, the Trustee is specifically authorized to (but is not required to) invest funds or assets belonging to the Trust Estate (a) in the purchase or construction of a home for a Beneficiary and/or (b) in the commencement or conduct of a trade or business by a Beneficiary. The Trustee is authorized to invest the entire Trust Estate in interest-bearing accounts, certificates of deposit, market funds, index funds or any other non-equity income-producing investment, notwithstanding the possible decrease of purchasing power of the value of the principal of the Trust Estate.

7.4    Special Provisions While Corporate Trustee Is Acting.  The Grantor acknowledges that, notwithstanding any provision in this Trust Agreement to the contrary, so long as any Corporate Trustee is serving as Trustee under this Trust Agreement, the provisions listed below shall apply.  To the extent that said provisions differ or are inconsistent with any provisions of this Trust Agreement, the terms of this Paragraph 7.4 shall control.

(a)    Any Corporate Trustee may, in its discretion, invest and reinvest in equity securities, securities of any registered investment company (mutual fund), units of common trust funds, interests in unregistered private placement investment funds or undivided interests in any other kind of commingled investment vehicle or strategy of which the Corporate Trustee or a parent or one or more affiliated

Page 17,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

companies is acting as Trustee, investment advisor or is providing services for compensation.

(b)     Any Corporate Trustee may, in its discretion, engage any one or more of its affiliates, including but not limited to an affiliate that may be a registered investment advisor under the Investment Advisors Act of 1940 or a national bank or trust company or a state bank or trust company with respect to any portion of the Trust Estate, and in such event the affiliate shall have the investment powers granted to the Corporate Trustee hereunder.  If the Corporate Trustee engages an affiliate, each shall be entitled to the compensation to which it would be entitled in the absence of the affiliation.

(c)     Any Corporate Trustee may exercise the powers granted under this Paragraph, even though such action may create a conflict of interest and/or may involve an investment that is not of a type or marketability traditionally considered for trust investments.  Grantor hereby waives any conflict of interest that may result directly or indirectly from purchasing, selling or holding any such affiliated investment on behalf of this Trust and from engaging the services of any affiliate and directs that with respect to party in interest transactions such as those outlined in this Paragraph, the Corporate Trustee shall be judged by the same standards and rules of law that would apply to transactions among strangers free of any element of divided loyalty or conflicting interests, notwithstanding the Corporate Trustee's customary duty to avoid conflicts of interest.

7.5     Power to Retain or Abandon Property.  The Trustee is authorized to continue to hold any property, including all assets received by the Trustee (from any and all sources) and to operate at the risk of the Trust Estate any property or business received as long as the Trustee may deem it advisable, the profits and losses thereon to inure to or be chargeable against the Trust Estate and not to the Trustee. Except to the extent prohibited by law, no statutory provision shall constitute a limitation upon the exercise by the Trustee of discretion in continuing to hold securities, properties, partnership interests (general and limited), interests in limited liability companies, business interests or investments received hereunder.  Notwithstanding the foregoing, no provision contained herein should be construed to give the Trustee the power to retain any property beyond the date such property is to be distributed to any Beneficiary hereunder.  The Trustee may, in the Trustee's discretion, abandon any property or interest in property belonging to any Trust if the Trustee determines, in the Trustee's discretion, that the abandonment is in the best interests of the Trust and its beneficiaries.

7.6     Certain Management Powers.

(a)     Compromise.  The Trustee may, at the option of the Trustee, at any time, in connection with the management of the Trust Estate or the collection of any monies due or payable to a Trust created hereunder, compromise any claims existing in favor of or against the Trust.

Page 18,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(b)    Trustee Loans. The Trustee may loan or advance the Trustee's own funds for any Trust purpose to the Trust without security or upon the security of all or any portion of the principal of the Trust involved. Those loans shall bear interest at the then-current rate from date of advancement until repaid. However, the Trustee shall in no event be required to make any loan or advancement to the Trust.

(c)    Nominees. Any certificate, security or any evidence of indebtedness or ownership of property may be registered or taken and held in the name of the Trustee, or in the name of the nominee or nominees of the Trustee, with or without the disclosure of fiduciary relations, in order to more readily facilitate the handling of the Trust Estate.

7.7    Reimbursement of Trustee. The Trustee is authorized to reimburse itself from principal or income for any expense incurred by reason of the Trustee's fiduciary ownership or holding of any property in the Trust Estate.

7.8    Power to Employ. The Trustee may employ attorneys, accountants, brokers, agents, managers, appraisers, investment advisers, custodians, corporate fiduciaries and others whose services are in the Trustee's discretion reasonably necessary or convenient to the administration of the Trust or for the carrying out of any of the Trustee's powers or discretions hereunder. The Trustee shall not be liable to the Trust or to any beneficiaries as a result of any losses, costs or damages of any kind, type or nature, suffered or incurred by the Trust or by any beneficiary resulting from the Trustee's reasonable good faith reliance on professional advice rendered by any professional advisers engaged by the Trustee on behalf of the Trust. The Trustee is authorized to employ the Trustee or any firm with which the Trustee is associated to perform any services that are in the Trustee's discretion necessary or convenient to the administration of the Trust created hereunder. Reasonable compensation for all services performed by these agents shall be paid from the Trust Estate, and shall not decrease the compensation to which the Trustee is entitled.

7.9    Installment Payments of Income. Except as otherwise indicated herein, the Trustee shall make the payments of the annual net income of any Trust required to be distributed hereunder at least quarter-annually or more often in the discretion of the Trustee. The Trustee shall have the power to budget the estimated annual income and expenses of the Trust in such manner as to equalize, as far as possible, periodic income payments to the Beneficiaries. In computing the amount of any such installment, the Trustee may, to the extent deemed appropriate by the Trustee, make reservation for expenses to be charged against such net income.

7.10    Segregation, Allocation and Distribution of Assets. There need be no physical segregation or division of the various Trusts, except as segregation or division may be required by the termination of any Trusts. Regardless of any segregation or division of the various Trusts, the Trustee shall keep separate accounts for the different undivided interests. Upon any division of the Trust Estate into separate shares or Trusts, and upon any distribution of the income or principal, the Trustee may apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in

Page 19,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

kind, or in undivided interests in such manner and at such values as the Trustee in its discretion deems advisable. Any distribution or division in kind may be made on a proportionate or a disproportionate basis so long as the respective assets allocated or distributed have equivalent or proportionate fair market value. In making in kind allocations of assets, the Trustee shall take into consideration the income tax basis of specific property to be so allocated in determining equivalence of value, to the extent that the Trustee deems it advisable and/or to the extent any other adjustments are determined by the Trustee to be reasonable. The Trustee may sell such property as it deems necessary to make any division or distribution. After any division of the Trust Estate, the Trustee may make joint investments with funds from some or all of the several shares or Trusts.

7.11    Trust Distributions. Upon any distribution of a Trust, in whole or in part, the Trustee may assign, transfer or deliver in kind to the Beneficiary then entitled thereto, any part of the Trust Estate or an undivided interest in the Trust Estate, or any portion thereof, at the value as the Trustee may establish as the then fair market value. No interest shall be paid on any specific distribution of cash or property (if any) set forth in this Trust, except that any specific distribution to a spouse of the Grantor shall bear interest. If the Trust Estate includes one or more promissory notes with respect to which gain would be accelerated under Section 453B of the Internal Revenue Code if distributed to a Beneficiary, the Trustee, in its sole discretion, may elect not to distribute such note(s) at the time provided in this Trust Agreement. In the event the Trustee so elects, such note(s) shall continue to be held in trust and the payments received by the Trustee under the note(s) shall be divided, held, administered and distributed as otherwise set forth in this Trust Agreement, until the Trustee determines to distribute the note(s) or until the note(s) are paid in full. Further, the Trustee may, for any reason, elect not to distribute all or any portion of the principal of the Trust Estate with the consent of the Beneficiary who or which is entitled to receive such distribution, until such time as that Beneficiary desires to receive distribution of such principal. In connection with any principal distributions required hereunder as a result of a Beneficiary attaining a stated age, the Trustee may make such distribution at any time after the date on which such Beneficiary attains such stated age and ending on the last day of the same calendar year.

7.12    Powers of Trustee In the Event of Beneficiary Misconduct.

(a)    Suspension of Withdrawal Rights and Mandatory Distributions. Notwithstanding anything to the contrary contained in this Trust Agreement, no Beneficiary shall have a right to withdraw or receive an otherwise mandatory distribution of all or any portion of the principal of a Trust, and/or the net income of the Trust, if on the date a withdrawal is requested or a distribution is provided under the terms of any Trust (collectively, the "Distribution Date"), an event of Beneficiary Misconduct (as hereafter defined) exists. For purposes of this Trust, "Beneficiary Misconduct" means any one or more of the following:

(1)    The Beneficiary is incarcerated.

Page 20,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(2)    The Beneficiary has been convicted of any crime, other than misdemeanors or minor traffic violations, within five (5) years of the Distribution Date.

(3)    The Beneficiary is on probation in connection with any criminal conviction, other than for misdemeanors or minor traffic violations.

(4)    The Beneficiary previously has been on probation and any such period of probation has expired less than two (2) years prior to the Distribution Date, other than for misdemeanors or minor traffic violations.

(5)    The Trustee determines in its sole discretion that within three (3) years of the Distribution Date, the Beneficiary has used or engaged in the purchase and/or sale of any illegal drugs or other illegal substances or has abused the use of alcohol.

Any right to withdraw principal exercisable by a Beneficiary and any right to receive a distribution of net income and/or principal otherwise provided under the terms of the Trust shall be delayed until the Beneficiary Misconduct no longer applies and any period of time defining such Beneficiary Misconduct (as described above) has expired. The determination of whether an event or condition of Beneficiary Misconduct exists shall be determined in the sole and absolute discretion of the Trustee, and shall be final and binding upon all parties interested in such Trust.

(b)    Optional Reduction or Suspension of Discretionary Distributions. Any discretionary distributions for a Beneficiary's health, education, support and maintenance shall be made by the Trustee after considering the Grantor's desire that a Beneficiary lead a life free of crime and substance abuse and the Grantor's intent that the assets of the Trust may not be used to encourage or support a Beneficiary in a lifestyle including criminal activities, illegal drugs or abuse of alcohol. Notwithstanding any other provisions in this Trust Agreement to the contrary, the Trustee shall withhold any and all distributions for support and maintenance which in the Trustee's sole and absolute discretion may (1) encourage a lifestyle involving criminal activities or (2) contribute to a chemical dependence or substance abuse, or otherwise free funds for such use by the Beneficiary; provided, however, that such distributions for support may be provided for a hospital or other program of recovery or a stay in a recovery house, plus all costs incident thereto. Nothing in this Trust Agreement shall prevent the Trustee from making discretionary distributions for the health, education, support and maintenance of a Beneficiary and/or a Beneficiary's issue as otherwise provided in this Trust Agreement to the extent that the Trustee, in its sole and absolute discretion, determines that the conditions described in this Paragraph 7.12(b), are satisfied and that the Beneficiary will use such funds for the purposes for which they are distributed.

(c)    Trustee's Right, But Not the Duty, To Investigate Beneficiary Misconduct. The Trustee shall not have any duty to investigate any Beneficiary Misconduct and shall not be liable to anyone for any Beneficiary

Page 21,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

Misconduct. If the Trustee suspects or becomes aware that the Beneficiary is involved with drug and/or alcohol abuse, the Trustee is authorized, but not required, to employ private investigators and to take such other actions as the Trustee determines appropriate, at the expense of the Trust, to determine whether any Beneficiary Misconduct exists or whether any distribution would be contrary to the Grantor's desires described herein. The Trustee shall not incur any liability to persons whose interest may have been affected by disbursements made or not made in good faith by the Trustee without knowledge of any event affecting distribution to a Beneficiary described in this Paragraph.

(d)    Death of a Beneficiary During Period of Beneficiary Misconduct. If termination of the Trust is postponed pursuant to this Paragraph and the Beneficiary dies during such postponement, the deceased Beneficiary's Trust shall be held, administered and distributed in accordance with this Trust Agreement.

(e)    "Interested" Trustee. In the event that one of two or more individual Co-Trustees then serving is an "Interested Trustee" (as that term is defined in this Paragraph 7.12(e), then the remaining Co-Trustees who are not Interested Trustees shall exercise the discretionary authorities under this Paragraph. In the event that the sole Trustee, or all of the Co-Trustees then serving, are Interested Trustees, then the next Trustee who is not an Interested Trustee and who is not related or subordinate to such individual serving as Trustee (within the meaning of Section 672 of the Internal Revenue Code) shall exercise the discretionary authorities under this Paragraph. For purposes of this Paragraph, "Interested Trustee" (as to any Beneficiary whose rights as a Beneficiary could be affected by that Trustee's exercise of discretionary authorities hereunder) means an individual Trustee who would be entitled to any portion of the interest in the Trust Estate held for that Beneficiary in the event of that Beneficiary's death. Further, for purposes of this Paragraph, an individual Trustee will be deemed to "be entitled to any portion of the interest in the Trust Estate held for that Beneficiary in the event of that Beneficiary's death," if a person who is related or subordinate to such individual Trustee would be entitled to any portion of the interest in that Beneficiary's Trust in the event of that Beneficiary's death.

7.13    Principal and Income. Except when the Trust Agreement specifically provides otherwise, the Trustee shall determine principal and income of the Trust Estate and from time to time apportion and allocate receipts, expenses, and other charges between those accounts according to the provisions of the California Uniform Principal and Income Act ("UPAIA"). With respect to matters not provided for in the UPAIA, the Trustee shall have the absolute discretion to determine what is principal or income, and apportion and allocate any and all receipts and disbursements between those accounts, subject only to fiduciary standards and limitations of law. The exercise of that discretion within the above set forth limitations shall be conclusive on all persons interested in the Trust Estate.

7.14    Acceptance of Gifts. The Trustee is authorized to accept gifts from any individual who desires to contribute to the principal of any of the respective Trusts created hereunder. The acceptance of any such additional gifts shall be in the sole and absolute discretion of the Trustee.

Page 22,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

7.15    <u>Powers Over Securities</u>. With respect to securities, interests in limited liability companies, partnership interests and similar property held in the Trust, the Trustee shall have all the rights, powers and privileges of an owner, including, but not by way of limitation:

(a)    to vote, give proxies and pay assessments;

(b)    to participate in voting trusts and similar agreements, pooling agreements, foreclosures, reorganizations, consolidations, mergers, liquidations, sales and leases, and incident to such participation to deposit securities with and transfer title to any protective or other committee on such terms as the Trustee may deem advisable;

(c)    to participate in and to exercise rights under buy-sell, close corporation and S corporation shareholder agreements, or similar agreements;

(d)    to exercise or sell stock subscription or conversion rights;

(e)    to consent to foreclosures, reorganizations, consolidations, mergers and liquidations; and

(f)    to deposit securities with and transfer title to any protective or other committee on any terms that the Trustee, in the Trustee's discretion, considers advisable.

The signature of the Trustee, or one of two or more acting Co-Trustees, if applicable, shall be sufficient to bind the Trust with respect to any of the foregoing actions taken pursuant to this Paragraph and any third party may rely upon the signature of one of two or more acting Co-Trustees in connection therewith. Notwithstanding the foregoing, it is the intention of the Grantor that Co-Trustees shall exercise their powers over securities as a single record holder and under no circumstances shall the vote of the Co-Trustees be split, regardless of whether a specific provision of any rule or law applicable to such securities (including the Corporations Code of the state in which the entity was formed) would permit joint holders of such securities to cast votes other than as a single vote. The signatures of all Co-Trustees shall be required to enter into partnership agreements, limited liability company operating agreements, buy/sell agreements or similar agreements.

7.16    <u>Transactions With Other Entities</u>. The Trustee is authorized to purchase assets from or sell assets to the probate estate of the Grantor or any other person, firm, trust or other entity. Any such purchase or sale shall be at the fair market value of those assets (as determined by the Trustee in the Trustee's discretion) and upon such terms and conditions and in such amounts as the Trustee may deem advisable. The Trustee is authorized to loan funds or assets belonging to the Trust Estate to the Grantor, to the probate estate of the Grantor, to any Beneficiary hereunder, or to any other person, firm, trust or other entity, upon such terms and in such amounts as the Trustee may deem advisable. Any such loan must (a) bear a reasonable rate of interest, but not more than the maximum interest rate allowed under California law and (b) must be adequately

Page 23,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

secured. Notwithstanding any provision of this Paragraph to the contrary, in no event shall the Trustee make any investment pursuant to the provisions of this Paragraph for less than adequate consideration in money or money's worth or that the Trustee determines would not be a prudent investment of the assets of the Trust Estate. Further, subject to the standards and limitations stated in this Trust Agreement, the Trustee is specifically authorized to (but is not required to) loan funds or assets belonging to the Trust Estate for (a) the purchase or construction of a home for a Beneficiary and/or (b) the commencement or conduct of a trade or business by a Beneficiary.

7.17    Power to Purchase Insurance. The Trustee is authorized to procure and carry, at the expense of the Trust, insurance of such kind and in such form and amount as the Trustee deems advisable to protect the Trustee, the Trusts and the Trust Estate against any insurable hazard, risk of loss or other potential liability.

7.18    Payments to or for Minors or Incapacitated Persons. If at any time or from time to time any beneficiary entitled to receive income or principal hereunder shall be a minor or an incapacitated adult, the Trustee may make the distribution or expenditure for the beneficiary, in the sole discretion of the Trustee, in any one or more of the following ways:

(a)    directly to the beneficiary;

(b)    to the guardian, conservator or other fiduciary of the person or estate of the beneficiary;

(c)    to a Uniform Transfers to Minors Act account, already existing or created for a minor, in any jurisdiction;

(d)    to any person or organization furnishing care, support, maintenance or education of the beneficiary; or

(e)    by itself making expenditures directly for the support, maintenance, health or education of the beneficiary.

The Trustee shall not be required to see to the application of any funds so paid or applied and the receipt by such payee shall be a full acquittal of the Trustee. The decision of the Trustee as to direct payments or application of funds shall be conclusive and binding upon all parties in interest.

7.19    Banks and Brokerage Accounts and Endorsements. The Trustee is authorized to maintain existing accounts and safe deposit boxes, and open new accounts and safe deposit boxes, at banks, savings and loan associations, brokerage houses and other financial institutions (including with the Trustee and affiliates of the Trustee) for the Trust Estate in such manner that funds may be withdrawn or investment direction given with respect to those accounts, or those safe deposit boxes may be accessed, upon the signature of and upon the instruction of the Trustee, or one of two or more acting Co-Trustees, if applicable. Therefore, one of two or more acting Co-Trustees, acting alone, shall have signature power with respect to any account maintained at a savings and loan

Page 24,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

institution, bank or other financial institution, safe deposit box or brokerage account which then constitutes an asset of the Trust Estate. The signature of the Trustee, or one of two or more acting Co-Trustees, if applicable, shall be sufficient to endorse any check, payment or other instrument which may be received for the account of the Trust, and such endorsement shall be a sufficient receipt to the person giving that check, payment or other instrument to the Trust. The Trustee is authorized, in its discretion, to appoint additional signatories to any accounts and safe deposit boxes maintained or opened at banks, savings and loan associations, brokerage houses and other financial institutions (including with the Trustee and affiliates of the Trustee) for the Trust Estate in such manner that funds may be withdrawn with respect to such accounts upon the signature of such additional signatory or signatories. The signature of such additional signatory or signatories shall be sufficient to endorse any check, payment or other instrument which may be received for the account of the Trust, and such endorsement shall be a sufficient receipt to the person giving the check, payment or other instrument to the Trust.

7.20    Option to Terminate Shares or Trusts. At any time after the death of the Grantor, in the event that:

(a)    the share or separate Trust held for any Beneficiary of a Trust created hereunder has, at any time, in the opinion of the Trustee, a fair market value of Fifty Thousand Dollars ($50,000) or less,

(b)    the aggregate fair market value, in the opinion of the Trustee, of all Trusts created hereunder and administered by the Trustee at any time is Two Hundred Fifty Thousand Dollars ($250,000) or less, or

(c)    the principal value of any Trust created hereunder at any time is less than an amount that can be economically administered in trust,

the Trustee may, in its discretion, but is not required to, terminate that Trust or those Trusts and, regardless of the age of the Beneficiary, distribute the principal and any accrued or undistributed net income thereon to the Beneficiary, or to its guardian, conservator, custodian under the California Uniform Transfers to Minors Act or other similar statute, or other fiduciary.

7.21    Power to Combine and Divide Trusts. Except as otherwise provided to the contrary in this Trust Agreement, the Trustee may, at any time and from time to time, and without court approval, for tax and/or administrative reasons:

(a)    combine any Trust created under this Trust Agreement for any Beneficiary with any other Trust otherwise created for that Beneficiary, whether created under this Trust Agreement or otherwise, the terms of which Trusts are substantially identical and the Trustees of which Trusts are identical, provided that the Trustee, in the Trustee's reasonable discretion, determines that administration as a single Trust will be consistent with the intent of the persons who established the Trusts and will facilitate Trust administration without defeating or impairing beneficial interests of current or future beneficiaries of this Trust; and

Page 25,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(b)      divide any Trust created hereunder into two or more separate Trusts, each of which shall have the same provisions as the original Trust from which it was established, and references in this Trust Agreement to the original Trust shall refer to the separate Trusts derived from it.

If a Trust is divided into separate Trusts, the Trustee may, at any time prior to a combination of such Trusts, take any and all actions consistent with such Trusts being separate entities including, without limitation, make different tax elections with respect to each separate Trust, expend principal and exercise any other discretionary powers differently with respect to each separate Trust. The donee or other holder of any power of appointment with respect to a Trust so divided may exercise such power differently with respect to the separate Trusts created. In addition, if property is directed to be added to any Trust created hereunder, the Trustee may:

(1)      hold such additional property as one or more separate Trusts having terms identical to the terms of the Trust to which it was to be added; and

(2)      allocate such additional property on a non-pro rata basis among the several Trusts, if any, into which the Trust to which such additional property is required to be added was previously divided (including an allocation of all such additional property to one of such Trusts).

No Trustee shall be liable for any good faith exercise of a power described in or otherwise authorized by this Paragraph and, in the event any such good faith exercise of such a power results in a detriment to one or more beneficiaries, the Trustee shall be exonerated and otherwise held harmless with respect to any such detriment.

7.22      Power to Withhold Distribution. The Trustee is authorized to withhold from distribution, at the time for distribution of any property of the Trust Estate, without the payment of interest, all or any part of the property, as long as the Trustee shall determine in its discretion that the property may be subject to conflicting claims, tax deficiencies or liabilities, contingent or otherwise.

7.23      Tax Elections. The Trustee shall have the power in the Trustee's absolute discretion to take any action and to make any election to minimize the tax liabilities of this Trust and/or one or more of its beneficiaries, regardless of the resulting effect on the Trust, the other beneficiaries or any other person interested in this Trust, to allocate the benefits among the various beneficiaries, and to make adjustments in the rights of any beneficiaries or between the income and principal accounts, to compensate for the consequences of any tax election or any investment or administrative decision that the Trustee believes has had the effect of directly or indirectly preferring one beneficiary or group of beneficiaries over others. In allocating assets hereunder, the Trustee may take into consideration the basis of such assets to the extent appropriate, as determined by the Trustee in its sole and absolute discretion.

Page 26,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

7.24 <u>Subdivision of Real Property</u>. The Trustee is authorized and empowered:

(a)   to subdivide and resubdivide Trust real property and sign applications, maps and other documents incidental thereto;

(b)   to dedicate Trust real property for public purposes, with or without consideration;

(c)   to grant and impose upon Trust real property conditions, covenants, easements, restrictions, rights of way and other servitudes;

(d)   to borrow against Trust real property; and

(e)   to do such other acts as may appear to the Trustee advisable in connection with the exercise of any of the foregoing powers.

7.25 <u>Purchase at Foreclosure</u>. The Trustee is authorized and empowered, as to any property (real, personal or mixed) in which the Trust has any interest, that is sold at foreclosure, judicial or non-judicial, to make bids upon or purchase the same or, as to such property, to accept a deed in lieu of foreclosure as full or complete satisfaction of the debt which is secured. The Trustee shall allocate income and expense attributable to such property or the proceeds of its sale as if such property were being initially acquired as a Trust investment.

7.26 <u>Fiduciary Related Party Transactions</u>. The Trustee is authorized to act on behalf of the Trust notwithstanding the self interest of the Trustee, subject to the fiduciary duty of the Trustee, including the power to lease, mortgage or sell any property to or lease or purchase any property from the Trustee; to determine the amount of and to receive compensation for services as Trustee or in any other capacity; in the case of a corporate Trustee, to borrow from, deposit money or otherwise deal with its own banking department or that of an affiliate, to invest in its own stock or stock of any of its affiliates, or to invest in its own common trust fund; and to be interested in any investment, corporation, limited liability company, partnership, other unincorporated business, farming or mining operation, real estate operation or other venture in which the Trust is interested. No person shall be precluded from acting as Trustee hereunder or being compensated therefore by reason of his employment in any capacity by any corporation, limited liability company or partnership or office in any capacity with any corporation, limited liability company or partnership, the stock of which corporation or an interest in which limited liability company or partnership constitutes a part or all of the assets of the Trust, nor shall the Trustee be so precluded from accepting such employment or appointment by any such corporation, limited liability company or partnership. The Trustee is specifically authorized and empowered to exercise all of the duties and powers entrusted to such Trustee under the terms of this Trust Agreement despite any duality of fiduciary obligations arising by reason of such person's service as the Trustee and as an officer, director, partner or employee of any corporation, limited liability company or partnership in which the Trust may be interested. No Trustee hereunder shall be liable

Page 27,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

for any loss or diminution in the Trust resulting from any action such Trustee may take or refrain from taking concerning the foregoing, except for such Trustee's own gross negligence or willful misconduct with regard thereto.

7.27    Power to Commence, Retain and Manage Closely Held Business. The Trustee is expressly authorized to commence or retain, regardless of lack of diversification, as an investment of any Trust created hereunder, securities of or any other ownership interest in any closely held business, whether a sole proprietorship, corporation, limited liability company, joint venture or partnership (including stocks, bonds, debentures and any other form of securities representing either or both a proprietary interest in or obligation of said corporation or other entity), and any other business entity which is a successor to, subsidiary of, or affiliated with, said corporation or other entity, which is now or hereafter assigned, devised, bequeathed, transferred or delivered to the Trustee (all of which, if more than one, are hereinafter referred to as "the Company"). Pending sale or final distribution of said securities or ownership interest or liquidation of the Company, the Trustee shall have the following authorities and discretions, in addition to any other grant of authority and discretion given elsewhere in this Trust Agreement:

(a)      to participate in the management of the Company;

(b)      to supervise, in any manner, the conduct of the Company's business;

(c)      to extend credit to the Company from any Trustee, including the banking department of a corporate Trustee, if one is acting, without in any way increasing, limiting or otherwise affecting its duties, responsibilities and liabilities as Trustee;

(d)      to increase the investment of any Trust in the Company, either or both by way of secured or unsecured loans to the Company, by the purchase of equity from other equity holders of the Company, expressly including equity owned by a Beneficiary, or by subscription to additional equity, either or both common or preferred stock, partnership interests and/or limited liability company membership interests, or by pledging assets for the debts of the Company, whether incurred before or after the death of the Grantor;

(e)      to organize a corporation, partnership or limited liability company under the laws of any state and to transfer to it all or any part of the Company or other property held in the Trust; and

(f)      to retain in the Company such amount of its net earnings as the Trustee may deem advisable in conformity with responsible business practice.

The Trustee may exercise such authority to such extent and in such manner as the Trustee, from time to time, deems necessary or advisable to protect the investment of any Trust created hereunder and to contribute to the best interest and welfare of the beneficiaries thereof.

Page 28,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

The Grantor expects the Trustee to exercise ordinary business judgment in determining how long such securities or ownership interest shall be retained as an investment and in deciding upon such action as may be taken in its supervision of the management of the Company during the period of such retention and the readjustment of the total investment therein, it being the intention of the Grantor to give to the Trustee every power and discretion it may need or require to provide proper management and supervision of the Company until such time as the Trustee, in its sole judgment, shall deem it to be to the best advantage of a Trust, and the beneficiaries thereof, to sell or otherwise dispose of such securities or ownership interest; and the Trustee shall not be liable for any loss that may result from the honest exercise of any such power or discretion granted in the Trust Agreement, and shall be indemnified against any such loss from the assets of any Trust holding securities of or any other ownership interest in the Company. The Grantor realizes that the Grantor is exposing any Trust to the risks inherent in all business operations, but it is the belief of the Grantor that the possibility of preserving the capital and income values which the Grantor believes the securities to contain justifies such risk. To the extent that the Trustee may render service to the Company, the Trustee is expressly authorized to take such steps as may be practicable to charge its fees for such service to the Company rather than to a Trust.

Nothing contained herein shall be construed to prevent any individual Trustee from being employed by the Company at a salary commensurate with the value of his or her service, or to prevent him or her from becoming a purchaser of any of such securities or other ownership interest either from the Trustee or from any other source.

The foregoing powers shall be deemed to be and shall be exercised as fiduciary powers. They shall not disqualify the possessor from holding office in the Company, accepting remuneration from it, voting any stock in favor of himself or herself as director or officer, or purchasing or selling stock of the Company.

7.28    Power Regarding S Corporations. The Trustee shall have the power to make any elections or decisions the Trustee deems appropriate with respect to any stock in an S corporation (as defined in Section 1361(a) of the Internal Revenue Code) held or acquired by the Trust.

7.29    Power Regarding Names of Trusts. The Trustee shall have the power, in the Trustee's sole and absolute discretion, to name, rename or change the name of the Trust or any Trust created hereunder.

7.30    Power to Transfer Trust to or from Another Jurisdiction. The Trustee shall have the power to remove any and all of the Trust Estate of any Trust created hereunder to or from any state of the United States, the District of Columbia or any foreign jurisdiction. Upon such removal, the laws and courts of such other jurisdiction shall govern the administration of the Trust, unless and until its removal therefrom or distribution. The Trustee shall have the power, from time to time, to change the jurisdiction of this Trust and, in such event, the laws and courts of such other jurisdiction shall govern the administration of the Trust, unless and until the Trustee changes jurisdiction again.

Page 29,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

7.31    Power to Initiate and Defend Litigation; Power to Compromise Claims.

(a)    The Trustee may, in the Trustee's discretion, initiate or defend, at the expense of the Trust, any litigation relating to the Trust or any property of the Trust Estate that the Trustee considers advisable.  The Trustee's powers under this Paragraph shall apply during the term of the Trust and after distribution of Trust assets.  The Trustee shall have no duties, however, regarding any litigation or claims occurring after distribution of Trust assets, unless the Trustee is adequately indemnified by the distributees for any loss occasioned by exercise of these powers.

(b)    The Trustee may, in the Trustee's discretion, compromise, submit to arbitration, abandon, or otherwise adjust any claims or litigation against or in favor of the Trust.  The Trustee's decision in this regard shall be conclusive.  The Trustee's powers under this Paragraph shall apply during the term of the Trust and after distribution of Trust assets.  The Trustee shall have no obligation or duties, however, regarding any litigation or claims occurring after distribution of Trust assets, unless the Trustee is adequately indemnified by the distributees for any loss occasioned by exercise of these powers.

7.32    Environmental Matters.  In addition to all other powers, rights and privileges conferred on the Trustee under this Trust Agreement, the Trustee shall also have the following rights, powers and privileges with respect to environmental matters:

(a)    Inspection of Property and Records Prior to Acceptance.

(1)    Prior to acceptance of this Trust by any proposed or designated Trustee (and prior to acceptance of any asset by any proposed, designated or acting Trustee), such Trustee or proposed or designated Trustee shall have the right to take the following actions at the expense of the Trust Estate:

(A)    to enter, inspect and take samples for laboratory analysis from any existing or proposed Trust asset for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any hazardous substance (as defined under any applicable federal, state or local environmental law or regulation) into, onto, beneath or from the asset; and

(B)    to review records of the currently acting Trustee or of the Grantor (or of any partnership, limited liability company or corporation in which either the Trust or the Grantor holds an interest) for the purpose of determining whether the asset is in compliance with all federal, state or local environmental laws and regulations, including those records relating to permits, licenses, notices, reporting requirements and governmental monitoring of hazardous waste.

(2)    The right of the Trustee or the proposed or designated Trustee to enter and inspect assets and records of a partnership, limited liability company or corporation under this Paragraph is equivalent to the right under

Page 30,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

state law of a partner, member or shareholder to inspect assets and records under similar circumstances.

(3)     Acts performed by a proposed or designated Trustee under this Paragraph shall not constitute acceptance of the Trust.

(4)     If an asset of the Trust is discovered upon environmental audit by any proposed or designated Trustee to be contaminated with hazardous waste or otherwise not in compliance with environmental law or regulation, the Trustee may decline to act as Trustee solely as to such asset, and accept the Trusteeship as to all other assets of the Trust. A court of competent jurisdiction shall appoint a receiver or Special Trustee to hold and manage the rejected asset under the preceding sentence, pending its final disposition. Any currently acting Trustee shall have the right to reject any asset proposed to be transferred to the Trustee.

(b)     <u>Termination, Bifurcation or Modification of Trust Due to Environmental Liability</u>.

(1)     If the Trust Estate holds one or more assets, the nature, condition, or operation of which is an actual or threatened violation of any federal, state or local environmental law or regulation, the Trustee may take one or more of the following actions, if the Trustee, in its discretion, determines that such action is in the best interests of the Trust and its beneficiaries:

(A)     modification of the Trust provisions, granting the Trustee such additional powers as are required to protect the Trust and its beneficiaries from liability or damage relating to actual or threatened violation of any federal, state or local environmental law or regulation;

(B)     bifurcation of the Trust; or

(C)     appointment of a Special Trustee to administer any Trust property or business which fails to comply with any federal, state or local environmental law or regulation.

(2)     With court approval, the Trustee may terminate the Trust or partially or totally distribute the Trust Estate to its Beneficiaries.

(3)     It is the intent of the Grantor that the Trustee shall have the widest discretion in identification of and response to administration problems connected to potential environmental liability to the Trust Estate and the Trustee, in order to protect the interests of the Trust, the Trustee and the beneficiaries of the Trust.

(c)     <u>Remedies</u>. The Trustee shall have the power to take, on behalf of the Trust, any action necessary to prevent, abate, or otherwise remedy any actual or threatened violation of any federal, state or local environmental law or regulation, relating to any asset, which is or has been held by the Trustee as part of the Trust Estate.

Page 31,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(d)    Indemnification of the Trustee from Trust Assets for Environmental Expenses.

(1)    The Trustee shall be indemnified and reimbursed from the Trust Estate for any liabilities, loss, damages, costs or expenses arising out of or relating to federal, state or local environmental laws or regulations, as amended from time to time (hereinafter "Environmental Expenses").

(2)    Environmental Expenses shall include, but shall not be limited to:

(A)    costs of investigation, analysis, removal, remediation, response or other cleanup costs of contamination by hazardous substances, as defined under any applicable federal, state or local environmental law or regulation;

(B)    legal fees and costs arising from any judicial, investigative or administrative proceeding relating to any federal, state or local environmental law or regulation;

(C)    civil or criminal fees, fines or penalties, incurred under any federal, state or local environmental law or regulation; and

(D)    fees and costs payable to environmental consultants, engineers or other experts, including legal counsel, relating to any federal, state or local environmental law or regulation.

(3)    The right to indemnification or reimbursement shall extend to Environmental Expenses relating to:

(A)    any real property or business enterprise which is or has been at any time owned or operated by the Trustee as part of the Trust Estate; and

(B)    any real property or business enterprise which is or has been at any time owned or operated by a corporation, partnership or association in which the Trustee holds or has held at any time an ownership or management interest as part of the Trust Estate.

(4)    The Trustee shall have the right to reimbursement for incurred Environmental Expenses without the prior requirement of expenditure of its own funds in payment of such Environmental Expenses, and shall have the right to pay Environmental Expenses directly from Trust assets.

(5)    The right of indemnification or reimbursement shall apply to all Environmental Expenses, except those resulting from the Trustee's intentional wrongdoing, bad faith or reckless disregard of fiduciary obligation.

Page 32,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(6)    If the assets of the Trust Estate are insufficient, or there is insufficient liquidity in the Trust Estate to satisfy the obligation of indemnification or reimbursement of the Trustee from the Trust Estate for Environmental Expenses, the Trustee shall have the right to request in writing indemnification or reimbursement for such Environmental Expenses directly from the Grantor and the beneficiaries.

7.33    Discretion of Trustee. Unless specifically limited, all discretions conferred upon the Trustee shall be absolute, and their exercise conclusive on all persons interested in the Trusts. The enumeration of certain powers of the Trustee shall not limit its general powers, the Trustee being vested with and having all the rights, powers and privileges with relation to the Trust Estate as could be exercised and executed by an individual holding and owning the same property in absolute and unconditional ownership. All powers of the Trustee shall be exercised in a fiduciary capacity. The Trustee shall not be liable to the Trust or to any beneficiaries as a result of any losses, costs or damages of any kind, type or nature suffered or incurred by the Trust or by any beneficiary resulting from the Trustee's reasonable actions taken in good faith, the actual result of which could not have been reasonably anticipated.

7.34    Power to Disclaim, Restrict or Enlarge Powers of Trustee. The Trustee is authorized to disclaim, release or restrict the scope of any power that the Trustee may hold in connection with the Trusts created by this Trust Agreement, whether that power is expressly granted in the Trust Agreement or implied by law. The Trustee shall exercise this power in a written instrument executed by the Trustee specifying the power to be disclaimed, released or restricted and the nature of the restriction. In the event the Trustee may deem it advisable to have its authority and powers enlarged or extended for any reason or purpose, the Trustee is authorized to file an appropriate petition therefore in a court of competent jurisdiction, and the Trustee is authorized to comply with any order made in response to any such petition.

7.35    Power to Loan without adequate interest or adequate security. During the lifetime of the Grantor, the Trustee shall have the power to loan the income and/or principal of the Trust without adequate interest and/or without adequate security to the Grantor.

7.36    Power to Exchange Property for Equivalent Value  During the lifetime of the Grantor, the Trustee shall have the power to transfer trust property to the Grantor in exchange for property of equivalent value.


ARTICLE 8

TRUST ADMINISTRATION:

8.1    Trust Administrative Provisions Set Forth in This Article. The provisions set forth in this Article shall apply to the administration of any and all Trusts created pursuant to the provisions of this Trust Agreement.

Page 33,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

8.2    <u>Bond of Trustee</u>.  No bond shall be required of any Trustee of any Trust created pursuant to the provisions of this Trust Agreement, regardless of residence and whether serving jointly or alone.

8.3    <u>Compensation of Trustee</u>.  An individual Trustee shall be entitled to receive reasonable compensation for his or her services.  The compensation for a Corporate Trustee's services shall be in accordance with the Corporate Trustee's published fee schedule from time to time existing for the administration of similar trusts in the state of California.

8.4    <u>Profits and Losses Charged to Trust</u>.  The profits and losses arising from any activity of the Trustee as Trustee of any Trust created hereunder shall respectively inure to the benefit of or be charged against the respective Trust and not the Trustee.

8.5    <u>Accrued and Undistributed Income</u>.  Except as may otherwise be specifically provided herein, upon the death of any Beneficiary for whom a Trust is held, any accrued or undistributed net income of that Beneficiary's Trust shall be held and accounted for, or distributed, in the same manner as if it had been accrued or received after the death of that Beneficiary.  This Paragraph shall not be applicable to any income derived by any Trust created hereunder from an S Corporation (as defined in the Internal Revenue Code).

8.6    <u>Payment of Expenses</u>.  The Trustee shall pay from income or principal of the Trust Estate, or partly from each, in its discretion, all expenses incurred in the administration of this Trust and the protection of the Trust against legal attack.  Those expenses shall include reasonable attorneys' fees and compensation payable to the Trustee under the provisions of this Trust Agreement.

8.7    <u>Disbursements in Good Faith</u>.  Unless the Trustee shall receive written notice of any birth, death or other event upon which the right to receive income or principal from a Trust may depend, the Trustee shall incur no liability for disbursements made in good faith to persons whose interests shall have been affected by that event.

8.8    <u>Disclosure to Third Parties</u>.  Any transfer agent or other person dealing with the Trust (hereinafter referred to as "third party") shall be entitled to rely upon a copy of those portions of the Articles herein titled "Powers of Trustee" and "Trust Administration" setting forth the powers of the Trustee, which partial copy shall be certified as a true copy of those portions then in effect by the Trustee then acting.  The third party shall incur no liability to the Trust or any beneficiary hereunder for acting upon an order or request of the Trustee made pursuant to the terms hereof as set forth in the partial copy, and shall not be required to see to the disposition of any proceeds for the faithful discharge of the Trustee's duties hereunder.  In no event shall any third party have access to a copy of the portion hereof setting forth the distribution of income and principal, except as may be determined in the absolute discretion of the Trustee.  Alternatively, any such third party may rely upon a Certification of Trust by the Trustee

Page 34,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

given pursuant to Section 18100.5 of the California Probate Code or any similar provision.

8.9    Liability for Conduct of Co-Trustees, Predecessor Trustees and Successor Trustees.  No Trustee or Co-Trustee shall be liable or responsible for any act, omission or default of any other Co-Trustee, predecessor Trustee or successor Trustee, as the case may be, provided that such Trustee or Co-Trustee shall have had no knowledge of that act, omission or default and no knowledge of facts which might reasonably be expected to put such Trustee or Co-Trustee on notice thereof.

8.10    Notification to Beneficiaries.  The Trustee shall provide notification upon each and every date that there is a change in Trustees of any irrevocable trust created hereunder, to the extent that such notification may be required under the laws of the state of California then in effect.  Such notification shall contain the information as required under, be served in a manner consistent with, and be provided to each Beneficiary of any Trust so affected and to any other person as may be required under, the laws of the state of California then in effect.  The notification required by this Paragraph may not be waived in any manner by the Grantor, the Trustee or any Beneficiary of any Trust hereunder, unless permitted by law.

ARTICLE 9

PROVISIONS REGARDING
GENERATION-SKIPPING TRANSFER TAX:

9.1    Intention Regarding Generation-Skipping Transfer Tax.  The Grantor intends that the Trustee shall perform (or refrain from performing) such acts as authorized pursuant to the terms of this Trust Agreement, or otherwise, as the Trustee shall determine, in the Trustee's sole discretion, with respect to any liability for the generation-skipping transfer ("GST") tax pursuant to Section 2601 of the Internal Revenue Code, whether imposed upon the Grantor, the Estate of the Grantor, any trust created by the Grantor, including without limitation the Trust or any subtrust created hereunder, or any beneficiary thereof, or upon any transferee or any other person or entity, in order to minimize the aggregate liability with respect to all estate, inheritance or other death taxes (including without limitation any GST tax) occasioned or payable by reason of the death of the Grantor or otherwise arising as a result of transfers of property, whether outright or in trust, made by or on behalf of, or which are otherwise attributable to, the Grantor, whether during life or upon the death of the Grantor.

9.2    Duties Regarding Allocation of GST Tax Exemption.  The Trustee shall cooperate with and otherwise assist the executor of the Will of the Grantor (or such other persons who may make the election in the absence of an executor) in the allocation of all or any portion of the Grantor's GST tax exemption (as defined in Section 2631 of the Internal Revenue Code), or of a counterpart exemption under any applicable state law, which has not been allocated during the Grantor's life.  The Grantor does not require that any allocation of the Grantor's GST tax exemption benefit the transferees of any property equally, proportionally or in any other particular manner.

Page 35,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

9.3    Creation of Separate Trusts Based Upon Inclusion Ratio.
Notwithstanding any other provision of this Trust Agreement, if all or a portion of the
GST tax exemption is or is anticipated to be allocated to any Trust created hereunder,
unless that Trust will thereby have an inclusion ratio (as defined in Section 2642 of the
Internal Revenue Code) (the "Inclusion Ratio") of zero, that Trust shall be divided into
two or more separate Trusts so that each Trust so created has an Inclusion Ratio of either
zero (an "Exempt Trust") or one (a "Nonexempt Trust").  In so dividing a Trust, the
Trustee shall distribute to the Nonexempt Trust property equal in value to the minimum
amount necessary to establish that Trust with property in an amount necessary to produce
an Inclusion Ratio of one while leaving the Exempt Trust with property in an amount
necessary to produce an Inclusion Ratio of zero.  Further, if property in a Trust having a
certain Inclusion Ratio is directed to be added to a Trust with a different Inclusion Ratio,
the Trustee may decline to make the addition and, instead, may administer the property as
a separate Trust with provisions identical to the Trust to which it otherwise would have
been added.

9.4    Power to Grant and Revoke General Testamentary Power of
Appointment.  The Trustee shall have the sole discretionary authority to amend the terms
of any Trust created hereunder having an Inclusion Ratio greater than zero (a) to grant to
any Beneficiary thereof a general testamentary power of appointment (as defined for
federal estate tax purposes) with respect to such Beneficiary's interest therein, if the
Trustee deems, in the Trustee's sole discretion, such action to be in the best interests of
the beneficiaries of the Trust as a group, and (b) to eliminate or otherwise revoke such
power of appointment, if created.  Any amendment pursuant to this Paragraph may limit
the amount subject to the power of appointment, may limit the class of permissible
appointees of such Beneficiary's interest (including without limitation an appointment to
only that Beneficiary's creditors), may require that the power of appointment be exercised
jointly with another in a manner consistent with the objectives of the power or otherwise
impose such conditions and limitations on its exercise as the Trustee shall determine.
Any amendment granting a power of appointment shall be in writing stating any
limitations on the exercise of such power and the manner in which it may be exercised.
The Trustee shall send a copy of such amendment to the Beneficiary who is the grantee
of the power.  The Trustee may exercise the powers described in this Paragraph from
time to time, and the Trustee may modify or reverse their prior exercise at any time.

9.5    Powers and Duties Regarding Payment of GST Tax Liability.  If
the Trustee determines that (a) any termination of an interest in or a power over Trust
property constitutes a taxable termination pursuant to Section 2612(a) of the Internal
Revenue Code, or (b) any distribution of Trust property constitutes a direct skip pursuant
to Section 2612(c) of the Internal Revenue Code, the Trustee shall pay the amount of
GST tax arising from such termination or distribution from the Trust property to which it
relates, without adjustment of the relative interests of the Trust Beneficiaries.  If the
Trustee determines that any distribution from a Trust (other than pursuant to a power to
withdraw or appoint) is a taxable distribution pursuant to Section 2612(b) of the Internal
Revenue Code, the Trustee shall have the power, exercisable if and to the extent
determined by the Trustee in the Trustee's sole discretion, to augment the distribution by
an amount which the Trustee estimates to be sufficient to pay all or a portion of the GST

Page 36,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

tax arising as a result of such distribution and shall charge the amount of the augmentation against the Trust to which the distribution relates. In general, any payment required to be made pursuant to this Paragraph or otherwise by the reason of the death of, or an assignment by, the Grantor shall be charged, first, entirely, or to the extent possible, to a Nonexempt Trust. If any GST tax paid pursuant to this Paragraph is imposed in part by reason of Trust property and in part by reason of property not held as part of the Trust Estate, the Trustee shall only pay that portion of the tax which the value of the Trust property taxed bears to the total property taxed, taking into consideration deductions, exemptions and other factors which the Trustee deems pertinent, in the Trustee's sole discretion.

9.6    General Powers Regarding GST Tax and Other Considerations. All provisions of this Trust Agreement, except to the extent inconsistent with the objectives of the Grantor, shall be construed to permit the division, consolidation and administration of, and distributions from, the Trust in a timely manner consistent with the Grantor's objective of obtaining the efficient and effective use of the Grantor's available GST tax exemption and otherwise reducing the incidence of the GST tax and other death taxes. Except as expressly provided in this Trust Agreement to the contrary, the Trustee shall have the sole discretionary authority to do any and all acts as the Trustee may deem necessary or desirable in furtherance of the Grantor's intentions, subject to the Trustee's fiduciary and other considerations, including without limitation the authority to:

(a)    allocate the burden of any GST tax in an equitable manner, whether or not pro rata;

(b)    pay or withhold any GST taxes levied upon any Trust from such sources of funds as the Trustee deems prudent and advisable;

(c)    make adjustments, unless otherwise restricted, in the amounts to be received by the beneficiaries in compensation for the tax consequences of paying or otherwise allocating the burden of the GST tax;

(d)    make distributions to beneficiaries from such sources of funds or other property as the Trustee deems prudent and advisable, unless otherwise restricted;

(e)    divide any Trust established or to be established pursuant to this Trust Agreement into separate Trusts; and

(f)    consolidate or otherwise combine separate Trusts: (1) having identical Inclusion Ratios; or (2) having different Inclusion Ratios if the Trustee believes that economic efficiency or other compelling considerations justify sacrificing their distinct GST tax characteristics.

Except as expressly provided to the contrary in this Trust Agreement, if a Trust otherwise to be established is divided under the provisions of this Article into separate Trusts, each such subtrust shall have the same provisions as the Trust from which it was established and references in this Trust Agreement to such original Trust shall collectively refer to

Page 37,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

the separate subtrusts derived from it. The Trustee may exercise the powers described in this Paragraph from time to time, and such powers may be used to modify or reverse their prior exercise. In deciding whether and how to exercise these powers, the Trustee may take account of efficiencies of administration, GST and other transfer tax considerations, income tax factors affecting the various Trusts and their beneficiaries, present and future financial and other objectives of the various Trusts and their beneficiaries, the need or desirability of having the same or different Trustees for various Trusts or shares, and any other considerations the Trustee may deem appropriate. There is no requirement that any acts taken to reduce the incidence of any tax occasioned or payable by reason of the death of the Grantor benefit the transferees of such property equally, proportionally or in any other particular manner.

9.7    Successor Trustee for Certain Purposes. Notwithstanding anything herein to the contrary, the Trustee may not exercise any power granted pursuant to this Article including, without limitation, (a) the power to make or participate in any decision regarding the allocation of the Grantor's GST tax exemption and (b) the power to create, eliminate or modify any power of appointment, in any way that would have the effect of granting the Trustee a general power of appointment (as defined for federal estate tax purposes) over property with respect to which the Trustee would not otherwise have such a general power. If this prohibition renders the Trustee unavailable to perform a duty or exercise a particular power, the person, persons or entity who would serve as successor Trustee to the Trustee shall serve as the Trustee for that limited purpose. If the successor Trustee so selected would similarly be prohibited from acting pursuant to the provisions of this Paragraph, the procedure provided in this Trust Agreement for selecting a successor Trustee shall be followed until a successor Trustee not so prohibited shall serve as Trustee for that limited purpose.

9.8    Exoneration of Trustee. The Trustee shall not be liable for any good faith exercise of, or failure to exercise, the Trustee's powers pursuant to the provisions of this Article. In the event the Trustee's actions result in a detriment to one or more beneficiaries or other transferees, it is the Grantor's intention that such beneficiaries and transferees shall exonerate and otherwise hold harmless the Trustee with respect to such detriment.

9.9    Simultaneous Death. Notwithstanding any provision in this Trust Agreement to the contrary, if pursuant to the terms of this Trust Agreement (a) property is to pass to or is to be held in trust for a lineal descendant of the Grantor (or of the spouse or a former spouse of the Grantor) (a "Deceased Child") and (b) in the event of the death of such Deceased Child, such property is to pass to a further lineal descendant of the Grantor (or of the spouse or a former spouse of the Grantor) assigned to a generation (as determined pursuant to the provisions of Section 2651 of the Internal Revenue Code) younger than the Deceased Child (a "Deceased Grandchild"), then, in the event that a Deceased Child and a Deceased Grandchild die simultaneously or under circumstances that make it difficult or impossible to determine their order of survival, the Trustee is hereby authorized to and shall presume, for purposes of this Article, that the Deceased Child and the Deceased Grandchild have died simultaneously.

Page 38,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

# ARTICLE 10

## ACCOUNTINGS

10.1    Duty to Account. The Trustee shall render reports or accounts of the administration of the Trust Estate (individually, an "Account" and collectively "Accounts") in accordance with the provisions of this Article.

10.2    No Court Accounts. Except as may otherwise be required by applicable law, the Trustee shall not at any time be required to render any Accounts to any Court or public authority whatsoever, or to anyone else, except as provided in this Article.

10.3    Requirement to Render Account. After the Death of the Grantor, upon the written request of an Account Beneficiary (as that term is hereafter defined), but not more often than once each year, and/or upon a change of Trustee or termination of any Trust (or as otherwise required by law), unless specifically waived in writing by an Account Beneficiary, the Trustee shall render an Account of the Trust to all Account Beneficiaries of such Trust in the manner required by law. For purposes of this Article, the term "Account Beneficiaries" shall include the persons required by law to receive an Account of such Trust to which the Account is being prepared. A waiver in writing by an Account Beneficiary to an Account may be withdrawn in writing by such Account Beneficiary at any time as to the most recent Account and future Accounts. In the event an Account Beneficiary is a minor, the Account shall be delivered to the guardian of such Account Beneficiary. In the event the Account Beneficiary is an incapacitated adult, the Account shall be delivered to such incapacitated Account Beneficiary's conservator or, if there is none, then to such incapacitated Account Beneficiary's primary care provider.

10.4    Predecessor Trustees. When a predecessor Trustee has failed to render Accounts as required under this provision, the successor Trustee may, but need not, render Accounts for such period with reasonable efforts without incurring any additional liability for acts of a predecessor Trustee, other than as already provided under California law. This provision is intended to permit the successor Trustee to render Accounts for the predecessor without creating any additional duty to investigate or to Account. Nonetheless, if in the course of rendering Accounts left undone by the predecessor Trustee, the successor Trustee obtains knowledge of a situation that may constitute a breach of trust committed by the predecessor Trustee, the successor Trustee shall deal with such knowledge in accordance with the successor Trustee's fiduciary duties and powers. The Trustee may, but need not, petition a court of competent jurisdiction for approval of an Account, and all the costs and expenses of such a proceeding shall be a proper charge of the trust with respect to which the Account is rendered.

10.5    Receipts, Accounts and Releases. The Trustee may require a receipt from a Beneficiary for the portion of the Trust Estate to be paid to such Beneficiary. If any Beneficiary refuses or neglects to furnish the Trustee with such written receipt, then the Trustee may, prior to making such distribution and at the expense

Page 39,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

of the appropriate Trust or Trusts, submit such matter to the Court of proper jurisdiction. The Trustee may, but need not, submit an Account to a Court of proper jurisdiction of the acts and doings of the Trustee then serving or any predecessor Trustee, and at the expense of the appropriate Trust or Trusts, in order to obtain a decree absolving the Trustee from all further liability hereunder after the making of such distribution. Alternatively, the Trustee may request from a Beneficiary a written release and discharge of the Trustee from all liability for any act, investment, transaction or distribution of the Trustee shown on that Account up to and including the date of such distribution, prior to making a distribution, if reasonable and appropriate under the circumstances, as determined by the Trustee, and permissible under applicable California law. If any Beneficiary refuses or neglects to release the Trustee upon terms acceptable to the Trustee, then the Trustee may, prior to making such distribution and at the expense of the appropriate Trust or Trusts, submit such matter to the Court of proper jurisdiction.

   10.6 <u>Settlement of Accounts</u>. The Trustee shall be released from any liability with respect to a particular item disclosed in an Account or any claims adequately disclosed by any item in the Account, if the Trustee provides to the Beneficiary with the Account a written "Notice to Beneficiaries" in the form and manner required by California law, informing the Beneficiaries that they have 180 days within which to object to the Account, and the beneficiary fails to timely object to such item in the Account. Unless one (1) or more Beneficiaries shall deliver written objections to the Trustee within 180 days from the date such Notice to Beneficiaries was received, the Account shall be deemed settled, and shall be final and conclusive in respect to all transactions disclosed in the Account as to all Beneficiaries of such Trust, including unborn and unascertained beneficiaries. Notwithstanding anything to the contrary herein, nothing in this section is intended to relieve the Trustee of liability (1) for breach of trust committed intentionally, with gross negligence, in bad faith or with reckless indifference to the interest of the Beneficiary or (2) for any profit that the Trustee derives from a breach of trust.

   10.7 <u>Limited Waiver of Accounts</u>. Except as provided in this section, any Accounts otherwise required by California law are hereby waived to the maximum extent permitted by law.

<div align="center">ARTICLE 11</div>

<div align="center"><u>NO CONTEST CLAUSE</u></div>

   11.1 <u>General</u>. The Grantor has intentionally made no provision in this Trust Agreement for any heirs or relatives of the Grantor who are not herein mentioned or designated, and the Grantor generally and specifically has intentionally omitted to provide for every person claiming to be or who may be determined to be an heir-at-law of the Grantor, except as otherwise mentioned in this Trust Agreement. If any beneficiary, or any assignee or other successor-in-interest of a beneficiary (a "Contesting Beneficiary") under a Protected Instrument (as defined in this Article), without Probable Cause (as defined in this Article), singularly or in combination with any other persons, directly or indirectly:

Page 40, SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(a)    engages in a Direct Contest (as defined in this Article);

(b)    files a Pleading (as defined in this Article) in any court to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer; or

(c)    files a Creditor's Claim (as defined in this Article) or prosecutes any action based upon it in the Grantor's probate estate or against the Trustee of any subtrust created under this Trust Agreement or against a beneficiary thereof;

then any share or interest in the Trust Estate and any subtrust created under this Trust Agreement, provided to or for the benefit of the Contesting Beneficiary, is revoked. In the event of such revocation, the revoked share or interest shall be disposed of as follows:

(1)    if the Contesting Beneficiary is an individual, as though that Contesting Beneficiary had died without issue before becoming entitled to receive any income or any portion of the principal of such Trust; or

(2)    if the Contesting Beneficiary is a charitable organization, to any one or more other charitable organizations which qualify for tax exemption under Section 2055(a) of the Internal Revenue Code and which meet the charitable intentions of the Grantor consistent with the provisions of this Trust Agreement (including, without limitation, any one or more of the charitable organizations named in this Trust Agreement which are not disqualified under this Article), as determined by the Trustee, in the Trustee's sole discretion.

The provisions of this Article shall not apply to any disclaimer by any person of any benefit under this Trust Agreement or under the Will of the Grantor.

11.2    Definitions. For purposes of this Article, the following terms have the following meanings:

(a)    "Creditor's Claim" includes any action to enforce a contract to make a will, or an action asserting that the Grantor's property is liable to the claimant, other than for funeral expenses or the Grantor's last illness expenses.

(b)    "Direct Contest" means a Pleading filed in any court that includes an allegation that a Protected Instrument or one or more of its terms is invalid, based on one or more of the following grounds:

(1)    Forgery.

(2)    Lack of due execution.

(3)    Lack of capacity.

(4)    Menace, duress, fraud or undue influence.

Page 41,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

(5)     Revocation of a will pursuant to Section 6120 of the California Probate Code (or any successor section), revocation of a trust pursuant to Section 15401 of the California Probate Code (or any successor section) or revocation of any instrument other than a will or trust pursuant to the procedure for revocation that is provided by statute or by the instrument.

(6)     Disqualification of a beneficiary under Section 6112 of the California Probate Code (or any successor section) or under Section 21350 of the California Probate Code (or any successor section).

(c)     "Pleading" means a petition, complaint, cross complaint, objection, answer, response or claim.

(d)     "Probable Cause" exists if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery.

(e)     "Protected Instrument" means all of the following instruments:

(1)     this Trust Agreement and any and all subtrusts created under this Trust Agreement, and any amendments to this Trust Agreement;

(2)     any other revocable or irrevocable trust established by the Grantor, and any amendments to any of the foregoing Trusts;

(3)     the Will of the Grantor or any codicil thereto;

(4)     any designation of beneficiary executed by the Grantor with respect to any insurance policy, annuity, individual retirement account, qualified or non-qualified employee benefit plan, plan of deferred compensation or other assets passing outside this Trust Agreement or the Will of the Grantor;

(5)     any written agreement between the Grantor and the Grantor's spouse (if any) defining or altering their property rights as married persons, whether entered into prior to, concurrently with or after marriage;

(6)     any buy-sell agreements in which the Grantor is a party; or

(7)     any family partnership agreements or limited liability company operating agreements in which the Grantor is, or was, a party.

11.3   Authorization of Trustee. The Grantor wishes to discourage a contest of the beneficial and administrative terms of this Trust Agreement. Discouraging such a contest is an important trust purpose. The Trustee may use assets of the Trust Estate to pay attorneys and other agents and to pay other costs and expenses to resist and

Page 42,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

**160**

defend any contest of this Trust Agreement or any of its provisions, any amendment to this Trust Agreement or any of its provisions, even if the contest does not attack the validity of the Trust, but instead its dispositive or administrative provisions. In authorizing the Trustee to use assets of the Trust Estate for these purposes, the Grantor intends to override any fiduciary duty that might otherwise constrain the Trustee, including, but not limited to, the duty of loyalty, the duty of impartiality and the duty to avoid conflicts of interest.

       11.4   Costs of Defenses Charged Against Contesting Beneficiary. If the Trustee is successful in defending any matter or action described in this Article, as reasonably determined by the Trustee, but the distributions and/or allocations of interests in the Trust Estate to the Contesting Beneficiary under this Trust Agreement and/or the Will of the Grantor are not forfeited, all of such costs of such defense may be charged against the distributions and/or allocations of interests to the Contesting Beneficiary under this Trust Agreement and/or the Will of the Grantor, and all distributions and/or allocations of interests to the Contesting Beneficiary under this Trust Agreement and/or the Will of the Grantor may be reduced on a dollar-for-dollar basis by the aggregate net value as determined by the Trustee, of all real and personal property passing to or distributable to or for the benefit of the Contesting Beneficiary as a result of such matter or action, including, without limitation, assets of the Trust Estate or the probate estate of the Grantor, insurance proceeds, employee benefits and deferred compensation, all determined in the sole and absolute discretion of the Trustee, but only to the extent permitted by law. In making any settlement of such matter or action, the Trustee shall consider the foregoing provisions of this Article.

<center>ARTICLE 12</center>

<center>GENERAL TRUST PROVISIONS:</center>

       12.1   Termination. Unless sooner terminated in accordance with other provisions of this Trust Agreement, each Trust created under this Trust Agreement shall terminate after the latest of:

       (a)    twenty-one (21) years after the latest of:

          (1)    the death of the Grantor;

          (2)    the death of all of the issue (if any) of the Grantor who are living at the time of the execution of this Trust;

          (3)    the death of the last survivor of any Beneficiary of the Trusts created hereunder and that Beneficiary's issue living at the time of the execution of this Trust; or

       (b)    such later time as may then be allowed by law.

All principal and undistributed income of any Trust so terminated shall be distributed to the then income Beneficiaries of that Trust in the proportions in which they are, at the

Page 43,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

time of termination, entitled to receive that income. However, if the rights to income are not then fixed by the terms of that Trust, distribution under this Paragraph shall be made to the Beneficiaries as are then entitled or authorized in the discretion of the Trustee to receive payments from that Trust. In the event there are no Beneficiaries so entitled, the Trustee shall use any reasonable method to make the distribution required hereunder, as determined in the Trustee's discretion.

12.2    Spendthrift Provision. No interest of any Beneficiary of any Trust created in this Trust Agreement shall be subject to sale, assignment, hypothecation or transfer by any Beneficiary, other than in the exercise of a power of appointment given to the Beneficiary, nor shall the principal of any Trust, or the income arising therefrom, be liable for any debt of any Beneficiary, or be subject to attachment by or the interference by or control of any creditor of any Beneficiary, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of any Beneficiary, including without limitation the process of any court in aid of execution of any judgment so rendered. All of the income and principal under any Trust shall be transferable, payable and deliverable only to the designated Beneficiary at the time the Beneficiary is entitled to take under the terms of this Trust. The personal receipt of the Beneficiary may be made a condition precedent to the payment or delivery by the Trustee to that Beneficiary. The Trustee may, however, deposit in any bank designated in writing by a Beneficiary, to his or her credit, income or principal payable to that Beneficiary. This Article shall not restrict any authority of the Trustee to use and disburse funds for the support, maintenance, health and education of a beneficiary, or to disburse funds to a guardian or conservator as herein provided.

12.3    Tax Allocation. The Grantor shall not have any powers or discretion that shall cause any portion of the Trust Estate to be included in the estate of the Grantor for federal estate tax purposes, and the provisions of this Trust shall be interpreted accordingly. If it is finally determined that any portion of the Trust will be included in the estate of the Grantor for federal estate tax purposes, then subject to any other provision of the Grantor's Will or other governing instrument, all the taxes allocable to the assets of the Trust Estate shall be recoverable from the Trust Estate, and the interest of each Beneficiary shall be reduced proportionally.

12.4    Invalidity. If any part, clause, provision or condition of this Trust Agreement shall be adjudged to be invalid or unenforceable, then, notwithstanding the invalidity or unenforceability of that part, clause, provision or condition, the remainder of this Trust Agreement shall continue and shall remain in full force and effect and that part, clause, provision or condition shall be reduced in scope to the minimum extent necessary to avoid the invalidity.

12.5    Governing Law. Subject to the Paragraph titled "Power to Transfer Trust to or from Another Jurisdiction," the internal laws (and not the law of conflicts) of the State of California in force from time to time shall govern the validity, construction, interpretation and administration of this Trust, except that all matters relating to real property shall be governed by the laws of the situs of that real property, including that state's conflict-of-law principles.

Page 44,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

12.6    Disclaimers.  Any Beneficiary shall have the right to disclaim all or any part of any interest in property to which he or she may be entitled under this Trust Agreement, by giving written notice of such disclaimer to the then-acting Trustee, to the adult Beneficiaries, to the guardians of any minor Beneficiaries and to the conservators of any incapacitated Beneficiaries; provided, however, that a failure to notify the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries regarding a Beneficiary's disclaimer shall not affect the validity or qualification of any disclaimer under any federal or state law.  The notice shall be delivered personally or by certified or registered mail, postage prepaid, return receipt requested.  Such disclaimer shall also in all respects comply with the applicable laws, rules, regulations and procedures, whether legislative, administrative, judicial or otherwise, as may be appropriate.  Except as otherwise provided herein, any interest so disclaimed shall be held or distributed as if the disclaimant was deceased as of the effective date of such disclaimer.  No other interest of the Beneficiary shall be affected by the disclaimer, unless that interest shall also be disclaimed.

12.7    Headings and Captions.  The headings and captions appearing at the commencement of the Articles and Paragraphs are descriptive only and for convenience in reference.  Should there be any conflict between any such heading or caption and the language of the Article or Paragraph over which the heading appears, the language of the Article or Paragraph, and not such heading or caption, shall control and govern in the construction of this Trust Agreement.

12.8    Cross-References.  All cross-references to Articles and Paragraphs contained in this Trust Agreement, unless otherwise specifically directed to another agreement or document, refer to provisions in this Trust Agreement and shall not be deemed to be references to any other agreement or document.

12.9    Notices.  Unless applicable law requires a different method of giving notice, any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party if (a) served personally (b) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested, (c) delivered to Federal Express or other recognized overnight delivery service or (d) delivered by facsimile transmission, if concurrently transmitted by one of the methods identified in (a), (b) or (c) of this Paragraph.  If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service.  If such notice, demand or other communication is given by mail, Federal Express or other recognized overnight delivery service, service shall be conclusively deemed given upon receipt (or refusal to accept delivery) as shown on the return receipt.  If such notice, demand or other communication is delivered by facsimile transmission (and subject to the other requirements of subsection (d) of this Paragraph), notice shall be deemed given on the date of delivery by facsimile transmission, as confirmed electronically.  Any notice, demand or other communication to be given hereunder shall be addressed to the party to whom such notice, demand or other communication is to be given at the last known address for that party or at the last known facsimile number.  Any party hereto may change its address or facsimile number for the purpose of receiving notices, demands and

Page 45,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

other communications as herein provided by a written notice given in the manner aforesaid to the Trustee hereof.

## ARTICLE 13

### DEFINITIONS AND RULES OF CONSTRUCTION:

13.1    <u>Definitions Set Forth in This Article</u>. The following definitions and rules of construction shall apply to the terms listed in this Article wherever those terms are used in this Trust Agreement and wherever reference is made to those terms in this Trust Agreement.

13.2    <u>Beneficiary</u>. The term "Beneficiary" shall be deemed to mean and is intended to include only those persons for whom a part of the Trust Estate has been apportioned. The term "Beneficiary" shall specifically not include any person who legally might be considered as a residuary or contingent beneficiary, and any such person shall be considered as a "Beneficiary" only at such time as a part of the Trust Estate actually has been apportioned for his or her use and benefit in accordance with the terms and provisions of this Trust Agreement. Throughout this document, the term "eligible spouse" shall mean a widow or widower, remarried or unremarried, of a deceased Beneficiary (descendant of the Grantor) who is also a parent of one or more of the Grantor's descendants.

13.3    <u>Corporate Trustee</u>. The term "Corporate Trustee" shall mean a corporation, the trust department of a bank or the trust department of any title insurance company, which is authorized by state law to be engaged and act as a trustee.

13.4    <u>Education</u>. The term "education" shall be construed to include private preschool, elementary and secondary education (including instruction in music, art, computers, sports and physical education, and other subjects and topics, and whether conducted before, during or after the regular school day, and wherever located or held), vocational training, college and postgraduate study (including professional education), so long as pursued to the advantage of a beneficiary, at any recognized educational institution of a beneficiary's choice; and in determining payments to be made for education, the Trustee shall take into consideration a beneficiary's tuition, books, supplies, tutors, appropriate travel expenses and reasonable living expenses. Notwithstanding the foregoing, education shall not have any meaning broader than that allowed by Section 2041(b) of the Internal Revenue Code.

13.5    <u>Gender or Number</u>. The masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so indicates.

13.6    <u>Incapacity</u>. The terms "incapacitated" or "incapacity," and the term "unable to serve" or equivalents thereof, as applied to any beneficiary or successor Trustee hereunder, shall be deemed to include not only a person who has been judicially declared incapacitated and a person for whom a guardian or conservator or other

Page 46,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

fiduciary of the person or estate or both shall have been appointed, but also a person who shall be deemed to have become substantially unable to manage his or her own financial resources or resist fraud or undue influence. That incapacity shall be evidenced by the written statement of two (2) licensed physicians upon the request of any beneficiary, Trustee or successor Trustee hereunder. In the case of a person who is serving as Trustee hereunder, the person or institution designated as next successor Trustee may commence acting in such capacity upon that evidence without liability by reason thereof. Any person who has been determined to be incapacitated under the provisions of this Paragraph shall be deemed to have regained his or her capacity for all purposes of this Trust, including to resume acting as Trustee, upon a written statement to that effect by two (2) licensed physicians.

13.7    Internal Revenue Code. Reference to code sections of the "Internal Revenue Code" shall refer to those sections of the Internal Revenue Code of 1986, as amended, as they exist at the time of execution of this Trust Agreement and any corresponding or substitute provisions from time to time existing and to the Treasury Regulations pertaining to those sections.

13.8    Issue; Child; Children. Subject to the provisions of the Paragraph titled "Declarations Concerning Family," the terms "issue," "child" and "children" shall mean lawful lineal descendants of all degrees, specifically including the following:

(a)    A child born outside of wedlock, if a parent and child relationship existed between such child and his or her deceased parent as determined under the laws of the state of California.

(b)    Adopted persons and their issue, provided that the person was adopted when he or she was a minor, and shall include any person conceived prior to the death of such person's deceased parent but born thereafter.

(c)    A child in gestation provided such child is later born alive.

(d)    A person born as a result of artificial insemination, in vitro fertilization or other medical intervention, which person shall be deemed to be a genetic descendant of (1) the woman (other than a woman who was contractually serving as a surrogate mother) who gave birth to such person (the "birth mother") and (2) the birth mother's domestic partner at the time such person was conceived or implanted, unless there is clear and convincing evidence that the birth mother's domestic partner withheld consent to the medical intervention and did not subsequently voluntarily acknowledge parentage. In the event of any question whether (A) a birth mother's domestic partner withheld consent to a medical intervention for purposes of this Paragraph or (B) parentage has been voluntarily acknowledged for purposes of this Paragraph, then the determination of the Trustee (other than the birth mother or the putative parent) shall be binding on all persons interested in the Trusts hereunder and on all persons claiming to be so interested.

Page 47,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

Unless expressly specified otherwise, distribution or apportionment to or among children and/or issue shall be made by right of representation.

13.9   Net Income. The term "net income" shall mean the income from the Trust Estate determined in accordance with this Trust Agreement and after the payment or reservation of sufficient funds to pay all expenses of management and administration of the Trust Estate, including the compensation of the Trustee.

13.10   Or. The word "or" used in any list of more than two items other than a list of beneficiaries shall be construed to include the conjunctive as well as the disjunctive.

13.11   Spouse. The term "spouse" shall include only persons who are lawfully married to and not legally separated from the person to whose spouse reference is made (or if the person to whose spouse reference is made is deceased at the time of interpretation hereunder, then the term "spouse" as it relates to such deceased person shall mean the person who was lawfully married to and not legally separated from the deceased person at the time of such person's death).

13.12   Support, Maintenance and Health. The terms "support," "maintenance" and "health" shall have the same meanings in this Trust Agreement as those terms have under Section 2041(b) of the Internal Revenue Code.

13.13   Survival. For purposes of this Trust Agreement, unless a specific period of survival is otherwise provided herein, a person shall be deemed to have survived the Grantor or shall be deemed to have been living at the date of the death of the Grantor only if such person survived the Grantor by at least ninety (90) days. Unless such person has survived the Grantor by at least ninety (90) days, such person shall be deemed to have predeceased the Grantor.

13.14   Treasury Regulations. Reference to Sections of the "Treasury Regulations" shall refer to those Sections of the Treasury Regulations promulgated under Code Sections of the Internal Revenue Code of 1986, as amended, as they exist at the time of execution of this Trust Agreement and any corresponding or substitute provisions from time to time existing.

13.15   Trust. The term "Trust" shall specifically include any Trusts created hereunder.

13.16   Trust Estate. The term "Trust Estate" shall be deemed to mean all of the property held in trust by the Trustee.

13.17   Trustee. The term "Trustee" shall be deemed to include not only the singular, but also the plural, and to include any successor Trustee or Co-Trustees.

## ARTICLE 14

### EXECUTION:

14.1    Declaration of the Grantor.  The undersigned Grantor does hereby certify that he has read this Trust Agreement and it fully and accurately sets out the terms, Trusts and conditions under which the Trust Estate herein described is to be held, managed and disposed of by the Trustee herein named, and he hereby approves, ratifies and confirms this Trust Agreement in all particulars.

14.2    Execution by the Grantor.  Executed at Los Angeles,  California, on April  12 , 2010.

GRANTOR:

_____
MARK A. SLOTKIN

14.3    Execution by the Trustee.  The foregoing Trust Agreement has been accepted by the Trustee hereunder.

TRUSTEE:

_____
LOREN MARKEN

Page 49,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

**ACKNOWLEDGMENT**

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

On APRIL 12 , 2010, before me, STEPHEN ALCOMBRIGHT JR

a Notary Public, personally appeared MARK A. SLOTKIN, who proved to me on the

basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the

within instrument and acknowledged to me that he/she/they executed the same in

his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the

instrument the person(s), or the entity upon behalf of which the person(s) acted, executed

the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California

that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



(SEAL)

Page 50,    SLOTKIN INTENTIONALLY DEFECTIVE TRUST

# ACKNOWLEDGMENT

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

On _APRIL 12_ , 2010, before me, STEPHEN ALCOMBRIGHT JR,

a Notary Public, personally appeared LOREN MARKEN, who proved to me on the basis

of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within

instrument and acknowledged to me that he/she/they executed the same in his/her/their

authorized capacity(ies), and that by his/her/their signature(s) on the instrument the

person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California

that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



STEPHEN ALCOMBRIGHT JR.
COMM. # 1707294
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. NOV. 24, 2010

(SEAL)

Page 51,   SLOTKIN INTENTIONALLY DEFECTIVE TRUST

## NOTICE TO BENEFICIARIES

_____
_____
_____

      Please be advised that $_____ has been added to the SLOTKIN INTENTIONALLY DEFECTIVE TRUST (the "Trust") and that, pursuant to Article 4 of the Trust, you are entitled to withdraw $_____ from the Trust during the period commencing on the date the contribution is made and ending within thirty (30) days of the date of this Notice (the "Withdrawal Period"). If you do not exercise your withdrawal right by the end of the Withdrawal Period, then your right to withdrawal shall lapse as follows: your right to withdraw the greater of $5,000 or 5% of the value of the Trust Estate shall be deemed to have lapsed at the beginning of the Withdrawal Period; thereafter, your right to withdraw the greater of an additional $5,000 or 5% of the then value of the Trust Estate shall lapse on January 1st of each year until you have no further right to withdraw. In lieu of a withdrawal of cash, the Trustee may substitute Trust property equal in value at the date of withdrawal to the amount of cash you are otherwise entitled to withdraw pursuant to this Notice. This right to substitute Trust property in kind shall include the right of the Trustee to distribute life insurance policies at their value at the date of withdrawal.

Dated: _____, _____

      _____
      Trustee of the Slotkin Intentionally
      Defective Trust

## BENEFICIARY ACKNOWLEDGMENT

      I, _____, hereby acknowledge receipt of the foregoing Notice to Beneficiary.

Dated: _____, _____      _____

Exhibit "A"

**170**

# EXHIBIT "7"

# TRUST AGREEMENT

## OF THE SLOTKIN DEFECTIVE TRUST

MAYMAN & MAYMAN LLP
10250 CONSTELLATION BLVD.
SUITE 2320
LOS ANGELES, CA 90067
(310) 553-8111

# SLOTKIN DEFECTIVE TRUST

## TABLE OF CONTENTS

Page

ARTICLE 1 DECLARATIONS OF TRUST: .................................................. 2

    1.1   Principal of Trust ................................................................. 2
    1.2   Acceptance of Trust by the Trustee ............................... 2

ARTICLE 2 RIGHTS RESERVED TO THE GRANTOR: ......................... 3

    2.1   Trust To Be Irrevocable .................................................. 3
    2.2   Additions .......................................................................... 3
    2.3   Grantor's Power to Remove and Replace Trustees
          and Named Successor Trustees .................................... 3
    2.4   Intent to Create Grantor Trust ...................................... 4

ARTICLE 3 PERSONAL DECLARATIONS: ........................................... 4

    3.1   Declarations Concerning Family ................................... 4
    3.2   Residency .......................................................................... 4

ARTICLE 4 BENEFICIARY POWER OF WITHDRAWAL DURING
          THE LIFE OF THE GRANTOR ......................................... 4

    4.1   Power to Withdraw Principal ......................................... 4
    4.2   Who May Exercise the Power ........................................ 5
    4.3   Notice to Beneficiaries ................................................... 5
    4.4   Exercise of Power to Withdraw .................................... 5
    4.5   Beneficiary Lacking Legal Capacity ............................ 5
    4.6   Non-Exercise of Power ................................................... 6
    4.7   Periodic Lapse of Power to Withdraw ......................... 6
    4.8   Beneficiary Power of Appointment ............................. 7
    4.9   Power of Trustee to Amend ........................................... 7

ARTICLE 5 ADMINISTRATION OF TRUST ESTATE: ........................ 7

    5.1   Administration of Trust Estate as Set Forth in This
          Article ............................................................................... 7
    5.2   Allocation of Trust Estate .............................................. 7

i

## TABLE OF CONTENTS
### (CONTINUED)

Page

| | | |
|---|---|---|
| 5.3 | Distribution of Income | 8 |
| 5.4 | Distributions of Principal | 9 |
| 5.5 | Partial Distributions of Principal | 9 |
| 5.6 | Distribution Upon the Death of a Beneficiary | 9 |
| 5.7 | Contingent Beneficiaries | 9 |

**ARTICLE 6 SUCCESSOR TRUSTEE:**  10

| | | |
|---|---|---|
| 6.1 | Designated Successor Trustee | 10 |
| 6.2 | Special Provisions Regarding Non-Resident Fiduciaries | 10 |
| 6.3 | Power of an Individual Trustee to Designate a Successor Trustee | 10 |
| 6.4 | Right of Trustee to Resign; Appointment of Successor Trustee in the Event of a Vacancy | 13 |
| 6.5 | Declination of a Named Successor Trustee | 13 |
| 6.6 | Substitution of Corporate Trustee | 13 |
| 6.7 | Effect of Succession of Trustees | 14 |
| 6.8 | Powers and Authorities of Successor Trustee | 14 |
| 6.9 | No Duty of Successor Trustees to Investigate | 14 |
| 6.10 | Indemnification of Trustee | 14 |
| 6.11 | Prohibited Trustee Designations | 15 |

**ARTICLE 7 POWERS OF TRUSTEE:**  15

| | | |
|---|---|---|
| 7.1 | Powers of Trustee Set Forth in This Article | 15 |
| 7.2 | Power to Act as Owner | 16 |
| 7.3 | Investment Powers | 16 |
| 7.4 | Special Provisions While Corporate Trustee Is Acting | 17 |
| 7.5 | Power to Retain or Abandon Property | 18 |
| 7.6 | Certain Management Powers | 18 |
| 7.7 | Reimbursement of Trustee | 19 |
| 7.8 | Power to Employ | 19 |
| 7.9 | Installment Payments of Income | 19 |
| 7.10 | Segregation, Allocation and Distribution of Assets | 19 |
| 7.11 | Trust Distributions | 20 |
| 7.12 | Powers of Trustee In the Event of Beneficiary Misconduct | 20 |
| 7.13 | Principal and Income | 22 |

## TABLE OF CONTENTS
### (CONTINUED)

Page

7.14 Acceptance of Gifts ....................................................................22
7.15 Powers Over Securities..............................................................23
7.16 Transactions With Other Entities...............................................23
7.17 Power to Purchase Insurance .....................................................24
7.18 Payments to or for Minors or Incapacitated
     Persons........................................................................................24
7.19 Banks and Brokerage Accounts and Endorsements ...................24
7.20 Option to Terminate Shares or Trusts.........................................25
7.21 Power to Combine and Divide Trusts..........................................25
7.22 Power to Withhold Distribution..................................................26
7.23 Tax Elections ..............................................................................26
7.24 Subdivision of Real Property......................................................27
7.25 Purchase at Foreclosure .............................................................27
7.26 Fiduciary Related Party Transactions.........................................27
7.27 Power to Commence, Retain and Manage Closely
     Held Business .............................................................................28
7.28 Power Regarding S Corporations ...............................................29
7.29 Power Regarding Names of Trusts .............................................29
7.30 Power to Transfer Trust to or from Another
     Jurisdiction.................................................................................29
7.31 Power to Initiate and Defend Litigation; Power to
     Compromise Claims. ..................................................................30
7.32 Environmental Matters ...............................................................30
7.33 Discretion of Trustee ..................................................................33
7.34 Power to Disclaim, Restrict or Enlarge Powers of
     Trustee ........................................................................................33
7.35 Power to Loan without adequate interest or
     adequate security.........................................................................33
7.36 Exchange Property for Equivalent Value ...................................33

ARTICLE 8 TRUST ADMINISTRATION:                                        33

8.1  Trust Administrative Provisions Set Forth in This
     Article ........................................................................................33
8.2  Bond of Trustee ..........................................................................34
8.3  Compensation of Trustee............................................................34
8.4  Profits and Losses Charged to Trust...........................................34
8.5  Accrued and Undistributed Income ............................................34
8.6  Payment of Expenses ..................................................................34

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

8.7    Disbursements in Good Faith ........................................34
8.8    Disclosure to Third Parties ..........................................34
8.9    Liability for Conduct of Co-Trustees, Predecessor
       Trustees and Successor Trustees....................................35
8.10   Notification to Beneficiaries.........................................35

ARTICLE 9 PROVISIONS REGARDING  GENERATION-SKIPPING
       TRANSFER TAX:                          35

9.1    Intention Regarding Generation-Skipping Transfer
       Tax ....................................................................35
9.2    Duties Regarding Allocation of GST Tax
       Exemption:..............................................................35
9.3    Creation of Separate Trusts Based Upon Inclusion
       Ratio....................................................................36
9.4    Power to Grant and Revoke General Testamentary
       Power of Appointment.................................................36
9.5    Powers and Duties Regarding Payment of GST
       Tax Liability ...........................................................36
9.6    General Powers Regarding GST Tax and Other
       Considerations ........................................................37
9.7    Successor Trustee for Certain Purposes.........................38
9.8    Exoneration of Trustee...............................................38
9.9    Simultaneous Death ..................................................38

ARTICLE 10 ACCOUNTINGS                      39

10.1   Duty to Account.......................................................39
10.2   No Court Accounts ...................................................39
10.3   Requirement to Render Account....................................39
10.4   Predecessor Trustees.................................................39
10.5   Receipts, Accounts and Releases..................................39
10.6   Settlement of Accounts ..............................................40
10.7   Limited Waiver of Accounts........................................40

ARTICLE 11 NO CONTEST CLAUSE             40

11.1   General..................................................................40
11.2   Definitions .............................................................41
11.3   Authorization of Trustee.............................................42

iv

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

11.4   Costs of Defenses Charged Against Contesting Beneficiary.................................................................43

ARTICLE 12 GENERAL TRUST PROVISIONS:    43

12.1   Termination...................................................................43
12.2   Spendthrift Provision ..................................................44
12.3   Tax Allocation ............................................................44
12.4   Invalidity....................................................................44
12.5   Governing Law ..........................................................44
12.6   Disclaimers ................................................................45
12.7   Headings and Captions ...............................................45
12.8   Cross-References ........................................................45
12.9   Notices .......................................................................45

ARTICLE 13 DEFINITIONS AND RULES OF CONSTRUCTION:    46

13.1   Definitions Set Forth in This Article ...........................46
13.2   Beneficiary.................................................................46
13.3   Corporate Trustee ......................................................46
13.4   Education ...................................................................46
13.5   Gender or Number .....................................................46
13.6   Incapacity...................................................................46
13.7   Internal Revenue Code...............................................47
13.8   Issue; Child; Children ................................................47
13.9   Net Income.................................................................48
13.10  Or...............................................................................48
13.11  Spouse.......................................................................48
13.12  Support, Maintenance and Health................................48
13.13  Survival......................................................................48
13.14  Treasury Regulations .................................................48
13.15  Trust..........................................................................48
13.16  Trust Estate ...............................................................48
13.17  Trustee ......................................................................48

ARTICLE 14 EXECUTION:    49

14.1   Declaration of the Grantor ..........................................49
14.2   Execution by the Grantor............................................49
14.3   Execution by the Trustee ............................................49

v

# SLOTKIN DEFECTIVE TRUST

### TRUST AGREEMENT

THIS TRUST AGREEMENT is made this ____th day of December 2012, by and between **MARK A. SLOTKIN**, a resident of Los Angeles County, State of California, (hereinafter sometimes referred to as the "Grantor") and **LOREN MARKEN** (hereinafter sometimes referred to as the "Trustee" or and "Initial Trustee") and his successors, (hereinafter referred to as the Successor Trustee", or the "Trustee").

### W I T N E S S E T H:

WHEREAS, the Grantor desires to establish an Irrevocable Trust pursuant to the California Probate Code, to make provisions for the care and management of his properties, for the ultimate dispositions of the trust properties and for such uses and purposes hereinafter set forth; and.

WHEREAS, it is contemplated that further sums of money investments or other property may be paid or transferred to or otherwise placed under the control of the Trustee hereof by way of addition to the Trust Fund to be held by the Trustee on the trusts hereinafter declared; and

WHEREAS, this Trust has been made intentionally defective by virtue of Grantor's rights contained in Article VII, Paragraphs 7.35 and 7.36 respectively; and

WHEREAS, for purposes of identification, the Trust shall be known as the **"SLOTKIN DEFECTIVE TRUST"** or such other name as the trustees shall from time to time determine.

Page 1,     SLOTKIN DEFECTIVE TRUST

NOW THEREFORE, in consideration of the premises and of the mutual covenants hereinafter made, the Grantor hereby assigns, gives, grant, convey, transfer, set over and deliver the sum of Fifty ($50.00) dollars, in cash, as the original trust estate, IN TRUST, unto the Trustee, who hereby declares that it has received from the Grantor the property listed in Exhibit "A" attached hereto and incorporated herein by reference, TO HAVE AND TO HOLD THE SAME IN TRUST, and to manage, invest and reinvest the same and any additions that may from time to time be made thereto, subject to the trust provisions hereinafter provided and the terms and conditions and powers and agreements relating thereto.

This **SLOTKIN DEFECTIVE TRUST** (the "Trust Agreement") is entered into between GRANTOR (hereinafter called "Grantor") and TRUSTEE (hereinafter called "Trustee"), effective as of the date of execution.

## ARTICLE 1

## DECLARATIONS OF TRUST:

1.1 <u>Principal of Trust</u>. The Grantor has transferred and delivered to the Trustee the sum of Fifty Dollars ($50), receipt of which is hereby acknowledged by the Trustee. The Grantor may also transfer substantial additional property to this Trust. The initial principal of the Trust together with any property that may be later transferred to the Trust and any income thereon, shall be held, administered and distributed by the Trustee as provided herein.

1.2 <u>Acceptance of Trust by the Trustee</u>. No consideration was or will be given to or by the Trustee for the conveyance or transfer to it of any of the Trust Estate. The Trustee accepts title to the Trust Estate which is conveyed or transferred to it hereunder, without liability or responsibility for the conditions or validity of that title. The Trust Estate has been or will be conveyed or transferred to the Trustee, in trust, with power of sale, for the uses and purposes and upon the terms herein set forth. The Trustee agrees to perform the duties of the Trustee and to hold the Trust Estate, the proceeds thereof, and any other property which may be later added to the Trust Estate, subject to the terms of this Trust Agreement.

Page 2,    SLOTKIN DEFECTIVE TRUST

## ARTICLE 2

### RIGHTS RESERVED TO THE GRANTOR:

2.1    <u>Trust To Be Irrevocable</u>. The Trust or Trusts created pursuant to this Trust Agreement are irrevocable and may not be altered or amended in any respect. Furthermore, the Trust or Trusts created pursuant to this Trust Agreement may not be terminated except by distributions permitted by this Trust Agreement.

2.2    <u>Additions</u>. The Grantor shall have the right, at any time, to add to the Trust Estate, and the property so added to the Trust Estate, whether real, personal or mixed, shall, after notice to the Trustee, be subject to all the terms of this Trust Agreement. Any other person may, from time to time, with the consent of the Trustee, add property of any kind to the Trust Estate, or any part thereof, which shall be subject to all the terms and provisions of this Trust Agreement.

2.3    <u>Grantor's Power to Remove and Replace Trustees and Named Successor Trustees</u>.

(a)    <u>Acting Trustees</u>. The Grantor shall have the right, at any time and from time to time, to remove any acting Trustee or Co-Trustee. Upon such removal, the remaining Co-Trustee shall serve as sole Trustee, or the next-named successor Trustee shall commence to act as Trustee, unless the Grantor shall concurrently name a replacement Trustee, who shall serve in place of the removed Trustee or Co-Trustee, taking precedence over all other named successor Trustees or Co-Trustees (and over all successor Trustees or Co-Trustees designated by any named Trustee(s)).

(b)    <u>Named Successor Trustees</u>. The Grantor shall have the right, at any time and from time to time, to delete any named successor Trustee or Co-Trustee under this Trust Agreement. Further, the Grantor may, but shall not be required to, concurrently name one or more replacement successor Trustees in place of the deleted named successor Trustee, taking precedence over all other named successor Trustees or Co-Trustees (and over all successor Trustees or Co-Trustees designated by any named Trustee(s)).

(c)    <u>Exercise of Power</u>. The foregoing powers set forth in Paragraph 2.3(a) and/or Paragraph 2.3(b) may be exercised or relinquished by the Grantor by giving written notice to:

(1)    any Trustee or Co-Trustee then serving,

(2)    all successor Trustees or Co-Trustees named in this Trust Agreement (or previously designated by any named Trustee or Co-Trustee) who have not yet commenced serving,

(3)    the then-living adult Beneficiaries,

(4)    the guardians of any minor Beneficiaries, and

Page 3,    SLOTKIN DEFECTIVE TRUST

(5)    as otherwise required by law.

Any replacement Trustee or Co-Trustee (either serving pursuant to Paragraph 2.3(a) or designated as a named successor Trustee pursuant to Paragraph 2.3(c) may be removed (or deleted) and replaced in turn by the Grantor giving written notice in the same manner as the removal (or deletion) and replacement was made as provided above. Any Trustee or Co-Trustee designated and serving pursuant to this Paragraph shall have all of the powers conferred upon a named Trustee under this Trust Agreement, shall serve without bond and shall for all other purposes be treated as a named Trustee under this Trust Agreement.

(d)    Prohibited Powers. Notwithstanding anything in this Paragraph 2.3 to the contrary, the Grantor shall not be permitted to name as a replacement Trustee or Co-Trustee (i) the Grantor, (ii) the spouse of the Grantor or (iii) any person considered a related or subordinate party subservient to the wishes of the Grantor, within the meaning of Internal Revenue Code Section 672(c) or any successor to that Section.

2.4    Intent to Create Grantor Trust. It is the intention of the Grantor that this Trust shall be treated as a grantor trust (as that term is defined in Sections 671-677 of the Internal Revenue Code) for federal income tax purposes, and all provisions of this Trust shall be construed so as to effectuate this intent.

ARTICLE 3

PERSONAL DECLARATIONS:

3.1    Declarations Concerning Family. The Grantor has two (2) children; namely:

NICOLLETTE A. SLOTKIN      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
SAVANNAH T. SLOTKIN        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

It is expressly stipulated that any child or children hereafter born to the Grantor and/or adopted by him shall share in the benefits of the Trust, or any trust created hereunder, to the same extent as the children above-named.

3.2    Residency. The Grantor is a permanent resident of the county of Los Angeles County, State of California.

ARTICLE 4

BENEFICIARY POWER OF WITHDRAWAL
DURING THE LIFE OF THE GRANTOR

4.1    Power to Withdraw Principal. For each direct or indirect transfer by a donor to the Trust prior to the death of the Grantor and during a calendar year, each beneficiary specified in this Article shall have the power to withdraw from the principal

Page 4,    SLOTKIN DEFECTIVE TRUST

of the Trust Estate the lesser of (a) the amount of the then maximum annual gift tax exclusion under Section 2503(b) of the Internal Revenue Code, less prior transfers during the year by such donor for such beneficiary or (b) such beneficiary's equal portion (unless a different allocation is indicated by the donor in a written notice accompanying the gift) of the fair market value at the time of transfer to the Trust of any property transferred to the Trust during that calendar year or which is considered to be an indirect transfer on his or her behalf during such year; provided, however, that any gift that is accompanied by a written notice from its donor to the effect that such gift shall not be subject to withdrawal under the provisions of this Article shall be excluded from consideration under this Article as though such gift had not been made. Fair market value shall be determined in the same manner as such amount would be determined for the donor's federal gift tax purposes. For purposes of determining the identity of the donor(s) and the amount of available gift tax exclusion remaining, any gift of separate property made by a married person shall be deemed to have been made one-half (1/2) by that person and one-half (1/2) by the spouse of that person so long as the gift is accompanied by a statement that this sentence shall apply, provided that each person is either a citizen of the United States or a United States resident alien.

4.2    Who May Exercise the Power. The beneficiaries entitled to withdraw principal pursuant to this Article shall be only those persons who would be Beneficiaries on the respective dates of transfer as if the Event Date had occurred.

4.3    Notice to Beneficiaries. Upon receipt of any transfer pursuant to Paragraph 4.1, the Trustee shall immediately give notice to each beneficiary who has a power to withdraw under this Article with respect to that transfer of (a) the transfer and (b) such beneficiary's power to withdraw under the provisions of this Article. Such notice may, but shall not be required to, be in the form of the Notice to Beneficiaries, attached hereto as Exhibit "A".

4.4    Exercise of Power to Withdraw. In the event a beneficiary elects to withdraw the amount allowable by this Article, the Trustee, in its sole discretion, may distribute to that beneficiary that amount in kind at its value at the date of withdrawal as determined by the Trustee. The right to withdraw Trust property in kind hereunder includes the right to withdraw life insurance policies in kind at the then values of those policies that are withdrawn at the election of the Trustee. The power to withdraw under this Article may be exercised by a beneficiary only by written instrument delivered to the Trustee by the earlier to occur of: (a) thirty (30) days of the giving of that notice or (b) the date of death of the Grantor (the "Exercise Period").

4.5    Beneficiary Lacking Legal Capacity. In the event that the owner of the power to withdraw under this Article lacks legal capacity, the natural or legal guardian of a minor beneficiary or other fiduciary of that beneficiary's estate (other than the Grantor, the Grantor's spouse or a natural guardian who is not related by blood to the Grantor), as determined by the Trustee, shall be given the notice and may exercise the power to withdraw granted under this Article, and, in that event, the Trustee shall distribute that property to or for the benefit of that beneficiary, as determined by the Trustee, in accordance with the terms of this Trust Agreement. However, if the Grantor,

Page 5,    SLOTKIN DEFECTIVE TRUST

the Grantor's spouse or a natural guardian who is not related by blood to the Grantor is that beneficiary's guardian or conservator, then the individual designated as next successor Trustee to the individual then serving as Trustee under this Trust Agreement (or any one of two or more Co-Trustees then serving) may make such demand on that beneficiary's behalf, unless the Trustee designates another individual in accordance with the remaining provisions of this Paragraph. If there is no individual designated successor Trustee, or if the Trustee prefers another individual to act in such capacity (in the exercise of the Trustee's discretion), the Trustee may designate an individual to so act (other than the Grantor or the Grantor's spouse, but specifically including a natural guardian who is not related by blood to the Grantor, if the Trustee deems it advisable).

4.6   Non-Exercise of Power . This power to withdraw shall be noncumulative and shall lapse if not exercised; provided, however, that to the extent the principal of the Trust Estate subject to a beneficiary's power to withdraw under this Article exceeds in value, at the end of the Exercise Period, the greater of the amounts stated in Section 2041(b)(2) of the Internal Revenue Code, that beneficiary's power to withdraw such excess amount of Trust principal (computed retroactively, as of the giving of notice and not at the end of the Exercise Period) shall not lapse if not exercised within the Exercise Period (a "Non-Lapsed Power"), but shall continue to be exercisable, on a cumulative basis, during the life of that beneficiary. If such power of withdrawal is not exercised as set forth hereinabove, then the portion of the Trust Estate which was the subject of such power of withdrawal shall remain as part of the Trust Estate to be held, divided, administered and distributed as hereinafter set forth in this Trust Agreement. Notwithstanding the foregoing, if a beneficiary under this Trust or one or more other trusts has powers of withdrawal that would otherwise appear to lapse in whole or in part in the same calendar year, for the purposes of taking such other lapses into account under this Trust, the Trustee may designate the order in which such provisions shall be taken into account for the purposes of this Paragraph. In the aggregate for a calendar year, the lapse of a beneficiary's powers of withdrawal under all such trusts shall be reduced to not more than the greater of Five Thousand Dollars ($5,000) or five percent (5%) of the aggregate value of the assets out of which the exercise of the lapsed powers could be satisfied under all such trusts and the lapse of the powers of withdrawal of a beneficiary under this Trust shall only be reduced to the extent necessary so that the aggregate lapse of all such rights does not exceed such amount.

4.7   Periodic Lapse of Power to Withdraw. Notwithstanding anything in this Article to the contrary, to the extent a beneficiary possesses a Non-Lapsed Power, a portion of such beneficiary's Non-Lapsed Power shall nevertheless lapse on the first day of the next calendar year in an amount equal to the excess, if any, of: (a) the greater of the amounts stated in Section 2041(b)(2) of the Internal Revenue Code; over (b) the amount of principal of the Trust Estate with respect to which such beneficiary newly obtains the right to withdraw pursuant to Paragraph 4.1 in such calendar year. In the event a beneficiary possesses Non-Lapsed Powers created in more than one calendar year, the portion of such Non-Lapsed Powers which shall lapse pursuant to this Paragraph shall relate to, first, the Non-Lapsed Powers arising in the earliest of such calendar years, then those Non-Lapsed Powers arising in chronologically successive calendar years, until the amount which shall lapse pursuant to this Paragraph is reached.

Page 6,    SLOTKIN DEFECTIVE TRUST

4.8    Beneficiary Power of Appointment. At any time, or from time to time, if a beneficiary holds a power of withdrawal that has not lapsed, the Trustee shall distribute all or any part of the Trust Estate which is subject to that beneficiary's continuing power of withdrawal to the beneficiary, the beneficiary's spouse, or to one or more of the Grantor's other issue then living, and on such terms and conditions, either outright or in trust, as that beneficiary shall appoint by an acknowledged instrument specifically referring to and exercising this continuing power of withdrawal and delivered to the Trustee. If a beneficiary dies while holding a power of withdrawal that has not lapsed, the beneficiary may exercise this power of appointment by a Will or other written document specifically referring to and exercising this power of appointment.

4.9    Power of Trustee to Amend. The power of a beneficiary to withdraw principal pursuant to this Article is intended to allow any and all transfers by donors to the Trust prior to the death of the Grantor to constitute transfers of a present interest in property pursuant to Section 2503(b) of the Internal Revenue Code. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee shall have the power to delete, supplement or otherwise amend those provisions of the Trust, including without limitation this Article, from time to time as may be necessary for the sole purpose of achieving this intention to the extent allowable under then-existing law. No such amendment shall in any way restrict, enlarge or otherwise affect any beneficiary's power of withdrawal which exists prior to or at the time the amendment is made. The Trustee shall be relieved from any liability to any Beneficiary or to any other person or entity arising from or related to the exercise or non-exercise of the powers granted under this Paragraph 4.9.

## ARTICLE 5

## ADMINISTRATION OF TRUST ESTATE:

5.1    Administration of Trust Estate as Set Forth in This Article. The Trust Estate, including any assets received by the Trust from time to time subsequent to the execution of this Trust Agreement, shall be held, administered and distributed as set forth in this Article.

5.2    Allocation of Trust Estate. The Trustee, in his sole, absolute and unreviewable discretion, shall have the power, the exercise of which shall be absolutely binding on all persons interested now or in the future in this trust, to distribute to or apply for the benefit, enjoyment or use of (herein sometimes collectively referred to as the "benefits") any one or more of the following permissible distributees:

(a)    The Grantor's children (hereinafter in this Paragraph 5.2 referred to individually as a "primary beneficiary" and collectively as the "primary beneficiaries"),

(b)    The descendants of a primary beneficiary who are then living (even though not now living), including a descendant whose parent or parents are then living,

Page 7,    SLOTKIN DEFECTIVE TRUST

(c)      An eligible spouse (as defined in Paragraph 13.2) of one of the Children or their descendants as to income only, and/or

(d)      Any trust for the primary benefit of any one or more of the above-described permissible distributees (even one created by a Trustee hereunder), whether now existing or hereafter created (except (i) any trust which is created by either the Grantor or a donor of such trust hereunder or (ii) any trust as to which either the Grantor or such donor has a beneficial interest or any power which could affect beneficial enjoyment), provided, however, that during the Grantor's lifetime, any such trust is governed by an irrevocable trust instrument executed prior to or concurrently with this Trust Agreement,

So much of the income or principal, or both, of the trust estate, in equal or unequal proportions, and at such time or times as such Trustee shall deem appropriate for such beneficiaries' health, maintenance, support and education or for any other purposes, after taking into consideration their income or other resources; provided, however, in no event shall such benefits be less than that needed for the reasonable support of a primary beneficiary (including the support of those for whom such primary beneficiary provides support as members of a primary beneficiary's family) if a primary beneficiary's own means of support are inadequate.  Such reasonable support shall be in the primary beneficiary's accustomed standard of support unless, in the Trustee's judgment, the size of this trust estate and the probable future needs of all of the permissible distributees require a lesser standard.  Any net income not distributed shall be accumulated and added to principal.  In exercising the discretions conferred in this section, the Trustee may pay more to or apply more for some beneficiaries than others and may make payments to or applications of benefits for one or more beneficiaries to the exclusion of others, if such Trustee deems this necessary or appropriate in light of the circumstances, the size of the trust estate, and the probable future needs of all beneficiaries.  In addition, the Trustee, in his or her sole discretion and without diminishing any of the Trustee's powers authorized elsewhere in this document, may pay less to, exclude or discontinue payments to eligible spouses who no longer have any children or have only adult children who are the Children's descendants or have other means of support.  Except however, after the death of  the Grantor, the Trustee shall make every effort within the discretion afforded herein to divide the Trust Estate equally among the primary beneficiaries or those beneficiaries described in Paragraph 3.1 hereof such that until the death of the last of the primary beneficiaries to die, each primary beneficiary is treated equally either directly or through his/her descendants.  The Trustee shall not make any such distributions of income or principal from the trust estate to or for the benefit of a trust beneficiary hereunder until consideration has first been given to the advisability of using the beneficiary's own assets and resources for such purpose or purposes in order to reduce the amount of the beneficiary's taxable estate, thereby minimizing the amount of the beneficiary's future taxes.

5.3    Distribution of Income.  Subject to the remaining provisions of this Article, the net income of the Trust created hereunder shall be distributed to or applied for the use and benefit of the respective Beneficiary thereof in convenient installments, but not less frequently than annually.

Page 8,    SLOTKIN DEFECTIVE TRUST

5.4    <u>Distributions of Principal</u>.  Upon the death of the last to die of the primary beneficiaries, the Trustee shall distribute the principal of the Trust Estate to the beneficiary (Trusts) identified in Paragraph 5.2 hereof.

5.5    <u>Partial Distributions of Principal</u>.  Until complete distribution pursuant to the provisions of Paragraph 5.4 the Trustee may distribute to or apply for the benefit of each Beneficiary those sums as the Trustee, in the Trustee's discretion, considers necessary for the proper support, maintenance, health and education of any one or more of that Beneficiary or that Beneficiary's issue, after taking into consideration, to the extent the Trustee considers advisable, any income or other resources of the Beneficiary or that Beneficiary's issue, as appropriate, outside of any Trust created pursuant to this Trust Agreement known to the Trustee and reasonably available for those purposes; provided, however, that no portion of the amount or amounts so distributed may be used to discharge any obligation of a parent of such issue to support any of those issue.

5.6    <u>Distribution Upon the Death of a Beneficiary</u>.  Upon the death of a Beneficiary, the undistributed balance of that Beneficiary's Trust shall be allocated into separate Trusts among the issue of that deceased Beneficiary, with allocation to be made among such issue by right of representation.  If there is no then-living issue of that deceased Beneficiary, the deceased Beneficiary's Trust shall be divided into shares and/or subshares for the then-living issue of that deceased Beneficiary's nearest ancestor not more remote than the Grantor (provided any such issue is a lineal descendant of the Grantor), with allocation to be made among such issue by right of representation.  Any share so established for either (a) the issue of that deceased Beneficiary or (b) the issue of that deceased Beneficiary's nearest ancestor not more remote than the Grantor (provided any such issue is a lineal descendant of the Grantor) shall be held in trust and distributed in accordance with this Article.  However, if any part of that deceased Beneficiary's Trust would otherwise be held in trust for a Beneficiary for whose benefit a Trust is already then being administered under this Trust Agreement, that part shall instead be added to that Trust and shall thereafter be administered according to its terms, except that, if that Trust provides for distribution in installments and if that Beneficiary has received a fractional distribution of that Trust pursuant to its terms, then there shall be distributed to that Beneficiary, free of trust, a fraction of that part equal to the fraction of that Beneficiary's interest previously distributed to that Beneficiary.

5.7    <u>Contingent Beneficiaries</u>.  If at any time before full distribution of the Trust Estate, no other disposition of the Trust Estate is directed by this Trust Agreement, the Trust Estate, or the portion of it then remaining, shall be distributed, free of trust, to those persons who would then be the heirs of the Grantor, their identities and respective shares to be determined as though the death of the Grantor had occurred at that time, in accordance with the laws of the state of California then in effect relating to the succession of separate property not acquired from a predeceased spouse or ancestor.

Page 9,    SLOTKIN DEFECTIVE TRUST

## ARTICLE 6

## SUCCESSOR TRUSTEE:

6.1    Designated Successor Trustee. If the TRUSTEE shall fail to qualify, become unable to serve or otherwise cease to act as Trustee hereunder, and no successor has been appointed by the Grantor to act in his stead, then DAVID MAYMAN shall serve in his stead.

6.2    Special Provisions Regarding Non-Resident Fiduciaries. Notwithstanding any other provision of this Trust Agreement, if at any time an individual who is named or nominated as a Trustee or successor Trustee of the Trust or any Trust created hereunder is not a United States citizen or a United States resident for United States income tax purposes (the "Non-Resident Fiduciary"), and any Trust created hereunder will be subject to treatment as a foreign trust for United States income tax purposes, then the next named successor Trustee shall act as Co-Trustee with the Non-Resident Fiduciary, provided such named successor Trustee is a United States citizen or United States resident for United States income tax purposes. If the next named successor Trustee shall fail to qualify, become unable to serve or otherwise cease to act as Co-Trustee hereunder, then the next named successor Trustee, if any, shall act as Co-Trustee with the Non-Resident Fiduciary, provided such named successor Trustee is a United States citizen or United States resident for United States income tax purposes. If there are no named successor Trustees or if all the named successor Trustees shall fail to qualify, become unable to serve or otherwise cease to act as Co-Trustee hereunder, then the Non-Resident Fiduciary shall either (a) exercise the Non-Resident Fiduciary's power under this Article to designate a Co-Trustee (either an individual or a Corporate Trustee) who is a United States citizen or a United States domestic corporation, who or which is not a related or subordinate party to the Non-Resident Fiduciary within the meaning of Section 672(c) of the Internal Revenue Code, to serve with the Non-Resident Fiduciary or (b) if the Non-Resident Fiduciary fails to exercise such power, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries of any Trust created hereunder, acting by majority vote, shall name a Co-Trustee (either an individual or a Corporate Trustee) who is a United States citizen or a United States domestic corporation, who or which is not a related or subordinate party to the Non-Resident Fiduciary within the meaning of Section 672(c) of the Internal Revenue Code, to serve with the Non-Resident Fiduciary. Moreover, notwithstanding the foregoing, unless the Non-Resident Fiduciary is a United States citizen or United States resident for United States income tax purposes, at no time shall the Non-Resident Fiduciary have the authority to control any substantial decisions of the Trust, and the Co-Trustee who is acting with the Non-Resident Fiduciary shall solely control all such decisions. The purpose of this provision is to avoid any Trust created hereunder from being treated as a foreign trust for United States income tax purposes.

6.3    Power of an Individual Trustee to Designate a Successor Trustee. Subject to the provisions of Paragraph 2.3 and Paragraph 6.11, this Paragraph provides for the designation of successor Trustees and/or Co-Trustees by an individual Trustee, as provided below:

Page 10,    SLOTKIN DEFECTIVE TRUST

(a)   An individual acting as Trustee or named as a successor Trustee in this Trust Agreement (the "Designating Trustee") shall have the power to designate one or more successor Trustees or Co-Trustees (referred to collectively as "Designated Successors" or individually as a "Designated Successor"). Such Designated Successors shall be entitled to serve as Co-Trustees or successor Trustees subject to the limitations or conditions set forth in the remainder of this Paragraph.

(b)   Designated Successors shall commence to serve and shall serve as Trustee or Co-Trustees hereunder as follows:

(1)   A Designated Successor may be appointed to serve concurrently with the Designating Trustee, with the Designated Successor's term ending when the Designating Trustee ceases to act as Trustee hereunder for any reason.

(2)   A Designated Successor may be appointed to serve concurrently with the Designating Trustee, with the Designated Successor's term as Trustee hereunder continuing after the Designating Trustee ceases to act as Trustee hereunder for any reason, provided that there is no successor Trustee named in this Trust Agreement who commences to act as successor Trustee, in which case the Designated Successor shall cease to act as Co-Trustee hereunder, but may be named to resume acting as successor Trustee hereunder at such time as there is no successor Trustee named in this Trust Agreement who is then qualified or able to serve as Trustee hereunder for any reason.

(3)   Designated Successors may be named to act as successor Trustees hereunder, one or more at a time, in the order indicated by the Designating Trustee at such time as there are no successor Trustees named in this Trust Agreement who are available to act as successor Trustee.

(c)   Each acting individual Trustee and each named successor individual Trustee may exercise the power to name Designated Successors, subject to the following limitations:

(1)   Any designation of Trustees and successor Trustees by the Grantor, as set forth in this Trust Agreement, shall take precedence over the exercise of the power to name Designated Successors by any Designating Trustee.

(2)   If the individual named as or serving as Trustee as well as any one or more individuals named as successor Trustees hereunder act as Designating Trustees and exercise the power to name Designated Successors, the exercise by the first-named successor Trustee shall take precedence over an exercise by the second-named successor Trustee, which shall take precedence over an exercise by the third-named successor Trustee, and so on.

(3)   While Co-Trustees are serving, they shall exercise this power jointly; provided, however, that if one Co-Trustee does not join in the designation and does not attempt to make an alternative designation, then the designation by the one Co-Trustee shall be effective.

Page 11,   SLOTKIN DEFECTIVE TRUST

(4)      A Designated Successor shall have the authority to name additional Designated Successors; provided, however, that any Designated Successor named by a Designated Successor may serve as Trustee hereunder only if no successor Trustees named in this Trust Agreement and no Designated Successors named by an individual named as a successor Trustee in this Trust Agreement are available to serve as Trustee hereunder.

(d)      The purpose of this Paragraph 6.3 is to provide a mechanism whereby one or more individuals may be named to serve as successor Trustee hereunder without a court proceeding.  However, no provision of this Paragraph 6.3 shall be interpreted to prevent a Designating Trustee from also naming a Corporate Trustee as a Designated Successor, subject to the provisions of Paragraph 6.3(h).

(e)      The foregoing power to name Designated Successors shall be exercised by a Designating Trustee by giving written notice of the designation of such Designated Successors to the then-living adult beneficiaries, the guardians of any minor beneficiaries and the conservators of any incapacitated beneficiaries, and as otherwise required by law.

(f)      Any designation pursuant to this Paragraph may be revoked or amended by the Designating Trustee by giving written notice in the same manner as the designation was made as provided above.

(g)      Any Designated Successor who serves as a successor Trustee (or Co-Trustee) hereunder shall have all of the powers conferred upon a named Trustee under this Trust Agreement, shall serve without bond and shall for all other purposes be treated as a named Trustee under this Trust Agreement.

(h)      A Designating Trustee may name a Corporate Trustee to act as a Designated Successor; provided that the Corporate Trustee has either (1) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (2) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000).

Page 12,   SLOTKIN DEFECTIVE TRUST

6.4    Right of Trustee to Resign; Appointment of Successor Trustee in the Event of a Vacancy.

(a)    Resignation of Trustee. Any Trustee acting as a Trustee under any Trust created hereunder may resign and be discharged from acting as a Trustee of that Trust by giving written notice of its resignation to any remaining Co-Trustee, to the adult Beneficiaries, to the guardians of any minor Beneficiaries and to the conservators of any incapacitated Beneficiaries. The notice shall be served personally or by certified or registered mail, postage prepaid, return receipt requested, and shall specify the date when the resignation shall take effect. The effective date of the resignation shall be at least thirty (30) days after the service or mailing thereof, unless the person or persons to whom notice of the resignation shall have been given shall otherwise consent.

(b)    Appointment of Successor Trustee to Fill Vacancy. In the event a vacancy exists in the office of Trustee (whether as a result of the resignation of the then-acting Trustee or for any other reason), and unless a successor Trustee is designated or otherwise appointed as provided in this Trust Agreement, and subject to the provisions of Paragraph 6.11, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries may, by action of a majority in interest, in a written instrument, designate a successor Trustee or Co-Trustees (either individual Trustees and/or a Corporate Trustee) for the Trusts created hereunder; provided that:

(1)    any designated successor Corporate Trustee has either (A) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (B) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000); and

(2)    the Beneficiaries shall not be permitted to designate any individual Trustee who is considered to be a related or subordinate party subservient to the wishes of any Beneficiary, within the meaning of Section 672(c) of the Internal Revenue Code or any successor to that Section.

6.5    Declination of a Named Successor Trustee. Any person or Corporate Trustee named as a successor Trustee under the Trust may decline at any time to act as Trustee of any Trust created hereunder by giving written notice of declination to the acting Trustee. If there is no acting Trustee at that time, notice shall instead be given to the next named Trustee or, if none is named, then to the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries. The notice may be served personally, or by certified or registered mail, postage prepaid, return receipt requested.

6.6    Substitution of Corporate Trustee. At any time that a Corporate Trustee is serving as Trustee of any Trust created pursuant to the provisions of this Trust Agreement, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries of such Trusts shall have the power, by

Page 13,    SLOTKIN DEFECTIVE TRUST

action of a majority in interest, to transfer the administration of those Trusts to a new Corporate Trustee who has either (a) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (b) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000). The substitution of a new Corporate Trustee shall be made by the giving of written notice by the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries, directed to the then-acting Corporate Trustee, indicating the desire of the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries to effect a substitution in the office of Corporate Trustee and designating the new Corporate Trustee selected. Upon securing the approval of the transfer and substitution by a court of competent jurisdiction to the extent that the approval may be required by law, or within thirty (30) days after receipt of the above-mentioned notice, the Corporate Trustee then serving as Trustee hereunder shall transfer and convey the entire interest of that Corporate Trustee in the Trust Estate to the new and substituted Corporate Trustee. The purposes of the foregoing provisions are to insure harmonious relations between the Corporate Trustee and the Beneficiaries, and to further the effective and efficient management of the Trusts created hereunder. At any time that a Corporate Trustee is named as a Trustee of any Trust created pursuant to the provisions of this Trust Agreement and that Corporate Trustee (a) declines to act as Trustee, (b) otherwise does not commence to act as Trustee or (c) is a named successor Trustee, the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries of such Trust shall have the power, by action of a majority in interest, to substitute a new Corporate Trustee in the place of the named Corporate Trustee. The new Corporate Trustee must have either (a) a combined capital and surplus (including the capital and surplus of its affiliated entities) of at least One Billion Dollars ($1,000,000,000) or (b) assets under management (including assets under management by its affiliated entities) of at least Twenty-Five Billion Dollars ($25,000,000,000). The new Corporate Trustee shall replace the named Corporate Trustee for all purposes of this Trust Agreement.

6.7    Effect of Succession of Trustees.  Any successor of a Trustee hereunder, whether resulting from consolidation, merger, or the transfer of Trust business or from death, resignation, refusal or inability to act, or by any other reason, shall succeed as Trustee with like effect as though originally named as such.

6.8    Powers and Authorities of Successor Trustee.  All powers and authorities, including discretionary and administrative powers, herein conferred upon a Trustee shall pass to any subsequent Trustee.

6.9    No Duty of Successor Trustees to Investigate.  A succeeding Trustee shall not be under any duty to examine the books and records of its predecessor Trustee and may accept as the full Trust Estate any properties which may be turned over to it.

6.10    Indemnification of Trustee.  To the fullest extent permissible under California law, no Trustee serving under this Trust Agreement shall be liable,

Page 14,    SLOTKIN DEFECTIVE TRUST

responsible or accountable in damages or otherwise to the beneficiaries of the Trust for any acts performed within the scope of the authority conferred on such Trustee by this Trust Agreement, except for such Trustee's willful misconduct, gross negligence, bad faith or reckless indifference to the interest of the beneficiaries. The Trust shall indemnify and hold harmless the Trustee from and against any and all losses, claims, demands, costs, damages, liabilities, expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, brought against, or threatened against, such Trustee because such Trustee was a Trustee of the Trust, except for such Trustee's willful misconduct, gross negligence, bad faith or reckless indifference to the interest of the beneficiaries. Such indemnification shall be provided regardless of whether the Trustee continues to be a Trustee at the time any such liability or expense is paid or incurred.

(a)    Expenses incurred by a Trustee in defending any claim, demand, action, suit or proceeding subject to this Paragraph shall from time to time be advanced by the Trust prior to the final disposition of such claim, demand, action, suit or proceeding.

(b)    The indemnification provided by this Paragraph shall be in addition to any other rights to which those indemnified may be entitled under any agreement, vote of the Beneficiaries, as a matter of law or equity or otherwise, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Trustee.

(c)    The Trustee may purchase and maintain insurance, at the Trust's expense, on behalf of the Trustee, against any liability that may be asserted against, or any expense that may be incurred by, such persons in connection with the activities of the Trust and/or the acts or omissions of such persons, regardless of whether the Trust would have the power to indemnify such persons against such liability under the provisions of this Trust Agreement.

6.11    <u>Prohibited Trustee Designations</u>.    Notwithstanding any provisions of this Article to the contrary, at no time shall the Grantor serve as Trustee under this Trust Agreement.

<div align="center">ARTICLE 7</div>

<div align="center"><u>POWERS OF TRUSTEE:</u></div>

7.1    <u>Powers of Trustee Set Forth in This Article</u>.    To carry out the purposes of any Trust created pursuant to the terms of this Trust Agreement and subject to any limitations stated elsewhere in this Trust Agreement, the Trustee is vested with the powers set forth in this Trust Agreement, including but not limited to those powers contained in this Article in addition to any now or hereafter conferred by law affecting any Trust created hereunder and the Trust Estate. In the event and to the extent that the terms of the prudent investor rule or the Uniform Prudent Investor Act broaden, restrict, conflict or contradict any of the terms of this Trust Agreement, then this Trust Agreement

Page 15,    SLOTKIN DEFECTIVE TRUST

and not the prudent investor rule or the Uniform Prudent Investor Act shall apply. Any and all of the powers of the Trustee are subject to the fiduciary obligation of the Trustee to treat all beneficiaries hereunder equitably. In the event that Co-Trustees are serving as Trustee of any Trust created hereunder, the powers set forth in this Trust Agreement shall be exercisable by unanimous action of the Co-Trustees acting jointly and not otherwise. Except as provided elsewhere in the Trust Agreement, the signatures of all Co-Trustees shall be required to evidence the exercise of any trustee power.

      7.2   <u>Power to Act as Owner</u>. The Trustee is authorized to do all acts, initiate all proceedings and exercise all rights and privileges in the management of the Trust Estate as if the absolute owner thereof. Without limiting the generality of the foregoing, the Trustee shall have the right and power to acquire, grant, bargain, sell (for cash or on deferred payments), sell short, convey, exchange, convert, lease for terms either within or beyond the duration of the Trust, grant for like terms the right to mine or drill for and remove from Trust properties gas, oil or minerals, encumber, borrow, hypothecate, assign, partition, divide, subdivide, improve, loan, reloan or grant options on any and all property of the Trust Estate. The Trustee is authorized to borrow money for any Trust purpose for the debts of the Trust, or the joint debts of the Trust and a Beneficiary, upon terms and conditions as the Trustee may deem to be proper and to obligate the Trust Estate for repayment; and the Trustee may encumber the Trust Estate or any of its property for the obligations of the Trust by mortgage, deed of trust, pledge, guarantee or otherwise, using such procedure or procedures to consummate the transaction or transactions as the Trustee may deem advisable. Except as otherwise specifically provided in this Trust Agreement, all transactions shall be for fair and adequate consideration.

      7.3   <u>Investment Powers</u>. The Trustee is authorized to invest and reinvest the principal, and the income if the Trustee is permitted to accumulate it. In so doing, the Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing, specifically including, but not by way of limitation, the following:

      (a)   General economic conditions.

      (b)   The possible effect of inflation or deflation.

      (c)   The expected tax consequences of investment decisions or strategies.

      (d)   The role that each investment or course of action plays within the overall Trust portfolio.

      (e)   The expected total return from income and the appreciation of capital.

      (f)   Other resources of the beneficiaries known to the Trustee as determined from information provided by the beneficiaries.

Page 16,   SLOTKIN DEFECTIVE TRUST

(g)    Needs for liquidity, regularity of income, and preservation or appreciation of capital.

(h)    An asset's special relationship or special value, if any, to the purposes of the Trust or to one or more of the beneficiaries.

(i)    The anticipated needs of the Trust and its beneficiaries.

The Trustee shall consider individual investments as part of an overall investment strategy having risk and return objectives reasonably suited to the purposes of the Trust. In so doing, the Trustee shall act as a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, to attain the goals of the Grantor as determined from the Trust Agreement. Within the limitations of the foregoing standard and considering individual investments as part of an overall investment strategy, the Trustee is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate and government obligations of every kind, preferred or common stocks (on margin or otherwise), interests in limited liability companies, commodities (on margin or otherwise), options (whether covered or not) or futures for stocks, stock index options, commodities or other assets, any other derivative securities, shares of investment trusts, shares of investment companies, shares of mutual funds (including mutual funds of which the then-acting Trustee or an affiliate of the then-acting Trustee serves as investment adviser), mortgage participations, partnership interests (general or limited) and common trust funds (including common trust funds administered by the then-acting Trustee or an affiliate of the then-acting Trustee). Further, subject to the standards and limitations stated in this Trust Agreement, the Trustee is specifically authorized to (but is not required to) invest funds or assets belonging to the Trust Estate (a) in the purchase or construction of a home for a Beneficiary and/or (b) in the commencement or conduct of a trade or business by a Beneficiary. The Trustee is authorized to invest the entire Trust Estate in interest-bearing accounts, certificates of deposit, market funds, index funds or any other non-equity income-producing investment, notwithstanding the possible decrease of purchasing power of the value of the principal of the Trust Estate.

7.4    Special Provisions While Corporate Trustee Is Acting. The Grantor acknowledges that, notwithstanding any provision in this Trust Agreement to the contrary, so long as any Corporate Trustee is serving as Trustee under this Trust Agreement, the provisions listed below shall apply. To the extent that said provisions differ or are inconsistent with any provisions of this Trust Agreement, the terms of this Paragraph 7.4 shall control.

(a)    Any Corporate Trustee may, in its discretion, invest and reinvest in equity securities, securities of any registered investment company (mutual fund), units of common trust funds, interests in unregistered private placement investment funds or undivided interests in any other kind of commingled investment vehicle or strategy of which the Corporate Trustee or a parent or one or more affiliated

Page 17,    SLOTKIN DEFECTIVE TRUST

companies is acting as Trustee, investment advisor or is providing services for compensation.

(b)    Any Corporate Trustee may, in its discretion, engage any one or more of its affiliates, including but not limited to an affiliate that may be a registered investment advisor under the Investment Advisors Act of 1940 or a national bank or trust company or a state bank or trust company with respect to any portion of the Trust Estate, and in such event the affiliate shall have the investment powers granted to the Corporate Trustee hereunder.  If the Corporate Trustee engages an affiliate, each shall be entitled to the compensation to which it would be entitled in the absence of the affiliation.

(c)    Any Corporate Trustee may exercise the powers granted under this Paragraph, even though such action may create a conflict of interest and/or may involve an investment that is not of a type or marketability traditionally considered for trust investments.  Grantor hereby waives any conflict of interest that may result directly or indirectly from purchasing, selling or holding any such affiliated investment on behalf of this Trust and from engaging the services of any affiliate and directs that with respect to party in interest transactions such as those outlined in this Paragraph, the Corporate Trustee shall be judged by the same standards and rules of law that would apply to transactions among strangers free of any element of divided loyalty or conflicting interests, notwithstanding the Corporate Trustee's customary duty to avoid conflicts of interest.

7.5    Power to Retain or Abandon Property.  The Trustee is authorized to continue to hold any property, including all assets received by the Trustee (from any and all sources) and to operate at the risk of the Trust Estate any property or business received as long as the Trustee may deem it advisable, the profits and losses thereon to inure to or be chargeable against the Trust Estate and not to the Trustee. Except to the extent prohibited by law, no statutory provision shall constitute a limitation upon the exercise by the Trustee of discretion in continuing to hold securities, properties, partnership interests (general and limited), interests in limited liability companies, business interests or investments received hereunder.  Notwithstanding the foregoing, no provision contained herein should be construed to give the Trustee the power to retain any property beyond the date such property is to be distributed to any Beneficiary hereunder. The Trustee may, in the Trustee's discretion, abandon any property or interest in property belonging to any Trust if the Trustee determines, in the Trustee's discretion, that the abandonment is in the best interests of the Trust and its beneficiaries.

7.6    Certain Management Powers.

(a)    Compromise.  The Trustee may, at the option of the Trustee, at any time, in connection with the management of the Trust Estate or the collection of any monies due or payable to a Trust created hereunder, compromise any claims existing in favor of or against the Trust.

(b)　　Trustee Loans. The Trustee may loan or advance the Trustee's own funds for any Trust purpose to the Trust without security or upon the security of all or any portion of the principal of the Trust involved. Those loans shall bear interest at the then-current rate from date of advancement until repaid. However, the Trustee shall in no event be required to make any loan or advancement to the Trust.

(c)　　Nominees. Any certificate, security or any evidence of indebtedness or ownership of property may be registered or taken and held in the name of the Trustee, or in the name of the nominee or nominees of the Trustee, with or without the disclosure of fiduciary relations, in order to more readily facilitate the handling of the Trust Estate.

7.7　　Reimbursement of Trustee. The Trustee is authorized to reimburse itself from principal or income for any expense incurred by reason of the Trustee's fiduciary ownership or holding of any property in the Trust Estate.

7.8　　Power to Employ. The Trustee may employ attorneys, accountants, brokers, agents, managers, appraisers, investment advisers, custodians, corporate fiduciaries and others whose services are in the Trustee's discretion reasonably necessary or convenient to the administration of the Trust or for the carrying out of any of the Trustee's powers or discretions hereunder. The Trustee shall not be liable to the Trust or to any beneficiaries as a result of any losses, costs or damages of any kind, type or nature, suffered or incurred by the Trust or by any beneficiary resulting from the Trustee's reasonable good faith reliance on professional advice rendered by any professional advisers engaged by the Trustee on behalf of the Trust. The Trustee is authorized to employ the Trustee or any firm with which the Trustee is associated to perform any services that are in the Trustee's discretion necessary or convenient to the administration of the Trust created hereunder. Reasonable compensation for all services performed by these agents shall be paid from the Trust Estate, and shall not decrease the compensation to which the Trustee is entitled.

7.9　　Installment Payments of Income. Except as otherwise indicated herein, the Trustee shall make the payments of the annual net income of any Trust required to be distributed hereunder at least quarter-annually or more often in the discretion of the Trustee. The Trustee shall have the power to budget the estimated annual income and expenses of the Trust in such manner as to equalize, as far as possible, periodic income payments to the Beneficiaries. In computing the amount of any such installment, the Trustee may, to the extent deemed appropriate by the Trustee, make reservation for expenses to be charged against such net income.

7.10　　Segregation, Allocation and Distribution of Assets. There need be no physical segregation or division of the various Trusts, except as segregation or division may be required by the termination of any Trusts. Regardless of any segregation or division of the various Trusts, the Trustee shall keep separate accounts for the different undivided interests. Upon any division of the Trust Estate into separate shares or Trusts, and upon any distribution of the income or principal, the Trustee may apportion and allocate the assets of the Trust Estate in cash or in kind, or partly in cash and partly in

Page 19,　SLOTKIN DEFECTIVE TRUST

kind, or in undivided interests in such manner and at such values as the Trustee in its discretion deems advisable. Any distribution or division in kind may be made on a proportionate or a disproportionate basis so long as the respective assets allocated or distributed have equivalent or proportionate fair market value. In making in kind allocations of assets, the Trustee shall take into consideration the income tax basis of specific property to be so allocated in determining equivalence of value, to the extent that the Trustee deems it advisable and/or to the extent any other adjustments are determined by the Trustee to be reasonable. The Trustee may sell such property as it deems necessary to make any division or distribution. After any division of the Trust Estate, the Trustee may make joint investments with funds from some or all of the several shares or Trusts.

7.11    Trust Distributions. Upon any distribution of a Trust, in whole or in part, the Trustee may assign, transfer or deliver in kind to the Beneficiary then entitled thereto, any part of the Trust Estate or an undivided interest in the Trust Estate, or any portion thereof, at the value as the Trustee may establish as the then fair market value. No interest shall be paid on any specific distribution of cash or property (if any) set forth in this Trust, except that any specific distribution to a spouse of the Grantor shall bear interest. If the Trust Estate includes one or more promissory notes with respect to which gain would be accelerated under Section 453B of the Internal Revenue Code if distributed to a Beneficiary, the Trustee, in its sole discretion, may elect not to distribute such note(s) at the time provided in this Trust Agreement. In the event the Trustee so elects, such note(s) shall continue to be held in trust and the payments received by the Trustee under the note(s) shall be divided, held, administered and distributed as otherwise set forth in this Trust Agreement, until the Trustee determines to distribute the note(s) or until the note(s) are paid in full. Further, the Trustee may, for any reason, elect not to distribute all or any portion of the principal of the Trust Estate with the consent of the Beneficiary who or which is entitled to receive such distribution, until such time as that Beneficiary desires to receive distribution of such principal. In connection with any principal distributions required hereunder as a result of a Beneficiary attaining a stated age, the Trustee may make such distribution at any time after the date on which such Beneficiary attains such stated age and ending on the last day of the same calendar year.

7.12    Powers of Trustee In the Event of Beneficiary Misconduct.

(a)    Suspension of Withdrawal Rights and Mandatory Distributions. Notwithstanding anything to the contrary contained in this Trust Agreement, no Beneficiary shall have a right to withdraw or receive an otherwise mandatory distribution of all or any portion of the principal of a Trust, and/or the net income of the Trust, if on the date a withdrawal is requested or a distribution is provided under the terms of any Trust (collectively, the "Distribution Date"), an event of Beneficiary Misconduct (as hereafter defined) exists. For purposes of this Trust, "Beneficiary Misconduct" means any one or more of the following:

(1)    The Beneficiary is incarcerated.

Page 20,    SLOTKIN DEFECTIVE TRUST

(2)    The Beneficiary has been convicted of any crime, other than misdemeanors or minor traffic violations, within five (5) years of the Distribution Date.

(3)    The Beneficiary is on probation in connection with any criminal conviction, other than for misdemeanors or minor traffic violations.

(4)    The Beneficiary previously has been on probation and any such period of probation has expired less than two (2) years prior to the Distribution Date, other than for misdemeanors or minor traffic violations.

(5)    The Trustee determines in its sole discretion that within three (3) years of the Distribution Date, the Beneficiary has used or engaged in the purchase and/or sale of any illegal drugs or other illegal substances or has abused the use of alcohol.

Any right to withdraw principal exercisable by a Beneficiary and any right to receive a distribution of net income and/or principal otherwise provided under the terms of the Trust shall be delayed until the Beneficiary Misconduct no longer applies and any period of time defining such Beneficiary Misconduct (as described above) has expired.  The determination of whether an event or condition of Beneficiary Misconduct exists shall be determined in the sole and absolute discretion of the Trustee, and shall be final and binding upon all parties interested in such Trust.

(b)    Optional Reduction or Suspension of Discretionary Distributions.  Any discretionary distributions for a Beneficiary's health, education, support and maintenance shall be made by the Trustee after considering the Grantor's desire that a Beneficiary lead a life free of crime and substance abuse and the Grantor's intent that the assets of the Trust may not be used to encourage or support a Beneficiary in a lifestyle including criminal activities, illegal drugs or abuse of alcohol. Notwithstanding any other provisions in this Trust Agreement to the contrary, the Trustee shall withhold any and all distributions for support and maintenance which in the Trustee's sole and absolute discretion may (1) encourage a lifestyle involving criminal activities or (2) contribute to a chemical dependence or substance abuse, or otherwise free funds for such use by the Beneficiary; provided, however, that such distributions for support may be provided for a hospital or other program of recovery or a stay in a recovery house, plus all costs incident thereto.  Nothing in this Trust Agreement shall prevent the Trustee from making discretionary distributions for the health, education, support and maintenance of a Beneficiary and/or a Beneficiary's issue as otherwise provided in this Trust Agreement to the extent that the Trustee, in its sole and absolute discretion, determines that the conditions described in this Paragraph 7.12(b), are satisfied and that the Beneficiary will use such funds for the purposes for which they are distributed.

(c)    Trustee's Right, But Not the Duty, To Investigate Beneficiary Misconduct.  The Trustee shall not have any duty to investigate any Beneficiary Misconduct and shall not be liable to anyone for any Beneficiary

Page 21,   SLOTKIN DEFECTIVE TRUST

Misconduct. If the Trustee suspects or becomes aware that the Beneficiary is involved with drug and/or alcohol abuse, the Trustee is authorized, but not required, to employ private investigators and to take such other actions as the Trustee determines appropriate, at the expense of the Trust, to determine whether any Beneficiary Misconduct exists or whether any distribution would be contrary to the Grantor's desires described herein. The Trustee shall not incur any liability to persons whose interest may have been affected by disbursements made or not made in good faith by the Trustee without knowledge of any event affecting distribution to a Beneficiary described in this Paragraph.

(d)     Death of a Beneficiary During Period of Beneficiary Misconduct. If termination of the Trust is postponed pursuant to this Paragraph and the Beneficiary dies during such postponement, the deceased Beneficiary's Trust shall be held, administered and distributed in accordance with this Trust Agreement.

(e)     "Interested" Trustee. In the event that one of two or more individual Co-Trustees then serving is an "Interested Trustee" (as that term is defined in this Paragraph 7.12(e), then the remaining Co-Trustees who are not Interested Trustees shall exercise the discretionary authorities under this Paragraph. In the event that the sole Trustee, or all of the Co-Trustees then serving, are Interested Trustees, then the next Trustee who is not an Interested Trustee and who is not related or subordinate to such individual serving as Trustee (within the meaning of Section 672 of the Internal Revenue Code) shall exercise the discretionary authorities under this Paragraph. For purposes of this Paragraph, "Interested Trustee" (as to any Beneficiary whose rights as a Beneficiary could be affected by that Trustee's exercise of discretionary authorities hereunder) means an individual Trustee who would be entitled to any portion of the interest in the Trust Estate held for that Beneficiary in the event of that Beneficiary's death. Further, for purposes of this Paragraph, an individual Trustee will be deemed to "be entitled to any portion of the interest in the Trust Estate held for that Beneficiary in the event of that Beneficiary's death," if a person who is related or subordinate to such individual Trustee would be entitled to any portion of the interest in that Beneficiary's Trust in the event of that Beneficiary's death.

7.13     Principal and Income. Except when the Trust Agreement specifically provides otherwise, the Trustee shall determine principal and income of the Trust Estate and from time to time apportion and allocate receipts, expenses, and other charges between those accounts according to the provisions of the California Uniform Principal and Income Act ("UPAIA"). With respect to matters not provided for in the UPAIA, the Trustee shall have the absolute discretion to determine what is principal or income, and apportion and allocate any and all receipts and disbursements between those accounts, subject only to fiduciary standards and limitations of law. The exercise of that discretion within the above set forth limitations shall be conclusive on all persons interested in the Trust Estate.

7.14     Acceptance of Gifts. The Trustee is authorized to accept gifts from any individual who desires to contribute to the principal of any of the respective Trusts created hereunder. The acceptance of any such additional gifts shall be in the sole and absolute discretion of the Trustee.

Page 22,   SLOTKIN DEFECTIVE TRUST

7.15    Powers Over Securities. With respect to securities, interests in limited liability companies, partnership interests and similar property held in the Trust, the Trustee shall have all the rights, powers and privileges of an owner, including, but not by way of limitation:

(a)    to vote, give proxies and pay assessments;

(b)    to participate in voting trusts and similar agreements, pooling agreements, foreclosures, reorganizations, consolidations, mergers, liquidations, sales and leases, and incident to such participation to deposit securities with and transfer title to any protective or other committee on such terms as the Trustee may deem advisable;

(c)    to participate in and to exercise rights under buy-sell, close corporation and S corporation shareholder agreements, or similar agreements;

(d)    to exercise or sell stock subscription or conversion rights;

(e)    to consent to foreclosures, reorganizations, consolidations, mergers and liquidations; and

(f)    to deposit securities with and transfer title to any protective or other committee on any terms that the Trustee, in the Trustee's discretion, considers advisable.

The signature of the Trustee, or one of two or more acting Co-Trustees, if applicable, shall be sufficient to bind the Trust with respect to any of the foregoing actions taken pursuant to this Paragraph and any third party may rely upon the signature of one of two or more acting Co-Trustees in connection therewith. Notwithstanding the foregoing, it is the intention of the Grantor that Co-Trustees shall exercise their powers over securities as a single record holder and under no circumstances shall the vote of the Co-Trustees be split, regardless of whether a specific provision of any rule or law applicable to such securities (including the Corporations Code of the state in which the entity was formed) would permit joint holders of such securities to cast votes other than as a single vote. The signatures of all Co-Trustees shall be required to enter into partnership agreements, limited liability company operating agreements, buy/sell agreements or similar agreements.

7.16    Transactions With Other Entities. The Trustee is authorized to purchase assets from or sell assets to the probate estate of the Grantor or any other person, firm, trust or other entity. Any such purchase or sale shall be at the fair market value of those assets (as determined by the Trustee in the Trustee's discretion) and upon such terms and conditions and in such amounts as the Trustee may deem advisable. The Trustee is authorized to loan funds or assets belonging to the Trust Estate to the Grantor, to the probate estate of the Grantor, to any Beneficiary hereunder, or to any other person, firm, trust or other entity, upon such terms and in such amounts as the Trustee may deem advisable. Any such loan must (a) bear a reasonable rate of interest, but not more than the maximum interest rate allowed under California law and (b) must be adequately

Page 23,    SLOTKIN DEFECTIVE TRUST

secured.  Notwithstanding any provision of this Paragraph to the contrary, in no event shall the Trustee make any investment pursuant to the provisions of this Paragraph for less than adequate consideration in money or money's worth or that the Trustee determines would not be a prudent investment of the assets of the Trust Estate.  Further, subject to the standards and limitations stated in this Trust Agreement, the Trustee is specifically authorized to (but is not required to) loan funds or assets belonging to the Trust Estate for (a) the purchase or construction of a home for a Beneficiary and/or (b) the commencement or conduct of a trade or business by a Beneficiary.

7.17    Power to Purchase Insurance.  The Trustee is authorized to procure and carry, at the expense of the Trust, insurance of such kind and in such form and amount as the Trustee deems advisable to protect the Trustee, the Trusts and the Trust Estate against any insurable hazard, risk of loss or other potential liability.

7.18    Payments to or for Minors or Incapacitated Persons.  If at any time or from time to time any beneficiary entitled to receive income or principal hereunder shall be a minor or an incapacitated adult, the Trustee may make the distribution or expenditure for the beneficiary, in the sole discretion of the Trustee, in any one or more of the following ways:

(a)    directly to the beneficiary;

(b)    to the guardian, conservator or other fiduciary of the person or estate of the beneficiary;

(c)    to a Uniform Transfers to Minors Act account, already existing or created for a minor, in any jurisdiction;

(d)    to any person or organization furnishing care, support, maintenance or education of the beneficiary; or

(e)    by itself making expenditures directly for the support, maintenance, health or education of the beneficiary.

The Trustee shall not be required to see to the application of any funds so paid or applied and the receipt by such payee shall be a full acquittal of the Trustee.  The decision of the Trustee as to direct payments or application of funds shall be conclusive and binding upon all parties in interest.

7.19    Banks and Brokerage Accounts and Endorsements.  The Trustee is authorized to maintain existing accounts and safe deposit boxes, and open new accounts and safe deposit boxes, at banks, savings and loan associations, brokerage houses and other financial institutions (including with the Trustee and affiliates of the Trustee) for the Trust Estate in such manner that funds may be withdrawn or investment direction given with respect to those accounts, or those safe deposit boxes may be accessed, upon the signature of and upon the instruction of the Trustee, or one of two or more acting Co-Trustees, if applicable.  Therefore, one of two or more acting Co-Trustees, acting alone, shall have signature power with respect to any account maintained at a savings and loan

Page 24,    SLOTKIN DEFECTIVE TRUST

institution, bank or other financial institution, safe deposit box or brokerage account which then constitutes an asset of the Trust Estate. The signature of the Trustee, or one of two or more acting Co-Trustees, if applicable, shall be sufficient to endorse any check, payment or other instrument which may be received for the account of the Trust, and such endorsement shall be a sufficient receipt to the person giving that check, payment or other instrument to the Trust. The Trustee is authorized, in its discretion, to appoint additional signatories to any accounts and safe deposit boxes maintained or opened at banks, savings and loan associations, brokerage houses and other financial institutions (including with the Trustee and affiliates of the Trustee) for the Trust Estate in such manner that funds may be withdrawn with respect to such accounts upon the signature of such additional signatory or signatories. The signature of such additional signatory or signatories shall be sufficient to endorse any check, payment or other instrument which may be received for the account of the Trust, and such endorsement shall be a sufficient receipt to the person giving the check, payment or other instrument to the Trust.

    7.20   Option to Terminate Shares or Trusts. At any time after the death of the Grantor, in the event that:

    (a)   the share or separate Trust held for any Beneficiary of a Trust created hereunder has, at any time, in the opinion of the Trustee, a fair market value of Fifty Thousand Dollars ($50,000) or less,

    (b)   the aggregate fair market value, in the opinion of the Trustee, of all Trusts created hereunder and administered by the Trustee at any time is Two Hundred Fifty Thousand Dollars ($250,000) or less, or

    (c)   the principal value of any Trust created hereunder at any time is less than an amount that can be economically administered in trust,

the Trustee may, in its discretion, but is not required to, terminate that Trust or those Trusts and, regardless of the age of the Beneficiary, distribute the principal and any accrued or undistributed net income thereon to the Beneficiary, or to its guardian, conservator, custodian under the California Uniform Transfers to Minors Act or other similar statute, or other fiduciary.

    7.21   Power to Combine and Divide Trusts. Except as otherwise provided to the contrary in this Trust Agreement, the Trustee may, at any time and from time to time, and without court approval, for tax and/or administrative reasons:

    (a)   combine any Trust created under this Trust Agreement for any Beneficiary with any other Trust otherwise created for that Beneficiary, whether created under this Trust Agreement or otherwise, the terms of which Trusts are substantially identical and the Trustees of which Trusts are identical, provided that the Trustee, in the Trustee's reasonable discretion, determines that administration as a single Trust will be consistent with the intent of the persons who established the Trusts and will facilitate Trust administration without defeating or impairing beneficial interests of current or future beneficiaries of this Trust; and

Page 25,  SLOTKIN DEFECTIVE TRUST

(b)    divide any Trust created hereunder into two or more separate Trusts, each of which shall have the same provisions as the original Trust from which it was established, and references in this Trust Agreement to the original Trust shall refer to the separate Trusts derived from it.

If a Trust is divided into separate Trusts, the Trustee may, at any time prior to a combination of such Trusts, take any and all actions consistent with such Trusts being separate entities including, without limitation, make different tax elections with respect to each separate Trust, expend principal and exercise any other discretionary powers differently with respect to each separate Trust. The donee or other holder of any power of appointment with respect to a Trust so divided may exercise such power differently with respect to the separate Trusts created. In addition, if property is directed to be added to any Trust created hereunder, the Trustee may:

(1)    hold such additional property as one or more separate Trusts having terms identical to the terms of the Trust to which it was to be added; and

(2)    allocate such additional property on a non-pro rata basis among the several Trusts, if any, into which the Trust to which such additional property is required to be added was previously divided (including an allocation of all such additional property to one of such Trusts).

No Trustee shall be liable for any good faith exercise of a power described in or otherwise authorized by this Paragraph and, in the event any such good faith exercise of such a power results in a detriment to one or more beneficiaries, the Trustee shall be exonerated and otherwise held harmless with respect to any such detriment.

7.22    Power to Withhold Distribution. The Trustee is authorized to withhold from distribution, at the time for distribution of any property of the Trust Estate, without the payment of interest, all or any part of the property, as long as the Trustee shall determine in its discretion that the property may be subject to conflicting claims, tax deficiencies or liabilities, contingent or otherwise.

7.23    Tax Elections. The Trustee shall have the power in the Trustee's absolute discretion to take any action and to make any election to minimize the tax liabilities of this Trust and/or one or more of its beneficiaries, regardless of the resulting effect on the Trust, the other beneficiaries or any other person interested in this Trust, to allocate the benefits among the various beneficiaries, and to make adjustments in the rights of any beneficiaries or between the income and principal accounts, to compensate for the consequences of any tax election or any investment or administrative decision that the Trustee believes has had the effect of directly or indirectly preferring one beneficiary or group of beneficiaries over others. In allocating assets hereunder, the Trustee may take into consideration the basis of such assets to the extent appropriate, as determined by the Trustee in its sole and absolute discretion.

Page 26,    SLOTKIN DEFECTIVE TRUST

7.24    <u>Subdivision of Real Property</u>. The Trustee is authorized and empowered:

    (a)    to subdivide and resubdivide Trust real property and sign applications, maps and other documents incidental thereto;

    (b)    to dedicate Trust real property for public purposes, with or without consideration;

    (c)    to grant and impose upon Trust real property conditions, covenants, easements, restrictions, rights of way and other servitudes;

    (d)    to borrow against Trust real property; and

    (e)    to do such other acts as may appear to the Trustee advisable in connection with the exercise of any of the foregoing powers.

7.25    <u>Purchase at Foreclosure</u>. The Trustee is authorized and empowered, as to any property (real, personal or mixed) in which the Trust has any interest, that is sold at foreclosure, judicial or non-judicial, to make bids upon or purchase the same or, as to such property, to accept a deed in lieu of foreclosure as full or complete satisfaction of the debt which is secured. The Trustee shall allocate income and expense attributable to such property or the proceeds of its sale as if such property were being initially acquired as a Trust investment.

7.26    <u>Fiduciary Related Party Transactions</u>. The Trustee is authorized to act on behalf of the Trust notwithstanding the self interest of the Trustee, subject to the fiduciary duty of the Trustee, including the power to lease, mortgage or sell any property to or lease or purchase any property from the Trustee; to determine the amount of and to receive compensation for services as Trustee or in any other capacity; in the case of a corporate Trustee, to borrow from, deposit money or otherwise deal with its own banking department or that of an affiliate, to invest in its own stock or stock of any of its affiliates, or to invest in its own common trust fund; and to be interested in any investment, corporation, limited liability company, partnership, other unincorporated business, farming or mining operation, real estate operation or other venture in which the Trust is interested. No person shall be precluded from acting as Trustee hereunder or being compensated therefore by reason of his employment in any capacity by any corporation, limited liability company or partnership or office in any capacity with any corporation, limited liability company or partnership, the stock of which corporation or an interest in which limited liability company or partnership constitutes a part or all of the assets of the Trust, nor shall the Trustee be so precluded from accepting such employment or appointment by any such corporation, limited liability company or partnership. The Trustee is specifically authorized and empowered to exercise all of the duties and powers entrusted to such Trustee under the terms of this Trust Agreement despite any duality of fiduciary obligations arising by reason of such person's service as the Trustee and as an officer, director, partner or employee of any corporation, limited liability company or partnership in which the Trust may be interested. No Trustee hereunder shall be liable

Page 27,    SLOTKIN DEFECTIVE TRUST

for any loss or diminution in the Trust resulting from any action such Trustee may take or refrain from taking concerning the foregoing, except for such Trustee's own gross negligence or willful misconduct with regard thereto.

7.27    <u>Power to Commence, Retain and Manage Closely Held Business</u>. The Trustee is expressly authorized to commence or retain, regardless of lack of diversification, as an investment of any Trust created hereunder, securities of or any other ownership interest in any closely held business, whether a sole proprietorship, corporation, limited liability company, joint venture or partnership (including stocks, bonds, debentures and any other form of securities representing either or both a proprietary interest in or obligation of said corporation or other entity), and any other business entity which is a successor to, subsidiary of, or affiliated with, said corporation or other entity, which is now or hereafter assigned, devised, bequeathed, transferred or delivered to the Trustee (all of which, if more than one, are hereinafter referred to as "the Company"). Pending sale or final distribution of said securities or ownership interest or liquidation of the Company, the Trustee shall have the following authorities and discretions, in addition to any other grant of authority and discretion given elsewhere in this Trust Agreement:

    (a)    to participate in the management of the Company;

    (b)    to supervise, in any manner, the conduct of the Company's business;

    (c)    to extend credit to the Company from any Trustee, including the banking department of a corporate Trustee, if one is acting, without in any way increasing, limiting or otherwise affecting its duties, responsibilities and liabilities as Trustee;

    (d)    to increase the investment of any Trust in the Company, either or both by way of secured or unsecured loans to the Company, by the purchase of equity from other equity holders of the Company, expressly including equity owned by a Beneficiary, or by subscription to additional equity, either or both common or preferred stock, partnership interests and/or limited liability company membership interests, or by pledging assets for the debts of the Company, whether incurred before or after the death of the Grantor;

    (e)    to organize a corporation, partnership or limited liability company under the laws of any state and to transfer to it all or any part of the Company or other property held in the Trust; and

    (f)    to retain in the Company such amount of its net earnings as the Trustee may deem advisable in conformity with responsible business practice.

The Trustee may exercise such authority to such extent and in such manner as the Trustee, from time to time, deems necessary or advisable to protect the investment of any Trust created hereunder and to contribute to the best interest and welfare of the beneficiaries thereof.

Page 28,    SLOTKIN DEFECTIVE TRUST

The Grantor expects the Trustee to exercise ordinary business judgment in determining how long such securities or ownership interest shall be retained as an investment and in deciding upon such action as may be taken in its supervision of the management of the Company during the period of such retention and the readjustment of the total investment therein, it being the intention of the Grantor to give to the Trustee every power and discretion it may need or require to provide proper management and supervision of the Company until such time as the Trustee, in its sole judgment, shall deem it to be to the best advantage of a Trust, and the beneficiaries thereof, to sell or otherwise dispose of such securities or ownership interest; and the Trustee shall not be liable for any loss that may result from the honest exercise of any such power or discretion granted in the Trust Agreement, and shall be indemnified against any such loss from the assets of any Trust holding securities of or any other ownership interest in the Company. The Grantor realizes that the Grantor is exposing any Trust to the risks inherent in all business operations, but it is the belief of the Grantor that the possibility of preserving the capital and income values which the Grantor believes the securities to contain justifies such risk. To the extent that the Trustee may render service to the Company, the Trustee is expressly authorized to take such steps as may be practicable to charge its fees for such service to the Company rather than to a Trust.

Nothing contained herein shall be construed to prevent any individual Trustee from being employed by the Company at a salary commensurate with the value of his or her service, or to prevent him or her from becoming a purchaser of any of such securities or other ownership interest either from the Trustee or from any other source.

The foregoing powers shall be deemed to be and shall be exercised as fiduciary powers. They shall not disqualify the possessor from holding office in the Company, accepting remuneration from it, voting any stock in favor of himself or herself as director or officer, or purchasing or selling stock of the Company.

7.28    Power Regarding S Corporations. The Trustee shall have the power to make any elections or decisions the Trustee deems appropriate with respect to any stock in an S corporation (as defined in Section 1361(a) of the Internal Revenue Code) held or acquired by the Trust.

7.29    Power Regarding Names of Trusts. The Trustee shall have the power, in the Trustee's sole and absolute discretion, to name, rename or change the name of the Trust or any Trust created hereunder.

7.30    Power to Transfer Trust to or from Another Jurisdiction. The Trustee shall have the power to remove any and all of the Trust Estate of any Trust created hereunder to or from any state of the United States, the District of Columbia or any foreign jurisdiction. Upon such removal, the laws and courts of such other jurisdiction shall govern the administration of the Trust, unless and until its removal therefrom or distribution. The Trustee shall have the power, from time to time, to change the jurisdiction of this Trust and, in such event, the laws and courts of such other jurisdiction shall govern the administration of the Trust, unless and until the Trustee changes jurisdiction again.

Page 29,    SLOTKIN DEFECTIVE TRUST

7.31    Power to Initiate and Defend Litigation; Power to Compromise Claims.

(a)    The Trustee may, in the Trustee's discretion, initiate or defend, at the expense of the Trust, any litigation relating to the Trust or any property of the Trust Estate that the Trustee considers advisable. The Trustee's powers under this Paragraph shall apply during the term of the Trust and after distribution of Trust assets. The Trustee shall have no duties, however, regarding any litigation or claims occurring after distribution of Trust assets, unless the Trustee is adequately indemnified by the distributees for any loss occasioned by exercise of these powers.

(b)    The Trustee may, in the Trustee's discretion, compromise, submit to arbitration, abandon, or otherwise adjust any claims or litigation against or in favor of the Trust. The Trustee's decision in this regard shall be conclusive. The Trustee's powers under this Paragraph shall apply during the term of the Trust and after distribution of Trust assets. The Trustee shall have no obligation or duties, however, regarding any litigation or claims occurring after distribution of Trust assets, unless the Trustee is adequately indemnified by the distributees for any loss occasioned by exercise of these powers.

7.32    Environmental Matters. In addition to all other powers, rights and privileges conferred on the Trustee under this Trust Agreement, the Trustee shall also have the following rights, powers and privileges with respect to environmental matters:

(a)    Inspection of Property and Records Prior to Acceptance.

(1)    Prior to acceptance of this Trust by any proposed or designated Trustee (and prior to acceptance of any asset by any proposed, designated or acting Trustee), such Trustee or proposed or designated Trustee shall have the right to take the following actions at the expense of the Trust Estate:

(A)    to enter, inspect and take samples for laboratory analysis from any existing or proposed Trust asset for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any hazardous substance (as defined under any applicable federal, state or local environmental law or regulation) into, onto, beneath or from the asset; and

(B)    to review records of the currently acting Trustee or of the Grantor (or of any partnership, limited liability company or corporation in which either the Trust or the Grantor holds an interest) for the purpose of determining whether the asset is in compliance with all federal, state or local environmental laws and regulations, including those records relating to permits, licenses, notices, reporting requirements and governmental monitoring of hazardous waste.

(2)    The right of the Trustee or the proposed or designated Trustee to enter and inspect assets and records of a partnership, limited liability company or corporation under this Paragraph is equivalent to the right under

Page 30,    SLOTKIN DEFECTIVE TRUST

state law of a partner, member or shareholder to inspect assets and records under similar circumstances.

(3)    Acts performed by a proposed or designated Trustee under this Paragraph shall not constitute acceptance of the Trust.

(4)    If an asset of the Trust is discovered upon environmental audit by any proposed or designated Trustee to be contaminated with hazardous waste or otherwise not in compliance with environmental law or regulation, the Trustee may decline to act as Trustee solely as to such asset, and accept the Trusteeship as to all other assets of the Trust. A court of competent jurisdiction shall appoint a receiver or Special Trustee to hold and manage the rejected asset under the preceding sentence, pending its final disposition. Any currently acting Trustee shall have the right to reject any asset proposed to be transferred to the Trustee.

(b)    Termination, Bifurcation or Modification of Trust Due to Environmental Liability.

(1)    If the Trust Estate holds one or more assets, the nature, condition, or operation of which is an actual or threatened violation of any federal, state or local environmental law or regulation, the Trustee may take one or more of the following actions, if the Trustee, in its discretion, determines that such action is in the best interests of the Trust and its beneficiaries:

(A)    modification of the Trust provisions, granting the Trustee such additional powers as are required to protect the Trust and its beneficiaries from liability or damage relating to actual or threatened violation of any federal, state or local environmental law or regulation;

(B)    bifurcation of the Trust; or

(C)    appointment of a Special Trustee to administer any Trust property or business which fails to comply with any federal, state or local environmental law or regulation.

(2)    With court approval, the Trustee may terminate the Trust or partially or totally distribute the Trust Estate to its Beneficiaries.

(3)    It is the intent of the Grantor that the Trustee shall have the widest discretion in identification of and response to administration problems connected to potential environmental liability to the Trust Estate and the Trustee, in order to protect the interests of the Trust, the Trustee and the beneficiaries of the Trust.

(c)    Remedies. The Trustee shall have the power to take, on behalf of the Trust, any action necessary to prevent, abate, or otherwise remedy any actual or threatened violation of any federal, state or local environmental law or regulation, relating to any asset, which is or has been held by the Trustee as part of the Trust Estate.

Page 31,    SLOTKIN DEFECTIVE TRUST

(d)    Indemnification of the Trustee from Trust Assets for Environmental Expenses.

(1)    The Trustee shall be indemnified and reimbursed from the Trust Estate for any liabilities, loss, damages, costs or expenses arising out of or relating to federal, state or local environmental laws or regulations, as amended from time to time (hereinafter "Environmental Expenses").

(2)    Environmental Expenses shall include, but shall not be limited to:

(A)    costs of investigation, analysis, removal, remediation, response or other cleanup costs of contamination by hazardous substances, as defined under any applicable federal, state or local environmental law or regulation;

(B)    legal fees and costs arising from any judicial, investigative or administrative proceeding relating to any federal, state or local environmental law or regulation;

(C)    civil or criminal fees, fines or penalties, incurred under any federal, state or local environmental law or regulation; and

(D)    fees and costs payable to environmental consultants, engineers or other experts, including legal counsel, relating to any federal, state or local environmental law or regulation.

(3)    The right to indemnification or reimbursement shall extend to Environmental Expenses relating to:

(A)    any real property or business enterprise which is or has been at any time owned or operated by the Trustee as part of the Trust Estate; and

(B)    any real property or business enterprise which is or has been at any time owned or operated by a corporation, partnership or association in which the Trustee holds or has held at any time an ownership or management interest as part of the Trust Estate.

(4)    The Trustee shall have the right to reimbursement for incurred Environmental Expenses without the prior requirement of expenditure of its own funds in payment of such Environmental Expenses, and shall have the right to pay Environmental Expenses directly from Trust assets.

(5)    The right of indemnification or reimbursement shall apply to all Environmental Expenses, except those resulting from the Trustee's intentional wrongdoing, bad faith or reckless disregard of fiduciary obligation.

Page 32,    SLOTKIN DEFECTIVE TRUST

(6)    If the assets of the Trust Estate are insufficient, or there is insufficient liquidity in the Trust Estate to satisfy the obligation of indemnification or reimbursement of the Trustee from the Trust Estate for Environmental Expenses, the Trustee shall have the right to request in writing indemnification or reimbursement for such Environmental Expenses directly from the Grantor and the beneficiaries.

7.33    Discretion of Trustee. Unless specifically limited, all discretions conferred upon the Trustee shall be absolute, and their exercise conclusive on all persons interested in the Trusts. The enumeration of certain powers of the Trustee shall not limit its general powers, the Trustee being vested with and having all the rights, powers and privileges with relation to the Trust Estate as could be exercised and executed by an individual holding and owning the same property in absolute and unconditional ownership. All powers of the Trustee shall be exercised in a fiduciary capacity. The Trustee shall not be liable to the Trust or to any beneficiaries as a result of any losses, costs or damages of any kind, type or nature suffered or incurred by the Trust or by any beneficiary resulting from the Trustee's reasonable actions taken in good faith, the actual result of which could not have been reasonably anticipated.

7.34    Power to Disclaim, Restrict or Enlarge Powers of Trustee. The Trustee is authorized to disclaim, release or restrict the scope of any power that the Trustee may hold in connection with the Trusts created by this Trust Agreement, whether that power is expressly granted in the Trust Agreement or implied by law. The Trustee shall exercise this power in a written instrument executed by the Trustee specifying the power to be disclaimed, released or restricted and the nature of the restriction. In the event the Trustee may deem it advisable to have its authority and powers enlarged or extended for any reason or purpose, the Trustee is authorized to file an appropriate petition therefore in a court of competent jurisdiction, and the Trustee is authorized to comply with any order made in response to any such petition.

7.35    Power to Loan without adequate interest or adequate security. During the lifetime of the Grantor, the Trustee shall have the power to loan the income and/or principal of the Trust without adequate interest and/or without adequate security to the Grantor.

7.36    Power to Exchange Property for Equivalent Value During the lifetime of the Grantor, the Trustee shall have the power to transfer trust property to the Grantor in exchange for property of equivalent value.

ARTICLE 8

TRUST ADMINISTRATION:

8.1    Trust Administrative Provisions Set Forth in This Article. The provisions set forth in this Article shall apply to the administration of any and all Trusts created pursuant to the provisions of this Trust Agreement.

Page 33,    SLOTKIN DEFECTIVE TRUST

8.2    Bond of Trustee. No bond shall be required of any Trustee of any Trust created pursuant to the provisions of this Trust Agreement, regardless of residence and whether serving jointly or alone.

8.3    Compensation of Trustee. An individual Trustee shall be entitled to receive reasonable compensation for his or her services. The compensation for a Corporate Trustee's services shall be in accordance with the Corporate Trustee's published fee schedule from time to time existing for the administration of similar trusts in the state of California.

8.4    Profits and Losses Charged to Trust. The profits and losses arising from any activity of the Trustee as Trustee of any Trust created hereunder shall respectively inure to the benefit of or be charged against the respective Trust and not the Trustee.

8.5    Accrued and Undistributed Income. Except as may otherwise be specifically provided herein, upon the death of any Beneficiary for whom a Trust is held, any accrued or undistributed net income of that Beneficiary's Trust shall be held and accounted for, or distributed, in the same manner as if it had been accrued or received after the death of that Beneficiary. This Paragraph shall not be applicable to any income derived by any Trust created hereunder from an S Corporation (as defined in the Internal Revenue Code).

8.6    Payment of Expenses. The Trustee shall pay from income or principal of the Trust Estate, or partly from each, in its discretion, all expenses incurred in the administration of this Trust and the protection of the Trust against legal attack. Those expenses shall include reasonable attorneys' fees and compensation payable to the Trustee under the provisions of this Trust Agreement.

8.7    Disbursements in Good Faith. Unless the Trustee shall receive written notice of any birth, death or other event upon which the right to receive income or principal from a Trust may depend, the Trustee shall incur no liability for disbursements made in good faith to persons whose interests shall have been affected by that event.

8.8    Disclosure to Third Parties. Any transfer agent or other person dealing with the Trust (hereinafter referred to as "third party") shall be entitled to rely upon a copy of those portions of the Articles herein titled "Powers of Trustee" and "Trust Administration" setting forth the powers of the Trustee, which partial copy shall be certified as a true copy of those portions then in effect by the Trustee then acting. The third party shall incur no liability to the Trust or any beneficiary hereunder for acting upon an order or request of the Trustee made pursuant to the terms hereof as set forth in the partial copy, and shall not be required to see to the disposition of any proceeds for the faithful discharge of the Trustee's duties hereunder. In no event shall any third party have access to a copy of the portion hereof setting forth the distribution of income and principal, except as may be determined in the absolute discretion of the Trustee. Alternatively, any such third party may rely upon a Certification of Trust by the Trustee

Page 34,    SLOTKIN DEFECTIVE TRUST

given pursuant to Section 18100.5 of the California Probate Code or any similar provision.

8.9    Liability for Conduct of Co-Trustees, Predecessor Trustees and Successor Trustees. No Trustee or Co-Trustee shall be liable or responsible for any act, omission or default of any other Co-Trustee, predecessor Trustee or successor Trustee, as the case may be, provided that such Trustee or Co-Trustee shall have had no knowledge of that act, omission or default and no knowledge of facts which might reasonably be expected to put such Trustee or Co-Trustee on notice thereof.

8.10    Notification to Beneficiaries. The Trustee shall provide notification upon each and every date that there is a change in Trustees of any irrevocable trust created hereunder, to the extent that such notification may be required under the laws of the state of California then in effect. Such notification shall contain the information as required under, be served in a manner consistent with, and be provided to each Beneficiary of any Trust so affected and to any other person as may be required under, the laws of the state of California then in effect. The notification required by this Paragraph may not be waived in any manner by the Grantor, the Trustee or any Beneficiary of any Trust hereunder, unless permitted by law.

ARTICLE 9

PROVISIONS REGARDING
GENERATION-SKIPPING TRANSFER TAX:

9.1    Intention Regarding Generation-Skipping Transfer Tax. The Grantor intends that the Trustee shall perform (or refrain from performing) such acts as authorized pursuant to the terms of this Trust Agreement, or otherwise, as the Trustee shall determine, in the Trustee's sole discretion, with respect to any liability for the generation-skipping transfer ("GST") tax pursuant to Section 2601 of the Internal Revenue Code, whether imposed upon the Grantor, the Estate of the Grantor, any trust created by the Grantor, including without limitation the Trust or any subtrust created hereunder, or any beneficiary thereof, or upon any transferee or any other person or entity, in order to minimize the aggregate liability with respect to all estate, inheritance or other death taxes (including without limitation any GST tax) occasioned or payable by reason of the death of the Grantor or otherwise arising as a result of transfers of property, whether outright or in trust, made by or on behalf of, or which are otherwise attributable to, the Grantor, whether during life or upon the death of the Grantor.

9.2    Duties Regarding Allocation of GST Tax Exemption. The Trustee shall cooperate with and otherwise assist the executor of the Will of the Grantor (or such other persons who may make the election in the absence of an executor) in the allocation of all or any portion of the Grantor's GST tax exemption (as defined in Section 2631 of the Internal Revenue Code), or of a counterpart exemption under any applicable state law, which has not been allocated during the Grantor's life. The Grantor does not require that any allocation of the Grantor's GST tax exemption benefit the transferees of any property equally, proportionally or in any other particular manner.

Page 35,    SLOTKIN DEFECTIVE TRUST

9.3    Creation of Separate Trusts Based Upon Inclusion Ratio.
Notwithstanding any other provision of this Trust Agreement, if all or a portion of the GST tax exemption is or is anticipated to be allocated to any Trust created hereunder, unless that Trust will thereby have an inclusion ratio (as defined in Section 2642 of the Internal Revenue Code) (the "Inclusion Ratio") of zero, that Trust shall be divided into two or more separate Trusts so that each Trust so created has an Inclusion Ratio of either zero (an "Exempt Trust") or one (a "Nonexempt Trust").  In so dividing a Trust, the Trustee shall distribute to the Nonexempt Trust property equal in value to the minimum amount necessary to establish that Trust with property in an amount necessary to produce an Inclusion Ratio of one while leaving the Exempt Trust with property in an amount necessary to produce an Inclusion Ratio of zero.  Further, if property in a Trust having a certain Inclusion Ratio is directed to be added to a Trust with a different Inclusion Ratio, the Trustee may decline to make the addition and, instead, may administer the property as a separate Trust with provisions identical to the Trust to which it otherwise would have been added.

9.4    Power to Grant and Revoke General Testamentary Power of Appointment.  The Trustee shall have the sole discretionary authority to amend the terms of any Trust created hereunder having an Inclusion Ratio greater than zero (a) to grant to any Beneficiary thereof a general testamentary power of appointment (as defined for federal estate tax purposes) with respect to such Beneficiary's interest therein, if the Trustee deems, in the Trustee's sole discretion, such action to be in the best interests of the beneficiaries of the Trust as a group, and (b) to eliminate or otherwise revoke such power of appointment, if created.  Any amendment pursuant to this Paragraph may limit the amount subject to the power of appointment, may limit the class of permissible appointees of such Beneficiary's interest (including without limitation an appointment to only that Beneficiary's creditors), may require that the power of appointment be exercised jointly with another in a manner consistent with the objectives of the power or otherwise impose such conditions and limitations on its exercise as the Trustee shall determine.  Any amendment granting a power of appointment shall be in writing stating any limitations on the exercise of such power and the manner in which it may be exercised.  The Trustee shall send a copy of such amendment to the Beneficiary who is the grantee of the power.  The Trustee may exercise the powers described in this Paragraph from time to time, and the Trustee may modify or reverse their prior exercise at any time.

9.5    Powers and Duties Regarding Payment of GST Tax Liability.  If the Trustee determines that (a) any termination of an interest in or a power over Trust property constitutes a taxable termination pursuant to Section 2612(a) of the Internal Revenue Code, or (b) any distribution of Trust property constitutes a direct skip pursuant to Section 2612(c) of the Internal Revenue Code, the Trustee shall pay the amount of GST tax arising from such termination or distribution from the Trust property to which it relates, without adjustment of the relative interests of the Trust Beneficiaries.  If the Trustee determines that any distribution from a Trust (other than pursuant to a power to withdraw or appoint) is a taxable distribution pursuant to Section 2612(b) of the Internal Revenue Code, the Trustee shall have the power, exercisable if and to the extent determined by the Trustee in the Trustee's sole discretion, to augment the distribution by an amount which the Trustee estimates to be sufficient to pay all or a portion of the GST

Page 36,    SLOTKIN DEFECTIVE TRUST

tax arising as a result of such distribution and shall charge the amount of the augmentation against the Trust to which the distribution relates. In general, any payment required to be made pursuant to this Paragraph or otherwise by the reason of the death of, or an assignment by, the Grantor shall be charged, first, entirely, or to the extent possible, to a Nonexempt Trust. If any GST tax paid pursuant to this Paragraph is imposed in part by reason of Trust property and in part by reason of property not held as part of the Trust Estate, the Trustee shall only pay that portion of the tax which the value of the Trust property taxed bears to the total property taxed, taking into consideration deductions, exemptions and other factors which the Trustee deems pertinent, in the Trustee's sole discretion.

9.6    General Powers Regarding GST Tax and Other Considerations. All provisions of this Trust Agreement, except to the extent inconsistent with the objectives of the Grantor, shall be construed to permit the division, consolidation and administration of, and distributions from, the Trust in a timely manner consistent with the Grantor's objective of obtaining the efficient and effective use of the Grantor's available GST tax exemption and otherwise reducing the incidence of the GST tax and other death taxes. Except as expressly provided in this Trust Agreement to the contrary, the Trustee shall have the sole discretionary authority to do any and all acts as the Trustee may deem necessary or desirable in furtherance of the Grantor's intentions, subject to the Trustee's fiduciary and other considerations, including without limitation the authority to:

(a)    allocate the burden of any GST tax in an equitable manner, whether or not pro rata;

(b)    pay or withhold any GST taxes levied upon any Trust from such sources of funds as the Trustee deems prudent and advisable;

(c)    make adjustments, unless otherwise restricted, in the amounts to be received by the beneficiaries in compensation for the tax consequences of paying or otherwise allocating the burden of the GST tax;

(d)    make distributions to beneficiaries from such sources of funds or other property as the Trustee deems prudent and advisable, unless otherwise restricted;

(e)    divide any Trust established or to be established pursuant to this Trust Agreement into separate Trusts; and

(f)    consolidate or otherwise combine separate Trusts: (1) having identical Inclusion Ratios; or (2) having different Inclusion Ratios if the Trustee believes that economic efficiency or other compelling considerations justify sacrificing their distinct GST tax characteristics.

Except as expressly provided to the contrary in this Trust Agreement, if a Trust otherwise to be established is divided under the provisions of this Article into separate Trusts, each such subtrust shall have the same provisions as the Trust from which it was established and references in this Trust Agreement to such original Trust shall collectively refer to

Page 37,    SLOTKIN DEFECTIVE TRUST

the separate subtrusts derived from it. The Trustee may exercise the powers described in this Paragraph from time to time, and such powers may be used to modify or reverse their prior exercise. In deciding whether and how to exercise these powers, the Trustee may take account of efficiencies of administration, GST and other transfer tax considerations, income factors affecting the various Trusts and their beneficiaries, present and future financial and other objectives of the various Trusts and their beneficiaries, the need or desirability of having the same or different Trustees for various Trusts or shares, and any other considerations the Trustee may deem appropriate. There is no requirement that any acts taken to reduce the incidence of any tax occasioned or payable by reason of the death of the Grantor benefit the transferees of such property equally, proportionally or in any other particular manner.

       9.7    <u>Successor Trustee for Certain Purposes</u>. Notwithstanding anything herein to the contrary, the Trustee may not exercise any power granted pursuant to this Article including, without limitation, (a) the power to make or participate in any decision regarding the allocation of the Grantor's GST tax exemption and (b) the power to create, eliminate or modify any power of appointment, in any way that would have the effect of granting the Trustee a general power of appointment (as defined for federal estate tax purposes) over property with respect to which the Trustee would not otherwise have such a general power. If this prohibition renders the Trustee unavailable to perform a duty or exercise a particular power, the person, persons or entity who would serve as successor Trustee to the Trustee shall serve as the Trustee for that limited purpose. If the successor Trustee so selected would similarly be prohibited from acting pursuant to the provisions of this Paragraph, the procedure provided in this Trust Agreement for selecting a successor Trustee shall be followed until a successor Trustee not so prohibited shall serve as Trustee for that limited purpose.

       9.8    <u>Exoneration of Trustee</u>. The Trustee shall not be liable for any good faith exercise of, or failure to exercise, the Trustee's powers pursuant to the provisions of this Article. In the event the Trustee's actions result in a detriment to one or more beneficiaries or other transferees, it is the Grantor's intention that such beneficiaries and transferees shall exonerate and otherwise hold harmless the Trustee with respect to such detriment.

       9.9    <u>Simultaneous Death</u>. Notwithstanding any provision in this Trust Agreement to the contrary, if pursuant to the terms of this Trust Agreement (a) property is to pass to or is to be held in trust for a lineal descendant of the Grantor (or of the spouse or a former spouse of the Grantor) (a "Deceased Child") and (b) in the event of the death of such Deceased Child, such property is to pass to a further lineal descendant of the Grantor (or of the spouse or a former spouse of the Grantor) assigned to a generation (as determined pursuant to the provisions of Section 2651 of the Internal Revenue Code) younger than the Deceased Child (a "Deceased Grandchild"), then, in the event that a Deceased Child and a Deceased Grandchild die simultaneously or under circumstances that make it difficult or impossible to determine their order of survival, the Trustee is hereby authorized to and shall presume, for purposes of this Article, that the Deceased Child and the Deceased Grandchild have died simultaneously.

Page 38,    SLOTKIN DEFECTIVE TRUST

ARTICLE 10

ACCOUNTINGS

10.1    Duty to Account. The Trustee shall render reports or accounts of the administration of the Trust Estate (individually, an "Account" and collectively "Accounts") in accordance with the provisions of this Article.

10.2    No Court Accounts. Except as may otherwise be required by applicable law, the Trustee shall not at any time be required to render any Accounts to any Court or public authority whatsoever, or to anyone else, except as provided in this Article.

10.3    Requirement to Render Account. After the Death of the Grantor, upon the written request of an Account Beneficiary (as that term is hereafter defined), but not more often than once each year, and/or upon a change of Trustee or termination of any Trust (or as otherwise required by law), unless specifically waived in writing by an Account Beneficiary, the Trustee shall render an Account of the Trust to all Account Beneficiaries of such Trust in the manner required by law. For purposes of this Article, the term "Account Beneficiaries" shall include the persons required by law to receive an Account of such Trust to which the Account is being prepared. A waiver in writing by an Account Beneficiary to an Account may be withdrawn in writing by such Account Beneficiary at any time as to the most recent Account and future Accounts. In the event an Account Beneficiary is a minor, the Account shall be delivered to the guardian of such Account Beneficiary. In the event the Account Beneficiary is an incapacitated adult, the Account shall be delivered to such incapacitated Account Beneficiary's conservator or, if there is none, then to such incapacitated Account Beneficiary's primary care provider.

10.4    Predecessor Trustees. When a predecessor Trustee has failed to render Accounts as required under this provision, the successor Trustee may, but need not, render Accounts for such period with reasonable efforts without incurring any additional liability for acts of a predecessor Trustee, other than as already provided under California law. This provision is intended to permit the successor Trustee to render Accounts for the predecessor without creating any additional duty to investigate or to Account. Nonetheless, if in the course of rendering Accounts left undone by the predecessor Trustee, the successor Trustee obtains knowledge of a situation that may constitute a breach of trust committed by the predecessor Trustee, the successor Trustee shall deal with such knowledge in accordance with the successor Trustee's fiduciary duties and powers. The Trustee may, but need not, petition a court of competent jurisdiction for approval of an Account, and all the costs and expenses of such a proceeding shall be a proper charge of the trust with respect to which the Account is rendered.

10.5    Receipts, Accounts and Releases. The Trustee may require a receipt from a Beneficiary for the portion of the Trust Estate to be paid to such Beneficiary. If any Beneficiary refuses or neglects to furnish the Trustee with such written receipt, then the Trustee may, prior to making such distribution and at the expense

Page 39,    SLOTKIN DEFECTIVE TRUST

of the appropriate Trust or Trusts, submit such matter to the Court of proper jurisdiction. The Trustee may, but need not, submit an Account to a Court of proper jurisdiction of the acts and doings of the Trustee then serving or any predecessor Trustee, and at the expense of the appropriate Trust or Trusts, in order to obtain a decree absolving the Trustee from all further liability hereunder after the making of such distribution. Alternatively, the Trustee may request from a Beneficiary a written release and discharge of the Trustee from all liability for any act, investment, transaction or distribution of the Trustee shown on that Account up to and including the date of such distribution, prior to making a distribution, if reasonable and appropriate under the circumstances, as determined by the Trustee, and permissible under applicable California law. If any Beneficiary refuses or neglects to release the Trustee upon terms acceptable to the Trustee, then the Trustee may, prior to making such distribution and at the expense of the appropriate Trust or Trusts, submit such matter to the Court of proper jurisdiction.

      10.6    <u>Settlement of Accounts</u>. The Trustee shall be released from any liability with respect to a particular item disclosed in an Account or any claims adequately disclosed by any item in the Account, if the Trustee provides to the Beneficiary with the Account a written "Notice to Beneficiaries" in the form and manner required by California law, informing the Beneficiaries that they have 180 days within which to object to the Account, and the beneficiary fails to timely object to such item in the Account. Unless one (1) or more Beneficiaries shall deliver written objections to the Trustee within 180 days from the date such Notice to Beneficiaries was received, the Account shall be deemed settled, and shall be final and conclusive in respect to all transactions disclosed in the Account as to all Beneficiaries of such Trust, including unborn and unascertained beneficiaries. Notwithstanding anything to the contrary herein, nothing in this section is intended to relieve the Trustee of liability (1) for breach of trust committed intentionally, with gross negligence, in bad faith or with reckless indifference to the interest of the Beneficiary or (2) for any profit that the Trustee derives from a breach of trust.

      10.7    <u>Limited Waiver of Accounts</u>. Except as provided in this section, any Accounts otherwise required by California law are hereby waived to the maximum extent permitted by law.

<div align="center">ARTICLE 11</div>

<div align="center"><u>NO CONTEST CLAUSE</u></div>

      11.1    <u>General</u>. The Grantor has intentionally made no provision in this Trust Agreement for any heirs or relatives of the Grantor who are not herein mentioned or designated, and the Grantor generally and specifically has intentionally omitted to provide for every person claiming to be or who may be determined to be an heir-at-law of the Grantor, except as otherwise mentioned in this Trust Agreement. If any beneficiary, or any assignee or other successor-in-interest of a beneficiary (a "Contesting Beneficiary") under a Protected Instrument (as defined in this Article), without Probable Cause (as defined in this Article), singularly or in combination with any other persons, directly or indirectly:

Page 40,    SLOTKIN DEFECTIVE TRUST

(a)    engages in a Direct Contest (as defined in this Article);

(b)    files a Pleading (as defined in this Article) in any court to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer; or

(c)    files a Creditor's Claim (as defined in this Article) or prosecutes any action based upon it in the Grantor's probate estate or against the Trustee of any subtrust created under this Trust Agreement or against a beneficiary thereof;

then any share or interest in the Trust Estate and any subtrust created under this Trust Agreement, provided to or for the benefit of the Contesting Beneficiary, is revoked.  In the event of such revocation, the revoked share or interest shall be disposed of as follows:

(1)    if the Contesting Beneficiary is an individual, as though that Contesting Beneficiary had died without issue before becoming entitled to receive any income or any portion of the principal of such Trust; or

(2)    if the Contesting Beneficiary is a charitable organization, to any one or more other charitable organizations which qualify for tax exemption under Section 2055(a) of the Internal Revenue Code and which meet the charitable intentions of the Grantor consistent with the provisions of this Trust Agreement (including, without limitation, any one or more of the charitable organizations named in this Trust Agreement which are not disqualified under this Article), as determined by the Trustee, in the Trustee's sole discretion.

The provisions of this Article shall not apply to any disclaimer by any person of any benefit under this Trust Agreement or under the Will of the Grantor.

11.2    Definitions.  For purposes of this Article, the following terms have the following meanings:

(a)    "Creditor's Claim" includes any action to enforce a contract to make a will, or an action asserting that the Grantor's property is liable to the claimant, other than for funeral expenses or the Grantor's last illness expenses.

(b)    "Direct Contest" means a Pleading filed in any court that includes an allegation that a Protected Instrument or one or more of its terms is invalid, based on one or more of the following grounds:

(1)    Forgery.

(2)    Lack of due execution.

(3)    Lack of capacity.

(4)    Menace, duress, fraud or undue influence.

Page 41,    SLOTKIN DEFECTIVE TRUST

(5)    Revocation of a will pursuant to Section 6120 of the California Probate Code (or any successor section), revocation of a trust pursuant to Section 15401 of the California Probate Code (or any successor section) or revocation of any instrument other than a will or trust pursuant to the procedure for revocation that is provided by statute or by the instrument.

(6)    Disqualification of a beneficiary under Section 6112 of the California Probate Code (or any successor section) or under Section 21350 of the California Probate Code (or any successor section).

(c)    "Pleading" means a petition, complaint, cross complaint, objection, answer, response or claim.

(d)    "Probable Cause" exists if, at the time of filing a contest, the facts known to the contestant would cause a reasonable person to believe that there is a reasonable likelihood that the requested relief will be granted after an opportunity for further investigation or discovery.

(e)    "Protected Instrument" means all of the following instruments:

(1)    this Trust Agreement and any and all subtrusts created under this Trust Agreement, and any amendments to this Trust Agreement;

(2)    any other revocable or irrevocable trust established by the Grantor, and any amendments to any of the foregoing Trusts;

(3)    the Will of the Grantor or any codicil thereto;

(4)    any designation of beneficiary executed by the Grantor with respect to any insurance policy, annuity, individual retirement account, qualified or non-qualified employee benefit plan, plan of deferred compensation or other assets passing outside this Trust Agreement or the Will of the Grantor;

(5)    any written agreement between the Grantor and the Grantor's spouse (if any) defining or altering their property rights as married persons, whether entered into prior to, concurrently with or after marriage;

(6)    any buy-sell agreements in which the Grantor is a party; or

(7)    any family partnership agreements or limited liability company operating agreements in which the Grantor is, or was, a party.

11.3    Authorization of Trustee. The Grantor wishes to discourage a contest of the beneficial and administrative terms of this Trust Agreement. Discouraging such a contest is an important trust purpose. The Trustee may use assets of the Trust Estate to pay attorneys and other agents and to pay other costs and expenses to resist and

Page 42,    SLOTKIN DEFECTIVE TRUST

defend any contest of this Trust Agreement or any of its provisions, any amendment to this Trust Agreement or any of its provisions, even if the contest does not attack the validity of the Trust, but instead its dispositive or administrative provisions. In authorizing the Trustee to use assets of the Trust Estate for these purposes, the Grantor intends to override any fiduciary duty that might otherwise constrain the Trustee, including, but not limited to, the duty of loyalty, the duty of impartiality and the duty to avoid conflicts of interest.

11.4    Costs of Defenses Charged Against Contesting Beneficiary. If the Trustee is successful in defending any matter or action described in this Article, as reasonably determined by the Trustee, but the distributions and/or allocations of interests in the Trust Estate to the Contesting Beneficiary under this Trust Agreement and/or the Will of the Grantor are not forfeited, all of the costs of such defense may be charged against the distributions and/or allocations of interests to the Contesting Beneficiary under this Trust Agreement and/or the Will of the Grantor, and all distributions and/or allocations of interests to the Contesting Beneficiary under this Trust Agreement and/or the Will of the Grantor may be reduced on a dollar-for-dollar basis by the aggregate net value as determined by the Trustee, of all real and personal property passing to or distributable to or for the benefit of the Contesting Beneficiary as a result of such matter or action, including, without limitation, assets of the Trust Estate or the probate estate of the Grantor, insurance proceeds, employee benefits and deferred compensation, all determined in the sole and absolute discretion of the Trustee, but only to the extent permitted by law. In making any settlement of such matter or action, the Trustee shall consider the foregoing provisions of this Article.

## ARTICLE 12

## GENERAL TRUST PROVISIONS:

12.1    Termination. Unless sooner terminated in accordance with other provisions of this Trust Agreement, each Trust created under this Trust Agreement shall terminate after the latest of:

(a)    twenty-one (21) years after the latest of:

(1)    the death of the Grantor;

(2)    the death of all of the issue (if any) of the Grantor who are living at the time of the execution of this Trust;

(3)    the death of the last survivor of any Beneficiary of the Trusts created hereunder and that Beneficiary's issue living at the time of the execution of this Trust; or

(b)    such later time as may then be allowed by law.

All principal and undistributed income of any Trust so terminated shall be distributed to the then income Beneficiaries of that Trust in the proportions in which they are, at the

Page 43,   SLOTKIN DEFECTIVE TRUST

time of termination, entitled to receive that income.  However, if the rights to income are not then fixed by the terms of that Trust, distribution under this Paragraph shall be made to the Beneficiaries as are then entitled or authorized in the discretion of the Trustee to receive payments from that Trust.  In the event there are no Beneficiaries so entitled, the Trustee shall use any reasonable method to make the distribution required hereunder, as determined in the Trustee's discretion.

12.2    Spendthrift Provision.  No interest of any Beneficiary of any Trust created in this Trust Agreement shall be subject to sale, assignment, hypothecation or transfer by any Beneficiary, other than in the exercise of a power of appointment given to the Beneficiary, nor shall the principal of any Trust, or the income arising therefrom, be liable for any debt of any Beneficiary, or be subject to attachment by or the interference by or control of any creditor of any Beneficiary, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of any Beneficiary, including without limitation the process of any court in aid of execution of any judgment so rendered.  All of the income and principal under any Trust shall be transferable, payable and deliverable only to the designated Beneficiary at the time the Beneficiary is entitled to take under the terms of this Trust.  The personal receipt of the Beneficiary may be made a condition precedent to the payment or delivery by the Trustee to that Beneficiary. The Trustee may, however, deposit in any bank designated in writing by a Beneficiary, to his or her credit, income or principal payable to that Beneficiary.  This Article shall not restrict any authority of the Trustee to use and disburse funds for the support, maintenance, health and education of a beneficiary, or to disburse funds to a guardian or conservator as herein provided.

12.3    Tax Allocation.  The Grantor shall not have any powers or discretion that shall cause any portion of the Trust Estate to be included in the estate of the Grantor for federal estate tax purposes, and the provisions of this Trust shall be interpreted accordingly.  If it is finally determined that any portion of the Trust will be included in the estate of the Grantor for federal estate tax purposes, then subject to any other provision of the Grantor's Will or other governing instrument, all the taxes allocable to the assets of the Trust Estate shall be recoverable from the Trust Estate, and the interest of each Beneficiary shall be reduced proportionally.

12.4    Invalidity.  If any part, clause, provision or condition of this Trust Agreement shall be adjudged to be invalid or unenforceable, then, notwithstanding the invalidity or unenforceability of that part, clause, provision or condition, the remainder of this Trust Agreement shall continue and shall remain in full force and effect and that part, clause, provision or condition shall be reduced in scope to the minimum extent necessary to avoid the invalidity.

12.5    Governing Law.  Subject to the Paragraph titled "Power to Transfer Trust to or from Another Jurisdiction," the internal laws (and not the law of conflicts) of the State of California in force from time to time shall govern the validity, construction, interpretation and administration of this Trust, except that all matters relating to real property shall be governed by the laws of the situs of that real property, including that state's conflict-of-law principles.

Page 44,    SLOTKIN DEFECTIVE TRUST

12.6    Disclaimers. Any Beneficiary shall have the right to disclaim all or any part of any interest in property to which he or she may be entitled under this Trust Agreement, by giving written notice of such disclaimer to the then-acting Trustee, to the adult Beneficiaries, to the guardians of any minor Beneficiaries and to the conservators of any incapacitated Beneficiaries; provided, however, that a failure to notify the adult Beneficiaries, the guardians of any minor Beneficiaries and the conservators of any incapacitated Beneficiaries regarding a Beneficiary's disclaimer shall not affect the validity or qualification of any disclaimer under any federal or state law. The notice shall be delivered personally or by certified or registered mail, postage prepaid, return receipt requested. Such disclaimer shall also in all respects comply with the applicable laws, rules, regulations and procedures, whether legislative, administrative, judicial or otherwise, as may be appropriate. Except as otherwise provided herein, any interest so disclaimed shall be held or distributed as if the disclaimant was deceased as of the effective date of such disclaimer. No other interest of the Beneficiary shall be affected by the disclaimer, unless that interest shall also be disclaimed.

12.7    Headings and Captions. The headings and captions appearing at the commencement of the Articles and Paragraphs are descriptive only and for convenience in reference. Should there be any conflict between any such heading or caption and the language of the Article or Paragraph over which the heading appears, the language of the Article or Paragraph, and not such heading or caption, shall control and govern in the construction of this Trust Agreement.

12.8    Cross-References. All cross-references to Articles and Paragraphs contained in this Trust Agreement, unless otherwise specifically directed to another agreement or document, refer to provisions in this Trust Agreement and shall not be deemed to be references to any other agreement or document.

12.9    Notices. Unless applicable law requires a different method of giving notice, any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party if (a) served personally (b) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested, (c) delivered to Federal Express or other recognized overnight delivery service or (d) delivered by facsimile transmission, if concurrently transmitted by one of the methods identified in (a), (b) or (c) of this Paragraph. If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service. If such notice, demand or other communication is given by mail, Federal Express or other recognized overnight delivery service, service shall be conclusively deemed given upon receipt (or refusal to accept delivery) as shown on the return receipt. If such notice, demand or other communication is delivered by facsimile transmission (and subject to the other requirements of subsection (d) of this Paragraph), notice shall be deemed given on the date of delivery by facsimile transmission, as confirmed electronically. Any notice, demand or other communication to be given hereunder shall be addressed to the party to whom such notice, demand or other communication is to be given at the last known address for that party or at the last known facsimile number. Any party hereto may change its address or facsimile number for the purpose of receiving notices, demands and

Page 45,    SLOTKIN DEFECTIVE TRUST

other communications as herein provided by a written notice given in the manner aforesaid to the Trustee hereof.

## ARTICLE 13

### DEFINITIONS AND RULES OF CONSTRUCTION:

13.1   <u>Definitions Set Forth in This Article</u>.  The following definitions and rules of construction shall apply to the terms listed in this Article wherever those terms are used in this Trust Agreement and wherever reference is made to those terms in this Trust Agreement.

13.2   <u>Beneficiary</u>.  The term "Beneficiary" shall be deemed to mean and is intended to include only those persons for whom a part of the Trust Estate has been apportioned.  The term "Beneficiary" shall specifically not include any person who legally might be considered as a residuary or contingent beneficiary, and any such person shall be considered as a "Beneficiary" only at such time as a part of the Trust Estate actually has been apportioned for his or her use and benefit in accordance with the terms and provisions of this Trust Agreement.  Throughout this document, the term "eligible spouse" shall mean a widow or widower, remarried or unremarried, of a deceased Beneficiary (descendant of the Grantor) who is also a parent of one or more of the Grantor's descendants.

13.3   <u>Corporate Trustee</u>.  The term "Corporate Trustee" shall mean a corporation, the trust department of a bank or the trust department of any title insurance company, which is authorized by state law to be engaged and act as a trustee.

13.4   <u>Education</u>.  The term "education" shall be construed to include private preschool, elementary and secondary education (including instruction in music, art, computers, sports and physical education, and other subjects and topics, and whether conducted before, during or after the regular school day, and wherever located or held), vocational training, college and postgraduate study (including professional education), so long as pursued to the advantage of a beneficiary, at any recognized educational institution of a beneficiary's choice; and in determining payments to be made for education, the Trustee shall take into consideration a beneficiary's tuition, books, supplies, tutors, appropriate travel expenses and reasonable living expenses.  Notwithstanding the foregoing, education shall not have any meaning broader than that allowed by Section 2041(b) of the Internal Revenue Code.

13.5   <u>Gender or Number</u>.  The masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so indicates.

13.6   <u>Incapacity</u>.  The terms "incapacitated" or "incapacity," and the term "unable to serve" or equivalents thereof, as applied to any beneficiary or successor Trustee hereunder, shall be deemed to include not only a person who has been judicially declared incapacitated and a person for whom a guardian or conservator or other

Page 46,   SLOTKIN DEFECTIVE TRUST

fiduciary of the person or estate or both shall have been appointed, but also a person who shall be deemed to have become substantially unable to manage his or her own financial resources or resist fraud or undue influence. That incapacity shall be evidenced by the written statement of two (2) licensed physicians upon the request of any beneficiary, Trustee or successor Trustee hereunder. In the case of a person who is serving as Trustee hereunder, the person or institution designated as next successor Trustee may commence acting in such capacity upon that evidence without liability by reason thereof. Any person who has been determined to be incapacitated under the provisions of this Paragraph shall be deemed to have regained his or her capacity for all purposes of this Trust, including to resume acting as Trustee, upon a written statement to that effect by two (2) licensed physicians.

13.7    <u>Internal Revenue Code</u>. Reference to code sections of the "Internal Revenue Code" shall refer to those sections of the Internal Revenue Code of 1986, as amended, as they exist at the time of execution of this Trust Agreement and any corresponding or substitute provisions from time to time existing and to the Treasury Regulations pertaining to those sections.

13.8    <u>Issue; Child; Children</u>. Subject to the provisions of the Paragraph titled "Declarations Concerning Family," the terms "issue," "child" and "children" shall mean lawful lineal descendants of all degrees, specifically including the following:

(a)    A child born outside of wedlock, if a parent and child relationship existed between such child and his or her deceased parent as determined under the laws of the state of California.

(b)    Adopted persons and their issue, provided that the person was adopted when he or she was a minor, and shall include any person conceived prior to the death of such person's deceased parent but born thereafter.

(c)    A child in gestation provided such child is later born alive.

(d)    A person born as a result of artificial insemination, in vitro fertilization or other medical intervention, which person shall be deemed to be a genetic descendant of (1) the woman (other than a woman who was contractually serving as a surrogate mother) who gave birth to such person (the "birth mother") and (2) the birth mother's domestic partner at the time such person was conceived or implanted, unless there is clear and convincing evidence that the birth mother's domestic partner withheld consent to the medical intervention and did not subsequently voluntarily acknowledge parentage. In the event of any question whether (A) a birth mother's domestic partner withheld consent to a medical intervention for purposes of this Paragraph or (B) parentage has been voluntarily acknowledged for purposes of this Paragraph, then the determination of the Trustee (other than the birth mother or the putative parent) shall be binding on all persons interested in the Trusts hereunder and on all persons claiming to be so interested.

Page 47,    SLOTKIN DEFECTIVE TRUST

Unless expressly specified otherwise, distribution or apportionment to or among children and/or issue shall be made by right of representation.

13.9    Net Income.  The term "net income" shall mean the income from the Trust Estate determined in accordance with this Trust Agreement and after the payment or reservation of sufficient funds to pay all expenses of management and administration of the Trust Estate, including the compensation of the Trustee.

13.10    Or.  The word "or" used in any list of more than two items other than a list of beneficiaries shall be construed to include the conjunctive as well as the disjunctive.

13.11    Spouse.  The term "spouse" shall include only persons who are lawfully married to and not legally separated from the person to whose spouse reference is made (or if the person to whose spouse reference is made is deceased at the time of interpretation hereunder, then the term "spouse" as it relates to such deceased person shall mean the person who was lawfully married to and not legally separated from the deceased person at the time of such person's death).

13.12    Support, Maintenance and Health.  The terms "support," "maintenance" and "health" shall have the same meanings in this Trust Agreement as those terms have under Section 2041(b) of the Internal Revenue Code.

13.13    Survival.  For purposes of this Trust Agreement, unless a specific period of survival is otherwise provided herein, a person shall be deemed to have survived the Grantor or shall be deemed to have been living at the date of the death of the Grantor only if such person survived the Grantor by at least ninety (90) days.  Unless such person has survived the Grantor by at least ninety (90) days, such person shall be deemed to have predeceased the Grantor.

13.14    Treasury Regulations.  Reference to Sections of the "Treasury Regulations" shall refer to those Sections of the Treasury Regulations promulgated under Code Sections of the Internal Revenue Code of 1986, as amended, as they exist at the time of execution of this Trust Agreement and any corresponding or substitute provisions from time to time existing.

13.15    Trust.  The term "Trust" shall specifically include any Trusts created hereunder.

13.16    Trust Estate.  The term "Trust Estate" shall be deemed to mean all of the property held in trust by the Trustee.

13.17    Trustee.  The term "Trustee" shall be deemed to include not only the singular, but also the plural, and to include any successor Trustee or Co-Trustees.

ARTICLE 14

EXECUTION:

14.1    Declaration of the Grantor. The undersigned Grantor does hereby certify that he has read this Trust Agreement and it fully and accurately sets out the terms, Trusts and conditions under which the Trust Estate herein described is to be held, managed and disposed of by the Trustee herein named, and he hereby approves, ratifies and confirms this Trust Agreement in all particulars.

14.2    Execution by the Grantor. Executed at Los Angeles, California, on December _____, 2012.

GRANTOR:

MARK A. SLOTKIN

14.3    Execution by the Trustee. The foregoing Trust Agreement has been accepted by the Trustee hereunder.

TRUSTEE:

LOREN MARKEN

Page 49,   SLOTKIN DEFECTIVE TRUST

## ACKNOWLEDGMENT

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF LOS ANGELES                  )


On _DECEMBER 14_, 2012, before me, STEPHEN ALCOMBRIGHT JR

a Notary Public, personally appeared  MARK A. SLOTKIN, who proved to me on the

basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the

within instrument and acknowledged to me that he/she/they executed the same in

his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the

instrument the person(s), or the entity upon behalf of which the person(s) acted, executed

the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California

that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.


Signature _____



STEPHEN ALCOMBRIGHT JR.
Commission # 1928724
Notary Public - California
Los Angeles County
My Comm. Expires Mar 17, 2015

(SEAL)


Page 50,    SLOTKIN DEFECTIVE TRUST

## ACKNOWLEDGMENT

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )


On _DECEMBER 14_ , 2012, before me, _STEPHEN ALCOMBRIGHT JR._

a Notary Public, personally appeared LOREN MARKEN, who proved to me on the basis

of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within

instrument and acknowledged to me that he/she/they executed the same in his/her/their

authorized capacity(ies), and that by his/her/their signature(s) on the instrument the

person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.


I certify under PENALTY OF PERJURY under the laws of the State of California

that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.


Signature _____

STEPHEN ALCOMBRIGHT JR.
Commission # 1928724
Notary Public - California
Los Angeles County
My Comm. Expires Mar 17, 2015

(SEAL)


Page 51,   SLOTKIN DEFECTIVE TRUST

## NOTICE TO BENEFICIARIES

_____
_____
_____

Please be advised that $_____ has been added to the SLOTKIN DEFECTIVE TRUST (the "Trust") and that, pursuant to Article 4 of the Trust, you are entitled to withdraw $_____ from the Trust during the period commencing on the date the contribution is made and ending within thirty (30) days of the date of this Notice (the "Withdrawal Period"). If you do not exercise your withdrawal right by the end of the Withdrawal Period, then your right to withdrawal shall lapse as follows: your right to withdraw the greater of $5,000 or 5% of the value of the Trust Estate shall be deemed to have lapsed at the beginning of the Withdrawal Period; thereafter, your right to withdraw the greater of an additional $5,000 or 5% of the then value of the Trust Estate shall lapse on January 1st of each year until you have no further right to withdraw. In lieu of a withdrawal of cash, the Trustee may substitute Trust property equal in value at the date of withdrawal to the amount of cash you are otherwise entitled to withdraw pursuant to this Notice. This right to substitute Trust property in kind shall include the right of the Trustee to distribute life insurance policies at their value at the date of withdrawal.

Dated: _____, _____      _____
                                      Trustee of the Slotkin  Defective Trust


## BENEFICIARY ACKNOWLEDGMENT

I, _____, hereby acknowledge receipt of the foregoing Notice to Beneficiary.

Dated: _____, _____      _____

Exhibit "A"

**229**

# EXHIBIT "8"

# OPERATING AGREEMENT

# OF

# CLOVER INDUSTRIAL PROPERTIES, LLC

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR UNDER ANY STATE SECURITIES LAWS.  WITHOUT SUCH REGISTRATION, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED, EXCEPT UPON DELIVERY TO THE LIMITED LIABILITY COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER AND COUNSEL FOR THE LIMITED LIABILITY COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER AND THAT ANY SUCH TRANSFER SHALL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.

THE SALE, TRANSFER OR OTHER DISPOSITION OF THIS SECURITY OR ANY INTEREST THEREIN IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

OPERATING AGREEMENT
OF

CLOVER INDUSTRIAL PROPERTIES, LLC

A California limited liability company

This **Operating Agreement** of CLOVER INDUSTRIAL PROPERTIES, LLC (the "**Company**"), dated as of October 29, 2018 is made by LOREN MARKEN, Trustee of the SLOTKIN INTENTIONALLY DEFECTIVE TRUST dated April 12, 2010, LOREN MARKEN, Trustee of the SLOTKIN DEFECTIVE TRUST dated December 14, 2012 and such persons listed on Exhibit "A" as amended from time to time attached hereto and incorporated hereat, the **Members**"). Each Member and any additional signatory added from time to time is a "**Member**," and collectively they are the "**Members**."

### Recitals

The Member(s) desire to form a limited liability company (the "Company" herein) pursuant to the Revised Uniform Limited Liability Company Act, as enacted in California in 2014, including amendments from time to time (the "Act"), to have and to hold its interests in the Company as set forth on **Exhibit A** hereof.

In consideration of the covenants and agreements set forth below, the party, desiring to form a limited liability company pursuant to the Code for the purposes set forth below and upon the terms and conditions set forth below, hereby agrees as follows:

A.     On October 29, 2018, Articles of Organization for CLOVER INDUSTRIAL PROPERTIES, LLC (the "**Company**"), a limited liability company organized under the laws of the State of California were filed.

B.     The parties hereto desire to adopt and approve an operating agreement for the Company for the purpose of achieving capital appreciation and to provide a current return on investment through ownership, leasing and investments under the protections of the Act and such other activities as may be permitted under the Act as approved by its Members.

NOW, THEREFORE, the parties hereto, constituting all of the Members (as defined herein) of the Company as of the date hereof, hereby set forth the operating agreement for the Company.

NOW THEREFORE, incorporating and in consideration of the foregoing facts, which the parties agree to be true, and in consideration of the mutual covenants and conditions set forth herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I

-2-

## DEFINITIONS

1.1 "Act" means the Revised Uniform Limited Liability Company Act as enacted in California in 2014 as set forth in the California Corporations Code of the State of California Sections 17701.01 through 17713.13, inclusive and any amendments thereto.

1.2 "Adjusted Capital Contribution" means a Member's Capital Contribution less all amounts previously distributed to the Member from Capital Transactions.

1.3 "Affiliate" means, with respect to any person or entity, (a) another Person directly or indirectly owning, controlling, or holding with power to vote ten percent (10%) or more of the outstanding voting securities of such person or entity; (b) any Person ten percent (10%) or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such person or entity; (c) any Person directly or indirectly controlling, controlled by, or under common control with such person or entity; (d) any officer, director or Member of such person or entity; and (e) if such other Person is an officer, director or Member, any company for which such Person acts in any such capacity.

1.4 "Assigning Member" means a Member who assigns, hypothecates or transfers any beneficial interest in any portion of his Limited Liability Company Interest.

1.5 "Assignee" means a person who has acquired a Member's beneficial interest in some or all of his Limited Liability Company Interest and has not become a Substituted Member.

1.6 "Book" means, with respect to a Revaluation Event, that which relates to the books and records of the Limited Liability Company established and maintained pursuant to Section 6.7 and Article XIV hereof. Thus, "Book value" means the value of the referenced item appearing in the books and records of the Limited Liability Company and "Book purposes" means for purposes of such books and records.

1.7 "Capital Account".

(a) The term "Capital Account" means with respect to a Member, the sum total of (i) such Member's actual Capital Contributions, (ii) such Member's share of Net Profit and Gain From Sale, which, for this purpose, shall include any income or gain exempt from tax, (iii) such Member's share of any adjustment increasing the Member's Capital Accounts due to a Revaluation Event, (iv) such Member's share of any increase in the adjusted tax basis of the Limited Liability Company's assets pursuant to Code Section 48(q)(2) and (v) the amount of any Limited Liability Company liabilities assumed (as such term is defined in Section 1.7(d), below) by such Member less the sum total of (vi) all amounts distributed from Cash Available for Distribution to such Member, (vii) such Member's share of Net Loss and Loss From Sale, which, for this purpose shall include any Limited Liability Company expenditure not deductible in computing its net income which is not a capital expenditure for income tax purposes, (viii)

-3-

such Member's share of any decrease in the Members' Capital Accounts due to a Revaluation Event, (ix) such Member's share of any decrease in the adjusted tax basis of the Limited Liability Company's assets pursuant to Code Sections 48(q)(1) and 48(q)(3), (x) the amount of such Member's individual liabilities that are assumed (as such term is defined in Section 1.7(d), below) by the Limited Liability Company, (xi) such Member's share of any fees paid in connection with the organization of the Limited Liability Company with respect to which the Limited Liability Company has properly elected amortization treatment under Code Section 709(b); (xii) such Member's share of any syndication expenses (as that term is defined in Section 1.709-2(b) of the Income Tax Regulations) paid in connection with the issuance and marketing of Limited Liability Company Interests and (xiii) such Member's share of any loss incurred by the Limited Liability Company in connection with its sale or exchange of any assets, which loss is not allowed as a deduction for income tax purposes pursuant to Code Sections 267(a)(1) or 707(b), maintained in accordance with the provisions of the Code and applicable Income Tax Regulations, including, without limitation, the regulations under Code Section 704(b), as they may be amended from time to time;

(b)  If a Revaluation Event occurs, paragraph (a) above shall be applied by computing depreciation and amortization for Book purposes in accordance with a reasonable method, and under such method (i) if the Book value of the Limited Liability Company's assets exceeds the adjusted tax basis thereof, the depreciation or amortization as computed for Book purposes will be no less that the depreciation or amortization as computed for tax purposes and (ii) if the adjusted tax basis of the Limited Liability Company's assets exceeds the Book value thereof, the depreciation or amortization as computed for Book purposes will no greater than the depreciation or amortization as computed for tax purposes and (iii) if the Book value of the Limited Liability Company's assets equals the adjusted tax basis thereof, the depreciation or amortization as computed for Book purposes will equal the depreciation or amortization as computed for tax purposes.  Further, if the Capital Account of a Member is adjusted as a result of a Revaluation Event, Capital Accounts of the Members shall be adjusted thereafter solely for allocations of Book items to the Members, and each Member's share of the corresponding tax items shall not be independently reflected by further adjustment to such Member's Capital Account.  Thus, for purposes of determining the balance in a Member's Capital Account after an adjustment as a result of a Revaluation Event, Net Profit, Net Loss, Gain from Sale and Loss from Sale shall be determined by reference to the Book items corresponding to the tax items by which those amounts would otherwise be computed;

(c)  For purposes of this Section 1.7, a Member who has more than one interest in the Limited Liability Company shall have a single Capital Account that reflects all such interests, regardless of the class of interests owned by such Member (e.g. general or limited) and regardless of the time or manner in which such interests were acquired; and

(d)  For purposes of clauses (v) and (x) of Section 1.7(a), liabilities shall be considered to be "assumed" only to the extent the assuming party is thereby subjected to primary and personal liability with respect to the obligation, and the obligee is aware of the assumption and can directly enforce the assuming party's obligation.

1.8   "Capital Contribution" means any Initial Capital Contribution of a Member and any Additional Capital Contributions of such Member (as the terms "**Initial Capital Contribution**" "**Additional Capital Contribution(s)**" are defined in **Sections 9.1 and 9.2.1**, respectively). Notwithstanding the preceding sentence, for purposes of computing the balance in his Capital Account, a Member shall be credited with a Capital Contribution with reference to his transfer of a Promissory Note to the Limited Liability Company or when and to the extent that the Member makes principal payments on such Promissory Note. "**Aggregate Member Capital Contributions**" shall mean the aggregate of the Capital Contributions of all the Members.

1.9   "Capital Transactions" means those Limited Liability Company transactions not in the ordinary course of its business or operations in which cash or other assets are generated from the sale or other disposition of all or substantially all of the Limited Liability Company's assets or interests therein, the return of any debt reserves or capital Contributions not expended in the ordinary course of its business or operations, the financing or refinancing of obligations secured by mortgages or deeds of trust which may now or hereafter become a lien against the Limited Liability Company Property, condemnation of the Limited Liability Company Property, net insurance recoveries not used to restore the Limited Liability Company Property (other than for temporary loss of use) and any transaction generating proceeds from which, in accordance with generally accepted accounting principles and practices, are deemed attributable to capital.

1.10   "Cash Available for Distribution" means the remaining cash and other assets available for distribution to the Member after payment or satisfaction in the following order of priority, applicable as the Manager may determine:  (i) all Limited Liability Company liabilities for ordinary and necessary expenses then due and owing to persons other than Members; (ii) all payments currently due on account of Limited Liability Company Indebtedness, including but not limited to, principal and interest payments and other charges on the Limited Liability Company Indebtedness; (iii) the current cost of acquiring Limited Liability Company Property and any repairs, replacements and improvements thereto; (iv) such reserves which the Manager believes are reasonably necessary, including reserves for the operation of the Limited Liability Company's business; (v) such fees payable to the Members or the Manager's Affiliates as provided herein, unless otherwise provided.  The amount of "other assets" which shall be considered available for or to be Cash Available for Distribution shall be the fair market value of such other assets, net of liabilities securing such other assets that the distributee Member assumes or takes subject to.

1.11   "Chargeback Account" means an account to be maintained with, respect to each item of property (other than cash or a Promissory Note) contributed by a Member to the Limited Liability Company as a Capital Contribution.  The purpose of maintaining Chargeback Accounts is to permit the allocation of any Gain or Loss Form Sale pursuant to Section 8.1.3. in compliance with the requirements of Code Section 704(c).  Each Chargeback Account shall be identified with the Member who made the capital Contribution.  Each Chargeback Account shall

-5-

be determined as follows:

(a)  If at the time of a Capital Contribution of property, such property's fair market value exceeds its adjusted basis to the Limited Liability Company for federal income tax purposes, then the Chargeback Account shall have a positive balance equal to such excess. Upon a disposition of such property by the Limited Liability Company, the balance in such Chargeback Account shall be reduced to zero, without regard to the actual amount of gain or loss realized upon such disposition.

(b)  If at the time of a Capital Contribution of property, such property's adjusted basis to the Limited Liability Company for federal income tax purposes exceeds its fair market value, then the Chargeback Account shall have a negative balance equal to such excess. Upon a disposition of such property by the Limited Liability Company, the balance in such Chargeback Account shall be increased to zero, without regard to the actual amount of gain or loss realized upon such disposition.

1.12  "Code" or "Internal Revenue Code" means the Internal Revenue Code, as amended, or any corresponding provision or provisions of succeeding law.

1.13  "Debt Financing" shall mean one or more loans, credit lines or similar financing arrangements obtained or to be obtained by the Limited Liability Company from time to time for purposes of purchasing, improving, maintaining, operating, repairing, renovating, rebuilding and/or re-developing the Limited Liability Company Property, including any refinancings thereof, whether or not secured by all or any portion of the Limited Liability Company Property.

1.14  "Financing Documents" shall mean the promissory note, guarantees and all other documents executed by the Limited Liability Company evidencing, securing or otherwise in connection with any Debt Financing.

1.15  "Gain From Sale" and "Loss From Sale" means the gain or loss, if any, determined for income tax purposes from a Capital Transaction.

1.16  "Limited Liability Company Interest" means each Member's Interest in that portion of the Limited Liability Company owned by the Members set forth on Schedule 1 hereto.

1.17  "Limited Liability Company" means **CLOVER INDUSTRIAL PROPERTIES, LLC**, a California Limited Liability Company, created under this Agreement.

1.18  "Limited Liability Company Indebtedness" means any existing or hereinafter created mortgages, promissory notes, deeds of trust or other such indebtedness on the Limited Liability Company Property.

-6-

1.19  "Limited Liability Company Interest Liquidation Date" means the date upon which there is a liquidation of a Member's interest in the Limited Liability Company under Section 1.761-1(d) of the Income Tax Regulations.

1.20  "Limited Liability Company Property" means all right, title and interest of the Limited Liability Company in the Lease and the Facility (as those terms are defined in the Recitals to this Agreement) including all fixtures, furnishings, equipment and tangible and intangible personal property used in connection with the Facility.

1.21  "Liquidation Date" means the date which is the earlier of (a) the date upon which the Limited Liability Company is considered "terminated" under Code section 708(b)(1), or (b) the date upon which the Limited Liability Company ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its Members).

1.22  "Manager" means MARK A. SLOTKIN or any successor or additional Managers which the Manager may designate at any time pursuant to Section 10.8.

1.23  "Members" means such Persons as shall be admitted to the Limited Liability Company from time to time as Members, in accordance with the terms of this Agreement, including Substituted Members. "Member" shall mean any one of them.

1.24  "Members" means collectively the Manager and the Members, and reference to a "Member" shall be to any one of them.

1.25  "Net Chargeback Account" means an account to be maintained with respect to each Member, the balance of which shall equal the net amount of all Chargeback Account balances attributable to property contributed by such Member to the Limited Liability Company as a Capital Contribution.

1.26  "Net Profit" and "Net Loss" of the Limited Liability Company means the net profit or net loss determined for income tax purposes for taxable year.

1.27  "Net Revaluation Account" means an account to be maintained with respect to each Member. The balance in a Member's Revaluation Account shall be adjusted between Revaluation Events as set forth below, first, to net from Member's Revaluation Account any amount allocable to a Net Chargeback Account so that a Member's Next Revaluation Account reflects only amounts allocable to Revaluation Account balance for amounts allocated to such Member pursuant to Sections 8.1.3(a)(ii) or 8.1.3.(ii) after the occurrence of the most recent Revaluation Event.

(a)  A Member's Net Revaluation Account  balance shall be determined as follows:

-7-

(i) If a Member's Revaluation Account balance is greater than or equal to zero and his Net Chargeback Account balance is also greater than or equal to zero, then such Member's Net Revaluation Account balance shall equal his positive Revaluation Account balance reduced (toward zero or a negative balance) by the balance in his Net Chargeback Account;

(ii) If a Member's Revaluation Account balance is greater than or equal to zero and his Net Chargeback Account balance is less than zero, then such Member shall have a positive Net Revaluation Account balance equal to the sum total of both balances by treating the Net Chargeback Account balance as if the amount therein was a positive balance;

(iii) If a Member's Revaluation Account balance is less than zero and his Net Chargeback Account balance is greater than or equal to zero, then such Member shall have a negative Net Revaluation Account balance equal to the sum total of both balance by treating the Net Chargeback Account balance as if the amount therein was a negative balance; or

(iv) If a Member's Revaluation Account balance is less than zero and his Net Chargeback Account is also less than zero, then such Member's Net Revaluation Account balance shall equal his negative Revaluation Account balance increased (toward zero or a positive balance) by the balance in his Net Chargeback Account;

(b) If any Gain or Loss from sale has been allocated to a Member in accordance with Section 8.1.3(a)(ii) or Section 8.1.3(b)(ii) since the occurrence of the most recent Revaluation Event, then the balance in a Member's Net Revaluation Account shall be further adjusted as follows:

(i) If after making the adjustments in subsection (a), above, a Member has a positive balance in his Net Revaluation Account, then his Net Revaluation Account balance shall be reduced by any such Section 8.1.3(a)(ii) allocation of gain from Sale; or

(ii) If after making the adjustments in subsection (a), above, a Member has a negative balance in his Net Revaluation Account, then his Net Revaluation Account balance shall be increased (toward zero or a positive balance) by any such Section 8.1.3(b)(ii) allocation of Loss From Sale.

1.28 "Nonrecourse Debt" means the Limited Liability Company Indebtedness in which no Member has personal liability as set forth in Section 1.752-1(e) of the Income Tax Regulations.

1.29 "Ordinary Operations" means Limited Liability Company operations in which cash and other assets are generated in the Limited Liability Company's ordinary and normal course of business or operations, including but not limited to, cash and other assets

-8-

generated in connection with business activity by the Limited Liability Company.

1.30    "Person"    means any natural person, Limited Liability Company, corporation, association or other legal entity.

1.31    "Promissory Note" means any promissory note executed by any Member, as the borrower thereunder or maker thereof ("Maker"), to the Limited Liability Company or to any other Member, as the lender thereunder (such lender and any subsequent holder of any such note being referred to herein as the "Holder" thereof) for any purpose arising under or in connection with this Agreement.  The form of any such Promissory Note shall be prescribed by the Manager and shall provide, among other things, that all distributions of Cash Available for Distribution to the Member who is the Maker of any such Promissory Note shall, in the discretion of the Manager, be paid directly to the Holder of any such Promissory Note, for the account of the Maker thereof, to service the debt evidenced by the Promissory Note, until such time as the Promissory Note is paid in full.  The Maker of the Promissory Note shall be personally liable for all sums due thereunder, notwithstanding any security therefore, and the Maker shall waive any such protections in writing.

1.32    "Revaluation Account" means an account to be maintained with respect to each Member for purposes of permitting the allocation of any Gain or Loss From Sale pursuant to Section 8.1.3(a)(ii) and Section 8.1.3(b)(ii) in compliance with the requirements of Code Section 704(b).  The balance in a Member's Revaluation Account shall equal the difference, if any, between such Member's Capital Account balance as determined for Book purposes immediately after the occurrence of the most recent Revaluation Event over such balance as would have been determined for tax purposes but for clauses (iii) and (viii) of Section 7(a) and the last two sentences of Section 1.7(b).  If the Book Capital Account balance exceeds the tax Capital Account balance referred to above, then such Member shall have a positive balance in his Revaluation Account equal to such excess; if the tax Capital Account balance exceeds the Book Capital Account balance referred to above, then such Member shall have a negative balance in his Revaluation Account equal to such excess.   The balance in a Member's Revaluation Account prior to the occurrence of a subsequent Revaluation Event shall be disregard and the balance in such Member's Revaluation Account shall be entirely redetermined upon the occurrence of such subsequent Revaluation Event.

1.33    "Revaluation Event" means any event as a result of which the Capital Account of a Member established and maintained for Book purposes differs from that established and maintained for tax purposes, including but not limited to the following events; the contribution of property (other than money or Promissory Note) to the Limited Liability Company by a Member; the redemption by the Limited Liability Company of a Member's interest in the Limited Liability Company; the admission of a new Member; or the exercise by the Manager of its power to adjust the Capital Accounts of the Members pursuant to Section 6.2.16 hereof.

1.34    "Substituted Member" means a Person admitted to all of the rights of a

2.6   Term of Limited Liability Company. The term of the Limited Liability Company shall commence as of the date of filing the certificate of Organization, pursuant to the provisions of Section 2.1 hereof, and shall continue until the Limited Liability Company shall be dissolved, liquidated and terminated pursuant to the provisions of Article XI hereof.

2.7   Amendment of Agreement. Except as provided in Section 6.2.16, this Agreement may be amended in whole or in part by an agreement in writing signed by the Manager and seventy five percent (75%) of the Members. The Certificate of Organization shall be amended, executed, as permitted by the Act, or otherwise, acknowledged and filed with the Secretary of State of the State of California, as and whenever and within the time period required by the Act, including, but not by way of limitation, whenever there is (i) a change in the name of the Limited Liability Company, (ii) a change in the street address of the principal office of the Limited Liability Company or, if such office is not in the State of California, in the street address of an office of the Limited Liability Company in the State of California, which office is required by Section 2.3 of this Agreement, (iii) a change in the address of or the withdrawal of a Manager, or a change in the address of the agent for service of process of the Limited Liability Company, unless a corporate agent is designated, or appointment of a new agent for service of process, (iv) the admission of a new Manager and that Manager's address or (v) the discovery by the Manager of any false or erroneous material statement contained in the Certificate of Limited Liability Company or any amendment thereto. In addition, the Manager may execute, acknowledge and file an amendment to the Certificate of Limited Liability Company, on such form in such manner as hereinabove described, at any such other time or times as the Manager may, in its sole and absolute discretion, deem desirable or advisable.

## ARTICLE III
## MANAGER

3.1   Manager. The Manager of the Limited Liability Company is Mark A. Slotkin, whose principal executive office is located at 4851 S. Alameda Street, Los Angeles, CA 90058.

3.2   Manager's Capital Contribution. The Manager may, but shall not be required, make a Capital Contribution of cash or other property, in such amount as it determines in its sole discretion. Upon the dissolution and termination of the Limited Liability Company and subject to the provisions of Article IX, the Manager will contribute to the Limited Liability Company an amount equal to the lesser of (a) the deficit balance in its Capital Account, or (b) the excess of 1.00 percent (1.00%) of the total Capital Contributions of the Members over the capital previously contributed by the Manager; provided however that such contribution upon the dissolution and termination of the Limited Liability Company shall be required of the Manager only if the Manager determines, in its sole discretion, that such contribution is required by law or is in the best interest of the Limited Liability Company. As to a Limited Liability Company Interest, if any, acquired by the Manager, whether pursuant to Article IV hereof or otherwise, such interest in the Limited Liability Company shall be deemed to have been acquired as a Member for purposes of this Section 3.2.

-11-

3.3 <u>Automatic Removal and Replacement of the Manager Upon Occurrence of Conditions</u>. If any one or more of the following conditions occurs at any time or from time to time (hereinafter called "conditions subsequent"), then as of 6 pm the date of the first occurrence of any one or more of said conditions subsequent (or 6 pm on the date the Limited Liability Company first learns of the occurrence of any one or more of said conditions subsequent), which day shall be referred to hereinafter as the "Removal Date," the person or entity then serving as Manager ("Removed Manager") shall be automatically removed and no longer as the Manager and shall have no right or authority to act on behalf of or bind the Limited Liability Company. The conditions subsequent include any one or more of the following:

a.    Bankruptcy or any insolvency proceeding of the Manager, including, but not limited to, the filing of a voluntary or an involuntary Chapter 7, 11 or 13, any composition for the benefit of creditors, or any similar proceeding whether at equity or in law, whether under judicial supervision, ancillary to or as part of any litigation, or otherwise.

b.    A judgment being rendered by any court of general or limited jurisdiction within the United States or otherwise wherein a named defendant, or if not a defendant a party against whom any relief is granted, includes directly or indirectly, either the Manager or any or all of his or her interests whether in rem, quasi in rem, or otherwise.

c.    A receivership, a receiver, or a special master of any nature which in any way directly or indirectly affects either the Manager or any of his or her interests or property rights, personal or real, or mixed, whether at law or in equity.

d.    Death of Manager.

3.3.1    If the Manager is removed pursuant to this provision and becomes a Removed Manager, then and in that event to act as Manager in his or her stead and place until such time as the Members have effectuated a replacement of the Manager pursuant to other terms in this agreement, the Manager to serve in the place and stead of the Removed Manager shall be **Loren Marken** who shall immediately and without notice succeed to the position of Manager and be charged with the performance of the duties thereof; provided however that any such named person shall be temporarily disqualified from assuming the position and serving as Manager at any time such person is personally subject to unpaid legal judgments without reserves (separate from this Limited Liability Company) to pay such judgments. Each Member is charged with giving reasonably prompt notice of such automatic elevation to the position of Manager as soon as practicable upon the occurrence of the conditions subsequent, whether one or more, herein named.

3.3.2    If for any reason the Manager herein named to act in the place and stead of the removed Manager shall either fail to so act, or shall be otherwise disqualified at law or shall refuse to perform, the Office of Manager shall be deemed not to be vacant but shall continue to be occupied by said Manager so herein named until such time as there is a formal replacement of the Manager by the Members as otherwise herein provided.

-12-

## ARTICLE IV
## MEMBERS

4.1 <u>Members</u>.  A Member is such Person as shall be admitted to this Limited Liability Company from time to time in accordance with the terms of this Agreement.  Subject to Section 7.5, the Manager may admit as Members the Persons whose Capital Contributions for Limited Liability Company Interests are accepted by the Manager (which may refuse to admit any Person or Persons as Members for any reason whatsoever).  Each such Person shall become a Member in the Limited Liability Company when:

4.1.1.  Such Person has contributed to the capital of the Limited Liability Company the amounts set forth on Schedule 1 which is incorporated herein by this reference or cash, property or one or more Promissory Notes in amounts which shall be determined by the Manager; and

4.1.2  The Manager has caused this Agreement to be amended to show the admission of such Person as a Member.

4.2 <u>No Right to Withdraw</u>.  Except as otherwise specifically permitted by this Agreement, no Member will be entitled to withdraw any of his or its Capital Contributions or withdraw or retire from the Limited Liability Company prior to the dissolution and liquidation of Limited Liability Company.

4.3 <u>No Priorities</u>.  Except as otherwise provided in Article VIII and Article XIII of this Agreement, no Member shall have any priority over any other Member as to the return of his or its Capital Contribution or allocations of Net Loss, Net Profit, Loss From Sale or Gain From Sale.

4.4 <u>Identity of Members.</u>  The names, addresses and Capital Contributions of the Members on the date of each such Member's actual execution of this Agreement, and of each person with any interest therein, are set forth in Schedule 1.

## ARTICLE V
## COMPENSATION OF THE MANAGER

5.1 <u>Limit on Compensation</u>.  The Manager shall receive no compensation from the Limited Liability Company for its activities on behalf of the Limited Liability Company.

5.2 <u>The Interest of the Manager in the Limited Liability Company</u>.  The Manager's interest in Cash Available For Distribution shall be in accordance with Section 8.2.

5.3 <u>Expenses of the Limited Liability Company and Advances by the Manager</u>.  Except as otherwise specifically provided by this Agreement all expenses of the Limited

-13-

Liability Company, including, but not limited to, organizational expenses and operating expenses, shall be billed directly to, and paid and borne by the Limited Liability Company. The expense of performance of services on behalf of the Limited Liability Company by various persons shall be borne by the Limited Liability Company. The Limited Liability Company shall not pay or reimburse the Manager for any of the salaries, fringe benefits or travel expenses of the Manager. If the Manager advances funds to the Limited Liability Company for Limited Liability Company purposes, such advance shall bear interest at the money market account rate at a financial institution designated by the Manager at the time the advance is made.

## ARTICLE VI
## MANAGEMENT OF THE LIMITED LIABILITY COMPANY
## BY THE MANAGER

6.1 <u>Management by Manager</u>. The Manager shall have full, exclusive and complete power and authority to manage, control, administer and operate the business and affairs of the Limited Liability Company. The Manager is designated as the "tax matters" Member of the Limited Liability Company as that term is used in Section 6231(a) of the Code. The Manager, acting as tax matters Member, may enter into an agreement with the Internal Revenue Service with respect to the tax treatment of any Limited Liability Company income, deductions or credits and, to the extent permitted under the Code, may expressly agree that such agreement may bind the other Members.

6.2 <u>Powers</u>. Subject to the approval of the Members in those cases specified in Section 7.5 hereof, and further subject to the limitation that the Manager shall not amend this Agreement in any manner which would adversely affect the rights of the Members, nor the ownership interests of any of the Members without the consent of the Members whose ownership interests are to be effected, the Manager, in addition to the powers given to it by law or other provisions of this Agreement, shall, in its sole discretion, have full power in the management of the Limited Liability Company business to do or cause to be done any and all acts deemed by the Manager to be necessary or appropriate thereto, and the scope of such power and authority shall encompass all matters in any way connected with such business or incident thereto, including, without limitation, the power and authority, to do the following:

6.2.1 To deal in and with any and all of the assets of the Limited Liability Company, whether real or personal or mixed, including, but not by way of limitation, the right (a) to construct, alter, improve, repair, raze, and replace improvements, and to create easements and servitudes, by grant or otherwise, (b) to lease all or any portion of such assets without limit as to the term, whether or not such term or any extension or renewal thereof shall extend beyond the date of termination of the Limited Liability Company as set forth in Section 11.1 hereof, and (c) to sell, assign, transfer, encumber, hypothecate, convey or exchange any right, title or interest in or to, and to grant options for the sale, assignment, transfer, conveyance or exchange of any right, title or interest in or to, all or any portion of such assets, including, but not by way of limitation, any mortgage or leasehold interest or any other interest in realty or personalty which may be acquired by the Limited Liability Company, all of the foregoing upon such terms and

-14-

**243**

conditions as the Manager in its sole and absolute discretion shall determine.

6.2.2    To borrow money and as security for the repayment thereof to encumber all or any portion of the assets of the Limited Liability Company, to obtain financing of any and all obligations of the Limited Liability Company, including but not by way of limitation, any and all deeds of trust placed on all or any portion of such assets, and to prepay, increase, modify, consolidate or extend in whole or in part any and all such obligations, all of the foregoing upon such terms and conditions as the Manager in its sole and absolute discretion shall determine.

6.2.3    To purchase such insurance as the Manager in its sole and absolute discretion may deem appropriate for the protection of the Limited Liability Company and/or any of the parties hereto, including, but not by way of limitation, workmen's compensation insurance, public liability insurance, fire and extended coverage insurance and burglary and theft insurance.

6.2.4    To pay, collect, compromise, arbitrate or otherwise adjust any and all claims or demands of or against the Limited Liability Company, in such amounts and upon such terms and conditions as the Manager shall in its sole and absolute discretion determine.

6.2.5    The Manager shall retain such accounting firm as the Manager shall determine to provide accounting services for the Limited Liability Company; provided, however, in the event the Limited Liability Company is required by any lender to deliver certified financial statements, the Manager may retain alternate accountants if the applicable rules of accountancy would prohibit said firm from issuing certified financial statements due to the inclusion of members of such firm as Members in this Limited Liability Company.  Subject to the foregoing, from time to time to employ, engage, hire or otherwise secure the services of such persons, firms or corporations, including, but not by way of limitation, any of the parties hereto or any persons, firms or corporations related to or affiliated with any of the parties hereto, as the Manager may in its sole and absolute discretion deem advisable for the proper operation of the business of the Limited Liability Company and the discharge of its duties hereunder, including, but not by way of limitation, investment advisory personnel, property management personnel, leasing agents, brokers, attorneys and accountants, such employment to be for such compensation and upon such terms and conditions as the Manager in its sole and absolute discretion shall determine.

6.2.6    Possess and exercise, as may be required, all of the rights and powers of a Manager as more particularly provided by the Act, to the extent that any of such rights may be limited or restricted by the express provisions of this Agreement.

6.2.7    Exercise its fiduciary duty for the safekeeping and use of all funds and properties of the Limited Liability Company, whether or not in its immediate possession or control, and not to employ, or permit another to employ, such funds or properties in any manner except for the exclusive benefit of the Limited Liability Company.

-15-

6.2.8    To invest Limited Liability Company funds in government securities, certificates of deposit, bankers' acceptances or any other investments, accounts or properties, in its sole and absolute discretion.

6.2.9    To pay all taxes, licenses or assessments of whatever kind or nature imposed upon or against the Limited Liability Company or its assets and for such purposes to make such returns and do all such other acts and things as may be necessary or advisable.

6.2.10    To enter into such agreements, contracts, documents and instruments with such parties, and to give such receipts, releases and discharges with respect to any of the foregoing and any matters incident thereto, as the Manager may deem advisable, appropriate or convenient.

6.2.11    To deposit monies with any one or more banks, trust companies or other banking institutions deemed by the Manager to be reasonable, such monies to be subject to withdrawal on notice or on demand and in such manner as the Manager may determine.

6.2.12    To prepare or cause to be prepared reports, statements and other relevant information for distribution to Members, including annual and interim reports.

6.2.13    To cause the Limited Liability Company to make or revoke any of the elections permitted or required under the Code, including but not limited to the elections referred to in Sections 108, 179, 195, 709, 754 and 1017 of the Code of any similar provision enacted in lieu thereof.

6.2.14    To make such elections as the Manager deems appropriate under the accounting method or methods to be used by the Limited Liability Company.

6.2.15    To amend this Agreement to reflect the addition or substitution of Members or the reduction of Capital Accounts upon the return of capital to Members, or in any other manner required or permitted by this Agreement or by law.

6.2.16    To adjust the Capital Accounts of the Members upon the occurrence of a Revaluation Event to reflect the then current fair market value of the Limited Liability Company's assets as permitted by and subject to the requirements of the Code and applicable Income Tax Regulations, including, without limitation, the regulations under Code Section 704(b), as they may be amended from time to time. The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Income tax Regulations, and shall be interpreted and applied in a manner consistent with such Income Tax Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any adjustments thereto are maintained or computed in order to comply with such Income Tax Regulations, the Manager may make such modifications provided that they are not likely to have a material effect on the amounts distributable to the Members upon dissolution of the Limited Liability Company,

-16-

notwithstanding the first sentence of Section 2.6.

6.2.17   To prepare, execute and acknowledge by its signature or by signature of any two of its Members, unless otherwise required by law, or by signature of an attorney-in-fact appointed by written instrument executed and acknowledged by it, and to file, record, publish and deliver, any and all instruments in its sole and absolute discretion necessary or convenient to effectuate any and all actions authorized or required of the Limited Liability Company, including, but not by way of limitation, (a) any and all contracts, leases, bills of sale, notes, security agreements, deeds and deeds of trust, (b) any and all other investment instruments, documents or statements for the operation, sale, lease or encumbrance of any or all of the assets of the Limited Liability Company, (c) any and all other instruments, documents or statements required to effectuate the formation, continuation or dissolution, liquidation or termination of the Limited Liability Company, including, but not by way of limitation, the certificate of Limited Liability Company, and (d) any and all amendments to or modifications of any or all of the instruments, documents or statements described in this Section 6.2.

6.2.18   In its absolute and sole discretion, to determine the time, place and conditions of any meetings of the Limited Liability Company required by Section 7.5 of this Agreement, and to preside over such meetings and reconvened meetings, all within the provisions set forth in Section 101.355 of the Act, provided that it shall provide the notice contemplated by Section 101.352 of the Act for any matters on which the Members may vote or on which their consent is required.

6.2.19   To take such other action and to perform such other acts as may be necessary or desirable in the conduct of the Limited Liability Company's business, in the Manager's sole discretion.

6.2.20   Approval or action taken by the Manager in accordance with this Agreement shall be binding on the Members.  Any person dealing with the Limited Liability Company shall be entitled to rely on any certificate or any writing signed by the Manager as the duly authorized action of the Manager on behalf of the Limited Liability Company.

6.3   Authority.  No Person dealing with the Limited Liability Company shall be required to inquire into the authority of the Manager to take any action or make any decision.  In this connection, it is understood and agreed that the Manager and its Affiliates are engaged and intend to continue in the real estate business and must necessarily divide their time between this and other programs, both prior and future, as well as other real estate interests and that the Manager and any associate or Affiliate may, during the term of the Limited Liability Company, acquire real estate interests and not offer the same to this Limited Liability Company.

6.4   Liability.  Neither the Manager nor any of its Affiliates shall have any liability to any Member or the Limited Liability Company for any loss or damage, mistake or error in judgment, incurred by reason of any act or omission performed or omitted in good faith either on behalf of the Limited Liability Company or in furtherance of the interests of the

-17-

Limited Liability Company in a manner reasonably believed to be within the scope of authority conferred by this Agreement, provided such acts or omissions do not constitute gross negligence or gross misconduct or the breach of a fiduciary duty with respect to such acts or omissions. The Manager shall not be liable for any loss or damage to the Limited Liability Company Property caused by strikes, labor troubles, riots, fires, explosions, tornadoes, floods, acts of a public enemy, insurrections, acts of God, failure to carry out the provisions hereof due to provisions of law or rules or regulations promulgated by any governmental agency or any demand or requisition of any government, or from any other cause beyond the control of the Manager.

6.5 <u>Indemnification</u>. The Manager and its agents shall be indemnified, defended and held harmless by the Limited Liability Company from and against any and all losses, liabilities and expenses arising from any and all claims, demands, actions, suits or proceedings, civil, administrative or investigative, in which the Manager, or its agents may be involved, as a party or otherwise, by reason of the management of the affairs of the Limited Liability Company, whether or not the Manager continues to be such at the time any such liability or expense is paid or incurred. Neither the Manager nor any of its agents shall be entitled to indemnification hereunder for any conduct arising from (i) its' or such agent's gross negligence, fraud or gross misconduct; (ii) the breach of this Agreement by the Manager; or (iii) a matter unrelated to such Manager's management of the Limited Liability Company affairs. The rights of indemnification provided in this Section will be in addition to any rights to which the Manager, or such other persons, may otherwise be entitled by contract or as a matter of law, and shall extend to each of its successors and assigns. In particular, and without limitation of the foregoing, the Manager, and its agents, shall be entitled to indemnification by the Limited Liability Company against the reasonable expenses as incurred, including attorneys' fees, actually and necessarily incurred by any of them in connection with the defense of any action, to which it or any of them may be made a party, or the right of the Limited Liability Company to procure a judgment in favor of the Limited Liability Company, to the fullest extent permitted under the provisions of the Act or any other applicable statute.

6.6 <u>Duties of the Manager</u>. The Manager shall perform, or cause to be performed, at the expense of the Limited Liability Company, the following services.

6.6.1 Establish books of account, record and payment procedures, including individual Capital Accounts of the Members;

6.6.2 Provide bookkeeping and other related services for the Limited Liability Company;

6.6.3 Disburse the Capital Contributions of the Members for the purpose set forth in this Agreement;

6.6.4 Provide overall management, financial and business planning services to the Limited Liability Company;

-18-

**247**

6.6.5    Disburse all receipts and make all necessary payments and expenditures in accordance with the terms of this Agreement;

6.6.6    Make all reports to the Members required by this Agreement or by law; and

6.6.7    Conduct reasonable periodic inspections of the Limited Liability Company Property.

## ARTICLE VII
## POWERS OF THE MEMBERS; LIMITED LIABILITY

7.1    No Management or Control.    The non-Managers shall take no part in the management of the Limited Liability Company or transact any business for the Limited Liability Company and shall have no power to sign for or bind the Limited Liability Company.

7.2    Limited Liability.    Except as provided in **Article IX**, no Member shall be liable for any debts or obligations of the Limited Liability Company in excess of its Capital Contributions, including but not limited to any portion of any Capital Contribution which has been returned to such Member but for which the Member remains liable under applicable law. All undistributed Cash Available for Distribution which would otherwise be distributed to the Members, however, shall be available to creditors to satisfy the debts obligations of the Limited Liability Company until the time of actual distribution.

7.3    Waiver.    The liabilities of a Member as set forth in this Article can be waived or compromised only by the consent of all Members, but a waiver or compromise shall not affect the right of a creditor of the Limited Liability Company who extended credit or whose claims arose after the filing and before a cancellation or amendment of this Agreement to enforce such liabilities.

7.4    Qualification.    The Manager shall use its best efforts to qualify the Limited Liability Company as a Limited Liability Company in each jurisdiction in which the Limited Liability Company does business so as to ensure that the limited liability of the Members is effective in each such jurisdiction

7.5    Voting and Meetings.

7.5.1    Members shall have only the voting rights specifically set forth herein notwithstanding the provisions of the Act. Notwithstanding any other provision of this Agreement, matters on which the Members are entitled to vote shall require the affirmative vote or written consent of Members holding not less than **seventy five percent (75.0%)** of the Percentage Interests as shown on **Schedule 1**. The Members shall be entitled to vote on the following:

-19-

**248**

(a)     To elect to continue the business of the Limited Liability Company after the Manager or any other Manager of the Limited Liability Company ceases to be a Manager, where there is no remaining or surviving Manager, and none of the persons named in **Section 3.3.1** hereof agrees to act as Manager;

(b)     As provided in Section 12.1 relating to selection, removal and replacement of the Liquidator (as later defined);

(c)     To approve the admission of an additional Member(s); and

(d)     To approve the admission of an additional Manager(s) or the sale, transfer or assignment by the Manager of any interest in the Limited Liability Company or the sale, transfer or assignment of any interest in the Manager.

(e)     To approve the sale, transfer of the principal assets of the Company.

(f)     To approve the decision to recapitalize the Company above the sum of one hundred thousand dollars ($100,000).

7.5.2  Subject to Section 12.1, on any matter on which the Members may vote, each Member's vote shall bear the same relationship to the aggregate votes which could be cast by all Members as such Member's interest in Net Profits bears to the interest of all Members in Net Profits, as determined under Section 8.1.2 hereof and Schedule 1 hereto; provided that any vote of the Members shall be subject to the super-majority requirement specified in **Section 7.5.1.**

7.5.3  All meetings of the Limited Liability Company shall be called and held in compliance with the Act.

## ARTICLE VIII
## ALLOCATIONS AND DISTRIBUTIONS

8.1  Allocation off Income, Gains, Losses, deductions and Tax Credits.  Limited Liability Company income, gains, losses, deductions and tax credits shall be allocated as follows:

8.1.1  Net Loss shall be allocated to the Members in accordance with each Member's Membership percentage interest in the Company as reflected in Schedule 1. In determining whether the Limited Liability Company incurs a Net Loss during a taxable year, Gain or Loss From Sale shall be excluded.

8.1.2  Net Profit shall be allocated to the Members in accordance with each Member's Membership percentage interest in the Company as reflected in Schedule 1. In determining whether the Limited Liability Company incurs a Net Profit during a taxable year,

-20-

Gain or Loss From Sale shall be excluded.

8.1.3  Gain or Loss From Sale shall be allocated as follows:

(a)  Gain From Sale shall be allocated to the Members in the following order and priority:

(i)  To any Member in an amount not to exceed the positive balance in such Member's Chargeback Account but only if such Gain from Sale is attributable to the property transferred to the Limited Liability Company that gave rise to such Chargeback Account;

(ii)  To each Member, to the extent of such Member's positive Net Revaluation Account balance, among such Members in the ratio that each such Member's positive Net Revaluation Account balance bears to the aggregate of all such Member's positive Net Revaluation Account balances;

(b)  Loss From Sale shall be allocated to the Members in the following order and priority:

(i)  To any Member in an amount not to exceed the negative balance in such Member's Chargeback Account but only if such Loss from Sale is attributable to the property transferred to the Limited Liability Company that gave rise to such Chargeback Account;

(ii)  To each Member, to the extent of such Member's negative Net Revaluation Account balance, among such Members in the ratio that each such Member's negative Net Revaluation Account balance bears to the aggregate of all such Member's negative Net Revaluation Account balances;

(iii)  To the Members in accordance with each Member's Membership percentage interest in the Company as reflected in Schedule 1.

8.1.4  Investment credits allowed pursuant to Code Section 38 shall be allocated to the Members in accordance with the Members' interest in Net Profits under Section 8.1.2 for the fiscal year in which such credit is earned.  Any other tax credit shall be allocated to the Members in accordance with each Member's interest in Net Loss under Section 8.1.1 for the fiscal year in which such credit is earned.

8.1.5  For purposes of determining whether any allocation is required pursuant to Section 8.1.3(a)(ii) or 8.1.3(b)(ii), all adjustments to the Members' Book Capital Accounts shall be made before any adjustments are made to the Members' tax Capital Accounts.

8.1.6  The income, gain, loss, deduction, tax credit, Net Profit, Net Loss,

-21-

Gain From Sale and Loss From Sale of the Limited Liability Company shall be determined for each taxable year in accordance with the accounting method followed by the Limited Liability Company from income tax purposes. In the case of a sale, exchange or liquidation or in the case of any other change of all or any part of a Member's Interest or Manager Interest, as the case may be, during any taxable year of the Limited Liability Company, such Member's distributive share of these Limited Liability Company items shall be determined by taking into account such Member's varying interests during the Limited Liability Company taxable year in which such change occurs. Notwithstanding the foregoing, the Member's distributive share of these Limited Liability Company items shall be determined in accordance with Section 706(d) of the Code and the Treasury regulations thereunder.

8.1.7  Subject to Sections 8.1.4 and 8.1.6, the Members' shares of income, gains, losses, deductions and tax credits, Net Profit, Net Loss, Gain From Sale and Loss From Sale shall be allocated among the Members during each calendar year in proportion to the Member and prorated on a daily basis over such calendar year, taking into account any charges in the Limited Liability Company Interest held by any Member during such calendar year.

8.2  <u>Cash Distributions</u>.

8.2.1  All Cash Available For Distribution allocated to the Members shall be distributed at the discretion of the Manager. No Member shall be entitled to receive distributions of cash. Distributions of cash shall be made solely by the Manager at such time or times as the Manager determines, in its sole and absolute discretion, that such distribution is in the interests of the Limited Liability Company; and, when funds in excess of needs, as determined by the Manager, are on hand. The Manager may, in its discretion, set up such reserves as required by the needs of the Limited Liability Company.

8.2.2  Distributions of Cash Available For Distribution from Ordinary Operations shall be allocated to the Members and, amongst the Members, in accordance with their respective Limited Liability Company Interests shown on **Schedule 1** hereto.

8.2.3  Cash Available for Distribution from Capital Transactions shall be allocated (i) first to the Members until the Members shall have received an amount equal to their Adjusted Capital Contributions, and, amongst those Members in accordance with their Limited Liability Company Interests, as set forth in Column A of Schedule 1 hereto and then (ii) to the Manager until the Manager shall have received an amount equal to its Adjusted Capital Contribution. Thereafter, Cash Available for Distribution from Capital Transactions shall be allocated to the Members in accordance with their respective Limited Liability Company Interests, as more particularly described in Column B of Schedule 1 hereto.

8.2.4  If the Limited Liability Company Interest held by any Member changes during any taxable year of the Limited Liability Company, distributions of Cash Available For Distribution to the Members shall be paid to them in proportion to the Limited Liability Company Interest held by each, and based upon the number of days such Member held

-22-

such amount of Limited Liability Company Interest during the current calendar year.

## ARTICLE IX
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

9.1  Initial Capital Contributions of Members.    Each Member shall contribute cash to the capital of the Limited Liability Company in the amount shown opposite such Member's name on **Schedule 1** ("**Initial Capital Contribution**").    If any party to this Agreement fails to make his, her or its Initial Capital Contribution in the manner and by the deadline specified by the Manager, such party shall be in breach of this Agreement and shall be liable for damages caused to the Limited Liability Company and/or any other Member(s); and the Manager may, in its discretion and without waiving any claims against such defaulting party, terminate such defaulting party's interest in the Limited Liability Company.

9.2    Member Loans, Guaranties and Additional Capital Contributions.    No Member shall have the right or obligation to make any loans or additional contributions of capital to the Limited Liability Company except as provided in this **Section 9.2**.

9.2.1    Additional Capital Contributions and Guaranties by Members.

(a)    The Members shall make additional contributions of capital to the Limited Liability Company from time to time as determined by the Manager ("**Additional Capital Contribution(s)**") based on the Managers evaluation of the financial needs of the Limited Liability Company, in the Manager's sole discretion.    In determining whether Additional Capital Contributions are needed, the Manager shall consider the financial needs of the Limited Liability Company (including but not limited to any operating cash flow deficits and any need for capital improvements to the Limited Liability Company Property) and the availability of debt financing, all in the Manager's sole and absolute discretion.    Additional Capital Contributions required hereunder shall be made by the Members in proportion to percentages of their respective Limited Liability Company Interests as shown on **Schedule 1** from time to time ("**Percentage Interests**" or "**Limited Liability Company Percentage Interests**") and shall be payable in cash within five (5) business days of receiving written notice from the Manager that such Additional Capital Contribution is required.

(b)    To the extent the Manager determines that it is in the interest of the Limited Liability Company that any Debt Financing be guaranteed, then the Members shall provide written guaranties of such Debt Financing, pro rata in proportion to their respective Percentage Interests.  However, any such Debt Financing shall be on commercially reasonable terms consistent with market conditions, and all Members shall be entitled to review the Financing Documents.  Failure to provide any required guaranty shall be a default under this Agreement.

9.2.2    Default.  If a Member (the "**Non-Contributing Member**") defaults on its obligation to make any required Capital Contribution, the other Members (the "**Contributing**

-23-

**Member(s)**") shall have the right, but shall not be obligated, to contribute all or any portion of the Non-Contributing Member's share of such capital that was not contributed or paid (the "**Default Amount**"). Any contribution pursuant to the immediately preceding sentence shall be made within ten (10) business days after written notice of the applicable default. If the Contributing Member(s) contributes all or any portion of the Default Amount, such contribution shall be deemed a Member Loan (with the consequences described below).

      9.2.3  <u>Member Loans.</u>  If the Contributing Member funds all or any portion of the Default Amount pursuant to Section 9.2.2, then such amount ("**Member Loan**") shall be evidenced by a Promissory Note and Security Agreement and shall be treated as loaned by the Contributing Member(s) to the Non-Contributing Member, and in turn, contributed by the Non-Contributing Member to the capital of the Limited Liability Company. Member Loans shall bear interest at the lesser of (a) eight percent (8%) per year and (b) the maximum interest rate permitted by law. Until a Member Loan has been repaid in full by the Non-Contributing Member, all distributions pursuant to this Agreement that would otherwise be paid by the Limited Liability Company to the Non-Contributing Member shall instead be paid directly to the Contributing Member. Such amounts shall for all purposes of this Agreement be deemed distributed by the Limited Liability Company to the Non-Contributing Member pursuant to this Agreement and then paid by the Non-Contributing Member to the Contributing Member and applied first against accrued but unpaid interest owing with respect to the Member Loan and then in reduction of the principal balance thereof. The Non-Contributing Member shall, from time to time, execute, acknowledge, deliver, file and/or record as appropriate, any documents, instruments and agreements reasonably necessary to direct such distributions to the Contributing Member, or otherwise as requested by the Contributing Member(s) to evidence and/or secure the Member Loan. Each Member Loan, including all accrued interest thereon, shall be due and payable in full within six (6) months of the date on which the Contributing Member advances the applicable Default Amount to the Limited Liability Company (the "**Due Date**").

      9.2.4  <u>Maturity of Member Loan.</u>  If a Member Loan is not repaid in full on or before the Due Date of the Member Loan, then unless the Contributing Member elects in its sole discretion to extend the Due Date to a later date selected by such Contributing Member, the Contributing Member shall have the right, in its sole discretion, to (a) take appropriate legal action to enforce the obligation of the Non-Contributing Member to repay the outstanding principal balance and all accrued and unpaid interest on the Member Loan, and (b) continue to receive any distributions that would otherwise be payable to the Non-Contributing Member until the Member Loan and all accrued interest thereon is repaid in full.

      9.2.5  <u>Security Interests</u>. Each Promissory Note evidencing any Member Loan shall be secured by pledge or other security interest (satisfactory in form to the Contributing Member(s)) in the Non-Contributing Member's Limited Liability Company Interest. The Non-Contributing Member shall pay reasonable legal fees of the Contributing Member(s) in connection with any Member Loan, and any portion thereof not promptly paid by the Non-Contributing Member shall be added to the balance of the Promissory Note evidencing Member Loan. Without limiting the generality of the foregoing, each Member hereby severally pledges

-24-

and grants to the other Member a security interest in its entire Limited Liability Company Interest, including all distributions payable with respect thereto (the "**Pledged Interest**") as security for its obligation to repay a Member Loan made by the other Member and all interest thereon and in connection therewith, each Member agrees the other Member may file such Uniform Commercial Code financing statements as are required by the other Member. If a Member fails to timely repay a Member Loan(s) and/or fails to pay interest thereon as provided herein, in whole or in part, on the Due Date, the other Member shall have, in addition to all of the rights provided for herein, all of the rights and remedies of a secured party under the California Uniform Commercial Code with respect to such Member's Pledged Interest. In furtherance of the foregoing pledge and grant, the originally executed counterpart of this Agreement, which represents and evidences the Pledged Interest of each Member, shall be deposited with and held by the other Member throughout the term of the Limited Liability Company. Each Member may file such Uniform Commercial Code financing statements as the other Member deems necessary or desirable in furtherance of the foregoing pledges.

9.2.6    Extension of Due Date. If the Contributing Member does not elect to exercise its remedies under Section 9.2.4 as to an unpaid Member Loan within sixty (60) days after the Due Date of such Member Loan, then the Contributing Member shall be deemed to have elected to extend the Due Date for an additional six (6) months. If the Contributing Member elects to extend the Due Date of the Member Loan, and if the Member Loan and all accrued interest thereon are not paid in full on or before such extended Due Date, then at such time the Contributing Member shall again have the right to elect the remedies described in this Section 9.2.

9.2.7    Remedies of Members. Upon any default described in this Article IX by a Member (a "**Defaulting Member**"), the following provisions shall apply as the non-exclusive remedies of the parties hereto:

(a)    Reimbursement; Distributions. The Defaulting Member will not be entitled to any reimbursements or distributions of Net Operating Proceeds or Net Capital Proceeds until the distribution to the other Members (the "**Non-Defaulting Member(s)**") of all amounts (including reimbursements) due to the Non-Defaulting Member. Additionally, all reimbursements and distributions hereunder to the Defaulting Member shall be offset by the damages to the Limited Liability Company arising from such default, which offset shall accrue to the direct benefit of the Non-Defaulting Member(s). Without limiting the generality of the foregoing, the Members agree that damages resulting from a default to be offset against a Member's reimbursements or distributions shall include, without limitation, (a) uninsured claims, judgments or other liabilities of the Limited Liability Company arising from such default (including without limitation attorneys' fees, costs and expenses relating to any of the foregoing), (b) interest carry resulting from any delay in the marketing or sale of the Limited Liability Company Property directly or indirectly related to such default, and (c) all attendant losses, costs, expenses, charges and fees (including without limitation attorneys' fees and consultants' fees).

-25-

(b)     Buy-Out Event.  In addition to any other right or remedy provided under this Agreement or available at law or in equity, the Limited Liability Company and/or the Non-Defaulting Members shall be entitled to exercise all rights and remedies available under any buy-sell agreement, buy-out agreement or similar agreement between the Defaulting Member and any of them.

(c)     Loss of Limited Liability Company Rights.  During the pendency of a default by any Member, the Defaulting Member shall have no right to vote its Limited Liability Company Interest or otherwise to participate in Limited Liability Company consent or approval rights.

9.2.8   Remedies Not Exclusive.  The rights and remedies of the Contributing Member(s) and the Limited Liability Company set forth in this Article IX with respect to a failure by a Member to contribute any required capital or make any required payment shall not be exclusive and shall be in addition to any and all other rights and remedies that the Limited Liability Company or the Contributing Member may have at law or in equity against the Non-Contributing Member with respect to such failure.

9.3   No Interest on Capital Contributions.  No interest shall be paid on Capital Contributions.

## ARTICLE X
## TRANSFER OF LIMITED LIABILITY COMPANY INTERESTS

10.1   Consent of Manager - Right of First Refusal.  (a)  Subject to the provisions of this Article X, no Member shall assign, sell, transfer or hypothecate (collectively, "Assign") or offer to Assign all or any part of his or its Limited Liability Company Interest without the prior written consent of the Manager, in its sole and absolute discretion, other than a transfer for estate planning purposes or by will or the laws of intestacy and distribution.  Any sale, assignment, hypothecation or transfer (collectively, an "Assignment") must be of all of the Member's interest in the Limited Liability Company.  If a Member desires to obtain the consent of the Manager required hereby, he shall apply for such consent in writing to the Manager.  Such application shall set forth the name of the proposed Assignee and all of the terms and conditions of the proposed Assignment.  Submission of such application to the Manager shall automatically grant to the remaining  Members the first right of refusal to purchase the Limited Liability Company Interest of the Member who has submitted such application upon all of the terms and conditions set forth in such application.  Such right shall be exercised by the Member(s) giving such Member written notice of his intention to do so within thirty (30) days of submission of the application, but failure by the remaining Members to exercise such right shall in no event be deemed to constitute a waiver of the requirement of this Section 10.1 that no transfer may be made without the written consent of the Manager in its sole and absolute discretion, which requirement shall remain in full force notwithstanding the remaining Members' election not to exercise their right of first refusal.

-26-

10.1.1   No sale or exchange of any Limited Liability Company Interest may be made if the interest sought to be sold or exchanged, when added to the total of all other such interests sold or exchanged within the period of twelve (12) months, would, in the opinion of counsel to the Limited Liability Company, result in the termination of the Limited Liability Company under Section 708 of the Code.

10.1.2   No Assignment by a Member of his or its Limited Liability Company Interest shall be effective unless the Assigning Member has first either filed, or caused to be filed, a registration statement under the Securities Act of 1933, or applicable state laws, or both, or obtained an opinion from counsel satisfactory to the Manager to the effect that state or federal registration, or both, is not required.

10.1.3   Notwithstanding any provision hereof to the contrary (a) no Limited Liability Company Interest may be transferred to a "foreign person or entity" or a "tax-exempt entity" as those terms are defined in Section 168(j)(4) of the Code, and any such purported or attempted transfer will be void and of no effect and (b) no Limited Liability Company Interest may be transferred within nine (9) months from the date hereof to any person not a resident of the United States of America.

10.2   Effect.  Notwithstanding any contrary provision of this Agreement, any Assignment of any interest in the Limited Liability Company shall be subject to the provisions of Article IX hereof, including but not limited to any Promissory Note and any breach or default.

10.2.1   If consent to Assignment of an Assigning Member's interest is granted such Assignment shall become effective as of the first day of the calendar month following the month in which the assignment is made, and the Assignee will be added by the Manager as a Member to the list of such Members maintained by the Limited Liability Company at its office and place of business.  Such Assignment shall not release the assigning Member transferring his interest from his obligations under this Agreement.

10.2.2   The Limited Liability Company shall, after the effective date of any such Assignment pay all further distributions of profits or other compensation by way of income or return of capital on account of the interest so Assigned to the Assignee for such time as the interest is transferred on the books of the Limited Liability Company in accordance with the foregoing provisions.  In the absence of notice to the Manager and approval thereof in writing by it of the Assignment of a Limited Liability Company Interest, whether by operation of law or otherwise, any payment to an Assigning Member, or to his executors, administrators or legal representatives or assigns, shall absolve the Limited Liability Company and the Manager of liability to the extent of such payment as to any other person whether claiming as a remote or immediate Assignee of the Members, or by reason of his death, legal disability, bankruptcy, insolvency or otherwise.

10.2.3   In the event any Assignment of the Limited Liability

-27-

Company Interest shall be made, there shall be filed with the Limited Liability Company a duly executed and acknowledged counterpart of the instrument making such Assignment; such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Agreement; and if such an instrument is not so filed, the Limited Liability Company need not recognize any such Assignment for any purpose.

10.2.4  An Assignee of the Limited Liability Company Interest of an Assigning Member who desires to make a further Assignment of his interest shall be subject to all the provisions of this Article X to the same extent and in the same manner as any Assigning Member desiring to make an Assignment of his interest.

### 10.3 Tag Along Rights

10.3.1  In the event of the failure of the Members to exercise their rights of first refusal, an offer to purchase the Membership interests of a member acceptable to the Member and the Operating Manager shall be offered to the remaining Members for pro-rata participation on the same terms and conditions as made and acceptable to the Offeree Member.

### 10.4 Drag Along Rights

10.4.1  In the event of an offer to purchase the Membership Interests is approved by the Members holding two thirds of the Membership Interests and which requires the purchase of some or all of the remaining Membership Interests, the dissenting Members agree that they shall sell, assign, and transfer their Membership Interests for the same consideration as acceptable to the Members approving such sale, assignment and/or transfer.

10.4.2  The Members agree that the provisions of this Paragraph 10.4 are unique and not compensable by money damages alone.  Amongst any and all remedies available "at law" any Member or Purchaser is also entitled to specific performance of this Paragraph 10.4.

### 10.5  Death, Etc., of Member.

10.5.1  The death, incompetency, insolvency or bankruptcy of an individual Member shall not dissolve or terminate the Limited Liability Company.  In the event of such death, incompetency or bankruptcy, the executor, administrator, guardian, trustee or other personal representative (the "representative") of the deceased, incompetent or bankrupt Member shall be deemed to be the Assignee of such Member's Limited Liability Company Interest and may become a Substitute Member upon the terms and conditions set forth in Section 10.6.  The estate, representative, heirs, and distributees, as the case may be, of such a deceased, incompetent or bankrupt Member shall be liable for all of his liabilities and obligations to the Limited Liability Company.

10.5.2  The bankruptcy, insolvency or dissolution of a corporate

-28-

Member shall not dissolve or terminate the Limited Liability Company. In the event of such bankruptcy, insolvency or dissolution, the successors or assigns of such bankrupt, insolvent or dissolved Member shall be deemed to be the assignee of such Limited Liability Company Interest and may become Substituted Members upon the terms and conditions set forth in Section 10.6. The successors or assigns of such Member shall be liable for all of its liabilities and obligations to the Limited Liability Company.

        10.5.3  Any person who acquires in any manner whatsoever any interest in the Limited Liability Company, irrespective of whether such person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all the obligations of this Agreement that any predecessor in interest of such person was subject to or bound by.

        10.6  <u>Substituted Members</u>.  Except as otherwise provided in this Agreement, an Assignee of the whole or any portion of a Member's interest in the Limited Liability Company shall not have the right to become a Substituted Member in place of its Assigning Member unless (a) the written consent of the Manager (which may be withheld in its absolute discretion) to such substitution shall have been obtained; (b) the Assignment instrument shall have been in form and substance satisfactory to the Manager; (c) the Assigning Member and Assignee named therein shall have executed and acknowledged such other instrument or instruments as the Manager may deem necessary or desirable to effectuate such admission, including but not limited to a power of attorney with provisions more fully described in this Agreement; and (d) the Assignee shall have accepted, adopted and approved in writing all of the terms and provisions of this Agreement, as the same may have been amended. Assignees of a Limited Liability Company Interest will be recognized by the Limited Liability Company as Substituted Members as of the commencement of the first calendar month of the Limited Liability Company following the satisfaction of the foregoing conditions. Assuming compliance with the foregoing conditions, acceptance of a Substituted Member by the Manager will be allowed only if the Manager receives an opinion of counsel to the Limited Liability Company providing that the tax status of the Limited Liability Company will not be lost due to such acceptance.

        10.7  <u>Assignment of Limited Liability Company Interest Without Substitution</u>. Subject to Section 10.6 hereof, no Member shall have the right to assign any portion of such Member's interest in his/her/their Limited Liability Company Interest except by a written instrument of assignment, the terms of which are not in contravention of any of the provisions of this Agreement and with the consent of the Manager, whose consent shall be given or withheld in such Managers sole discretion. The Assigning Member shall deliver to the Manager a written instrument of Assignment inform and substance satisfactory to the Manager, duly executed by the Assigning Member or his personal representative or authorized agent. Any Assignment shall be accompanied by such assurance of genuineness and effectiveness and by such consents or authorizations of any governmental or other authorities as may be reasonably required by the Manager. An Assignee shall be entitled to receive distributions from the Limited

-29-

Liability Company attributable to the Limited Liability Company Interest acquired by reason of any such Assignment from and after effective date of the Assignment of such interest to such Assignee; provided, however, that the Limited Liability Company and the Manager shall be entitled to treat the assigning Member of such Limited Liability Company Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations or distributions made in good faith to such Assignor until such time as the written instrument of Assignment has been received by the Limited Liability Company and recorded on its books and the effective date of the Assignment has passed.

10.8   <u>Written Notice of Assignment</u>.   Notwithstanding anything to the contrary, any Member who Assigns all or any part of his Member Interest, whether or not the Assignee becomes a Substituted Member, shall notify the Limited Liability Company and the other Members in writing of such Assignment no later than fourteen (14) days after such Assignment and provide the Limited Liability Company and the other Members with the Assignee's name and address and the federal identification or social security number of both the Assignee and such Member.

10.9   <u>Recognition of Substituted and Assignee Members</u>.   An amendment to this Agreement shall be executed not less often than quarterly to recognize the admission of Substituted Members, provided that such amendments may be executed less frequently to the extent that substitutions occur less frequently.   Assignees of Members shall be recognized as such not later than the end of the calendar month following the Manager's receipt of notice of such Assignment.

10.10   <u>Manager's Interest:   Admission of Successor or Additional Managers</u>.

10.10.1   Subject to Section 7.5 hereof, the Manager may at any time designate one or more persons to be successors to the Manager or to be additional Managers, in each case with such participation in the Manager's interest as the Manager and such successor(s) or additional Manager(s) may agree upon, provided that the interests of the Members shall not be affected thereby.

10.10.2   Except in connection with a transfer to a successor or additional Manager pursuant to Section 10.9.1, no Manager shall have any right to retire or withdraw voluntarily from the Limited Liability Company or to sell, transfer or assign his or its interest, except as approved pursuant to Section 7.5 hereof.

10.10.3   Any voluntary withdrawal by any Manager from the Limited Liability Company or any sale, transfer or assignment by such Manager of its interest in the Limited Liability Company shall be effective only upon the admission in accordance with Section 10.8.1 of a successor or additional Manager, as the case may be.

10.10.4   The Manager shall notify the Limited Liability Company

-30-

and the Members in writing in advance of any planned sale, transfer or assignment of any interest in the Limited Liability Company or the Manager which is subject to the Members' approval pursuant to Section 7.5 hereof.

          10.11   <u>Investment Representations.</u>  Each party hereto does hereby covenant, agree, represent and warrant to each of the other parties hereto that the Limited Liability Company Interest which he or it is acquiring is being acquired for his or its own account (i.e., in the name and capacity specified on **Schedule 1**), and not as agent for any other person or entity, with the intention of holding the Limited Liability Company Interest for investment, and without any present intention of making any transfer, disposition or further distribution of any Limited Liability Company Interest. Each of the parties hereto is fully aware and does hereby acknowledge that the offer and sale of the interest which he or it is acquiring has neither been registered nor qualified under applicable federal or state law and does hereby covenant and agree, any other provisions of this Agreement to the contrary notwithstanding, that he or it will not transfer, sell or dispose any interest in the Limited Liability Company Interest unless he or it first obtains at his or its own expense an opinion of counsel satisfactory to the Manager in its sole and absolute discretion that neither such registration nor such qualification is required in order to consummate such transfer, sale or disposal or is excused from obtaining such opinion by the Manager in its sole and absolute discretion.

<div style="text-align:center">

**ARTICLE XI**
**TERM AND DISSOLUTION**

</div>

          11.1  <u>Basic Term</u>.  The Limited Liability Company shall commence on the date the Certificate of Limited Liability Company is filed with the Office of the California Secretary of State and shall continue until December 31, 2085 unless earlier dissolved pursuant to the terms hereof.  The Limited Liability Company may be dissolved, liquidated and terminated only pursuant to the provisions of this Article XI and the parties hereto do hereby waive, to the extent permitted by the Act, and all other rights they may have to cause a dissolution of the Limited Liability Company.

          11.2  <u>Events of Dissolution</u>.  The happening of any one of the following events shall dissolve the Limited Liability Company.

          11.2.1  The retirement, death, incompetency, wind-up, liquidation, dissolution, bankruptcy or resignation of the sole remaining Manager;

          11.2.2   The sale of all or substantially all the Limited Liability Company Property and the disposition of any note(s) received as part of the sale price thereof or disposition of any property foreclosed upon in satisfaction of the note (s);

          11.2.3   The expiration of the term of the Limited Liability Company as provided in Section 11.1 hereof unless otherwise extended.

<div style="text-align:center">-31-</div>

11.3 <u>Bankruptcy of Manager</u>. For purpose of this Agreement, the "bankruptcy" of the Manager shall be deemed to have occurred upon the happening of any of the following:

11.3.1 The filing of an application by the Manager for, or the Manager's consent to, the appointment of a trustee of all or a substantial portion of its assets;

11.3.2 The filing by the Manager of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due;

11.3.3 The making by the Manager of a general assignment for the benefit of creditors;

11.3.4 The filing by the Manager of an answer admitting the material allegations of, or its consenting to, or defaulting in answering a bankruptcy petition filed against it in any bankruptcy proceeding; or

11.3.5 The entry of an order, judgment or decree by any court of competent jurisdiction adjudicating the Manager a bankrupt or appointing a trustee of all or a substantial portion of its assets, and such order, judgment or decree continuing unstated and in effect for a period of sixty (60) days after such entry.

11.4 <u>Events Not Constituting Dissolution</u>. The death, dissolution, bankruptcy, expulsion, withdrawal or substitution of a Member shall not dissolve the Limited Liability Company. The retirement, death, incompetency, dissolution, bankruptcy or resignation of one Manager shall not act to dissolve the Limited Liability Company if there remains another Manager to continue the business of the Limited Liability Company.

11.5 <u>Reconstitution of Limited Liability Company</u>. Upon any dissolution of the Limited Liability Company, the Limited Liability Company may be reconstituted and its business continued by the decision of Members to elect a new Manager. Any such decision shall require the affirmative vote or written consent of the Percentage Interest specified in **Section 7.5.1**. Such new Manager shall be admitted to the Limited Liability Company on terms specified by the decision of the Members and upon execution of an appropriate amendment of this Agreement.

## ARTICLE XII
## WINDING UP AND TERMINATION OF THE LIMITED LIABILITY COMPANY

12.1 <u>Manner of Liquidation</u>. If the Limited Liability Company is dissolved for any reason and is not reconstituted pursuant to Section 11.5, the Manager (or in the event that the Manager has become bankrupt or incompetent or has dissolved or resigned, a liquidator or liquidating committee selected by a majority in interest of the then admitted Members) shall

-32-

commence to wind up the affairs of the Limited Liability Company and to liquidate and sell its assets. The Manager or other person or entity charged with such responsibility is referred to herein as the "Liquidator". The Liquidator shall have sufficient business expertise and competence to conduct the winding up and termination of the business the Limited Liability Company as it has theretofore or (subject to the limitations hereinafter set forth) may thereafter enter into. Upon the dissolution of the Limited Liability Company, the Liquidator shall file a certificate of dissolution with the Secretary of State of the State of California pursuant to Subchapter L of the Act, and proceed with the liquidation of the Limited Liability Company.

The Liquidator shall be instructed to proceed with such liquidation in as expeditious a manner as is reasonably practicable. The holders of interests in the Limited Liability Company shall continue to share distributions, profits and losses during the period of liquidation in accordance with Article VIII. The Liquidator shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Limited Liability Company property pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

The Liquidator (if other than Manager) appointed as provided herein shall be entitled to receive such compensation for his services as shall be agreed upon by the Liquidator and a majority in interest of the Members. The Liquidator may resign at any time by giving fifteen (15) days prior written notice to the Members and (other than the Manager) may be removed at any time, with or without cause, by written notice of removal signed by a majority in interest of the then admitted Members. Upon the death, dissolution, removal or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all the rights, powers and duties of the original Liquidator) shall, within thirty (30) days thereafter, be appointed by vote of a majority in interest of the Members evidenced by written appointment and acceptance. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the "Liquidator" will be deemed to refer also to any such successor or substitute Liquidator appointed in the manner herein provided.

Except as expressly provided in this Article XII, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Manager under the terms of this Agreement (but subject to all the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during the Liquidation Period. The "Liquidation Period" is defined as such period of time, not to exceed two (2) years after the date of dissolution of the Limited Liability Company, as shall be reasonably required in the good faith judgment of the Liquidator to complete the liquidation and dissolution of the Limited Liability Company as provided for herein.

-33-

The powers of the Liquidator include, without limitation, the following specific powers:

12.1.1  The power to continue to manage and operate any business of the Limited Liability Company during the period of such liquidation or dissolution proceedings.

12.1.2  The power to make sales and incident thereto to make deeds, bills of sale, assignments and transfers of assets and properties of the Limited Liability Company; provided, that the Liquidator may not impose personal liability upon any of the Members under any such instrument.

12.1.3  The power to borrow funds as may, in the good faith judgment of the Liquidator, be reasonably required to pay debts and obligations of the Limited Liability Company or its operating expenses, and to execute and/or grant deeds of trust, mortgages, security agreements, pledges and collateral assignments upon and encumbering any of the Limited Liability Company properties as security for repayment of such loans or as security for payment of any other indebtedness of the Limited Liability Company; provided, that the Liquidator shall not have the power to create any personal obligation on any of the Members to repay such loans or indebtedness other than out of available proceeds of foreclosure or sale of the properties or assets as to which a lien or liens are granted as security for payment thereof.

12.1.4  The power to settle, release, compromise or adjust any claims asserted to be owing by or to the Limited Liability Company, and the right to file, prosecute or defend lawsuits and legal proceedings in connection with any such matters.

12.2  Judicial Winding Up.  If the Limited Liability Company is dissolved for any reason and is not reconstituted and continued pursuant to Section 11.5 and if within ninety (90) days following the date of dissolution or other time period provided in Section 12.1 a Liquidator or successor Liquidator has not been appointed in the manner provided therein, any interested party shall have the right to seek judicial supervision of the winding up of the Limited Liability Company as may be contemplated in the Act.

12.3  Reserve of Liquidation.  After making payment or provision for payment of all debts and liabilities of the Limited Liability Company and all expenses of liquidation, the Liquidator may establish, for a period not to exceed the Liquidation Period, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Limited Liability Company.

12.4  Distributions.  Upon the winding up termination of the business and affairs of the Limited Liability Company, its assets (other than cash) shall be sold, its liabilities and obligations to creditors and all expenses incurred in its liquidation shall be paid, and all resulting items of Limited Liability Company income, gain, loss or deduction shall be allocated among the Members in accordance with Article VIII of this Agreement.  The net proceeds from such sales (after deducting all selling costs and expenses in connection therewith), together with (at the

-34-

expiration of the Liquidation Period) the balance in the reserve account referred to in Section 12.3 shall, subject to the requirements of section 9.1.2, be distributed among the Members in accordance with their positive Capital Account balances after taking into account all Capital Account adjustments for the taxable year of the Limited Liability Company in which the Liquidation Date occurs, other than those Capital Account adjustments required pursuant to Section 9.2 or this Section 12.4. All distributions required pursuant to this Section 12.4 shall be made by the later of the end of the taxable year of the Limited Liability Company which includes the Liquidation Date or the 90th day following the Liquidation Date.

12.5   Source of Distributions.   Each holder of an interest in the Limited Liability Company shall look solely to the assets of the Limited Liability Company for the return of his Capital Contribution and his share of Net Profit, Net Loss, Gain From sale and Loss From sale and shall have no recourse upon dissolution or otherwise against the Limited Liability Company, the Manager or the Liquidator. No holder of an interest in the Limited Liability Company shall have any right to demand or receive property other than cash upon dissolution and termination of the Limited Liability Company. All of the Limited Liability Company's properties shall be sold upon liquidation of the Limited Liability Company and no Limited Liability Company property shall be distributed in kind to the Members.

12.6   Termination.   Upon the completion of the liquidation of the Limited Liability Company and the distribution of all Limited Liability Company funds, the Limited Liability Company shall terminate and the Liquidator shall execute and record all documents required to effectuate the dissolution and termination of the Limited Liability Company and the cancellation of the Certificate.

## ARTICLE XIII
## DISTRIBUTIONS UPON LIQUIDATION OF A MEMBER'S
## INTEREST IN THE LIMITED LIABILITY COMPANY

13.1   Distributions.   Upon the liquidation of a Member's entire interest in the Limited Liability Company (as opposed to a liquidation of the Limited Liability Company itself), liquidating distributions shall be made in accordance with the positive Capital Account balance of the departing Member, as determined after taking into account all Capital Account adjustments under Section 1.7 for the Limited Liability Company's taxable year during which such liquidation occurs, other than those made pursuant to this Section 13.1 and those which would be made under Section 9.1.2 if such Section referred to the dissolution and final termination of a Member's entire interest in the Limited Liability Company.

13.2   Timing.   Distributions to a Member pursuant to this Article XIII shall be made by the latter of (a) the end of the taxable year of the Limited Liability Company which includes the Limited Liability Company Interest Liquidation Date or (b) the 90th day following the Limited Liability Company Interest Liquidation Date.

## ARTICLE XIV

-35-

**264**

## BOOKS AND REPORTS

14.1  <u>Books and Records</u>.  The Limited Liability Company shall maintain at its principal place of business full and complete books and records for the Limited Liability Company including the following:

14.1.1  A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the Capital Contribution and share of profit and losses of each Member.

14.1.2  A copy of the certificate of Limited Liability Company and all amendments thereto, and executed copies of all powers of attorney pursuant to which the certificate or any amendment has been executed;

14.1.3  Copies of the Limited Liability Company's federal, state and local income tax returns and reports, if any, for the six most recent taxable years, to the extent that such exist;

14.1.4  Copies of the original Agreement and all amendments thereto;

14.1.5  Financial statements of the Limited Liability Company for the six most recent fiscal years, to the extent such exist;

14.1.6  Full and accurate books and records of the Limited Liability Company for at least the current and past three fiscal years, to the extent such exist.

14.2  <u>Inspection</u>.  Each Member and his designated representative shall have the right to inspect and to copy the Limited Liability Company books and records at reasonable times and upon reasonable notice to the Manager, the Manager shall promptly deliver to the requesting Member, at the expense of the Limited Liability Company, a copy of the information described in sections 14.1.1., 14.1.2, 14.1.3 and 14.1.4.

14.3  <u>Accounting Method and Fiscal year</u>.  The books of account for income tax purposes and for purposes of preparing annual financial statements and reports shall be kept on the basis (cash or accrual) determined by the Manager.  The Limited Liability Company shall adopt a calendar year beginning on the first day of January and ending on the last day of December of each year.

14.4  <u>Annual Reports</u>.  As soon as reasonably practicable after the end of each fiscal year, and in no event later than ninety (90) days thereafter, each Member shall be furnished with financial statements of the Limited Liability Company for the prior year prepared on a cash basis and a report of the activities of the Limited Liability Company for such year.

14.5  <u>Tax Information</u>.  As soon as reasonably practicable, but in no event later

-36-

than ninety (90) days after the end of each fiscal year, each Member will be furnished with all information necessary for the preparation of each Member's Federal income tax return and a copy of the Limited Liability Company's federal, state and local tax or information returns for the year.

14.6  Adjustment of Tax Basis.  The Limited Liability Company may, at the sole discretion of the Manager, elect pursuant to section 754 of the Code, and similar provisions of applicable state income tax laws, to adjust the basis of the Limited Liability Company property as allowed by Section 734(b) and 743(a) of the Code (or such similar state law provisions). The election, if made, will be filed with the Limited Liability Company information income tax return for the first taxable year to which the election applies.

14.7  Bank Account.  The cash funds of the Limited Liability Company shall be deposited in a commercial bank account insured by the Federal Deposit Insurance Corporation, or otherwise as the Manager shall determine. Disbursements therefrom shall be made by the Manager is conformity with this Agreement. The funds of the Limited Liability Company shall not be commingled with the funds of any other Person.

14.8  Insurance.  The Limited Liability Company shall at all times maintain comprehensive insurance, including fire, liability and extended coverage fire insurance in amounts determined by the Manager for the protection of the Limited Liability Company and each of its Members.

14.9  Tax Records Regarding Limited Liability Company Property and Other Assets. The Limited Liability Company shall keep and maintain such full and complete records as are necessary or appropriate so that the allocations of Gain or Loss From Sale pursuant to Section 8.1.3(a) and (b) may be made. Such records shall include, but not be limited to, the following information regarding the Limited Liability Company Property or other assets with respect to which a Revaluation Event has occurred:

14.9.1  The agreed value and adjusted tax basis of the Limited Liability Company Property and other assets as of the date of their contribution or revaluation, as set forth in Schedule 2 or other documents;

14.9.2  A schedule of the accumulated depreciation and other adjustments to the basis, if any, of the Limited Liability Company Property or other assets for Book purposes, excluding from such schedule any depreciation or basis adjustments of the Limited Liability Company Property or other assets reflected in the Books of the Limited Liability Company attributable to any improvements to such Limited Liability Company Property or other assets which were placed in service after the effective date of this Agreement or after the occurrence of a Revaluation Event, as applicable; and

14.9.3  A schedule of the accumulated depreciation and other adjustments to the basis, if any, of the Limited Liability Company Property or other assets for income tax

-37-

purposes, excluding from such schedule any depreciation or basis adjustments of the Limited Liability Company Property or other assets reflected on the income tax records of the Limited Liability Company attributable to any improvements to such Limited Liability Company Property or other assets which were placed in service after the effective date of this Agreement or after the occurrence of a Revaluation Event, as applicable.

## ARTICLE XV
## SPECIAL POWER OF ATTORNEY

15.1 <u>Attorney-In-Fact</u>. By executing this Agreement, each Member is hereby granting to the Manager (acting through the persons who are its officers from time to time) a special power of attorney irrevocably making, constituting and appointing the Manager as the attorney-in-fact for such Member, with power and authority to act in his name and on his behalf to execute, acknowledge and swear to in the execution acknowledgment and filing of such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including but not limited to the following:

15.1.1  The Agreement, any Certificate of Limited Liability Company, as well as any amendments to the foregoing which, under the laws of the State of California or the laws of any other state, are required to be filed or which the Manager deems to be advisable to file;

15.1.2  Any other instrument or document which may be required to be executed, filed or recorded by the Limited Liability Company under the laws of any state or by any governmental agency, or which the Manager deems advisable to execute, file or record; and

15.1.3  Any instrument or document which may be required to effect the continuation of the Limited Liability Company, the admission of an additional or Substituted Member, or the dissolution and termination of the Limited Liability Company (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Limited Liability Company Agreement), or to reflect any reduction in the amount of capital contributions of the Members.

15.2 <u>Special Provisions</u>. The special power of attorney being granted by each Member:

15.2.1  Is a special power of attorney coupled with an interest, is irrevocable, shall survive the death or incapacity of the granting Member, and is limited to those matters herein set forth;

15.2.2  May be exercised by the Manager acting for each Member by a facsimile signature of the Manager, or by listing all of the Members executing any instrument with a signature of the Manager acting as an attorney-in-fact for all of them; and

-38-

15.2.3 Shall survive an assignment by a Member of all or any portion of his Limited Liability Company Interest of all or any portion of his Limited Liability Company Interest but only until such time, if any, that the Assignee, is admitted as a Substituted Member, if at all.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1  <u>Notices</u>.  All notices and other communications required or permitted under this Agreement shall be written and shall be sent to the address(es) of that party set forth herein by any one of the means listed in this paragraph.  Notices shall be deemed given and effective as follows: (a) if personally delivered, upon delivery; (b) if sent by Federal Express or similar means, upon delivery or refusal, as indicated in the records of the delivery company; and (c) if sent by certified or registered mail, return receipt requested, as of the date shown on the return receipt as the date of delivery or refusal, but in no event later than three (3) days after being deposited in the mail, postage-paid.  Notices may also be given by email or fax and shall be deemed delivered as of the date the recipient acknowledges receipt thereof (e.g., by responding), provided that the Notice shall also be sent in one of the three ways listed above.  Any party may from time to time change its address or add additional addresses (up to a total of 3 per party) by giving notice in the manner prescribed in this paragraph.  If the sending party is aware that any receiving party has an address more recent than the address specified herein, the notice shall be sent to both.  .

16.2  <u>Binding Effect; Survival Rights; Third Parties</u>.  This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legates, legal representatives, successors and assigns.  The obligations of the parties to this Agreement shall survive any dissolution or termination of the Limited Liability Company, provided however that, except to the extent expressly provided herein, there are no third party beneficiaries of this Agreement.

16.3  <u>Amendment</u>.  This Agreement may be amended, modified and changed only as provided herein.

16.4  <u>Headings</u>.  The captions of the articles and sections of this Agreement are for convenience only and shall not be deemed either to amplify or to limit the meaning of any provision of this Agreement

16.5  <u>Agreement in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute a single agreement.

16.6  <u>Governing Law</u>.  This Agreement shall be governed, construed, and enforced according to the laws of the State of California, without giving effect to principles of conflicts of laws.

-39-

16.7 <u>Time</u>. Time is of the essence of this Agreement.

16.8 <u>Additional Documents</u>. Each Member, upon the request of the others or the Manager, agrees to perform any further acts and execute and deliver any documents which may be reasonably necessary to carry out the provisions of this Agreement.

16.9 <u>Validity</u>. Should any portion of this Agreement be declared invalid and unenforceable, then such portion shall be deemed to be severable from this Agreement and shall not affect the remainder hereof.

16.10 <u>Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person, persons, entity or entities may require.

16.11 <u>Schedules</u>. The preamble to this Agreement, the factual recitals and all Schedules and Exhibits mentioned in this Agreement are incorporated herein and constitute a part of this Agreement.

16.12 <u>Additional Provisions</u>. This Agreement constitutes the entire agreement between the parties respecting the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, representations, warranties and statements, whether oral or written, regarding the subject matter. In the event of any arbitration, litigation or other proceeding respecting the interpretation or enforcement of this Agreement, the losing party shall pay the prevailing party's costs, including but not limited to reasonable attorney fees. The exclusive venue for any litigation arising under this Agreement shall be in Los Angeles County, California, and each party to this Agreement hereby expressly agrees and consents to be subject to the personal jurisdiction of the state and federal courts in that County. No waiver of any term or condition of this Agreement will be valid or binding on a party unless agreed upon by such party in writing. The exercise of any right or remedy by any party shall not be deemed an election of remedies, and all other remedies provided by this Agreement or available at law or in equity shall survive any such action. Each party represents and warrants that: (a) he has had an opportunity to consult an attorney before signing this Agreement and (b) the parties were not represented by the same attorney. The parties further acknowledge that this Agreement has been negotiated by the attorneys for the respective parties and is the product of that negotiation. The parties therefore agree that, notwithstanding the fact that the Agreement was prepared by one party, ambiguities in the Agreement shall not be construed against that party.

Signature Page to follow:

-40-

**IN WITNESS WHEREOF,** the undersigned hereby execute this Agreement of Limited Liability Company as of the date indicated above.

| | |
|---|---|
| **MANAGER** | **MEMBERS** |

**MARK A. SLOTKIN**

SLOTKIN INTENTIONALLY DEFECTIVE TRUST dated April 12, 2010.

By: _____
LOREN MARKEN, TRUSTEE

SLOTKIN DEFECTIVE TRUST dated December 14, 2012.

By: _____
LOREN MARKEN, TRUSTEE

-41-

## SCHEDULE 1

NAMES, ADDRESSES, CAPITAL CONTRIBUTION AND
PERCENTAGE INTERESTS OF THE MEMBERS OF

# CLOVER INDUSTRIAL PROPERTIES, LLC,

### AS OF NOVEMBER 1, 2018

| Member's Name | Member's Address (for notice and all other purposes) | Member's Initial Capital Contribution | Member's Total Capital Contribution | Member's Percentage Interest |
|---|---|---|---|---|
| SLOTKIN INTENTIONALLY DEFECTIVE TRUST, dated April 12, 2010 | 4851 S. Alameda Street, Los Angeles, CA 90058 | $25,000 | $25,000 | 50.000% |
| SLOTKIN DEFECTIVE TRUST, dated December 14, 2012 | 4851 S. Alameda Street, Los Angeles, CA 90058 | $25,000 | $25,000 | 50.000% |
| Totals | | | | 100.000% |

-42-

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| ROBYN B. SOKOL - Bar No. 159506<br>TAMAR TERZIAN - Bar No. 254148<br>JESSICA S. WELLINGTON - Bar No. 324477<br>BRUTZKUS GUBNER<br>21650 Oxnard Street, Suite 500<br>Woodland Hills, CA 91367<br>Telephone: (818) 827-9000<br>Facsimile: (818) 827-9099<br>Email: rsokol@bg.law; tterzian@bg.law<br>　　　　jwellington@bg.law<br><br>*Attorney for Plaintiff* | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| In re:<br>MARK ABBEY SLOTKIN,<br><br><br><br>　　　　　　　　　　　　　　　Debtor(s). | CASE NO.: 2:20-bk-12042-BB<br><br>CHAPTER: 7<br><br>ADVERSARY NO.: |
|---|---|
| ELISSA D. MILLER, CHAPTER 7 TRUSTEE,<br><br><br><br><br>　　　　　　　　　　　　　　　Plaintiff(s)<br>Versus<br>SLOTKIN DEFECTIVE TRUST OF DECEMBER 14, 2012; SLOTKIN DEFECTIVE TRUST OF APRIL 12, 2010; INTENTIONALLY DEFECTIVE SLOTKIN FAMILY CHILDREN'S TRUST DATED JANUARY 1, 1997; SAVANNAH SLOTKIN; ET AL.<br>　　　　　　　　　　　　　　　Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** _____ | **Address:**<br>☒ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL
CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
                    Deputy Clerk

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:


A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

_____

_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:


☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.


☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.


☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


_____    _____    _____
 *Date*                              *Printed Name*                                  *Signature*

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.