

**FILED & ENTERED**

**NOV 08 2022**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** evangeli **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>MARK ABBEY SLOTKIN,<br><br><br>Debtor(s),<br><br>ELISSA MILLER,<br><br>Plaintiff(s),<br><br>Vs.<br><br>SLOTKIN DEFECTIVE TRUST OF DECEMBER 14, 2012, ETC., <u>ET</u> <u>AL.</u>,<br><br>Defendant(s). | Case No.: 2:20-bk-12042-BB<br><br>Chapter: 7<br><br>Adversary No.: 2:20-ap-01672-BB<br><br>**MEMORANDUM DECISION HOLDING DEBTOR IN CIVIL CONTEMPT FOR FAILING TO DELIVER 2007 FERRARI 612 SCAGLIETTI TO CHAPTER 7 TRUSTEE AND VALUING VEHICLE**<br><br>Date:      October 13, 2022<br>Time:      10:00 AM<br>Location: Courtroom 1539 and via<br>               Zoom for Government |

Following an evidentiary hearing held October 13, 2022 in the above adversary proceeding, the Court ruled that, as of the commencement of the above chapter 7 case, (1) debtor Mark Abbey Slotkin or Antiquarian Traders Inc. (which the Court has found is an alter ego of the debtor) owned a 2007 Ferrari 612 Scaglietti automobile (the "Ferrari") and (2)

the sum of $144,000 represents a reasonable valuation for the Ferrari.  This memorandum sets forth the basis for this ruling and for the Court's decision to issue an order directing that Slotkin be held in civil contempt and incarcerated until he takes the steps necessary to deliver to his chapter 7 trustee, Elissa Miller, the Ferrari or, if he has disposed of the vehicle, the sum of $144,000.

# I
# FACTUAL BACKGROUND/PROCEDURAL HISTORY

Debtor Mark Abbey Slotkin ("Slotkin") filed a voluntary petition under chapter 7 of Title 11 of the United States Code on February 25, 2020.  Elissa Miller (the "Trustee") was appointed trustee in the resulting chapter 7 case (the "Case").  On the schedules that Slotkin filed on March 11, 2020 [Docket No. 10 in the Case[1]], he disclosed no ownership interests in any real property and scheduled only $3,300 in various items of personal property and household furnishings.  Other than $150 of cash in the bank, Slotkin claimed to own no interests, either legal or equitable, in any trusts, incorporated or unincorporated businesses or business-related property or any other financial assets or property of any type or variety, bringing the total value of the assets of his estate to $3,450.

On his Schedule I [id., pp. 30-32], Slotkin claimed to be unemployed and showed monthly income totaling $7,458, consisting of Social Security of $1,558, gambling winnings of $4,000, income from "real estate consulting" of $1,500 and "garage rental" of $400.[2]  On his Schedule J [Docket No. 10 in the Case, pp. 33-35], as his estimate of ongoing monthly expenses, he showed no expenses for rent or utilities, insurance, car payments or secured debt.  The only monthly expenses he listed were food and housekeeping supplies ($800), personal care products and services ($50), medical and dental expenses ($400),

---

[1] References to a docket number "in the Case" refer to entries on the docket in the underlying bankruptcy case (no. 2:20-bk-12042-BK).  References to a docket number in the Action, or without any mention of whether the entry is in the Case or in the Action, refer to entries on the docket in the above adversary proceeding (no. 2:20-ap-01672-BB).

[2] As Slotkin claimed not to own or lease any real property, it is unclear how he could have been generating monthly income of $400 from leasing or renting a garage to someone.

transportation ($200), entertainment, clubs, recreation, etc. ($2,000), dog food and grooming ($250) and legal fees ($2,000).

On his Statement of Financial Affairs ("SOFA") [Docket No. 10 in the Case, pp. 37-49], Slotkin said that he did have income from employment or operating a business but showed the amount of that income as $0 for calendar years 2018, 2019 and 2020 [id. at p. 38, Part 2]. In the section for debts paid during the 90 days before bankruptcy [id., p. 29, Part 3], Slotkin disclosed having paid $7,000 to Hillcrest Country Club for country club dues and reported that he owed an additional $26,148 in unpaid dues. In part 9 of his SOFA [id. at p. 46], in response to the question, "Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone," Slotkin answered "No." In part 11 of the SOFA [id. at pp. 47-48], he states that he is an officer, director or managing executive of Antiquarian Traders, Inc." On his Declaration by Debtor as to Whether Income was Received from an Employer within 60 Days of the Petition Date [id. at p. 52], he declares that he was not paid by an employer because he was either self-employed or not employed.

On November 23, 2020, the Trustee commenced the above-referenced adversary proceeding (the "Action") against Slotkin, his daughter Savannah Slotkin, a series of "defective" and "intentionally defective" trusts[3] that Slotkin had created, and a number of limited liability companies in which the Trusts held interests, among other defendants. By and through her complaint in the Action, the Trustee sought, among other things, to unwind the intricate web of intentionally defective grantor trusts, limited liability companies and corporations that she claimed the Debtor had set up for the purpose of hiding and attempting to shield valuable assets from his creditors, while maintaining full control over the Trusts and continuing to use the proceeds generated by assets of the Trusts as he pleased to pay his personal expenses and maintain his lifestyle.

---

[3] Investopedia.com defines an intentionally defective grantor trust as an estate planning tool in which the grantor creates a trust with a purposeful flaw in order to ensure that the grantor remains liable for income taxes but that the grantor's probate estate will not owe any estate taxes when the grantor dies.

On October 5, 2021, the Trustee filed a motion for partial summary judgment in the Action [Docket No. 143 in the Action] (the "SJM"). In the SJM, the Trustee sought, among other things, summary judgment in her favor on the First, Second, Third, Seventh and Eighth Claims for Relief in the Action. In response to the SJM, the Court entered its December 21, 2021 "Order Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment" [Docket No. 201 in the Action] (the "SJ Order").

In the SJ Order, the Court denied the SJM without prejudice with regard to the Trustee's Second, Third and Seventh Claims for Relief, but granted summary judgment in favor of the Trustee and against all defendants on the Trustee's First and Eighth claims for relief. More specifically, the SJ Order included, among other things, a finding that all assets held by the (1) Slotkin Defective Trust of December 14, 2012, (2) the Slotkin Defective Trust of April 12, 2010, and (3) the Intentionally Defective Slotkin Family Children's Trust Dated January 1, 1997 (collectively, the "Trusts") were property of Slotkin's bankruptcy estate (the "Estate") and must be turned over to the Trustee pursuant to 11 U.S.C. § 542(a), including without limitation the following:

(a) Alameda Holdings, Inc.;

(b) Antiquarian Traders Inc. ("Antiquarian");

(c) Golden Oak Partners, LLC;

(d) Breakfront, LLC;

(e) Wooton Group, LLC;

(f) Olympic Holdings, LLC ("Olympic");

(g) 8777 Appian Way, LLC;

(h) 748 N. Detroit Manor, LLC;

(i) 14257 Chandler Blvd. Manor, LLC;

(j) 17841 Palora Manor, LLC;

(k) Clover Industrial Properties, LLC;

(l) Cruises to Nowhere, LLC;[4]

---

[4] The entities identified in subparagraphs (a) through (l) above are collectively referred to as the "Entities."

(m) Rolltop, LLC, Abbey-Properties, LLC and Consolidated Assets Co. and any and all assets owned by these entities;

(n) inventory, accounts, accounts receivable and other tangible and intangible assets owned by Antiquarian Traders Inc.;

(o) 14806 Hesby Street, Sherman Oaks, California 91403 (the "Hesby Property");

(p) 852 North Vista Street, Los Angeles, California 90046 (the "Vista Property");

(q) 823 North Citrus Avenue, Los Angeles, California 90038 (the "Citrus Property");

(r) 14827 Huston Street, Sherman Oaks, California 91403 (the "Huston Property");

(s) proceeds from the sale of the property located at 15714 Morrison Street, Encino, California 91436 in the amount of $545,951.61 currently in escrow at Commerce Escrow, located at 1055 Wilshire Blvd. Suite 1000, Los Angeles, California 90017, Escrow No. 21-86639-DB (the "Morrison Funds");

(t) 8777 Appian Way, LLC, Los Angeles, California 90046 (the "Appian Way Property");

(u) 748 N. Detroit, Los Angeles, California 90046 (the "Detroit Property");

(v) 14257 Chandler Blvd., Sherman Oaks, California 91401 (the "14257 Chandler Property");

(w) 14520 Greenleaf Street, Sherman Oaks, California 91403 (the "Greenleaf Property");

(x) 13348 Chandler Blvd., Sherman Oaks, California 91403 (the "13348 Chandler Property");

(y) 24050 Park Casino, Calabasas, California 91302 (the "Park Casino Property"); and

(z) a boat and all other assets held by Cruises to Nowhere, LLC.[5]

The SJ Order further required the defendants, including Slotkin, to cooperate and facilitate the turnover of the Assets to the Trustee.

In light of Slotkin's failure to cooperate fully in the turnover of the Assets to the Trustee, on February 25, 2022, the Trustee filed a Motion requesting that the Court enter an Order to Show Cause why Slotkin should not be held in civil contempt of the SJ Order [Docket No. 243 in the Action]. The Court granted that motion and issued its March 9, 2022 Order to Show

---

[5] The Entities, properties and other assets identified in subparagraphs (a) through (z) are collectively referred to as the "Assets."

- 5 -

Cause why Slotkin should not be held in contempt for violating the SJ Order [Docket No. 250] (the "OSC"). The Court conducted a hearing on the OSC on April 5, 2022.

Following the April 5, 2022 hearing, the Court entered its April 7, 2022 "Order Holding Debtor Mark Abbey Slotkin in Contempt for Violating this Court's 'Order Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment'" [Docket No. 263] (the "April Contempt Order"). At the hearing on the OSC, the Court provided the following explanation for this ruling:

> The record is clear that the debtor has not complied with this Court's order directing that he cooperate in the turnover of assets to the trustee. The debtor has instructed tenants to wire funds to his daughter's bank account; he has extended lease agreements and attempted to release properties of the estate; he has produced only redacted copies of lease agreements and refused to disclose the identity or contact information of tenants; he entirely cleaned out the contents of the Appian Way property that he had been using as a showroom for antiques that he had previously testified was worth at least at least $300,000; he has continued to market and sell antiques that belong to the estate after entry of the order; and he has not turned over or disclosed the location of the Ferrari that was previously at the Appian Way property.

The April Contempt Order therefore held Slotkin in civil contempt and provided that he should be arrested and held in custody until he took (or caused to be taken on his behalf) a series of steps (itemized in paragraphs 3(a) through (h) of the April Contempt Order) that included, among other things, returning all furniture, artwork, chandeliers, rugs, and other personal property removed from the Appian Way Property after commencement of the Case and delivering to the Trustee the 2007 Ferrari 612 Scagliette, VIN ZFFJB54AX70157304 (the "Ferrari") that the Debtor had testified Antiquarian owned at the meetings of creditors under Bankruptcy Code section 341(a) (the "341(a) Meetings") held on April 29, 2020 and May 27, 2020 in the Case.

Thereafter, Slotkin filed a series of declarations – all of which were executed under penalty of perjury -- detailing the extent to which he claimed to have complied, or the reasons that he could not comply, with the April Contempt Order, including without limitation docket

nos. 268, 275, 287, 294, 310, 324, 329, 344, 354 and 365.[6]  In response to these declarations, the Court entered or issued a series of orders and notices setting forth the extent to which the Court was prepared to treat Slotkin as having purged his contempt and what additional steps Slotkin would be required to take in order to avoid being arrested for civil contempt.  See Docket Nos. 271, 300, 318, 326, 338, 348, 356, 360, 372 and 376.  As a result of this process, eventually, the Court concluded that, for reasons detailed in these orders and notices, it would not require Slotkin to take any additional steps to purge his contempt with regard to Assets other than the Ferrari.[7]

With regard to the Ferrari, Slotkin had filed a number of declarations [see, e.g., Docket Nos. 275, 287 and 294] in which he claimed that he had sold the Ferrari to Ultra Hot Motor Sports in Lufkin, Texas, on September 26, 2017 for $75,000 and provided copies of documents that he claimed were a bill of sale, a certificate of title and a declaration to this effect from Andy House, who identified himself as the proprietor of Ultra Hot Motor Sports. The Trustee, on the other hand, had filed with the Court (1) excerpts from the transcripts of Slotkin's testimony at the 341(a) Meetings in which Slotkin testified that, as of the date of those meetings, Antiquarian owned the Ferrari and (2) evidence that Slotkin had maintained insurance coverage on the Ferrari through at least June of 2022.  In light of the conflicting

---

[6] The first three of these declarations were prepared with the assistance of counsel, Jon H. Fries.  Thereafter, it appears that Slotkin prepared these declarations himself, as Mr. Fries had resigned as Slotkin's counsel.  On April 22, 2022, Mr. Fries filed a motion to withdraw as Slotkin's counsel of record in the Action [Docket No. 279].  In the amended declaration that he filed in support of that motion [Docket No. 281], Mr. Fries explained the basis of his request as follows:  "Recently, MARK ABBEY SLOTKIN, the sole representative of all of the Defendants, (except for Mr. Mayman and Savannah Slotkin) and I have had a complete breakdown in the attorney-client relationship caused by fundamental disagreements as to the best course of action and non-payment of attorney's fees such that it has made it impossible for my firm to effectively continue representation and that withdrawal is required under the Rules of Professional Conduct. I have communicated with Robert Mayman and Savannah Slotkin from time to time and it is clear that Mr. Slotkin is the primary contact and decision maker with respect to the remaining issues in the case that pertain to them and that they did not participate in the specific conduct that requires me to withdraw. However, due to the relationship they have with Mr. Slotkin, it is not possible for me to continue representing them."  Mr. Fries subsequently withdrew that motion in light of Slotkin's execution of a Substitution of Attorney substituting himself in propia persona for Mr. Fries as counsel of record on April 27, 2022 [Docket No. 284].  Since that time, Slotkin has represented himself in the Action.

[7] In its October 6, 2022 "Order Lifting September 20, 2022 Body Detention Order Without Prejudice" [Docket No. 376], the Court vacated the body detention order that it had issued on September 20, 2022 (which had replaced an earlier body detention order), but reserved jurisdiction to enter one or more new body detention orders if in the exercise of its discretion the Court concluded that such orders were necessary to enforce prior orders of this Court, including without limitation the April Contempt Order [Docket No. 263].

evidence in the record, the Court concluded that an evidentiary hearing would be required to determine whether Slotkin or Antiquarian owned the Ferrari at any time after the commencement of the Case and the value of the Ferrari before it would be appropriate for the Court to use the prospect of an arrest for civil contempt to compel Slotkin to turnover either the Ferrari or the value thereof to the Trustee.

Toward that end, in its June 22, 2022 "Order Determining that Debtor's May 9, 2022 and June 14, 2022 Filings (Docket Nos. 287 and 294) Failed to Fully Purge Debtor's Contempt, Clarifying Remaining Steps Necessary to Avoid Incarceration for Civil Contempt and Setting Evidentiary Hearing re Ownership and Value of Ferrari" [Docket No. 300] (the "Trial Procedures Order"), the Court, among other things, scheduled an evidentiary hearing for September 8, 2022 (the "Trial") for it to adjudicate "(a) whether the Debtor, or any entity controlled by the Debtor, owns a Ferrari automobile; and, if so, (b) the value of that vehicle." In its Trial Procedures Order, the Court established procedures to govern the conduct of the Trial, which included the presentation of direct testimony by declarations and provided that "[t]he declaration of a witness for a party will be admissible at trial, subject to timely objections, only if the declarant is present at Trial and subject to cross-examination." See Trial Procedures Order, p. 14, at ¶ j.

The Trial Procedures provided further that the following documents filed in the Action and their accompanying declarations and exhibits were already in the record and need not be refiled in conjunction with the Trial: Docket Nos. 243; 247; 250; 255; 268; 269; 270; 271; 272; 275; 287; 288; 290; 294; and the Trial Procedures Order itself.   The Trial Procedures Oder also established the following deadlines for the filing of additional declarations, requests for judicial notice and evidentiary objections:

- **August 11, 2022** for the filing of the Trustee's direct testimony declarations and requests for judicial notice;
- **August 18, 2022** for the filing of any additional declarations and requests for judicial notice from Slotkin and for Slotkin to file any evidentiary objections that he may have to the admissibility of anything contained in the Trustee's direct testimony declarations;

- **August 25, 2022** for the Trustee to file any reply declarations and any evidentiary objections that she may have to the admissibility of Slotkin's direct testimony declarations; and

- **September 1, 2022** for Slotkin to file any evidentiary objections that he may have to the admissibility of any testimony contained in the Trustee's reply declarations.

The Trial Procedures Order identified the foregoing deadlines as dates certain and *not* as deadlines calculated as a particular number of days prior to the date of the Trial.

In or about August of 2022, the Court learned that the United States District Court for the Central District of California (the "District Court") had scheduled a hearing on Slotkin's appeal of the SJ Order for the morning of September 8, 2022 – the same date as the Trial. The Trustee moved the District Court for a continuance of that hearing, but the District Court denied that motion. To accommodate the scheduling preferences of the District Court, this Court issued its August 22, 2022 "Order Continuing September 8, 2022 Hearings" [Docket No. 342] (the "August 22 Order"). In the August 22 Order, the Court continued the Trial and the status conference in the Action to October 13, 2022 at 10:00 a.m. The Court did *not* continue any of the dates set forth above for the filing of trial declarations. To the contrary, the August 22 Order expressly stated on page 2 at paragraph 4,

> Notwithstanding the foregoing [continuance], with the exception of the date of the Evidentiary Hearing and the deadlines that are defined as a specified number of days prior to the date of the Evidentiary Hearing rather than as a date certain, the trial procedures, Zoom information and filing deadlines set forth in this Court's June 22, 2022 order setting the Evidentiary Hearing (docket no. 300) remain unchanged.

## II

## EVIDENCE ADDUCED AT TRIAL

The Court treated the testimony contained in the following declarations as the parties' direct testimony at trial:

1. The declarations of the Trustee and her counsel, Robyn B. Sokol ("Sokol") attached to the Trustee's motion requesting that the Court enter an Order to Show Cause why

- 9 -

Slotkin should not be held in civil contempt of the SJ Order [Docket No. 243] (the "Motion for OSC") filed February 25, 2022;

2. Slotkin's declaration in opposition to the Motion for OSC [Docket No. 247] filed March 4, 2022;

3. The declarations of the Trustee and Sokol attached to the Trustee's response to item no. 2 above [Docket No. 255] filed March 29, 2022;

4. Slotkin's April 11, 2022 declaration [Docket No. 268];

5. The Trustee's April 11, 2022 declaration [Docket No. 269] and the errata thereto filed April 12, 2022 [Docket No. 269];

6. The Trustee's April 14, 2022 declaration [Docket No. 272] providing excerpts from the 341(a) Meetings;

7. Slotkin's April 19, 2022 declaration [Docket No. 275] (subject to the Trustee's evidentiary objections thereto, Docket Nos. 346 and 347);

8. Slotkin's May 9, 2022 declaration [Docket No. 287] (subject to the Trustee's evidentiary objections thereto, Docket Nos. 346 and 347);

9. The declarations of the Trustee, Sokol and Dennetta A. Mulvaney attached to the Trustee's response to Slotkin's May 9, 2022 Declaration [Docket No. 288] filed May 13, 2022;

10. Sokol's May 25, 2022 declaration filed in support of the Trustee's supplemental brief in support of request for monetary damages [Docket No. 290];

11. Slotkin's June 13, 2022 declaration [Docket No. 294];

12. Slotkin's July 25, 2022 declaration [Docket No. 321];

13. Slotkin's July 28, 2022 declaration [Docket No. 324];

14. Slotkin's August 9, 2022 declaration [Docket No. 329];

15. The Trustee's August 11, 2022 declaration [Docket No. 330];

16. The August 11, 2022 declaration of Jeff Tanenbaum regarding the value of the Ferrari [Docket No. 331];

17. The August 11, 2022 declaration of Noelle Lesinski, former employee of Antiquarian and Olympic [Docket No. 333];

18. The August 11, 2022 declaration of Jennifer Mercado, the custodian of records for Hagerty Insurance Agency, LLC ("Hagerty") [Docket No. 334];

19. Sokol's August 11, 2022 declaration regarding excerpts from the transcript of the deposition of Savannah Slotkin [Docket No. 335];

20. Sokol's September 20, 2022 declaration regarding the declaration of Mandy Warfield [Docket No. 361]; and

21. The September 20, 2022 declaration of Mandy Warfield, as replacement custodian of records for Hagerty [Docket No. 362].[8]

Although Slotkin filed a document entitled "Rebuttal to Elissa Miller, Trustee, Noelle Lesinski, Jeff Tannenbaum, and Regarding 2007 Ferrari 612 Scaglietti" [Docket Nos. 359 and 360] on September 19, 2022, the Court did not accept as testimony or admit into evidence any of the factual assertions contained in that document for two reasons.  First, the document was filed more than a month after the August 18, 2022 deadline established by the Trial Procedures Order for Slotkin to file declarations that would be considered as his testimony at the Trial; and, second, unlike each and every one of the eight prior declarations that Slotkin had filed in the Action (including several filed in propia persona after his counsel resigned), docket nos. 359 and 360 were not signed under penalty of perjury and were not therefore declarations.

In response to evidentiary objections advanced by the Trustee in docket no. 346, the Court excluded from the record the undated declaration of Any House and the exhibits thereto, which were attached to Slotkin's April 19 and May 9, 2022 declarations [Docket Nos. 275 and 287], on the ground that Andy House did not appear at Trial to be cross-examined.[9]  The Court

---

[8] As Sokol's September 22, 2022 declaration [Docket No. 361] explains, the witness that the Trustee had originally intended to use as the custodian of records for Hagerty became unavailable when the Court continued the Trial to October 13, 2022. The Trustee therefore provided the declaration of Mandy Warfield instead, which declaration was identical to that of the prior custodian, with the exception of the declarant's job title in paragraph 1 and the signature block at the end, and made Ms. Warfield available for cross-examination at the Trial.

[9] Slotkin made no effort to arrange for House to appear at Trial, and the Trustee was unable to effectuate service of a trial subpoena on Mr. House.  According to the Trustee's evidentiary objection [Docket No. 346], "Once the process server was able to locate Andy House (after several attempts), the process server provided the following message re service attempt: 'Minor female answered the door, stated she would go get [Andy House], however, a Women [sic] came back and said he wasn't there. Jeep Truck present RYB1887 plates.'  The process server was instructed to subserve at the 130 White Oak Loop,Lufkin Texas address and attempted to do so on July 21, 2022. The process server reported the following regarding her visit on July 21, 2022 at 5:22 p.m. CDT:  'No answer at door, however there is note on the door now that says "**No**

overruled the evidentiary objections advanced by the Trustee in docket no. 347 to Slotkin's testimony in paragraph 12 of docket no. 275, except insofar as that paragraph sought to introduce the declaration of Andy House, which, as previously noted, the Court excluded based on Mr. House's failure to appear.

The Court admitted the following exhibits into evidence at Trial:

1. The Trustee's Exhibits 1 through 11 (the foundation for which were laid by the August 11, 2022 Miller Declaration, docket no. 330);
2. The Trustee's Exhibits 12 through 22 (the foundation for which were laid by the September 20, 2022 declaration of Mandy Warfield, docket no. 362);
3. The Trustee's Exhibits 23 through 31 (the foundation for which were laid by the August 11, 2022 declaration of Jeff Tanenbaum, docket no. 331);
4. The Trustee's Exhibit 32 (the foundation for which was laid by the August 11, 2022 declaration of Noelle Lesinski, docket no. 333);
5. The Trustee's Exhibits 33 and 34 (the foundation for which were laid by the August 11, 2022 Sokol declaration, docket no. 335);
6. The Trustee's rebuttal Exhibits 101 and 104, of which the Court took judicial notice; and
7. The first 6 pages of Exhibit A to Slotkin's April 19, 2022 declaration [Docket No. 275], consisting of documents that purport to be a certificate of title (front and back) for the Ferrari, a sales order or bill of sale for the vehicle (3 pages) and a one page document signed by Slotkin representing that an error had been made on the Assignment of Title and that the name of the buyer of the Ferrari was Ultra Hot Motor Sports, not Eric Peterson.

The Trustee elected not to cross-examine Slotkin at Trial, and the Court did not permit Slotkin to offer oral testimony in addition to that already contained in the multiple declarations that the Court had admitted into evidence. Slotkin elected to cross-examine both Jeff

---

**trespassing you will be shot**".' As a result, the process server was instructed to discontinue approaching the premises where Mr. House resides. The Andy House Declarations, which are identical, are not dated and state that they were executed in Los Angeles, California which is unlikely [as Mr. House resides and does business in Texas]."

Tanenbaum (the valuation expert) and Nicolle Lesinski (his former employee), and the Court received additional oral testimony from both witnesses during their cross-examination and redirect examinations. Slotkin also expressed a desire to cross-examine the custodian of records for Hagerty, Mandy Warfield, but Slotkin refused to do so until he first had an opportunity to cross-examine the two other witnesses. As the subject matter of the three witnesses was entirely unrelated, Ms. Warfield was appearing remotely at Trial from the East Coast, and she was testifying only as a custodian of records and not as a percipient witness, the Court instructed Slotkin to cross-examine her first in order to accommodate her schedule. When Slotkin refused, the Court deemed Slotkin to have waived the right to cross-examine Ms. Warfield and excused the witness.[10]

## III
## FINDINGS OF FACT

### A. Antiquarian Still Owned the Ferrari as of the Entry of the SJ Order

1. Slotkin testified at both of the 341(a) Meetings that, as of the date of these meetings, Antiquarian owned the Ferrari. During the May, 2020 session of the 341(a) Meetings, Slotkin testified that Antiquarian had the Ferrari listed for sale on eBay. The Court read the written transcripts and listened to the audio tapes of both meetings. Slotkin did not seem flustered, overwhelmed or confused by the questions that produced these answers.

2. The Court rejects as not credible Slotkin's testimony that he was confused and mistaken at the time he acknowledged that Antiquarian owned the Ferrari. Whether or not you or (a company you control) currently owns a Ferrari that you personally drive and store in your garage is not something that anyone is likely to be confused about.

---

[10] It is worthy of note that, despite an extended exchange on the issue, Slotkin was either unable or unwilling to articulate any reason or basis for his insistence that he be permitted to cross-examine Ms. Warfield last. In light of the complete lack of overlap between the subject matter of her testimony and that of the two other witnesses and Slotkin's unwillingness or inability to explain why he needed to cross-examine Ms. Warfield last, the Court advised Slotkin that, if he wanted to cross-examine Ms. Warfield, he would need to proceed with her cross-examination first. Slotkin refused and was therefore deemed to have waived his opportunity to cross-examine Ms. Warfield.

3. As of the date of the 341(a) Meetings, Slotkin had been taking the position that assets belonging to Antiquarian were not assets of his bankruptcy estate. He therefore had no reason to deny at that time that Antiquarian still owned the vehicle. It was not until after the Court found in connection with the SJ Order that assets belonging to Antiquarian were assets of Slotkin's bankruptcy estate that Slotkin first asserted that he had sold the Ferrari prepetition in 2017.

4. The party to whom Slotkin claims to have sold the Ferrari, Andy House, refused to accept service of a trial subpoena and is a convicted felon, having pled guilty to wire fraud. [Trustee's Exhibit 101, Amended Judgment in a Criminal Case, dated April 15, 2016.] The entity that Slotkin claims Andy House used to purchase the vehicle in 2017, Ulta Hot Motorsports LLC, forfeited its existence and became inactive on January 29, 2016. [Trustee's Exhibit 104.]

5. Hagerty Insurance Agency, LLC provided insurance for the Ferrari – a 2007 Ferrari 623 Scaglietti, Vin No. ZFFJB54AX70157304 – from 2013 through June 7, 2022. Warfield Declaration, Docket No. 362, p. 3, ¶ 5.

6. The Ferrari was insured in the name of Mark A. Slotkin with a stated value of $120,000 through June 7, 2022. Hagerty provided copies of the insurance cards and the Classic Automobile Endorsement Policy declarations pages for the period from 2019 through 2022. Hagerty's records identify the Ferrari as being owned and insured by Slotkin throughout this period. The policy was issued to Slotkin as an individual and not as a licensed car dealer. According to Hagerty's records, premiums were paid for the policies through June of 2022. The last such payment was made on June 2, 2021 in the amount of $2,688. Hagerty would not have issued insurance coverage if the premiums had not been paid. Warfield Declaration, pp. 3-5.

7. The Court rejects as not credible Slotkin's testimony that payments were made to Hagerty by mistake for insurance coverage after he had sold the vehicle almost five years earlier and/or without Slotkin's knowledge by someone working for him. If this had been true, in light of the various documents sent to him

annually (the insurance cards, the declarations pages, etc.), Slotkin would have noticed the problem and stopped paying for the insurance long before June of 2021.

8. On October 2, 2019, more than two years after Slotkin claims to have sold the Ferrari, he instructed his then employee, Noelle Lesinski, to post the Ferrari for sale on Ebay for $232,500.  Lesinski testified that she was the sales director for Antiquarian and the director of property operations for Olympic and that she was responsible for the sales and marketing of all inventory of Antiquarian, including but not limited to its motor vehicles.  Lesinski testified that, in response to this instruction, she caused the Ferrari to be listed for sale on eBay and the listing remained in placed after Slotkin's bankruptcy filing.  She also testified that the Ferrari was in the possession and control of Slotkin after he filed bankruptcy on February 15, 2020, that she saw him driving the vehicle in June of 2020 and that she observed the vehicle in his garage after the bankruptcy filing.  She also testified that she was not aware of any sale of the Ferrari to Ultra Hot Motorsports or anyone else in 2017.

9. Slotkin attempted to impeach Lesinski's credibility by asserting that she had converted a company car that actually belonged to Antiquarian even though title had been placed in her name and that she was fired because of this incident. Lesinski offered an alternate explanation of these events and claimed that she had terminated her employment with Slotkin because he was an abusive boss. Notwithstanding this exchange, the Court finds that Lesinski's testimony as to Slotkin's continued ownership and possession of the Ferrari post-petition was credible and not the result of bias or animosity toward Slotkin.

10. Antiquarian still had the Ferrari listed for sale on eBay as of May of 2020. <u>Trustee's Declaration</u>, Docket No. 330 at ¶ 8 and Exhibit 5.

11. On December 10, 2021, Slotkin posted on his personal Facebook page pictures of a Ferrari along with a loving description of "My 2007 612, SWEETNESS" of

which he says, "It took me 3 ½ years to find it and I've had it since 2012." <u>Trustee's Declaration</u>, Docket No. 330, at ¶ 11 and Exhibit 6.

12. In August of 2021, Slotkin posted on his personal Facebook page a video of himself taking his dogs Charlie and Clover for a ride in the Ferrari and videos of him with his dogs at a car show at which people were wearing face masks and in a park. The narrative that accompanied the video (written in the voice of Slotkin's dog Charlie) claims that Slotkin took his dogs to the car show that day in the Ferrari. <u>Trustee's Declaration</u>, Docket No. 330, at ¶¶ 13-20 and Exhibits 7 through 10.

13. Slotkin contends that some of these photos are of a different Ferrari and that the video of the dogs getting into the Ferrari was taken years prior to the filing of the Case.[11] However, the fact remains that, on Facebook, Slotkin was still claiming to own the Ferrari in August and December 2021. The fact that he may have used old photos or videos or stock photos to illustrate his posts does not prove that he had sold the Ferrari by the date of these posts. Slotkin seemed to believe at Trial that the Trustee's entire case that he still owned the Ferrari was based on these Facebook posts. He is mistaken. There is a substantial body of evidence, in addition to these Facebook posts, to support the conclusion that Slotkin still owned the Ferrari post-petition, as described in more detail above.

**B. The Sum of $144,000 Represents a Reasonable Value for the Ferrari**

1. Slotkin claims to have sold the Ferrari in 2017 for $75,000 because it had a "flood title" and was not worth more than that.

2. Throughout the period from 2013 through June of 2022, Slotkin had the Ferrari insured through Hagerty with a stated value of $120,000.

---

[11] Slotkin's daughter Savannah testified that Charlie, one of the dogs pictured in these videos, did not start living with Slotkin at the Appian Way Property until 2019. See <u>Transcript of Savannah's Deposition</u>, at internal page 36, lines 23-25, attached to Sokol's August 11, 2022 declaration, Docket No. 335, at page 26.

- 16 -

3. Slotkin claimed in his June 13, 2022 declaration [Docket No. 294] on page 6 at paragraph k(a) that a 612 Ferrari with a flood title is worth about 60 percent of normal 612 values.

4. The Trustee's valuation expert, Jeff Tanenbaum, testified in his August 11, 2022 declaration [Docket No. 331] that the VINCheck Report that he generated for the Ferrari [Exhibit 30] shows that the Ferrari was listed for sale by the seller "antiquesfromantiquariantraders in Beverly Hills, California" on October 25, 2019, December 30, 2020, May 8, 2021 and August 8, 2021 with a listed sale price of $232,500 and total vehicle miles of 15,468. Neither the VINCheck Report nor the ClearVIN Report [Exhibit 29] (jointly, the "Vehicle Reports") that he generated for the vehicle reflect any change in ownership for the Ferrari after October of 2011. The last sale reflected was on October 17, 2011 for $154,243.

5. Both the Vehicle Reports identify the Ferrari as having been branded a flood damage vehicle, which would result in the issuance of a salvage title. Tanenbaum agrees that the fact that the Ferrari is or was a salvage vehicle would adversely impact its overall value.

6. According to Tanenbaum, based on the average sale value of like vehicles in 2022 and adjusting the value by 25 to 35 percent for its salvage history, he conservatively estimates that, at an auction conducted in the context of a bankruptcy case, the Ferrari would sell for $160,000 to $180,000. Slotkin argued during the course of his cross-examination of Tanenbaum that the discount for a salvage title vehicle should be higher than 25 to 35 percent, but the Court accepts as credible and reliable Tanenbaum's testimony that 25 to 35 percent represents a reasonable and appropriate level of discount in light of the salvage title.

7. Slotkin challenged Tanenbaum's credentials as an expert for the purpose of valuing a vehicle of this kind. The Court, having heard Slotkin's contentions and Tanenbaum's oral testimony and having read Tanenbaum's written testimony

concerning his qualifications, finds that Tanenbaum is a qualified witness for the purpose of valuing the Ferrari.

8. On cross-examination, Tanenbaum testified that he had assumed for the purpose of his valuation that there were approximately 15,000 to 25,000 miles on the Ferrari.

9. Slotkin argued (during the course of his cross-examination of Tanenbaum) that the Ferrari should be valued as if it had significantly more miles, but there is no evidence in the record that the Ferrari has been driven more than 15,000 to 25,000 miles or that the vehicle is in need of repairs of any kind. The only information in the record as to the amount of mileage on the vehicle and the condition of the vehicle are the sale listings by Antiquarian reflected on Exhibits 26 and 30, which show mileage of 15,468 for the vehicle as recently as August of 2021 and do not mention any problems with the vehicle, and the odometer readings for the vehicle on Exhibit 29, which show mileage of 13,910 as of 2011. Based on this record, the Court finds that it was reasonable of Tanenbaum to assume for the purpose of the valuation that the Ferrari had between 15,000 and 25,000 miles on the vehicle.

10. During the course of his cross-examination, Tanenbaum testified that his valuation of $160,000 to $180,000 included the assumption that the Trustee would be able to achieve a "bankruptcy bump" of 5 to 10 percent by selling the Ferrari at auction during the course of a bankruptcy case.  Although the Court accepts this testimony as credible, as the Court was attempting to quantify the amount that Slotkin should be required to pay in lieu of turning over the vehicle in the event that he had disposed of the Ferrari post-petition and not necessarily the amount of damage that the Trustee has sustained based on Slotkin's failure to turnover the vehicle, the Court found that it was appropriate to substract the amount of this "bankruptcy bump" from Tanenbaum's valuation to arrive at a value for the Ferrari.

11. Based on the foregoing, the Court finds that a 10 percent reduction (the high end of the "bankruptcy bump" range) from the lowest end of Tanenbaum's valuation ($160,000) will produce a conservative value for the vehicle. Therefore, the Court finds that the value of the Ferrari for the purpose of this contempt proceeding is $160,000 - $16,000 or $144,000.[12]

# I
# CONCLUSION

The evidence presented to the Court during the course of the Trial overwhelmingly supports the conclusion that Slotkin's original testimony at the 341(a) Meetings was accurate – as of the date of the 341(a) Meetings, Antiquarian owned the Ferrari. Slotkin continued to have the Ferrari listed for sale during the pendency of the Case. His employee testified that she saw him driving the vehicle after the Case was filed and had seen the vehicle parked in his garage post-petition. Hagerty continued to insure the vehicle in his name for almost 5 years after Slotkin claims to have sold it – through as recently as June of this year. The Vehicle Reports, which Tanenbaum testified are based on data gathered from the National Motor Vehicle Title Information System (an electronic system that contains information on automobile titles in the United States) reflect that the vehicle continued to be listed for sale by Antiquarian after the Case was filed, but that no sales of the vehicle occurred after Slotkin's purchase of it in 2011. Slotkin continued to brag about how much he loved driving the vehicle and what a wonderful vehicle it was in his Facebook posts as recently as December of 2021. Slotkin only started asserting that he had sold the vehicle after the Court entered an order requiring Slotkin to turnover to the Trustee assets held in the name of Antiquarian. The entity to which Slotkin claims to have sold the vehicle had been dissolved as of the date of the purported sale and the principal of that business, a felon convicted of wire fraud, refused to accept service of a trial subpoena and threatened the Trustee's process server with violence if efforts to serve him

---

[12] Were the Court to calculate the amount of damage that the Trustee incurred as a proximate result of Slotkin's failure to deliver the Ferrari to her as required by this Court's SJ Order, the Court finds that that value would be $170,000, less costs of sale.

continued. There is only one conclusion that any reasonable trier of fact could reach on this record – that Slotkin's testimony that he sold the vehicle to Ultra Hot Motorsports in 2017 is false and that Antiquarian still owned the vehicle as of the time the Court entered the SJ Order in December of 2021.

Therefore, it was appropriate for this Court to have held Slotkin in civil contempt for violating its "Order Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment" entered March 9, 2022 [Docket No. 201] by failing to deliver the Ferrari to the Trustee as required by the terms of the SJ Order. In an effort to inspire Slotkin to comply with the SJ Order, on October 14, 2022, the Court entered its "Order After Evidentiary Hearing Holding Debtor in Contempt for Failing to Turnover 2007 Ferrari 612 Scaglietti" [Docket No. 380], in which the Court directed the U.S. Marshal to arrest Slotkin and hold him in custody until he purges his contempt by delivering the Ferrari (together with the keys and the original pink slip) to the Trustee or by paying the Trustee the sum of $144,000 by wire transfer, cashier's check, money order or other immediately available funds.

The purpose of this exercise and this Court's October 14, 2022 order is not to punish Slotkin for failing to turnover the Ferrari or for filing false declarations with the Court.[13] To the contrary, this Court's objective is to cause Slotkin to comply with its orders so that the Ferrari or its proceeds may be administered for the benefit of Slotkin's creditors. It will be up to Slotkin to decide whether he enjoys driving his Ferrari enough to elect incarceration over compliance.

###

Date: November 8, 2022

Sheri Bluebond
United States Bankruptcy Judge

---

[13] Whether or not Slotkin deserves to be punished for his conduct in this Case will be the subject of further proceedings before the District Court. This Court intends to issue a report and recommendation to the District Court for its consideration in connection with that issue.